**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No. 18-cv-61117-BLOOM/Valle**

```
FILED BY ____W____ D.C.

SEP 2 4 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.
```

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

       *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

       *Defendants.*

_____/

**PLAINTIFFS' RESPONSE TO DEFENDANTS D MAGAZINE
PARTNERS, L.P. f/k/a MAGAZINE LIMITED PARTNERS, ALLISON
MEDIA, INC., AND JAMIE THOMPSON'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION AND IMPROPER
VENUE OR, ALTERNATIVELY, TO TRANSFER VENUE**

## TABLE OF CONTENTS

I.  BACKGROUND ……………………………………………………………  1

II.  STATEMENT OF FACTS ……………………………………………….....  4

III.  ARGUMENT and AUTHORITY……………………………………...…….  6

    A.  Defendants are subject to personal jurisdiction in Florida ……………………  6

        1.  Florida Long Arm Statute establishes personal jurisdiction …………..  6

        2.  Plaintiffs' Due Process ……………………………………………..…….  9

            a)  Relatedness ……………………………………………………..  10

            b)  Purposeful Availment ……………………………………….....  10

            c)  Fair Play and Substantial Justice ……………………………......  11

    B.  Florida venue is proper ……………………………………………………  13

        1.  Florida events gave rise to the claim …………………………………  13

        2.  Events essential to the existence of the claim …………………………  14

    C.  Transfer to Texas would violate Plaintiffs' due process …………...…………  16

        1.  Texas venue is bias and prejudice ………….……...……………….....  16

        2.  Convenience to the parties and witnesses and the
           interests of justice weigh in favor of Florida …………………………  18

IV.  CONCLUSION …………………………………………………………..…….  20

Plaintiffs Steven B. Aubrey ("Aubrey") and Brian E. Vodicka ("Vodicka"), (collectively "Plaintiffs"), respond to Defendants D Magazine Partners, L.P., f/k/a Magazine Limited Partners, Allison Media, Inc., and Jamie Thompson's Motion to Dismiss or Transfer Venue ("Motion") as follows:

## BACKGROUND

Plaintiffs had planned to move to Florida from Austin in early 2016.   Ira Tobolowsky teamed up with his lawyer/partner, Defendant Stephen Schoettmer ("Schoettmer") and they filed a frivolous defamation suit against Plaintiffs in Dallas, like they had done to others over the years.   Plaintiffs' plans to move were short circuited by the lawsuit and due to Schoettmer's frequent harassing settings for hearings and the travel they required, Plaintiffs decided to move to Dallas for one year assuming the litigation would be finished and done in one year's time. They were wrong.   After moving to Dallas, where Aubrey was born and raised, Schoettmer's judicial gamesmanship was less of a burden on Plaintiffs.   Several months after moving to Dallas, Ira Tobolowsky was murdered.  Because the interactions between Plaintiffs, Schoettmer and Ira Tobolowsky seemed fairly typical as they go with opposing parties, after the murder, the family could not think of anybody who wanted to harm Mr. Tobolowsky.

> The detective asked Debbie: "Do you think this was an accident, or could someone have done this?" "What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at p.16)

> Before the flight, Michael had learned the fire might have been set intentionally. The thought infused his grief with rage. Cramped in his window seat, Michael felt his hands aching and realized both fists were clenched. All he could think about was *"Who? (See* Motion, Doc. 56-2, Decl. of Earnshaw at p.16)

Clearly, the family had not heard any special complaints about Plaintiffs, because there was nothing extraordinary to complain about.   Michael Tobolowsky ("Michael") and his brothers

were on vacation in Florida when they got the bad news.  They booked a flight to go back to Texas and while on the flight wondering "who," the Dallas Morning News posted the first online story about the fire and death at 9:32 am, stating: "His law partner told the station that Tobolowsky had recently been involved in contentious litigation."

Without motive and without anything connecting Plaintiffs to the crime except a lawsuit, Schoettmer, who knows less about Plaintiffs than almost anybody, told the media and investigators that he believed Plaintiffs were very angry and were responsible.  Schoettmer, a hate-filled person who directs his prejudice at the LGBT community, took center stage and began holding press conferences and giving interviews because his connection was  to the lawsuit he was making famous.

Schoettmer's finger pointing followed by Defendant Eric Moye ("Moye") announcement that he believed Aubrey murdered Ira Tobolowsky, triggered epic events followed by epic defamatory attacks on Plaintiffs that continue today.  Frustrated and desperate for leads to find who murdered their husband/father, the family grew to believe what they read.

Plaintiffs have never been convicted, indicted, charged with, arrested or even named as suspects for the murder of Ira Tobolowsky and they never will be, because they had nothing to do with it.

For 50 plus years, Plaintiffs' lives were meaningful, happy, filled with friends and free of criminal accusations, but the defendants changed that and completely destroyed Plaintiffs.  The defendants' war on Plaintiffs and the life-threatening assaults with deadly weapons caused Plaintiffs to move several months before their planned departure and they finally moved to South Florida. (*See* Exs. A & B, Plaintiffs' Decl. at ¶ 1)  Plaintiffs previously owned a second home on Miami Beach and they could not wait to come back to spend time with friends they had known

for many years and feel the way they used to feel, on the beach and happy.   Driving to Florida in a U-haul truck was rough but the moment Plaintiffs crossed the Texas border into Louisiana, there was a fantastic feeling of freedom and safety.   Expecting they would never return, Plaintiffs felt they were leaving the darkness of Dallas behind.   Those good feelings and hopes only lasted a few days because Dallas law enforcement called ahead, poisoned the well, and effectively convinced local law enforcement to continue harassing Plaintiffs and destroy their reputations here as well.

Police officers and Sheriff deputies harassed Plaintiffs for weeks upon their arrival. Plaintiffs' next-door neighbors, who were verbally excited to have a new neighbor, have not spoken a word to Plaintiffs since that first day, almost two years ago.   Law enforcement made sure to let Plaintiffs know they were not welcome here and that they were being watched very closely.   Plaintiffs had extremely close friends in Broward County, who were not aware of law enforcements harassment, but whose close friendships soon evaporated.   Plaintiffs were invited to one set of friend's house for Thanksgiving and another for Christmas.

Defamatory articles published on the Internet are like an aggressive cancer that before long will cause serious damage.   Plaintiffs learned that it was only a matter of time until someone would search their names on the Internet someone will search a name and at any given time somebody will do a search for your name and the close friendships immediately evaporate. Gossip spreads the news of what is found on the Internet in quick fashion.   The family Plaintiffs spent Christmas and New Years with sold their house and moved without telling Plaintiffs and without any forwarding information.   They have toddlers and likely feared for their children's safety, because of the what has been said about Plaintiffs on the Internet, here in Florida.

## II. STATEMENT OF FACTS

On November 15, 2016, Plaintiffs became State of Florida residents. (*See* Exs. A & B, Plaintiffs' Decl. at ¶ 1)  In December 2016, Defendant Jamie Thompson ("Thompson") began researching and writing a stories about Plaintiffs for Defendants D Magazine Partners, L.P. d/b/a D Magazine (formally known as Magazine Limited Partners, L.P.) and Allison Media, Inc. (collectively "D Magazine")   (*See* Motion, Doc. 56-1, Decl. of Thompson ¶ 10)   In April and May 2017, Thompson and D Magazine (collectively "Defendants") published five (5) stories and posted one video on YouTube, all causing injury to Plaintiffs, which continues.   The defamatory publications include:

1.  Article-1: April 26, 2017, *Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky*, by Matt Goodman, was the first digital online publication, targeting a worldwide market, including Florida. (*See* Ex. D. Article-1)   The story's purpose was to grab attention by insinuating Defendants' May 2017 issue would reveal who killed Ira Tobolowsky. It was published on Frontburner, one of D Magazine's websites designed to reach their online digital media audience, sell subscriptions and solicit advertisers.

2.  Article-2: April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the online version of Defendants' feature story designed to reach their online digital media audience, sell subscriptions and solicit advertisers. (*See* Motion, Doc. 56-2, Decl. of Earnshaw Tabs 2)

3.  Article-3: April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the print version of the feature story that was published it the May 2017 magazine with the cover title: "*Scene of the Crime: Ira Tobolowsky was burned alive in his North Dallas garage.  The family is convinced they know who did it*" (*See* Motion, Doc. 56-2, Decl. of Earnshaw Tab 1) D Magazine ships the magazine to customers in multiple states, including Florida.  (*See* Motion, Doc. 56-2, Decl. of Earnshaw at ¶ 10)

4. <u>Article-4</u>: May 3, 2017, *Who Murdered Ira Tobolowsky?*, is D Magazine's video post on YouTube.[1] (*See* Ex. E, Screenshots of video)

5. <u>Article-5</u>: May 8, 2017, *The Unsolved Murder of Ira Tobolowsky, The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it*, by Tim Rogers was published on Frontburner to reach Defendants' online digital media audience, sell subscriptions and solicit advertisers. (*See* Ex. F, Article-5)

6. <u>Article-6</u>: May 9, 2017, *Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit,* (*See* Ex. G, Article-6)  The title indicates a story about a defamation suit, resulting in a $5.5 million judgment.[2]    Defendants used the story to continue defaming Plaintiffs, stating:

- "The sons had continued to pursue the case after their father's death. And they all believe that Aubrey killed Ira."

- Two judges had voluntarily recused themselves from the case after Ira's death, and the Supreme Court of Texas had to appoint Cosby, a Fort Worth judge, to hear the case."

- "A key reason the family and police suspect Aubrey in the murder is the personal animosity he showed against Tobolowsky…"

- "'I wish the defendants were here,' Schoettmer said. 'What these two defendants do ... is that they sue people in order to destroy their lives.'" [3] (*See* Ex. G, Article-6)

---

[1] Naming this video post "Article-4" is used for simplicity. Link: https://www.youtube.com/watch?v=Sp6LCb5kweo

[2] The irony of a $5.5 million judgment for defamation is not lost on Plaintiffs.  Defendant Moye and the Tobolowsky's have publically accused Plaintiffs of murder. The hostile judge who awarded the $5.5 million should have recused himself from this case at its inception.  The Supreme Court of Texas appointed him to preside over the case without a witness, following 4 recusals of Dallas County judges.  Phone records indicate the appointed judge from neighboring Tarrant County, began a pattern of ex parte communications with the Defendant Stephen Schoettmer contacting the new judge by phone 3 times before everybody's "first" meeting wih the new judge.

[3] This was flipped upside down; Defendant Stephen Schoettmer represented the Tobolowskys bringing the lawsuit against Plaintiffs to destroy their lives, using religious based hate speech in pleadings with 24 "Jihsd" references, "Isis" reference and one "Muslim" reference in their 3 petitions

One of the Article-6 target readers, "ecstatist," shared her interesting observations at the end of the story in the comments section. Ecstatist believed Defendants reporting was not balanced and that most Texas judges could not be impartial in dealing with the case, stating:

- "There was too much innuendo to call the reporting balanced."

- "I fail to see how most Texas judges could be impartial dealing with the defamation of a fellow (dead) lawyer in the same generation as so many judges. Lawyers seldom criticize lawyers unless there is some money in it"

- "The suspects certainly don't seem to be nice people but assume for a moment that they are actually innocent. And consider what their situation would be now if they were African- Americans!" (*See* Ex. G, Article-6)

## II. ARGUMENT and AUTHORITY

### A. Defendants are subject to personal jurisdiction in Florida.

Plaintiffs' injuries arose when Defendants published the Articles in Florida. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 3)  The materials published on Defendants' websites and YouTube post, about Florida residents, must not only be accessible in Florida, but also be accessed in Florida in order to constitute the commission of the tortious act of defamation within Florida under section 48.193(1)(b).  Defendants Article-2 printed Plaintiffs' proper names 120 times indicating the material was about Plaintiffs, who were/are Florida residents and the material was accessible and was accessed in Florida, thereby constituting the tortious act of defamation against Plaintiffs.  Under section 48.193(1)(a)2, Defendants' acts subject them to this Court's jurisdiction because they committed a tortious act within this state.

### 1.    Florida Long Arm Statute establishes personal jurisdiction.

Plaintiffs' claim fits squarely within the provisions of Florida's long-arm statute to give this Court personal jurisdiction over Defendants.

6

D Magazine engaged in solicitation or service activities within this state. D Magazine admits they distributed copies of Article-3 to their subscribers in Florida, thereby "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state…," establishing engagement in solicitation or service activities within this state. (*See* Motion, Doc. 56-2, Decl. of Earnshaw ¶ 10) While admitting to "service activities within this state," Thomas Earnshaw ("Earnshaw"), D Magazine CFO, attempted to deceive the Court about D Magazine's solicitation in the state. He fraudulently represents in his declaration that, "D Magazine does not solicit new subscriptions or advertisers in Florida." (*See* Motion, Doc. 56-2, Decl. of Earnshaw ¶ 7) His claim is false, as D Magazine does, in fact, solicit new subscriptions or advertisers in Florida to anyone who accesses one of their websites or YouTube post. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 4)

Additionally, Earnshaw's declaration includes Tab 2, a 38-page print version of Article-2. The first 36 pages of Tab 2 are very clear with excellent resolution. Earnshaw, who represents that "D Magazine does not solicit new subscriptions or advertisers in Florida," altered the last two (2) pages of his Tab 2 so that "Subscribe" and "Advertise" features offered by D Magazine to Florida residents, can barely be read. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at pp. 51-2)

Though the exhibit is computer generated, Earnshaw unsuccessfully tried to digitally make the exhibit appear as though a hard copy was first printed and the printer was running out of ink, would explaining the extremely reduced resolution. Then, supposedly they scanned the document back into a digital format to then submit it to this Court. First, there is no logical reason to print out a document for an electronic submission. In fact, Plaintiffs and Defendant Stephen Schoettmer are the only parties to this case that could attempt what   has done here because their submissions are hard copies only. Second, page 51 of Doc. 56-2 has clearly been

digitally altered.  The first half is perfectly clear and instead of a consistent fade of resolution, Earnshaw faded only certain letters within a word, rendering some letters clearly readable and others not readable.  At the bottom of pages 51 and 52, Earnshaw forgot to fade out the dmagazine.com links and the page numbers of the document.  There is not a hard copy printer that can accomplish what was done here digitally, for purposes of deception. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at pp. 51-52)

Further proof that D Magazine engaged in solicitation or service activities within this state was their  "[c]ausing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury,…"   The act that establishes Defendants' cause of injury to Plaintiffs was their publication of the Articles, when Plaintiffs resided in Florida.

Plaintiffs resided in Florida when Defendants published the Articles causing injury to Plaintiffs, thereby sufficient for long-arm jurisdiction. *Honus Wagner Co. v. Luminary Group LLC*, No. 17-cv-61317-Bloom/Valle, 2017 WL 6547899, *12 (S.D. Fla. Dec. 21, 2017):

> Fla. Stat.  § 48.193(1)(a)(1), (2), & (6). "The reach of Florida's long-arm statute `is a question of Florida law,' and this Court is required to apply the statute as would the Florida Supreme Court.'" *Louis Vuitton*, 736 F.3d at 1352 (quoting *United Techs.*, 556 F.3d at 1274). Under § 48.193(1)(a)(2), a defendant commits a tortious act within Florida when that act causes injury in Florida. *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999) (holding that the Eleventh Circuit's "firmly established precedent . . . interprets subsection [48.193(1)(a)(2)] to apply to defendants committing tortious acts outside the state that cause injury in Florida").

Defendants' tortuous act, publication of the Articles, caused Plaintiffs' injuries in Florida.

> *Nida Corp. v. Nida*, 118 F. Supp. 2d 1223, 1228 (M.D. Fla. 2000)  ("The act is considered to take place within the state for purposes of the long-arm statute if the injured party resides in Florida, regardless of where the acts were actually committed.")

When Defendants published Articles 1, 2, 4, 5 and 6 on the World Wide Web, the material was accessible worldwide.  They specifically targeted anyone who would access their websites or

YouTube post, including Florida residents.  Florida residents who accessed Defendants' websites or YouTube became targets.  A publisher's use of the World Wide Web is its intention to target anywhere and everywhere and when the material is accessed, the publisher has established a target.  D Magazine's websites and YouTube post target everyone everywhere and when someone accesses D Magazine's websites or YouTube post, a target is established.  D Magazine solicits their established targets for subscriptions and advertising business, as they did here in Florida. (*See* Ex. I, Last page of Article-2)  Plaintiffs know a Florida resident who did access Defendants' website and read the material on it. (*See* Ex. A, Decl. of Vodicka at ¶ 9)

### 2. Plaintiffs' Due Process.

Defendants could have reasonably anticipated it would be subject to suit here in Florida. They purposefully directed its defamatory publications at Florida residents, established by its admitted distribution of Article-2 in Florida and by Plaintiffs' knowledge that online Article-3 has been accessed by a Florida resident.   *Honus Wagner Co. v. Luminary Group LLC*, No. 17-cv-61317-Bloom/Valle, 2017 WL 6547899, *12 (S.D. Fla. Dec. 21, 2017):

> The Constitution prohibits the exercise of personal jurisdiction over a nonresident defendant unless its contacts with the state are such that it has "fair warning" or could have "reasonably anticipated" that it may be subject to suit there. *Licciardello,* 544 F.3d at 1284 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)); *Burger King,* 471 U.S. at 472 (quoting *International Shoe,* 326 U.S. at 316). "This `fair warning' requirement is satisfied if the defendant has `purposefully directed' [its] activities at residents of the forum and the litigation results from alleged injuries that `arise out of or relate to' those activities." *Licciardello,* 544 F.3d at 1284. (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). In        addition, the Court must also examine whether the exercise of jurisdiction comports with "fair play and substantial justice." *Licciardello,* 544 F.3d at 1284 (11th Cir. 2008) (quoting *International Shoe,* 326 U.S. at 320).
>
> The Eleventh Circuit has distilled the due process analysis into a three-part test: "(1) whether the plaintiffs claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the

benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "`traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355 (citation omitted). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, `a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

### a)   Relatedness

Plaintiffs' claim arose from Defendants' contact with Florida, through publication of the

Articles in Florida, defaming Florida residents.   In *Honus*:

> "[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum.'" *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010) (quoting *Oldfield*, 558 F.3d at 1222 (some internal quotation marks omitted)). The "inquiry must focus on the direct causal relationship between the defendant, the forum, and the litigation." *Fraser*, 594 F.3d at 850 (internal quotation marks omitted) (quoting *Helicopteros*, 466 U.S. at 414, 104 S.Ct. at 1872).

### b)   Purposeful Availment

Defendants' aimed their intentional tort at Plaintiffs who lived in Florida and were

injured in Florida.   These allegations satisfy the *Calder* effects test for personal jurisdiction.   In

*Honus*:

> Accordingly, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* (citing Burger King, 471 U.S. at 478). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the `random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* (quoting *Burger King*, 471 U.S. at 475).
>
> Under the effects test articulated by the Supreme Court in *Calder v. Jones*, a nonresident defendant's single tortious act can establish purposeful availment even if a defendant does not have any additional contacts with the forum state. *See Licciardello*, 544 F.3d at 1285 (citing *Calder v. Jones*, 465 U.S. 783 (1984). This occurs when the tort was: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* (citations omitted).

Defendants intentionally published the Articles, depicting that Plaintiffs murdered Ira Tobolowsky.   Defendants aimed their Articles everywhere through magazine distribution, publication on their websites, and a Youtube post, thereby aiming the Articles at Florida. Defendants admit they knew Plaintiffs were living in Florida when they published the Articles and Defendants should have anticipated Plaintiffs would suffer from the injuries, in Florida because they distributed 124 copies in Florida. (*See* Motion, Doc. 56-2, Decl. of Earnshaw ¶ 10)

Plaintiffs' allegations satisfy the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum." *Licciardello,* 544 F.3d at 1287-88 (11th Cir. 2008).

### c)   Fair Play and Substantial Justice

The burden on Defendants would be minimal as the only critical witnesses are Plaintiffs, other Florida residents who have accessed the Articles and Thompson, who lives in Maryland. Her travel to Florida from Maryland is likely less expensive and more convenient.   Thompson did not find travel to Florida burdensome when she offered to come and interview Aubrey so she could better portray "his side" of the story. (See Ex. M, Thompson email)  Considering all of the defendants in this case, first glance would indicate this Court's jurisdiction over them might be "overly burdensome."   However, when this Court weighs the factors including judicial abuse suffered by Plaintiffs in Texas, the interest of fair play and substantial justice indicate Florida jurisdiction is proper so the playing field is level for all parties.

In *Honus*:

> Defendants bear the burden of establishing that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice. *See Louis Vuitton,* 736 F.3d at 1355. This inquiry requires consideration of the following factors: (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the [interstate] judicial

system's interest in resolving the dispute." *Mighty Men,* 102 F. Supp. 3d at 1275 (quoting *Licciardello,* 544 F.3d at 1288).

(1) <u>Burden on the defendant</u>.  The defendants acts are what caused jurisdiction and/or venue in Texas to be extremely prejudicial towards Plaintiffs.  Defendant Eric Moye gathered the media in his courtroom and announced to the world that Aubrey murdered Ira Tobolowsky and because Aubrey was so dangerous, he was recusing himself from the case. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at p. 29)  For Plaintiffs, there is no possibility for a fair trial or impartial jury pool in Texas.  Defendants' allegation of their burden is disingenuous.  (See Ex. A, Decl. of Vodicka at ¶ 8)

(2) <u>Forum's interest in adjudicating the dispute</u>.  Plaintiffs pray this Court takes interest in helping Florida residents who continue to be injured by Texas defendants.  The defendants cannot resist the temptation of continually availing themselves to Florida's jurisdiction.  Plaintiffs should have the same rights as others, to live peacefully and without the fear of being harmed by those who are supposed to protect them.  The other defendants successfully ran Plaintiffs out of Dallas and now with Defendants, they seem to want to run Plaintiffs out of the country.  This is an opportunity for this Florida Court to send a message to Texas that their continued harassment and influence in Florida is not welcome.  Texas should learn that its "good ol boy" thing, which Defendant Eric Moye has grown to depend on, does not work past Texas state lines and it does not work here.

(3) <u>Plaintiff's interest in obtaining convenient and effective relief</u>.  Closer to the truth, this would state Plaintiffs' interest in obtaining *affordable* and effective relief.  Plaintiffs would not be able to afford the expense of travel, lodging and time from work if this case was in a venue any further than a four (4) hour drive from Fort Lauderdale.  Jurisdiction

in Texas would guarantee injustice and ineffective relief. As well, the relevant witnesses and documents are located in Florida. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 4)

(4) <u>The interstate judicial system's interest in resolving the dispute.</u> The most efficient resolution to this controversy includes, among other things, considerations of witness location and evidence location. Here, the witnesses are Plaintiffs and Thompson. The evidence is the Articles themselves, which except for Article-3, are here and everywhere as they are published on the World Wide Web. Plaintiffs have a copy of Article-3, the magazine, here in Florida. The interstate judicial system's interest in resolving this case most efficiently is best served by adjudicating this case in Florida, where the injury occurred. The facts here demonstrate that exercise of jurisdiction by a Texas court offends traditional notions of fair play and substantial justice.

**B.**     **Florida venue is proper.**

**1.**     **Florida events gave rise to the claim.**

Defendants admit that Plaintiffs were residing in the State of Florida when they published the Articles that injured Plaintiffs and gave rise to their claim. Defendants were not even a twinkle in Plaintiffs' eyes when they moved from Texas to Florida. The Articles were published after Plaintiffs had become residents in Florida, they caused damage and continue to cause damage to Plaintiffs, therefore Florida venue is proper. "A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *See* 28 U.S.C. § 1391(b)(2).

Injury from the Articles was realized by Plaintiffs here, in Florida   *See, e.g.*, *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005) ("[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in

question, even if other material events occurred elsewhere."); *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998) *See Estate of Abtan v. Blackwater Lodge & Training Ctr.*, 611 F. Supp. 2d 1, 8 (D.D.C. 2009) ("In tort cases, when determining whether a substantial part of the events or omissions giving rise to the plaintiff's claim occurred . . . in a particular district for purposes of § 1391(b)(2), . . . courts focus on . . . the place where the allegedly tortious actions occurred and the place where the harms were felt." (internal quotations and citations omitted)). For purposes of § 1391(b)(2), Florida is where the Articles were and are published and Florida is where Plaintiffs have suffered harm from Defendants' publications.

### 2.     Events essential to the existence of the claim.

The Motion consistently tries to spin the idea that Thompson's interviews, D magazine's edits and even the murder are the "events giving rise to the claim." (*See* Motion III.B) But Plaintiffs did not experience injury when Defendants' researched, wrote, conducted interviews, and reviewed records.  As well, Plaintiffs did not experience injury from Defendants because they lived in Texas at the time of the murder and investigation.

The only events giving rise to the claim were the publications of the online Articles 1, 2, 4, 5 and 6, in Florida.  (*See* Exs. A & B, Plaintiffs' Decl. at ¶ 4)

*Perdue v. Miami Herald Publishing Company, 291 So.2d 604 (Fla. 1974):*

In 1967 the Florida Legislature responded to the above decision by enacting Chapter 67-52 which in pertinent part became F.S. § 770.05, F.S.A. (limiting a damages claim founded upon any single publication to only one choice of venue) and F.S. § 770.07, F.S.A., (providing that the cause of action shall be deemed to have accrued at the time of the first publication in this state).

In the Firstamerica Development Corporation case, supra, this Court relied upon F.S. § 46.04, F.S.A. as then worded,[3] which permitted (and still permits as present § 47.051) litigation against corporations in any county in which the cause of action arose. The Court held that venue could properly be laid in any county where the newspaper was published.

Plaintiffs' claims are based entirely on injury suffered in Florida as a result of Defendants publishing the Articles. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 433 (2d Cir. 2005) ("When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue."); *Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1371 (11th Cir. 2003) ("Only the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered [for determining venue].").

Libel occurs when a defendant publishes a false statement; about the plaintiff; to a third party; and the falsity of the statement caused injury to the plaintiff.  The injury to a plaintiff does not begin until the defendant publishes the false statement.  Therefore, no matter how much research Defendants did for their defamatory Articles, no matter how many Tobolowsky family members were asked to give their opinions, and no matter where Defendants sales are the strongest, it is only the act of publishing the Articles that injured Plaintiffs, in Florida.

The Motion also states: "The Article was not posted to a website directed at this district, but rather on a site that publishes content—like the Article—targeted at the residents of Dallas." (*See* Motion at p.14)  Certainly, Internet savvy D Magazine, with a digital audience that generates 2.6 million pageviews per month, cannot possibly allege that its World Wide Web websites and YouTube post are directed any place other than everywhere, including Florida.  The World Wide Web is not similar to a local television station, hence the name, World Wide Web.

Defendants' repeated irrelevant assertions about research fail.  The only proper venue is in Florida, where the injury occurred.

**C.      Transfer to Texas would violate Plaintiffs' due process.**

      **1.      Texas venue is bias and prejudice.**

The overriding factor that must be considered is that Texas is a hostile venue for Plaintiffs.   In 2016, the media's defamation of Plaintiffs was so pervasive and prevalent that it instilled hate for Plaintiffs in the Texas general public and the judiciary, especially in Dallas-Fort Worth.    Trial by media caused 5 judge's voluntary recusals because they feared Plaintiffs would murder them. (*See* Ex. C, Recusals) (*See* Motion, Doc. 56-2, Decl. of Earnshaw p. 29)   Moye announced to a circus parade of media in his courtroom, that he was recusing himself because he believed Aubrey murdered Ira Tobolowsky and was going to murder him next. Moye warned law enforcement that his life was in danger regarding Plaintiffs and Sheriff deputies began instructing the area judges to carry guns.  (*See* Motion, Doc. 56-2, Decl. of Earnshaw p. 29)

Judicial abuse directed at Plaintiffs was established when very aggressive sanctions were awarded against Plaintiffs, including Moye's  $250,000 sanction against Aubrey, followed by threats from multiple judges to throw Plaintiffs in jail for their inability to pay the sanctions. (*See* Ex. B, Decl. of Aubrey at ¶ 8)

Vodicka is currently being sued by the Texas State Bar as a result of Michael living up to his promise found in Articles 2 and 3: "Michael wanted to get Vodicka disbarred, to shut them down for good." (See Motion, Doc. 56-2, Decl. of Earnshaw at p. 36) (*See* Ex. A, Decl. of Vodicka at ¶ 8) At Michael's request, the action was filed in the most hostile venue of them all, Dallas County, though the bogus accusation involved events that took place when Vodicka lived in Austin, Travis County, Texas.  Because no judge in Dallas will preside over a case that involves Plaintiffs, it became necessary for a Texas Supreme Court justice to appoint a judge to the case.  He appointed a Fort Worth judge so the commute to the Dallas court for hearings and

trial would be possible.  Vodicka filed a motion to transfer venue and the judge agreed that an impartial jury in Dallas was impossible.    The judge was restricted to transfer the case somewhere in Texas and it was transferred out of North Texas to Austin, Texas. (*See* Ex. A, Decl. of Vodicka at ¶ 8)

The Dallas venue is excessively friendly with the Tobolowsky's, whose cousin is a state district judge in Dallas. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at p. 27)  Plaintiffs were unable to travel and attend the trial where Michael testified, resulting in the $5.5 million verdict. (*See* Ex. G, Article-6)  The *very next day*, Michael filed a lawsuit against Aubrey's brother and a friend of Plaintiffs who lives in Detroit Michigan, an elderly woman and retired physician. Plaintiffs intervened in the action and did everything they could to stop the harassment that spilled over onto family and friends, but Michael was able to encourage the judge to order the defendant's depositions and production of documents, invoking the Texas long-arm statute. Michael and his brother flew up to Michigan to take the deposition of Dr. Krot where they learned there was not a "murder for hire" involving Plaintiffs, Dr. Krot and Aubrey's brother. (*See* Exs. A & B, Plaintiffs' Decl. at ¶ 6)

The Tobolowsky family made Dallas a dangerous place for Plaintiffs.  The Tobolowskys retained "investigators" (criminals) who repeatedly trespassed onto private property, waited in the parking lot and would ambush Plaintiffs, screaming, "You are in danger" while brandishing their loaded firearms as though they would shoot them.  (*See* Motion at p. 4) It was the fear from the investigators/criminals that caused Plaintiffs to move with they did.  The Tobolowsky death threats do not end there. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 7)

Defendants' Articles 2 and 3 eerily sent a message to Plaintiffs, and millions of its readers, that Ira Tobolowsky's sons had threatened to murder Plaintiffs.   The message was passed from Mrs. Tobolowsky to Thompson who included the threat in Articles 2 and 3, stating:

> It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?' " (*See* Motion, Doc. 56-2, Decl. of Earnshaw at p. 37)

### 2.    Convenience to the parties and witnesses and the interests of justice weigh in favor of Florida.

*Carucel Investments, L.P. v. Novatel Wireless, Inc.*, 157 F. Supp. 3d 1219, 1222 (S.D. Fla. 2016).  In determining the appropriateness of transfer, courts employ a two-step process. *See Osgood*, 981 F.Supp.2d at 1263 (citing *Abbate v. Wells Fargo Bank, Nat. Ass'n,* 2010 WL 3446878, at \*4 (S.D.Fla. Aug. 31, 2010)); *Precision Fitness Equip., Inc. v. Nautilus, Inc.,* 2008 WL 2262052, at \*1 (S.D.Fla. May 30, 2008) (citing *Thermal Techs., Inc. v. Dade Serv. Corp.,* 282 F.Supp.2d 1373, 1376 (S.D.Fla. 2003).   In analyzing whether or not a defendant has sufficiently demonstrated entitlement to transfer, a court considers the following private and public interest factors:

(1) <u>Convenience of the witnesses</u>:   The primary witnesses for this action are Thompson, Aubrey and Vodicka, none living in Dallas. Thompson lives in Maryland and will need to travel either way and Plaintiffs live in Florida.  The Motion states: "most of the Article's sources, live in or around Dallas."   No witnesses are needed to testify as to why Aubrey's name appears one more time than Ira's in Article-2 nor is testimony regarding whose decision it was to keep the names of all other persons of interest out of the story.  Origins of the Articles are irrelevant.  The Articles speak for themselves and a jury will determine if the Articles defamed Plaintiffs.

18

(2)  Location of relevant documents and the relative ease of access to sources of proof:  The relevant documents are Articles 1, 2, 4, 5 and 6 themselves, which have proven to be easily accessed anywhere in the world, including here in Florida.  Much of the Articles' content is assembled Tobolowsky family opinions.  The origin of the Articles' titles are not important but what they say is. Article-1 titled: ***Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky***, is closely followed by Thompson's feature story, Article-2, published on the same day and answering the question. (*See* Ex. D, Article-1)  Article-2:

> While **believing the men killed her husband**, Debbie sometimes wonders whether police have adequately ruled out the other suspects. "I'm deathly afraid we've spent all our time focused on them, and someone else is out there laughing, thinking they got away with it," she says. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at p. 43)

In fact, the Article focuses more on Aubrey and Vodicka than Ira Tobolowsky and the Articles do not explore the other "suspects."   The name "Aubrey" appears 93 times in Article-2, once more than the name "Ira," which is printed 92 times.    (*See* Motion, Doc. 56-2, Decl. of Earnshaw Tab 2)   Defendants absolutely answered their question about who killed Ira Tobolowsky.  The gist of the publications is that Plaintiffs murdered Ira Tobolowsky.

(3)  Convenience of the parties: Venue in Florida is not only more convenient for Plaintiffs, it is essential to that this case is tried somewhere outside of Texas.  The Dallas defendants compromised that venue and poisoned the jury pool, by their own hands, therefore, their privilege to convenience should not be a consideration.

(4)  Locus of operative facts:  The operative facts occurred here in Florida, where Defendant's published the Articles.  Where the Articles were researched, written, edited and printed are not relevant events to Plaintiff's defamation claim and injury.

(5)  Availability of process to compel the attendance of unwilling witnesses: Unwilling witnesses for this claim will be here in Florida.  They are unwilling because they no

longer communicate with Plaintiffs due to the Articles. The  unwilling witnesses include neighbors and Plaintiffs' former close friends.

   (6) <u>Relative means of the parties</u>:  As the Co-founder, Chairman, Editor in Chief and Publisher of  D Magazine, Wick Allison grew his magazine company to generate $30 million in revenues operating in Dallas, Houston, and New York.[4]  It is likely Mr. Allison can afford a couple of plane tickets for his people and it must be fair that he should spend whatever profits he made from dragging Plaintiffs' names around in the mud and back. He could afford to pay Thompson to write the defamatory Articles so he should be able to bear the cost to defend it. Plaintiffs do not have savings or finances that permit travel to Dallas.  (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 5)  The Motion does offer the fact that "Aubrey owns valuable property interests in Dallas."[5] (*See* Motion at p. 20)  Stated more accurately, Aubrey has a beneficiary interest in Trust properties in Dallas, which cannot be sold and Aubrey receives no financial or economic benefits from the trust. (See II.C.1)

### IV. CONCLUSION

  The facts here demonstrate that exercise of jurisdiction by a Texas court offends traditional notions of fair play and substantial justice and venue in Texas is not proper.  All of the defendants in this case took part in making Texas a hostile environment for Plaintiffs.  All things considered, this Court's jurisdiction over Defendants is proper and fair to all parties, as is a Florida venue.  Defendants D Magazine Partners, L.P., f/k/a Magazine Limited Partners, Allison Media, Inc., and Jamie Thompson's motions to Dismiss and/or transfer should be denied.

---

[4] Information retrieved from Bloomberg.com.

[5] Edward Fik, III ("Mr. Fik") serves as an "Internet researcher" for Haynes and Boone, LLP., Defendants' primary lawyers in this case.   The law firm's clients pay $195 per hour for Mr. Fik's services to find dirt on opposing parties, Plaintiffs in this case.  It would be nice if Mr. Fik could be taught to do conflict checks for his firm as well, since he is inclined to research things on the computer.

Respectfully submitted,

By: _____
Steven Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: _____
Brian Vodicka, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com

## CERTIFICATE OF SERVICE

This is to certify that on August 17, 2018, the undersigned has served the foregoing by USPS regular mail, Email, or through the CM/ECF docketing system. Therefore, the undersigned upon information and belief certifies that all counsel or parties of record will receive a copy of these papers.

_____
Steven Aubrey

_____
Brian Vodicka

21

## SERVICE LIST

***Via CM/ECF Notice:***
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Jason P. Bloom
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
**COUNSEL FOR DEFENDANTS:**
**D MAGAZINE PARTNERS, L.P. f/k/a**
**MAGAZINE LIMITED PARTNERS, L.P.,**
**ALLISON MEDIA, INC.**
**JAMIE L. THOMPSON**

***Via CM/ECF Notice:***
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Peter L. Harlan
DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE
133 N. Riverfront Blvd., LB 19
Dallas, Texas 75207
**COUNSEL FOR DEFENDANTS:**
**DALLAS COUNTY, TEXAS**
**DALLAS COUNTY SHERIFF'S DEPARTMENT**
**MELINDA CHRISTINE URBINA**

***Via CM/ECF Notice:***
Eric P. Hockman
WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
**LOCAL COUNSEL FOR DEFENDANTS:**
**CITY OF DALLAS**
**DALLAS POLICE DEPARTMENT**
**SCOTT ROBERT SAYERS**
**ROBERT L. ERMATINGER, JR**

*Via CM/ECF Notice:*

Tierman Cole

OFFICE OF ATTORNEY GENERAL OF FLORIDA

110 SE 6th St., FI 10

Fort Lauderdale, FL. 33301-5001

Demetri Anastasiadis

OFFICE OF ATTORNEY GENERAL OF TEXAS

P.O. Box 12548, Capitol Station

Austin, Texas 78711

**COUNSEL FOR DEFENDANT:**

**ERIC VAUGHN MOYE**


*Via Email: steve.schoettmer1@gmail.com*

Stephen Charles Schoettmer

4305 W Lovers Ln

Dallas, TX 75209-2803

**DEFENDANT PRO SE**

Exhibit  A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

### Case No. 18-cv-61117-BLOOM/Valle

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

      *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

      *Defendants.*

_____/

## DECLARATION OF BRIAN E. VODICKA

1. My name is Brian E. Vodicka.  I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude.  I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2. I have been a resident and citizen of the State of Florida since November 15, 2016.

3. I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4. I have accessed Defendants' Articles 1, 2, 4, 5 and 6, as defined in my response to the D Magazine defendants' motion to dismiss or transfer, on multiple occasions since their publications, which began in April 2017. Articles 1, 2, 5 and 6 are published on D Magazine's commercial interactive websites, which solicit all viewers to subscribe or advertise by clicking on "Subscribe" or "Contact Us," which is located under the "ADVERTISE" section found at the end of the web pages. As well, D Magazine's commercial interactive websites themselves feature a red lettered "SUBSCRIBE" feature that remains visible and accessible at the top of the website's window. These features are on Defendants two websites used to publish articles and solicit subscribers and advertisers: https://www.dmagazine.com/ and https://www.dmagazine.com/section/frontburner/

5. I cannot afford the expense of travel and lodging to attend hearings set by a court in Texas.

6. On April 26, 2017, D Magazine began publishing Articles 1, 2, 3, 4 and 5, pretrial publicity for an upcoming trial. On May 8, 2017, Michael Tobolowksy, in his capacity as Independent Executor of the Estate of Ira E. Tobolowsky, was awarded $5.5 million in the defamation case filed by Ira Tobolowsky and Defendant Stephen Schoettmer. On May 9, 2017, the very next day, Mr. Tobolowsky filed a new lawsuit against Steve Aubrey's brother, Thomas Aubrey, and Dr. Alexandra Krot, an elderly retired physician who lives in Detroit. Mr. Tobolowsky's petition alleged: "Since May 13, 2016, Respondent Alexandra Krot has continued to communicate with SA and BV on a regular basis" and "Thomas Aubrey is the only other individual Petitioner is aware of who maintains a relationship and communications with his brother, SA, as well as BV." Mr. Tobolowsky signed his verification in the presence of a notary public, attesting: "I have read the Petitioner's Texas Rule of Civil Procedure 202 Petition. The factual information stated therein is within my personal knowledge, and [sic]

2

true and correct." The statements in Mr. Tobolowsky's petition and verification are all false. We were estranged from Tom Aubrey for nearly one year and calls with Dr. Krot were very infrequent. Mr. Tobolowsky's petition further alleged:

"Petitioner expects to learn the following from the requested subpoenas:

1. the "plan" to commit the capital murder / wrongful death of Ira E. Tobolowsky;

2. the series of events that occurred on May 13, 2016, which resulted in the capital murder/ wrongful death of Ira E. Tobolowsky;

3. the identity of the individual(s) who murdered/ caused the wrongful death of Ira E. Tobolowsky;

4. the identity of the individual(s) who acted or served as accessories, accomplices, and/ or who otherwise participated in the capital murder / wrongful death of Ira E. Tobolowsky;

5. information pertaining to the destruction or hiding of evidence relevant to the capital murder/ wrongful death of Ira E. Tobolowsky; and

6. other relevant information pertaining to the capital murder / wrongful death of Ira E. Tobolowsky."

Mr. Tobolowsky was able to take the depositions of Thomas Aubrey and Alexandr Krot and obtain over 12 months of text messages, emails and letters and phone logs. Ultimately, he learned there was no murder for hire scheme involving Vodicka, Aubrey, Thomas Aubrey and/or Dr. Alexandra Krot in relation to the murder of Ira Tobolowsky.

7. Two persons, who identified themselves as agents for the Tobolowsky family and working with Defendant Robert Ermatinger, physically assaulted me in the private parking area of my residence. One of the two agents openly carried a firearm, which was forbidden on the private property. The Tobolowsky agents illegally trespassed to gain access to the property and to harass, threaten and assault me. On the days that followed, the same agents continued to trespass onto private property and the male agent, approximately 30 feet away, screamed

at me "You are in danger." This same scenario occurred multiple occasions. In fear of my personal safety, I hurriedly moved away from Dallas and gun violence. The Tobolowsky gun-carrying agents trespassed onto private property with open firearms in violation of the License to Carry handgun laws under the Texas Penal Code § 42.06, 46.02, 46.035.

8.  I am currently a defendant to litigation instigated by Michael Tobolowsky.  It was filed Dallas County and the presiding judge transferred the venue out of the entire Dallas-Fort Worth area and North Texas area due, in part, to the effects of the prejudice and bias of the media's pretrial defamatory publications that saturated the entire state.

9.  I have personally witnessed two Florida residents access Defendants' Article-2 and read the published content of the article.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the __24 th__ day of September 2018.


Brian E. Vodicka

Exhibit  B

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

#### Case No. 18-cv-61117-BLOOM/Valle

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

        *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

        *Defendants.*

_____/

## DECLARATION OF STEVEN AUBREY

1. My name is Steven Aubrey. I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude. I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2. I have been a resident and citizen of the State of Florida since November 15, 2016.

3. I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4. I have accessed Defendants' Articles 1, 2, 4, 5 and 6, as defined in my response to the D Magazine defendants' motion to dismiss or transfer, on multiple occasions since their publications, which began in April 2017. Articles 1, 2, 5 and 6 are published on D Magazine's commercial interactive websites, which solicit all viewers to subscribe or advertise by clicking on "Subscribe" or "Contact Us," which is located under the "ADVERTISE" section found at the end of the web pages. As well, D Magazine's commercial interactive websites themselves feature a red lettered "SUBSCRIBE" feature that remains visible and accessible at the top of the website's window. These features are on Defendants two websites used to publish articles and solicit subscribers and advertisers:

5. I cannot afford the expense of travel and lodging to attend hearings set by a court in Texas.

6. On April 26, 2017, D Magazine began publishing Articles 1, 2, 3, 4 and 5, pretrial publicity for an upcoming trial. On May 8, 2017, Michael Tobolowksy, in his capacity as Independent Executor of the Estate of Ira E. Tobolowsky, was awarded $5.5 million in the defamation case filed by Ira Tobolowsky and Defendant Stephen Schoettmer. On May 9, 2017, the very next day, Mr. Tobolowsky filed a new lawsuit against Steve Aubrey's brother, Thomas Aubrey, and Dr. Alexandra Krot, an elderly retired physician who lives in Detroit. Mr. Tobolowsky's petition alleged: "Since May 13, 2016, Respondent Alexandra Krot has continued to communicate with SA and BV on a regular basis" and "Thomas Aubrey is the only other individual Petitioner is aware of who maintains a relationship and communications with his brother, SA, as well as BV." Mr. Tobolowsky signed his verification in the presence of a notary public, attesting: "I have read the Petitioner's Texas Rule of Civil Procedure 202 Petition. The factual information stated therein is within my personal knowledge, and [sic] true and correct." The statements in Mr. Tobolowsky's petition and verification are all false.

2

We were estranged from my Tom Aubrey for nearly one year and calls with Dr. Krot were very infrequent. Mr. Tobolowsky's petition further alleged:

"Petitioner expects to learn the following from the requested subpoenas:

1. the "plan" to commit the capital murder / wrongful death of Ira E. Tobolowsky;

2. the series of events that occurred on May 13, 2016, which resulted in the capital murder/ wrongful death of Ira E. Tobolowsky;

3. the identity of the individual(s) who murdered/ caused the wrongful death of Ira E. Tobolowsky;

4. the identity of the individual(s) who acted or served as accessories, accomplices, and/ or who otherwise participated in the capital murder / wrongful death of Ira E. Tobolowsky;

5. information pertaining to the destruction or hiding of evidence relevant to the capital murder/ wrongful death of Ira E. Tobolowsky; and

6. other relevant information pertaining to the capital murder / wrongful death of Ira E. Tobolowsky."

Mr. Tobolowsky was able to take the depositions of Thomas Aubrey and Alexandr Krot and obtain over 12 months of text messages, emails and letters and phone logs. Ultimately, he learned there was no murder for hire scheme involving Vodicka, Aubrey, Thomas Aubrey and/or Dr. Alexandra Krot in relation to the murder of Ira Tobolowsky.

7. In October 2016, two persons, who identified themselves as agents for the Tobolowsky family and working with Defendant Robert Ermatinger, physically assaulted me in the private parking area of my residence. One of the two agents openly carried a firearm, which was forbidden on the private property. The Tobolowsky agents illegally trespassed to gain access to the property and to harass, threaten and assault me. On the days that followed, the same agents continued to trespass onto private property and the male agent, approximately 30 feet away, screamed at me "You are in danger." This same scenario occurred multiple

occasions. In fear of my personal safety, I hurriedly moved away from Dallas and gun violence. The Tobolowsky gun-carrying agents trespassed onto private property with open firearms in violation of the License to Carry handgun laws under the Texas Penal Code § 42.06, 46.02, 46.035.

8. While I was living in Austin, Texas, Defendant Eric Moye conducted a hearing and granted Ira Tobolowsky's motion to find that I was a vexatious litigant and a few days later signed and ex parte order granting $250,000 in sanctions against me. I had filed a motion for continuance with Mr. Moye's court because I was not able to make the trip to Dallas for the hearing but Mr. Moye ignored my motion. Mr. Tobolowsky filed a near identical motion only 28 day prior in a different court in a different county and following a 4-hour evidentiary hearing, the court denied Mr. Tobolowsky's motion.

9. Exhibit C to this Response is a true and correct copy of five (5) voluntary recusals, caused from the defamation following the murder of Ira Tobolowsky.

10. Exhibit D to this Response is a true and correct copy of the April 26, 2017 article, *Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky*, by Matt Goodman, identified in the Response as Article-1 and retrieved in Florida from the d.magazine.com website.

11. Exhibit E to this Response is a true and correct copy of the screenshots from the May 3, 2017, video, *Who Murdered Ira Tobolowsky?*, by D Magazine, retrieved in Florida from the YouTube website and identified in the Response as Article-4.

12. Exhibit F to this Response is a true and correct copy of the May 8, 2017 article, *The Unsolved Murder of Ira Tobolowsky, The prominent lawyer was burned alive in his North*

*Dallas garage. The family thinks they know who did it,* by Tim Rogers, identified in the Response as Article-5 and retrieved in Florida from the d.magazine.com website.

13. Exhibit G to this Response is a true and correct copy of the May 9, 2017 article, *Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit,* by Jamie Thompson, identified in the Response as Article-6 and retrieved in Florida from D Magazine's website.

14. Exhibit H to this Response is a true and correct copy of D Magazine media kit, D Online, retrieved from the d.magazine.com website, in Florida, on September 19, 2018.  D Online represents an audience that generates 2.6 million pageviews per month.

15. Exhibit I to this Response is a true and correct copy of the April 26, 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson, last page or the publication.  The exhibit was retrieved from the d.magazine.com website, in Florida, on September 16, 2018, and represents the interactive solicitation for subscribers and advertisers.

16. Exhibit J to this Response is a true and correct copy of pages 1 and 99 from the May 8, 2017 official trial transcript for Cause No. DC-15-08135 in the 14th Judicial District Court, Dallas County, Texas.  The transcript contradicts representations in Articles-6, which states: "He began asking his wife to put on his socks during the litigation with Aubrey, became more stooped and began looking tired."  The official transcript states:  "And I know that after all this stuff surfaced, he started needing my mom, too."

17. Exhibit K to this Response is a list that I researched and generated.  The list identifies 84 publications and broadcasts that defamed me, or me and Brian Vodicka.

18. Exhibit L to this Response is a chart that I researched and generated.  It represents 18 media outlets with a combined audience of 247,613,931 persons who had the opportunity to read stories or watch television broadcasts the defamed me, or me and Brian Vodicka.

19. Exhibit M to this Response is a true and correct copy of a March 14, 2017 email from Defendant Jamie Thompson to me. In the email, Ms. Thompson expresses interest in travel to Florida. This email represents a document that might be used for evidence in this case. The document is stored electronically with others, here in Florida.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the 29th day of September 2018.

Steven Aubrey

6

Exhibit  C

365

CAUSE NO. DC15-08135

| IRA TOBOLOWSKY | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 14TH JUDICIAL DISTRICT |
| | § | |
| STEVEN AUBREY,   ET AL. | § | DALLAS COUNTY, TEXAS |

## ORDER OF VOLUNTARY RECUSAL

After considering the parties, attorneys, subject matter, pleadings, and proceedings in this matter, including the pending motions to recuse and for reconsideration of prior orders, the undersigned finds in the interest of judicial economy and so all parties will have confidence in a fair and impartial tribunal, recusal is appropriate.

Accordingly, this matter is referred to the Chief Justice of the Supreme Court of Texas for assignment of a judge to hear any recusal motions directed to Judge Eric Moyé and any other judges sitting in this case.

Signed this 16 day of May, 2016.


MARY MURPHY, Senior Justice
Sitting by Assignment

444A
0004  3

Cause No.  DC-15-08135

| IRA TOBOLOWSKY, | )( | IN THE DISTRICT COURT |
| Plaintiff, | )( | |
| | )( | |
| VS. | )( | DALLAS COUNY, TEXAS |
| | )( | |
| STEVEN AUBREY and  BRIAN | )( | |
| VODIKA. | )( | |
| Defendant | )( | 14th JUDICIAL DISTRICT |

## ORDER OF VOLUNTARY RECUSAL

After considering the parties and the circumstances surrounding the recent developments related to the above styled and referenced matter, the undersigned finds *sua sponte* that the interest of Justice suggests that recusal is appropriate in this cause.

It is so ORDERED.  Pursuant to the Order of Senior Justice Mary Murphy of 16 May, 2016, this matter shall be referred to the Honorable Chief Justice of the Supreme Court of Texas for reassignment

Signed this ___18th___ day of ___May___, 2016.

Eric V. Moyé, Presiding Judge

Cause No. DC-16-12693

*446F895*

| | | |
|---|---|---|
| BRIAN E. VODICKA AND STEVEN B. AUBREY, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS | § | 116TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| A.H. BELO CORPORATION | § | |
| ERIC VAUGHN MOYE | § | |
| STEPHEN C. SCHOETTMER AND | § | |
| DEBRA G. TOBOLOWSKY, Independent | § | DALLAS COUNTY TEXAS |
| Executor of the Estate of Ira E. Tobolowsky, | § | |

Defendants

### RECUSAL ORDER

The Judge of this court, being advised as to the identity of the parties & issues and being of the opinion that it is proper to recuse herself from service in this case; it is so ORDERED.

It is further ORDERED that this case be and is hereby certified to the Honorable Local Administrative Judge for re-assignment and such other proceedings as may be deemed proper.

SIGNED this 29th day of September, 2016.

_____
JUDGE PRESIDING

CAUSE NO. DC-16-12693

*446F 912*

| | | |
|---|---|---|
| BRIAN E. VODICKA AND<br>STEVEN B. AUBREY | §<br>§<br>§ | IN THE DISTRICT COURT |
| V. | §<br>§ | |
| A.H. BELO CORPORATION,<br>ERIC VAUGHN MOYE, INDIVIDUALLY,<br>STEPHEN C. SCHOETTMER, AND<br>DEBRA G. TOBOLOWSKY, INDEPENDENT<br>EXECUTOR OF THE ESTATE OF IRA E.<br>TOBOLOWSKY | §<br>§<br>§<br>§<br>§<br>§ | 116TH JUDICIAL DISTRICT<br><br><br><br>DALLAS COUNTY, TEXAS |

## ORDER OF RECUSAL

Being advised of the pleadings, parties, issues, and subject matter of the above case, the

undersigned respectfully recuses herself and requests the Chief Justice of the Supreme Court of

Texas to assign a judge to hear the case.

SIGNED this _30_ day of _September_, 2016.


_Mary Murphy_
MARY MURPHY, Presiding Judge
First Administrative Judicial Region



DC-17-5504

**MICHAEL B TOBOLOWSKY**
**vs.**
**THOMAS AUBREY, et al**

In the District Court
of Dallas County, Texas
**298ᵗʰ Judicial District Court**

## <u>ORDER OF REFERRAL ON RECUSAL SUA SPONTE</u>

I hereby recuse myself, SUA SPONTE, and request that the
Local Administrative District Judge assign a judge to hear the
above cause.

Signed this ___10___ day of ___May___, 20_17_.

_____
EMILY TOBOLOWSKY, Judge Presiding
298ᵀᴴ CIVIL DISTRICT COURT

Exhibit  D



MEDIA

# Sneak Peek: *D Magazine*'s May Issue, Which Explores Who Killed Ira Tobolowsky

**We're giving you a look inside the pages of our May issue weeks before the stories are published online.**

BY MATT GOODMAN    PUBLISHED IN FRONTBURNER    APRIL 26, 2017    3:22 PM



On newsstands now!

Beginning today, you'll see the May issue of *D Magazine* rolling out on newsstands. That's it on the left. The name Ira Tobolowsky figures prominently on the cover. I'm willing to bet many of you remember that name. For one, Tobolowsky was a highly regarded attorney who operated for decades out of a small office on Lovers Lane, west of the Tollway. And two, he was burned to death in his North Dallas home just under a year ago, and police have still yet to charge anyone with the crime.

But the family believes they are close: "We are a little bit of evidence short of getting this case taken to a grand jury, getting an indictment, and moving forward with a capital murder trial," says Ira's 28-year-old son, Michael, who now runs his father's practice. "We've been here a couple months or so. The type of information we're looking for we believe someone has out there. We're just trying to reach out and connect with that person."

Michael, along with his siblings and his mother, spent hours with *D Magazine* writer Jamie Thompson for her cover story, "A Place Where Something Evil Happened." What emerges is a picture of a family driven to get justice, another family torn apart by greed and anger, and an overtaxed police department trying hard to solve a bizarre and unthinkable tragedy but coming up just short. Head to newsstands to read it now. (It'll go online in a few weeks.) But first, I wanted to leave you with how Michael described his father:

> "Ira was definitely the type of person who had more personality than you could imagine. He was hands down the smartest person in the room, no matter what room he was in. He was caring, he was affectionate, he was a loving guy. He really was a perfect combination of all the good attributes you would want in a husband, father, friend, everything. He was amazing.

> "Dad was actually what I would call an old school lawyer. He was a true councilor, someone who would help you on your

business transactions, he'd help you in court, he would help you if you had just a little dispute where you needed some advice. No matter what it was, he was there. After all this happened, I started talking with a bunch of different lawyers. Dad did both transactional and litigation, and I found the transactional attorneys telling me, you know, 'Your dad is a very good transactional attorney, but what he's best at is litigation.' I had the litigators telling me, 'Your dad is really good at litigation but what he was best at was transactional work.' That really made me smile, because it proved he was one of the best at each and every aspect of law that he practiced."

After you pick up the May issue and read Jamie's story, flip one page to learn about the next Floyd Mayweather (minus the ever-mounting legal problems, we pray) under our noses. We'll find out on May 27, when DeSoto native Errol Spence Jr. flies to London to battle International Boxing Federation welterweight champion Kell Brook, who's 36-1. Spence is 21-0, with 18 knockouts, and he's got the eye of people like Mayweather, who had this to say: "The guy that I think that's gonna really make the most noise in boxing is Errol Spence."

Our dining critic, Eve Hill-Agnus, has a pair of important pieces—a review of famed restaurateur Nick Badovinus' opulent temple to beef, Town Hearth; and a guide to the finest regional Indian food in Dallas-Fort Worth, a trip that will take you well beyond biryani and butter chicken. Meanwhile,

Sneak Peek: D Magazine's May Issue, Which Explores Who K...          https://www.dmagazine.com/frontburner/2017/04/sneak-peek...

Michael J. Mooney returns to the pages of *D* by asking attorneys to explore their most memorable divorce cases. He gets dirt on murder-for-hires, pastor-punchers, stalkers, and more.

In the front of the book, Peter Simek chronicles the troubles of the Fort Worth Opera, and city columnist Eric Celeste has an exclusive profile of the Democrat policy wonk who is convinced that he can knock Pete Sessions from his longstanding congressional seat in District 32.

There's something for everyone. Get to your favorite local newsstand now.

**LOCAL NEWS**    **MEDIA**

**ιet a weekly recap in your inbox every Sunday of our best stories from th week plus a primer for the days ahead.**

ail

- Receive D Brief

## RELATED CONTENT

   

**CAL NEWS**

**onna Be An Intense
unch at Wild Salsa,
pparently**

**C CRAIN**

**LOCAL NEWS**

**How To Approach the
Trinity: Wild Dallas vs.
the Status Quo**

**MATT GOODMAN**

**SPORTS**

**Dirk Hits 30,000:
Revisit How He Saved
Dallas Basketball, One
Shot at a Time**

**ZAC CRAIN**

**LOC

Da
Ap
Ele
Sw

MICI**

# COMMENTS

## D MAGAZINE PARTNERS

750 North St.Paul St.
Suite 2100
Dallas, Texas 75201

Tel: 214.939.3636
Fax: 214.748.4579

CONTACT US

## SECTIONS

FrontBurner

Food & Drink

Arts & Entertainment

Nightlife

Home & Design

Shopping & Fashion

Health & Fitness

Business & Economy

Weddings

## PUBLICATIONS

D Magazine

D Home

D CEO

Subscribe

Renew D Magazine

Subscriber Services

## COMPANY INFO

About Us

Masthead

Job Openings

Internships

Awards

Customer Service

## ADVERTISE

Media Kits

Events

Case Studies

Contact Us

## CONNECT

Facebook

Twitter

Instagram

Pinterest

YouTube

LinkedIn

Google+

Reddit

Copyright © 2018, D Magazine Partners, Inc. All Rights Reserved. Privacy Policy

# Exhibit  E



Prominent Dallas attorney **IRA TOBOLOWSKY** was found in the garage of his North Dallas home.

IRA HAD BEEN

# MURDERED.

# BURNED *to* DEATH

# Who wanted Ira Tobolowsky dead?



A strong suspect quickly emerged.

Read the story in
*D Magazine*'s May issue.

ON NEWSSTANDS NOW



# Exhibit  F





CRIME

# The Unsolved Murder of Ira Tobolowsky

**The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it.**

BY TIM ROGERS   PUBLISHED IN FRONTBURNER   MAY 8, 2017   10:00 AM

The May issue of *D Magazine* features a story by Jamie Thompson about the murder of Ira Tobolowsky. A year ago, the prominent lawyer was burned alive on a

Friday morning in his North Dallas garage. Police still don't know who did it. But the Tobolowsky family thinks they know who the killer is. The story is now online.

I asked Jamie about her reporting process and what she had to leave out of the story that she wished we'd had the space to include.

> I followed the news about Ira's death when it happened. I live about 10 minutes from his house, and it is rare for someone to be murdered in this part of North Dallas. Rarer still that it would be a respected attorney, killed in such a violent way, as he's about to climb into his Lexus and head to his law office. I thought I might want to write something about it. After about six months—when no one had been charged with the murder—I decided to look into the case.

> I reached out to Jonathan Tobolowsky, the eldest brother, toward the end of last year, told him I'd like to meet with him and his two brothers. They weren't sure they wanted to do a story, but agreed to get together and talk about it. We met for lunch at Mi Cocina in West Village. I didn't take any notes or record. We just chatted and got to know each other. Jonathan seemed the most hesitant. He had to get up and leave the table at one point, because talking about his dad's death upset him so much. He looked me in the eye at one point and said something like: We don't want to be a crazy story. If we do this,

you will write this story, then move on. We will still be here, without our dad. This isn't just a story to us. Someone stole our father from us. We want that person to be caught and to pay for what they've done.

I started out thinking the story would be part biography and part murder investigation. I interviewed several dozen people about Ira— the man, the father, the friend, the lawyer— and have several hundred pages of notes of interesting stories and interviews about him, and zero of that made it into the story. Of all the people I've written about over the years, it's rare that I encounter a person who was as beloved as Ira. People often talk about lost loved ones in adoring terms, but this man was LOVED. Nearly everyone I spoke to said the same things: Ira dropped everything and focused on whoever was in front of him in the moment. Ira was a loyal, faithful friend. I laughed my ass off and cried more than a few times, hearing Ira's relatives and friends talk about their times with him. He loved the law, loved his family and friends, loved living. Although he was often in excruciating pain due to his spine deformity, whenever anyone asked how he was doing, he'd say, "I'm terrific." It is my one regret that more of Ira didn't make it into the story.

But as the reporting unfolded, I began spending more and more time with Michael, Jonathan's brother, keeping up with the investigation. The story began to turn in that

direction. In March, I talked to Michael at least once a day—sometimes multiple times a day—as I followed along. I was at his office at least once a week, sitting across from him as he sat in his father's chair, at his father's desk, trying to find justice for his dad.

Ira's death shook—probably forever—how his family and friends and acquaintances feel about their own safety. Michael sleeps with a gun in his nightstand. After learning so much about Ira's death, I, too, got a little paranoid, making sure my keys were in my hand when I walked out of my house into the garage toward my car, making sure no one was out there. That's part of what's so unsettling about this crime. If a lawyer like Ira could get murdered in daylight in a safe neighborhood, it starts to strip away everyone else's feelings of safety.

I have no doubt that this family will not rest until they discover, for certain, who killed Ira. They believe that if the tables had been turned, and one of them had been murdered, Ira would have done the same, probably to an even greater extent than what they are doing.

CRIME

# Exhibit  G





Family Man: Ira and Debbie with their three sons, (from left) Zach, Michael, and Jonathan, at a wedding in 2015.

LAW

# Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit

**Neither Steve Aubrey nor Brian Vodicka, the defendants, appeared in court.**

BY JAMIE THOMPSON   PUBLISHED IN FRONTBURNER   MAY 9, 2017   10:01 AM

On Monday morning, when visiting Judge Don Cosby

Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky D...                    https://www.dmagazine.com/frontburner/2017/05/judge-award...

called to order his courtroom in downtown Dallas, he quickly noted the absence of the co-defendants in the case he was about to hear. Steve Aubrey and and his partner Brian Vodicka had moved to Florida. The original plaintiff in the case, Ira Tobolowsky, wasn't there either. He'd been murdered in his North Dallas garage on May 13, 2016.

This defamation suit was anything but usual. Ira's widow, Debbie, and their three sons were all in the courtroom. The sons had continued to pursue the case after their father's death. And they all believe that Aubrey killed Ira. Aubrey's unorthodox defense in the defamation case — some done *pro se*, some done by Vodicka, a lawyer — had consisted of numerous lengthy and venomous motions. But after the couple's move to Florida, they quit showing up at hearings. Two judges had voluntarily recused themselves from the case after Ira's death, and the Supreme Court of Texas had to appoint Cosby, a Fort Worth judge, to hear the case.

A key reason the family and police suspect Aubrey in the murder is the personal animosity he showed against Tobolowsky, who had represented Aubrey's estranged mother in a contested estate case. Aubrey strongly denies that he had anything to do with Ira's death. Aubrey and Vodicka have said in court filings that they are indigent and could not afford to travel to Texas for the trial. They asked Judge Cosby if the court would pay for travel and lodging. They also asked to appear by telephone. Cosby denied that request.

The bailiff yesterday called out into an empty court

corridor: "Mr. Aubrey? Mr. Vodicka?" He walked back into the courtroom and shook his head. The judge nodded. Time to begin.

Tobolowsky's attorney, Steve Schoettmer, rose and motioned to the empty defense table. "I wish the defendants were here," Schoettmer said. "What these two defendants do ... is that they sue people in order to destroy their lives."

Schoettmer called his first witness, Ira Tobolowsky's youngest son, Zach, who described seeing a blog post Aubrey had written about his father, calling him a mortgage fraudster, jail bars superimposed over his picture. Zach called Ira to tell him about the post.

"He was taken aback, to say the least," Zach testified. "He was very caught off guard." What most upset Ira about the post was that it listed some corporations he had formed for his clients. To take aim at him was one thing, but maligning his clients was another, Zach said. Ira suspected Aubrey was responsible. (Aubrey had first denied, but later admitted he had written the post about Ira.)

Ira typically would downplay and laugh at anything that happened to him, Zach said. "But this was different to me. I could tell that this truly affected him in a serious way ... . The heart of a lawyer's success is their reputation. That's all a lawyer has."

Schoettmer put a picture of the post on an overhead projector in the courtroom, showing it had been viewed more than 800 times. How many times had that post been seen by potential clients thinking of hiring Ira? It was likely that at least a handful of

people had viewed the post and decided against hiring him, his family said.

Schoettmer called his second witness, Ira Tobolowsky's middle son, Michael. Michael took the judge through his father's work in defending Aubrey's mother, showing how contentious the litigation had become. Schoettmer put on the screen an affidavit Ira had written before his death, detailing the things Aubrey had said about him. That he was a crooked lawyer, a fraudulent businessman. That he was part of a team of attorneys who represented pedophiles. That he'd had a sexual relationship with the CEO of the *Dallas Morning News*. Judge Crosby listened from the bench, raising his eyebrows, shaking his head.

After every filing, Michael said, his father had called him. "It was very clear Dad was stressed," Michael said. "I know he had a lot of emotion surface every single time they accused him of something like this. Dad had dealt with crazy individuals in the past. He had dealt with evil individuals." But this was different, he testified. "He'd spent so long and so much effort building and creating a name for himself for being ethical, being honest, being trustworthy." No one had ever attacked him like this before, with such blatant lies, Michael said.

He told the judge that his father had a medical condition that had caused his spine to fuse and caused symptoms similar to arthritis. It was exacerbated by stress. His dad didn't like people to know this, but during times of stress, Ira needed more help doing basic tasks, like putting on his socks. He began asking his wife to put on his socks during the litigation with

Aubrey, became more stooped and began looking tired.

After testifying for about an hour, Michael stepped off the witness stand. Schoettmer made his closing statement. He asked the judge to rule against the defendants and order them to pay $500,000 for mental anguish and damage to Ira's reputation. "It probably should be more," Schoettmer said. "But this has never truly been about going to judgment for damages. This was about trying to absolutely stop the conduct that is so atrocious."

Schoettmer rested. All eyes turned toward Judge Cosby. He sat quietly for a minute or two, looking down. Then he raised his head and spoke. "I think the fear that this family, the Tobolowsky family, has endured over these past many months ... the court recognizes what has been happening," Cosby said. The plaintiff proved his case, Cosby said. He awarded the Tobolowskys $500,000. And then he went further.

In addition to the half a million the family had asked for, the court would grant them an additional $5 million. Hearing the number, Tobolowsky's eldest, Jonathan, sharply inhaled. He looked at his brothers. Their eyes filled with tears.

The judge looked at Tobolowsky's widow, Debbie, in the front row. "I'm sorry it's come this far."

Debbie Tobolowsky started to weep, as did the other family members in the courtroom. They rose and hugged. As they walked out into the hallway, Debbie looked at her sons. "I wish your father had been here to see this," she said. "He would be proud." She turned

toward her dead husband's friend and attorney, Schoettmer, a former linebacker who also was in tears. "Steve, you did an amazing job," she said. He nodded quietly.

In the year since Ira's death, the family has had little relief. For that one brief moment on Monday, the legal system that Ira had loved seemed to stand behind him.

"The judge seemed to be sending a message," Debbie said. "He seemed to be saying that he believed those guys were lying. That he respected Ira. That Ira didn't deserve this. It felt like the judge was saying, 'I'm with you. I feel your family's pain.'"

For the youngest of Ira's sons, Zach, the verdict felt as if one small painful chapter had come to a close. "For us, this was about finishing a fight for our father," he said.

"I genuinely lost my breath," Jonathan said of the verdict. "For the first time since my father's death, I felt completely happy for a moment."

The middle son, Michael, who has taken over his father's law practice, also felt relieved. But he and the rest of the family know their fight is not over. The verdict will be appealed. More motions will be filed. Aubrey and Vodicka claim to be indigent, so there seems little possibility of ever collecting any money. Most important, they still don't know if police will ever solve their father's murder case.

Michael walked out of the courthouse into the sunlight, relishing the verdict, but planning to soon return to his father's law office. There he would take

his seat behind his father's desk and continue working to solve his murder.

When asked for comment over email, Aubrey wrote: "I hope this trial gives the Tobolowsky family the closure they have been so desperate to find."

**LAW**

**Get a weekly recap in your inbox every Sunday of our best stories from the week plus a primer for the days ahead.**

ail

- Receive D Brief

## RELATED CONTENT







**IME**

**Place Where omething Evil appened'**

MIE THOMPSON

**MEDIA**

**Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky**

MATT GOODMAN

**CRIME**

**The Unsolved Murder of Ira Tobolowsky**

TIM ROGERS

COMMENTS

Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky D...                    https://www.dmagazine.com/frontburner/2017/05/judge-award...

**3 Comments**    **D Magazine**                                                                ● **Login**

♡ Recommend  4         ☑ Share                                                         Sort by Oldest

  Join the discussion…

**LOG IN WITH**                    **OR SIGN UP WITH DISQUS** ?

           Name

  **Kathy Wise**  Mod · 10 months ago
What an epilogue.
1 ∧  ∨ · Reply · Share ›

  **Mavdog** · 10 months ago
olav ha-shalom
∧  ∨ · Reply · Share ›

  **ecstatist** · 2 months ago
I wonder what skeletal problems Ira suffered from. The journalist I think should have
mentioned it to make the reporting comprehensive, no shame in disease. It could be
relevant as far as his death may have been suicide which he may have tried to disguise to
protect his post mortem reputation. Many people including older generation Jews
dogmatically consider suicide to be cowardly and shameful and he was known to be a
tenacious fighter.
I take a guess at (progressive) ankalosing spondylitis. He exhibits the bending back that
causes one's breathing volume to decrease and some times losing throat control to the
point that it similar to waterboarding and can be the ultimate cause of a horrifying
death. He may have wanted to protect his family from witnessing this kind of ending.
Some of the drugs used to extend life are also used in cancer treatment with varying side
effects.
I wonder what Ira's feelings were about homosexuals. Nevertheless I have great pity and
sympathy for the man
There was too much innuendo to call the reporting balanced.
I fail to see how most Texas judges could be impartial dealing with the defamation of a
fellow (dead) lawyer in the same generation as so many judges. Lawyers seldom criticize
lawyers unless there is some money in it Consider their prejudices exhibited in patent
cases so flagrant that patent cases are now disallowed in that part of Texas. Also their
crazy responses to the Waco "motorbike gang" / "police gang" debacle.
The suspects certainly don't seem to be nice people but assume for a moment that they
are actually innocent. And consider what their situation would be now if they were
African- Americans!

Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky D...          https://www.dmagazine.com/frontburner/2017/05/judge-award...

## D MAGAZINE PARTNERS

750 North St.Paul St.
Suite 2100
Dallas, Texas 75201

Tel: 214.939.3636
Fax: 214.748.4579

CONTACT US

## SECTIONS

FrontBurner

Food & Drink

Arts & Entertainment

Nightlife

Home & Design

Shopping & Fashion

Health & Fitness

Business & Economy

Weddings

## PUBLICATIONS

D Magazine

D Home

D CEO

Subscribe

Renew D Magazine

Subscriber Services

## COMPANY INFO

About Us

Masthead

Job Openings

Internships

Awards

Customer Service

## ADVERTISE

Media Kits

Events

Case Studies

Contact Us

## CONNECT

Facebook

Twitter

Instagram

Pinterest

YouTube

LinkedIn

Google+

Reddit

Copyright © 2018, D Magazine Partners, Inc. All Rights Reserved. Privacy Policy

# Exhibit  H

D Online | About D Magazine

https://advertise.dmagazine.com/media-kits/d-online/

**HOME     MEDIA KITS     EVENTS     CASE STUDIES     CUSTOM CONTENT**

**ABOUT US**

# D ONLINE

### Demographics

### D Blogs

#### FrontBurner

#### SideDish

#### FrontRow

#### Home/Design

#### D Real Estate Daily

#### D Health Care Daily

### Directories

### Advertising Specifications

### Custom

D's digital audiences embody the strategic advantages of our print readerships, eschewing mass numbers and undistinguished demographic profiles for active, high-value influencers in the Dallas market. Our audience of 1.1 million average unique users per month is the right audience, generating 2.6 million pageviews and equivalent to an 80% share of college-educated locals between ages 18 and 65 across Dallas, Tarrant, Collin, and Denton counties.

No other local medium offers advertisers and sponsors such a vast number of high-value frequent users in such a sophisticated, stylish digital environment.

In addition, your advertising on dmagazine.com can be targeted to



9/19/18, 11:36 AM

D Online | About D Magazine

**Content**

**Events**

**Media Kit**

our core communities of passion:
civic/politics/media;
fashion/shopping; home/design;
business; health care; legal;
art/culture/events; food/wine;
weddings; sophisticated moms,
and more. Roadblocks,
sponsorships, sponsored posts, as
well as CPM buys are all available,
along with custom programs
developed for your business by our
marketing services team.

Please contact Laurie Stovall at
laurie.stovall@dmagazine.com
(mailto:suzanne.laforgia@dmagazine.com)

# Exhibit I

The Search For Who Killed Ira Tobolowsky                    https://www.dmagazine.com/publications/d-magazine/2017/ma...

## PUBLICATIONS

D Magazine

D Home

D CEO

Subscribe

Renew D Magazine

Subscriber Services

## COMPANY INFO

About Us

Masthead

Job Openings

Internships

Awards

Customer Service

## ADVERTISE

Media Kits

Events

Case Studies

Contact Us

## CONNECT

Facebook

Twitter

Instagram

Pinterest

YouTube

LinkedIn

Google+

Reddit

Copyright © 2018, D Magazine Partners, Inc. All Rights Reserved. Privacy Policy

# Exhibit  J

1              REPORTER'S RECORD
               VOLUME 1 OF 2 VOLUMES
2        COURT OF APPEALS CAUSE NO. 05-17-00727-CV
            TRIAL COURT CAUSE NO. DC-15-08135
3
                              §
4   MICHAEL B. TOBOLOWSKY,     §   IN THE DISTRICT COURT
    EXECUTOR OF THE ESTATE OF  §
5   IRA E. TOBOLOWSKY,         §
                              §
6        PLAINTIFF,            §
                              §
7   VS.                        §   14TH JUDICIAL DISTRICT
                              §
8   STEVEN B. AUBREY,          §
    AND BRIAN E. VODICKA,      §
9                              §
         DEFENDANTS.           §   DALLAS COUNTY, TEXAS
10

11

12

13        ------------------------------

14              TRIAL ON THE MERITS

15        ------------------------------

16

17

18

19           On the 8th day of May, 2017, the

20   following proceedings came on to be heard in the

21   above-entitled and -numbered cause before the Honorable

22   Don Cosby, Judge presiding, held in Dallas, Dallas

23   County, Texas;

24      Proceedings reported stenographically in realtime

25   by machine shorthand.

1 | certain point in his life, and it is a condition that

2 | sits in the arthritis family.  And stress and anxiety

3 | made dad's ankles and wrists flare up like crazy, to the

4 | point where there was a -- for a period of time when

5 | dad's arthritis was really bad, he needed -- and he

6 | didn't like for people to know this, but he'd be upset

7 | with me for saying this -- but he needed me and my

8 | brothers to help him put on his socks.  And I know that

9 | after all this stuff surfaced, he started needing my

10 | mom, too.

11 |     Q.   Are you aware of any other litigation that

12 | caused your dad more stress, anguish, frustration, all

13 | similar adjectives, than the Aubrey Vodicka matter?

14 |     A.   No, simply -- if for no other reason, I saw dad

15 | turn away cases because of having to deal with what I'll

16 | call their nonsense.

17 |             One of the exhibits -- or excuse me, dad

18 | testified in his affidavit that they had faxed him a

19 | hundred plus page lawsuit five plus times.  That day he

20 | specifically had to reschedule two meetings because he

21 | was dealing with that.  And ultimately what they ended

22 | up doing was having to cut off their fax machine that

23 | resulted in him missing whatever faxes would have come

24 | through that day.

25 |             So I know that the things that they were

# Exhibit  K

**84 Publications & Broadcasts**

1. Farmer, Liz. (2016, May 13). Fire that killed Dallas lawyer from prominent Tobolowsky family may have been arson. *THE SCOOP.* Retrieved from http://thescoopblog.dallasnews.com/2016/05/1-man-found-dead-as-crews-battle-fire-at-north-dallas-house.html/  (Exhibit 6)

2. WFAA Staff. (2016, May 13 updated 16).  Lawyer found dead in fire may be homicide victim. *WFAA8 News.* Retrieved from http://www.wfaa.com/news/crime/lawyer-found-burned-to-death-may-be-homicide/191299349  (Exhibit 7)

3. Blackburn, Bradley. (2016, May 13).  Lawyer found dead in fire may be homicide victim. *WFAA8 News.* (video link at Exhibit 8)

4. Pickett, Steve.  (2016, May 15).  Judge Receives Added Security After Lawyer's Death. *CBS News.* (video link at Exhibit 9)

5. Pickett, Steve. (2016, May 15). Judge Receives Added Security After Lawyer's Death. *CBS News.* Retrieved from http://dfw.cbslocal.com/2016/05/15/police-patrol-judges-neighborhood-after-lawyers- death/  (Exhibit 10)

6. Robinson, Wills. (2016, May 15). Dallas police tells judge to arm himself and be on alert as they investigate whether a prominent lawyer killed in fire was doused in fuel and set alight in a revenge attack by a former client. *DAILYMAIL UK.* Retrieved from http://www.dailymail.co.uk/news/article-3592060/Dallas-police-warns-judge-alert-investigate-prominent-lawyer-killed-house-fire-doused-fuel-set-alight-revenge-attack-former-client.html  (Exhibit 11)

7. Anchondo, Jenny (2016, May 15). Dallas judge warned to be on alert following death of prominent attorney.  *FOX4 News.* (video link at Exhibit 12)

8. Waldrop, Justin.  (2016, May 15). Investigators now call the death of a Dallas-based attorney suspicious. *FOX4 News.* Retrieved from http://www.fox4news.com/news/dallas-judge-warned-to-be-on-alert-following-death-of-prominent-attorney  (Exhibit 13)

9. Smith, Jeff. (2016, May 15). Security Bolstered For Dallas Judge After Attorney's Suspicious Death. *NBC News.* (video link at Exhibit 14)

10. Smith, Jeff. (2016, May 15). Security Bolstered For Dallas Judge After Attorney's Suspicious Death. *NBC News.* Retrieved from https://www.nbcdfw.com/news/local/Safety-Bolstered-For-Dallas-Judge-After-Attorneys-Death-379599291.html  (Exhibit 15)

11. Cardona, Claire Z., Chiquillo, Julieta. (2016, May 15).  Dallas judge given extra security after attorney's death in suspicious fire. *THE SCOOP.* Retrieved from https://www.dallasnews.com/news/news/2016/05/15/dallas-judge-warned-to-be-cautious-after-suspicious-death-of-local-attorney   (Exhibit 16)

12. Anchondo, Jenny. (2016, May 16).  Dallas judge on alert after attorney's death. *FOX4 News*. (video link at Exhibit 17)

13. Rabb, Shaun. (2016, May 16). Family of Dallas lawyer killed in suspicious fire devastated by death. *FOX4 News*. (video link at Exhibit 18)

14. FOX 4News.com Staff. (2016, May 16). Family of Dallas lawyer killed in suspicious fire devastated by death. *FOX4 News*.  Retrieved from http://www.fox4news.com/news/family-of-dallas-lawyer-killed-in-suspicious-fire-devastated-by-death  (Exhibit 19)

15. BoKnowsEntertainment.  (2016, May 16). Judge told to be on high alert following death of prominent attorney. *YouTube*. (video link at Exhibit 20)

16. Oster, Marcy. (2016, May 16).  Was Prominent Dallas Lawyer Ira Tobolowsky Killed in Revenge 'Suspicious' Fire? *FORWARD*.  Retrieved from http://forward.com/news/breaking-news/340724/was-prominent-dallas-lawyer-ira-tobolowsky-killed-in-revenge-suspicious-fir/?attribution=tag-article-listing-2-headline  (Exhibit 21)

17. Weiss, Debra Cassens. (2016, May 16).  Dallas judge gets extra security after lawyer's suspicious death.  *ABA Journal*. Retrieved from http://www.abajournal.com/news/article/dallas_judge_gets_extra_security_after_lawyers_suspicious_death/ (Exhibit 22)

18. Goins, David.  (2016, May 16*)*.  Extra security for judge after death of Dallas attorney.  *WFFA8 Houston*.  Retrieved from http://www.khou.com/news/local/texas/extra-security-for-judge-after-death-of-dallas-attorney/196284187 (Exhibit 23)

19. Goins, David.  (2016, May 16*)*.  Extra security for judge after death of Dallas attorney. *WFFA News 8*.  (video link at Exhibit 24)

20. JTA.  (2016, May 16*)*.  Death of Jewish Lawyer in Dallas May Have Been Revenge. *HAARETZ*.  Retrieved from http://www.haaretz.com/jewish/news/1.719898  (Exhibit 25)

21. Davis, Josh; Goins, David & Lopez, Rebecca. (2016, May 16).  Lawyer in suspected homicide case received email threatening to kill him. *WFAA8 News*. Retrieved from http://www.wfaa.com/news/local/dallas-county/dallas-judge-reports-incident-with-tailgater-after-security-warning/196973952 (Exhibit 26)

22. Goins, David. (2016, May 16*)*.  Lawyer in suspected homicide case received email threatening to kill him.  *WFAA8 News*. (video link at Exhibit 27)

23. Smith, Jeff. (2016, May 16). Security Bolstered For Dallas Judge After Attorney's Suspicious Death.  *NBC News*.  Retrieved from http://www.nbcdfw.com/news/local/Family-of-Dallas-Attorney-Fears-He-Was-Attacked-And-Killed-Says-They-Are-Praying-For-Justice-379708641.html

2

24. Smith, Jeff. (2016, May 16). Security Bolstered For Dallas Judge After Attorney's Suspicious Death. *NBC News.* (Video)

25. KTVT/CNN. (2016, May 17). Attorney's mysterious death spurs heightened security for judge. *CBS News.* (Link to video is no longer active.)

26. KTVT/CNN. (2016, May 17). Attorney's mysterious death spurs heightened security for judge. *CBS News.* Retrieved from http://www.kctv5.com/story/31996071/attorneys-mysterious-death-spurs-heightened-security-for-judge  (Link to online news is no longer active. An exact copy of the article is attached as Exhibit 28)

27. FOX4News.com Staff.  (2016, May 18). Judge recuses self in case of slain attorney. *FOX4 News.*  (video)

28. FOX4News.com Staff.  (2016, May 18). Judge recuses self in case of slain attorney. *FOX4 News.*  Retrieved from http://www.fox4news.com/news/judge-recuses-himself-from-slain-dallas-attorneys-defamation-lawsuit

29. Dolsten, Josefin. (2016, May 18).  Who Was Prominent Dallas Lawyer Ira Tobolowsky — and Did 'Jihad' Man Want Him Dead? *Forward.* Retrieved from http://forward.com/news/national/340881/who-was-prominent-dallas-lawyer-ira-tobolowsky-and-did-jihad-man-want-him-d/  (Exhibit 31)

30. Fox News. (2016, May 18).   Authorities investigate suspicious death of prominent Dallas lawyer.  *FOX4 News.* Retrieved from http://www.foxnews.com/us/2016/05/18/authorities-investigate-suspicious-death-prominent-dallas-lawyer.html  (Exhibit 32)

31. McDonald, Shanon.  (2016, May 18).  Judge Fears for His Life After Lawyer's Mysterious Death. *Veuer.*  (video link at Exhibit 33)

32. Graham, Regina F. & Robinson, Wills. (2016, May 18). Was it foul play? Police probe 'suspicious' death of prominent Dallas attorney, 68, found dead in his burned out garage as his family fears he was attacked and killed. *DAILYMAIL UK.*   Retrieved from http://www.dailymail.co.uk/news/article-3596831/Dallas-police-probing-suspicious-death-prominent-Dallas-attorney-68-dead-burned-garage-family-fears-attacked-killed.html  (Exhibit 34)

33. DeFrank, Polly & Siemaszko, Corky.  (2016, May 18).  Police Probing Mysterious Death of Dallas Lawyer Ira Tobolowsky.  *NBC News.*  Retrieved from https://www.nbcnews.com/news/us-news/cops-probing-mysterious-death-dallas-lawyer-n575541  (Exhibit 35)

34. Lauer, Matt  & Shamlian, Janet. (2016, May 18).  Police investigating mysterious death of Dallas lawyer Ira Tobolowsky. *NBC News -The Today Show.* (video link at Exhibit 36)

3

35. Tsiaperas, Tasha. (2016, May 18). Judge steps down from civil case after Dallas lawyer's suspicious death. *DallasNews.Com*. Retrieved from https://www.dallasnews.com/news/news/2016/05/18/district-judge-removed-from-civil-case-after-dallas-lawyers-suspicious-death (Exhibit 37)

36. McCarthy, G.J. (2016, May 18). Attorney Steve Schoettmer talks after judge removes himself from case. *The Dallas Morning News*. Retrieved from https://www.youtube.com/watch?v=HnluQUC7a_Y (video link at Exhibit 38)

37. Smith, Jeff. (2016, May 18). Dallas County Judge Recuses Self Over Safety Concerns, Connects Defendant in Civil Case to Suspicious Death. *NBC News*. (video link at Exhibit 39)

38. Smith, Jeff. (2016, May 18). Dallas County Judge Recuses Self Over Safety Concerns, Connects Defendant in Civil Case to Suspicious Death. *NBC News*. Retrieved from https://www.nbcdfw.com/news/local/Dallas-County-Judge-Recuses-Self-Over-Safety-Concerns-Connects-Defendant-in-Civil-Case-to-Suspicious-Death-380035111.html (Exhibit 40)

39. Rabb, Shaun. (2016, May 18). Judge recuses himself from slain Dallas attorney's defamation lawsuit. *FOX4 News*. (video link at Exhibit 30)

40. Eiserer, Tanya. (2016, May 18). Judge recuses himself from case after lawyer's fire death. *ABC News*. Retrieved from http://www.wfaa.com/news/crime/judge-recuses-himself-from-case-after-lawyers-fire-death/201805881 (Exhibit 41)

41. Allen, Ginger & Pickett, Steve. (2016, May 19). Lawyer's Death Could Be Connected To Court Case. *CBS News*. (video link at Exhibit 42)

42. Silverstein, Jason. (2016, May 19). Dallas lawyer found dead in scorched garage was victim of 'a hit' during contentious case, friend says. *New York Daily News*. Retrieved from http://www.nydailynews.com/news/national/dallas-lawyer-victim-hit-suspicious-death-friend-article-1.2642670 (Exhibit 43)

43. JTA. (2016, May 19). Dallas Jewish lawyer was victim of 'a hit,' a friend says. *Times of Israel*. Retrieved from http://www.timesofisrael.com/dallas-jewish-lawyer-was-victim-of-a-hit-a-friend-says/ (Exhibit 44)

44. Smith, Jeff. (2016, May 19). Dallas Homicide Detectives Now Investigating Fatal House Fire. *NBC News*. (video link at Exhibit 45)

45. Smith, Jeff. (2016, May 19). Dallas Homicide Detectives Now Investigating Fatal House Fire. *NBC News*. Retrieved from http://www.nbcdfw.com/news/local/Dallas-Homicide-Detectives-Now-Investigating-Fatal-House-Fire-380183881.html (Exhibit 46)

46. Nicholson, Eric. (2016, May 20). The Wild Legal Case at the Heart of Lawyer's Homicide Investigation. *Dallas Observer*. Retrieved from http://www.dallasobserver.com/news/the-wild-legal-case-at-the-heart-of-lawyers-homicide-investigation-8317224

47. Bever, Lindsey. (2016, May 20). 'This was a hit': Prominent Texas attorney found dead after suspicious fire. *The Washington Post.* Retrieved from https://www.washingtonpost.com/news/morning-mix/wp/2016/05/20/this-was-a-hit-prominent-attorney-involved-in-contentious-case-found-dead-after-suspicious-fire/ (Exhibit 47).

48. Ygartua, Elizabeth. (2016, May 24). PH Attorney Dies in Suspicious Fire. *PrestonHollowPeople.*

49. Tsiaperas , Tasha; Horn, Barry & Ballor, Claire. (2016, May 27). Ira Tobolowsky: Law, love, loyalty the essence of Dallas lawyer found dead in 'suspicious' fire. *DallasNews.Com.* Retrieved from https://www.dallasnews.com/news/news/2016/05/27/ira-tobolowsky-law-love-loyalty-the-essence-of-dallas-lawyer-found-dead-in-suspicious-fire (Exhibit 48)

50. Tsiaperas, Tasha (2016, May 27). Prominent Dallas lawyer's nasty lawsuit gets attention in his death. *DallasNews.Com.* Retrieved from https://www.dallasnews.com/news/news/2016/05/27/prominent-dallas-lawyers-nasty-lawsuit-gets-attention-in-his-death (Exhibit 49)

51. CBSDFW. (2016, June 23). Sons Of Deceased Dallas Lawyer "Looking For Justice." *CBS News.* Retrieved from http://dfw.cbslocal.com/2016/06/23/sons-of-deceased-dallas-lawyer-looking-for-justice/ (Exhibit 50)

52. Tsiaperas, Tasha. (2016, June 23). Family of slain Dallas attorney Ira Tobolowsky offers $20,000 reward for tips. *DallasNews.Com.* Retrieved from https://www.dallasnews.com/news/crime/2016/06/23/family-slain-dallas-attorney-offers-20000-reward-tips (Exhibit 51)

53. Allen, Ginger. (2016, June 28). I-Team Exclusive: Murdered Dallas Lawyer's Widow Talks. *CBS News.* (video link at Exhibit 52)

54. Allen, Ginger. (2016, June 28). I-Team Exclusive: Murdered Dallas Lawyer's Widow Talks. *CBS News.* Retrieved from http://dfw.cbslocal.com/2016/06/28/i-team-exclusive-murdered-dallas-lawyers-wife-talks/ (Exhibit 53)

55. Allen, Ginger. (2016, June 29). I-Team Exclusive: Murdered Dallas Lawyer's Widow Talks. *CBS News.* Retrieved from https://www.youtube.com/watch?v=OPSW_9_Myg0 (video link at Exhibit 54)

56. Phillips, L.P. (2016, August 25). Medical Examiner Rules Lawyer Tobolowsky's Death A Homicide. *CBS News.* Retrieved from http://dfw.cbslocal.com/2016/08/25/medical-examiner-rules-lawyer-tobolowskys-death-a-homicide/ (Exhibit 55)

57. Dzikowski, Jennifer. (2016, August 25). Ira Tobolowsky: 5 Fast Facts You Need to Know. *HEAVY.* Retrieved from https://heavy.com/news/2016/08/ira-tobolowsky-fire-murder-attorney-photos-dallas-texas-wife-family/ (Exhibit 56)

58. Rabb, Shaun. (2016, August 25). Report: Smoke, burns & blunt force trauma led to local attorney's death. *FOX4 News.* (video link at Exhibit 57)

59. FOX4News.com Staff. (2016, August 25). Report: Smoke, burns & blunt force trauma led to local attorney's death. *FOX News.com* Retrieved from http://www.fox4news.com/news/judge-recuses-himself-from-slain-dallas-attorneys-defamation-lawsuit (Exhibit 58)

60. Crimesider Staff. (2016, August 25). Medical examiner: Dallas attorney found dead in house fire was murdered. *CBS News.* Retrieved from http://www.cbsnews.com/news/ira-tobolowsky-murder-medical-examiner-dallas-attorney-found-dead-in-house-fire-was-murdered/ (Exhibit 59)

61. Rajwani, Naheed & Downs, Caleb. (2016, August 25). Dallas attorney died from blunt-force injuries, burns suffered in suspicious fire at his home. *DallasNews.Com.* Retrieved from https://www.dallasnews.com/news/crime/2016/08/25/dallas-attorney-ira-tobolowskys-death-ruled-homicide (Exhibit 60)

62. Rajwani, Naheed & Downs, Caleb. (2016, August 25). Dallas attorney died from blunt-force injuries, burns suffered in suspicious fire at home. *ScoopNest.Com.* Retrieved from https://www.scoopnest.com/user/dallasnews/768840373204578304 (Exhibit 61)

63. Rajwani, Naheed & Downs, Caleb. (2016, August 25). Dallas attorney died from blunt-force injuries, burns suffered in suspicious fire at home. *WN.COM.* Retrieved from https://article.wn.com/view/2016/08/25/Dallas_attorney_died_from_bluntforce_injuries_burns_suffered/ (Exhibit 62)

64. Boroff, David. (2016, August 25). Mysterious death of prominent Dallas lawyer Ira Tobolowsky ruled homicide by medical examiner. *New York Daily News.* Retrieved from http://www.nydailynews.com/news/crime/mysterious-death-prominent-dallas-lawyer-ruled-homicide-article-1.2765900 (Exhibit 63)

65. Crimesider Staff. (2016, August 25). Medical examiner: Dallas attorney found dead in house fire was murdered. *CBS News.* Retrieved from https://www.cbsnews.com/news/ira-tobolowsky-murder-medical-examiner-dallas-attorney-found-dead-in-house-fire-was-murdered/ (Exhibit 64)

66. WFAA Staff. (2016, August 25). Lawyer's arson death officially ruled a homicide. *WFAA News.* Retrieved from http://www.wfaa.com/news/crime/me-lawyer-found-dead-in-dallas-home-after-fire-was-murdered/308102794 (Exhibit 65)

67. Ong, Jennifer. (2016, August 27). Atty Ira Tobolowsky Cause Of Death: Prominent Lawyer Still Alive During Suspicious Fire? *Morning News USA.* Retrieved from https://www.morningnewsusa.com/atty-ira-tobolowsky-cause-death-prominent-lawyer-still-alive-suspicious-fire-23100051.html (Exhibit 66)

68. Baethge, Joshua. (2016, September 23). Mystery Shrouds Lawyer's Death After Homicide Ruling. *PrestonHollowPeople.*

69. Shine, Conor. (2016, September 29). Dallas Morning News named in defamation suit involving lawyer Ira Tobolowsky's death. *DallasNews.Com*. Retrieved from http://www.dallasnews.com/business/business/2016/09/28/dallas-morning-news-named-defamation-suit-involving-lawyer-ira-tobolowskys-death  (Exhibit 67)

70. Siron, Chris. (2016, October 13). Dallas attorney Ira Tobolowsky was spied on before he was killed, police suspected. *DallasNews.Com*. Retrieved from https://www.dallasnews.com/news/crime/2016/10/13/dallas-attorney-ira-tobolowsky-spied-killedpolice-suspected  (Exhibit 68)

71. Emily, Jennifer. (2016, October 14).  Police: Killer who set Dallas lawyer on fire may have 'suffered serious burns.' *DallasNews.Com*. Retrieved from https://www.dallasnews.com/news/crime/2016/10/14/police-killer-set-dallas-lawyer-fire-may-suffered-serious-burns  (Exhibit 69)

72. Baethge, Joshua. (2016, October 27, 2016). Dallas Police Release Affidavit, Warrant Regarding Tobolowsky Murder. *PrestonHollowPeople*.

73. Baethge, Joshua. (2016, October 28, 2016). Man Involved in Tobolowsky Lawsuit Arrested on Prostitution Charge. *PrestonHollowPeople*.

74. Emily, Jennifer. (2017, February 1). Lawsuit against A. H. Belo, others over coverage of Dallas lawyer's death is to be dropped. *DallasNews.Com*. Retrieved from https://www.dallasnews.com/news/crime/2017/02/01/lawsuit-ah-belo-othersover-coverage-dallas-lawyers-death-dropped  (Exhibit 70)

75. Goodman, Matt.  (2017, April 26). Sneak Peak: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky. *D Magazine*. Retrieved from https://www.dmagazine.com/frontburner/2017/04/sneak-peek-d-magazines-may-issue-which-explores-who-killed-ira-tobolowsky/?ref=rtn (Exhibit 71)

76. Thompson, Jamie.  (2017, April 26). 'A Place Where Something Evil Happened.' *D Magazine*. Retrieved from https://www.dmagazine.com/publications/d-magazine/2017/may/ira-tobolowsky-lawyer-murder-something-evil-happened/ (Exhibit 72)

77. Thompson, Jamie.  (2017, April 26).  Scene of the Crime. Ira Tobolowsky was burned alive in his North Dallas garage.  The family is convinced they know who did it. *D Magazine* (hard copy - Exhibit 73)

78. Allen, Ginger. (2017, April 27).  I-Team: Inside A Dallas Murder Mystery… 1 Year Later. *CBS News*.   Retrieved from http://dfw.cbslocal.com/2017/04/27/i-team-inside-a-dallas-murder-mystery-1-year-later/ (Exhibit 74)

79. Allen, Ginger. (2017, April 27).  I-Team: Inside A Dallas Murder Mystery… 1 Year Later. *CBS News*. (video link at Exhibit 75)

80. Rogers, Tim. (2017, May 8). The Unsolved Murder of Ira Tobolowsky - The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it.  *D Magazine*. Retrieved from

https://www.dmagazine.com/frontburner/2017/05/the-unsolved-murder-of-dallas-lawyer-ira-tobolowsky/?ref=rtn   (Exhibit 76)

81. Allen, Ginger. (2017, May 8). Tobolowsky Family Awarded $5.5M In Defamation Case. *CBS News.* (video link at Exhibit 77)

82. Thompson, Jamie.  (2017, May 9).  Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit - Neither Steve Aubrey nor Brian Vodicka, the defendants, appeared in court.  *D Magazine.*  Retrieved from https://www.dmagazine.com/frontburner/2017/05/judge-awards-huge-5-5-million-verdict-in-ira-tobolowsky-defamation-suit/?ref=rtn (Exhibit 78)

83. Chiquillo, Julieta. (2017, May 9).  Family of slain Dallas lawyer Tobolowsky wins $5.5 million in defamation suit. *DallasNews.Com.*  Retrieved from https://www.dallasnews.com/news/courts/2017/05/09/family-slain-lawyer-tobolowsky-wins55-million-defamation-suit (Exhibit 79)

84. Feldman, Ari. (2018, January 11).  Who Killed Ira Tobolowsky? *FORWARD.* Retrieved from https://forward.com/news/national/391545/who-killed-ira-tobolowsky/ (Exhibit 80)

# Exhibit  L

At least 18 media sources published at least 84 articles and television news segments regarding Steve Aubrey, Brian Vodicka and the murder of Ira Tobolowsky

These 7 media giants, whose demographics are readily available online, printed or aired stories that defamed Steve Aubrey and Brian Vodicka.

| Media Source | Print Reads | Online Views | Mobile Views | Television Viewers |
|---|---|---|---|---|
| Observer | 513,600 | 3,841,068 | | |
| Dallas Morning News | | 1,500,000 print & online | | |
| D Magazine | 551,535 | 4,000,000+ | | |
| ABC WFAA | | 22,800,000 | 6,000,000 | 219,010 late news |
| NBCDFW KXAS | | 4,600,000 | 11,600,000 | 5,440,000 |
| CBS KTVT | | 150,000,000 | 36,000,000 | 202,670 late news |
| Fox 4 KDFW | | 207,708 | | 138,340 late news |
| | 1,065,135 | 186,948,776 | 53,600,000 | 6,000,020 |

Total Potential Reads/Views: **247,613,931**

Almost ¼ of a billion people had the opportunity to read an article or watch a news segment that defamed Steve Aubrey and Brian Vodicka.

Exhibit  M

 Gmail

Vodicka & Aubrey <defamationperse@gmail.com>

---

**Re: Tuesday Hearing**
1 message

---

**Jamie Thompson** <Jamie.Thompson@dmagazine.com>
To: Steve Aubrey <defamationperse@gmail.com>

Tue, Mar 14, 2017 at 9:20 PM

I did not know all of this -- thanks for sending, Steve.

There are so many things I'd like to talk to you about. If I come to Florida, could we talk?
(Not sure I can make this happen, but I'd like to try if you're open to it.)

---

**From:** Steve Aubrey <defamationperse@gmail.com>
**Sent:** Tuesday, March 14, 2017 7:47:36 PM
**To:** Jamie Thompson
**Subject:** Tuesday Hearing

I will not attend the hearing set for next Tuesday.

Last week I asked the Court for a hearing and Judge Cosby offered March 21. I asked if I could attend the hearing by telephone because it was impossible for me to be there in person. Judge Cosby said that because the hearing needed to be recorded, everyone must appear personally and a telephonic hearing would not work with the court reporter (that was a lie...I participated in a telephonic hearing just a couple of months ago, and every word was recorded for the record). The local court rules allow for telephonic hearings.

Since Judge Cosby figured out that I could not attend, he has now Ordered my attendance (first time he has done this), to the hearing I requested! See attached.

Judge Cosby's mission has been to prosecute the death of Tobolowsky through this civil case. He was totally influenced by Dallas Morning News' defamatory articles and even brought his young teenage son from Fort Worth over to our very first hearing in Dallas, just to witness the freak show.

This case should have been dismissed long ago. There is no witness because Tobolowsky is no longer here. There has not been a single document produced to prove up their defamation case. Judge Cosby has coincidentally scheduled the trial to take place on the one year anniversary of Tobolowsky's murder. Unbelievable.

Texas Government Code. Section 21.002 states, in part:

(a) Except as provided by Subsection (g), a court may punish for contempt.

(b) The punishment for contempt of a court other than a justice court or municipal court is a fine of not more than $500 or confinement in the county jail for not more than six months, or both such a fine and confinement in jail.

So, we will not be present for the hearing and the completely prejudice and nasty judge will find us in contempt of court. In October 2016, Judge Cosby said in open court that he could throw Brian Vodicka and myself in jail for contempt. And that is his intention; to throw both of us in jail for six months for defying his Order to attend the hearing I requested!

Steve

---

1 of 1

9/15/18, 8:54 PM