EXHIBIT B

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

**BRIAN VODICKA AND STEVE AUBREY,**
   **Plaintiffs,**

**v.**               **CIVIL ACTION NO.**
                **A-10-CA-076-SS**

**PETER E. BARLIN, GREGORY H. LAHR,**
**SANDRA G. GUNN, NORTH AMERICAN**
**TITLE COMPANY, LESLEY KAREN**
**WILLIAMS, JEFFREY TURNER and VITALY**
**ZARETSKY,**
    **Defendants.**

---

**CHESTER D. TUTOR,**
    **Plaintiff,**

**v.**               **CIVIL ACTION NO.**
                **1:12-cv-503-SS**

**NORTH AMERICAN TITLE COMPANY,**
**LESLEY KAREN WILLIAMS, JEFF**
**TURNER, and VITALY ZARETSKY**
    **Defendants.**

---

**BRIAN VODICKA and STEVEN AUBREY,**
    **Plaintiffs,**

**v.**               **CIVIL ACTION NO.**
                **1:12-cv-00768-SS**

**NORTH AMERICAN TITLE COMPANY,**
**LESLEY KAREN WILLIAMS, JEFF**
**TURNER, and VITALY ZARETSKY**
    **Defendants.**

---

## PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT

---

Plaintiffs Chester D. Tutor (**"Tutor"**), Brian E. Vodicka (**"Vodicka"**) and Steven B. Aubrey (**"Aubrey"**) (collectively, **"Plaintiffs"**) file their Second Amended Consolidated Complaint as follows:

## I. PARTIES & RICO CO-CONSPIRATORS[1]

1.    Plaintiff Tutor resides in Georgetown, Williamson County, Texas.

2.    Plaintiffs Vodicka and Aubrey reside in Austin, Travis County, Texas.

3.    Defendant North American Title Company ("**NAT**"), a title company with offices throughout the United States, has appeared in this lawsuit.

4.    Defendant Lesley Karen Williams ("**Williams**"), an employee of NAT, has appeared in this lawsuit.

5.    Defendant Jeffrey Turner ("**Turner**"), the Mayor of, and resident of, Manor, Texas at all times relevant to this suit, has appeared in this lawsuit.

6.    Defendant Vitaly Zaretsky ("Zaretsky"), resides in New Jersey, and has appeared in this lawsuit.

7.    Defendant Gennady Borokhovich a/k/a Gemnagy Doraborakhovich a/k/a Eugene Borokhovich (**"Borokhovich"**) currently resides and operates from Kiev, Ukraine.  He may be served wherever he may be found.

8.    Defendant Gregory Lahr ("**Lahr**"), a resident of Travis County, Texas, has appeared in this lawsuit.

9.    Defendant Peter Barlin ("**Barlin**"), a resident of Travis County, Texas, has appeared in this lawsuit.

---

[1] Additional facts, entities, and other individuals who assisted Defendants in orchestrating and perpetuating the Scheme are included and described more specifically in the RICO Statement, which is incorporated by reference as if fully set forth herein.

10.     Defendant Sandra Gunn ("**Gunn**"), a resident of Travis County, Texas, has appeared in this lawsuit.

## II. JURISDICTION AND VENUE

11.     Federal question and original jurisdiction are invoked and are proper under 28 U.S.C. § 1331, because this action involves violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*. (**"RICO"**). This Court has supplemental jurisdiction under 28 U.S.C. § 1367.  Pursuant to 18 U.S.C. § 1965(b), justice requires that the Court exercise personal jurisdiction over all Defendants.

12.     Venue is proper under 28 U.S.C. § 1391(b)(2) insofar as the Western District of Texas is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. The Western District of Texas is also the judicial district including Williamson County, Texas, from which district court the Tutor action was removed.

## III.  THE SCHEME AGAINST PLAINTIFFS

13.     Defendants swindled individuals, banks, and non-bank lenders, including the Plaintiffs,  by fraudulently inducing them to loan money in what they touted as a commercial land development project known as "Sky Station" in Travis County, Texas.  Sky Station was represented to include four developments–collectively known as Wildhorse Ranch – featuring 9,200 lots spread across lakes, nature trails, and trees along with hundreds of stores, hotels, and restaurants. Nothing was ever built and the Defendants pocketed the money.

14.     The Defendants committed the fraud using two schemes:  an illegal land-flipping scheme and an illegal loan-flipping scheme (the **"Scheme"**).   The Scheme utilized numerous entities, owned, operated, and controlled by Defendants, to sell the same land to themselves, artificially inflating the property's value to fraudulently obtain loans.   Defendants used North

American Title Company (**"NAT"**), by and through its agent, Lesley Karen Williams (**"Williams"**), to create false real estate and closing documents that enabled the Scheme to continue to divert funds. Defendants engaged in falsifying deeds of trust and other real property records, fraudulent real estate closings, bribes characterized as "consulting" and other fees, false appraisals, and false marketing materials, as well as acts of extortion, mail and wire fraud, bribery, mortgage fraud, title fraud and bank frauds.

15.     Victor and Natalia Wolf (the "**Wolfs**") started the Scheme under the name Sky Development Group in Florida and continued the Scheme across interstate lines in Texas where the Scheme ultimately collapsed under the direction of Zaretsky and Borokhovich. The Wolfs are fugitives, have ties to organized crime,[2] are the subject of Federal arrest warrants issued on January 18, 2011, for conspiracy to commit mail and wire fraud, and are listed on the FBI's "Most Wanted List." (*see* www.fbi.gov/wanted/wcc/victor-wolf/). The Scheme perpetrated by the Defendants targeted the victims' money by fraudulently obtaining real estate loans to unlawfully and unjustly enrich themselves, using mortgage brokers and other "trusted" individuals to induce the victims' to loan money in what was a pyramid of mortgage loans on land used as cow pastures in Travis County, Texas. In reliance upon Defendants' false representations and failure to disclose material facts, Plaintiffs loaned in excess of $1,500,000.00 purportedly to be used to develop the land. Plaintiffs' money was stolen by the Defendants and their co-conspirators who assisted them in orchestrating the Scheme. Defendants never developed the property, never generated any earnings, and paid disbursements to lenders solely from other loan proceeds. Defendants were insolvent from the moment the first loan contract was signed by the first victim of the Ponzi Scheme, and they became more insolvent with each successive loan

---

[2] Other parties involved in the Scheme with ties to organized crime include Defendants Vitaly Zaretsky and Gennady Borokhovich.

contract. Not one penny of the loan proceeds fraudulently obtained from Plaintiffs and other victims was ever used to develop the property or for any other legitimate purpose. In some cases, Plaintiffs received as "security" for their loan a purported "mortgage lien" on property that the Defendants did not own.

16.     Defendants misappropriated Plaintiff's loan proceeds for themselves and also used the loan proceeds to perpetuate the Scheme by (a) paying off prior loan obligations; (b) making down payments in other fraudulent schemes to obtain loans; and (c) paying kickbacks to a government official, straw buyers, mortgage officers, closing agents, and bankers for their active participation in the Scheme.

17.     The Wolfs, and later Zaretsky, Borokhovich, and others made the Scheme appear legitimate through the use of false promotional materials and the involvement of persons holding licenses with the State of Texas.  The Wolfs formed Sky Development Group, LLC **("Sky Development")** one of the many entities used to perpetrate the Scheme. Together with the assistance of non-party Boris Serebro, a New York lawyer and their front man, they also formed non-party J&T Development Group, L.P., and other Texas entities, to carry out the Scheme. NAT, by and through its agent, Williams, created sham real estate and closing documents that enabled the Scheme to continue to divert, hide, and fraudulently conceal the theft of money and to siphon the funds to the Defendants' and co-conspirators' bank accounts in Brooklyn, New York. In fact, NAT forged signatures on closing documents, including Defendant Turner's.

18.     Other individuals conspired, aided, and abetted the Scheme.[3] In furtherance of the Scheme, Defendant Jeffery Turner ("**Turner**"), Mayor of Manor, Texas, obtained bribes under

---

[3] **Error! Main Document Only.** The individuals referenced herein include the Defendants to this lawsuit. Additional entities and other individuals who assisted Defendants in orchestrating and

the guise of "consulting fees" that were paid to him from the Wolfs' Austin-based attorney, William Hemphill's ("**Hemphill**") IOLTA account. J&T was a fictitious entity specifically created by Hemphill as a conduit for numerous fraudulent transactions in the Scheme. J&T was insolvent and served as a front for the flow of money to other entities, and ultimately the Defendants, as the alter egos behind those entities. J&T had no books or records, no bank accounts, and never filed any tax returns. Turner and Zaretsky acted as the straw-buyer on behalf of J&T and routinely executed false real estate documents.

19. NAT, through its agent Defendant Williams, "closed" the fraudulent loan transactions and operated as an illegal unchartered bank in furtherance of the Scheme. NAT diverted the Plaintiffs' money, and falsified records showing where the money was diverted to fraudulently conceal the fraud. The "closings" were further improper because all parties to the transactions were seldom in the same room. Closing documents were executed at the offices of Hemphill, Serebro, and the United States Embassy in Tel Aviv, instead of at a title company's offices. NAT, through Williams, knew that the closings were not being conducted at NAT's offices, which was required pursuant to NAT's own policies. NAT, through its agent, Williams, created false real estate and closing documents, including fraudulent HUD-1 closing statements that enabled NAT, Williams, and Hemphill to divert Plaintiffs' money as well as millions of dollars of other peoples' money.

20. Two of the real estate loans that were used to swindle Plaintiffs were commercial syndicated bridge loans. The administrator of the syndicated bridge loans was CFS, a mortgage brokerage owned, operated, and controlled by Defendants Lahr and Gunn. The loans were made to J&T; however, as stated, J&T was a shell entity that received no benefit and did not own the

---

carrying out the Scheme are included and described more specifically the RICO Statement, which is incorporated by reference as if fully set forth herein.

properties made the subject of Plaintiffs' loans, except title to one 100-acre tract in the Wildhorse Ranch. The 100 acres' value was $1.95 million; however, J&T had incurred real estate loan obligations totaling $15 million. Thus, J&T was insolvent and all money coming from Plaintiffs and others deepened J&T's insolvency while unjustly benefiting Defendants and others.

21. The first syndicated bridge loan to J&T was for $4.5 million (**"CFS Loan No. 1"**), and the second syndicated bridge loan was for $4 million (**"CFS Loan No. 2" a/k/a the "Manor Loan"**). Plaintiff Tutor participated in CFS Loan No. 1 by lending $600,000.00. Plaintiffs Vodicka/Aubrey participated in the Manor Loan by lending $415,000.00 and later $500,000.00. Defendants never intended to repay the loans, nor did Zaretsky ever intend to personally guaranty them (though he signed one for each loan). NAT aided and abetted the Scheme by diverting the loan proceeds directly to the Defendants, and/or fraudulently transferring the loan proceeds first through improper inter-file transfers to other real estate closings, before diverting the loan proceeds to the Defendants, or alter egos of J&T controlled by Defendants. NAT diverted the money utilizing an escrow fraud scheme, originally directed by non-party Wolf but later by Zaretsky and Borokhovich, creating falsified HUD-1 settlement statements and other false real estate records as set forth herein.

22. Although not directly part of Plaintiffs' RICO claims or the Scheme, as defined herein, Plaintiffs Aubrey and Vodicka participated in two other loans, referred to herein as the "Temple Loan," which occurred seven months before their first involvement in the Manor Loan, and the "Long Beach Loan," in which Aubrey and Vodicka first lent money in April 2007. These two additional loans involved some of the same participants as the Manor Loan, with similar means and methods of fraud.

23.    Plaintiffs invested a total of $120,000 in the Temple loan in two installments made on June 5 and June 9, 2006, respectively.  This Loan was created, packaged, and offered by Creative Financial at the direction of Lahr and Gunn and promoted and sold by Lahr and Barlin as the employees/agents of Creative Financial.  The investment was purportedly secured by a second lien position against real property and improvements in Temple, Texas.  Plaintiffs purchased the initial tranche directly from Lahr, who assigned his personal interest to Plaintiffs.  Lahr represented to Plaintiffs that he had previously invested $70,000.00 in the deal, but he may have invested as little as nothing.  Plaintiffs purchased the second tranche from Creative Financial through Lahr.  In total, Plaintiffs have suffered no less than $75,896.00 in damages on this investment

24.    On April 19, 2007, Plaintiffs loaned a total of $140,000.00 in the Long Beach Loan.  This Loan was created, packaged, and offered by Capital Advantage, at Lahr's direction, and promoted and sold by Lahr as the employee/agent of Capital Advantage.  This investment was secured by a junior lien against real property and improvements in Long Beach, California. Plaintiffs suffered damages in excess of $70,000.00 on this investment.

**A.    Vodicka/Aubrey's Inducement Into Scheme – Their Two RICO Injuries.**

25.    As of January 2007, the Scheme had already been in existence for more than two years.  Despite Barlin's awareness that the Scheme was disintegrating, he began his quest for even more money for Zaretsky and Sky Development Group's global real estate fraud.[4]

---

[4] A chronology of the events that followed in 2007, including specifics as to persons, places, dates, times, and locations of those events and the rampant misrepresentations associated therewith, with respect to Vodicka and Aubrey, can be found in the RICO Statement at page 24, beginning at paragraph 4, and continuing through the top of page 28.  This chronology, which includes not one but two fraudulently induced payments totaling nearly a million dollars, is incorporated herein by reference.

**B.** **Tutor's RICO Injury Fraudulently Induced Him to Pay Over $600,000.**

26.     Barlin, Lahr, Gunn, and Zaretsky perpetuated the Scheme by fraudulently inducing others to loan money in the Wildhorse Ranch development. On or about March 10, 2007, Lahr, Caufmann (an agent of Lahr and Gunn), and Zaretsky met with Plaintiff Tutor at the 290 Café in Manor, Texas. During this meeting and subsequently, Lahr and Zaretsky made numerous material misrepresentations to Tutor both orally, on or about March 10, 2007, and through false promotional materials.[5]

**C.** **Broker's Lulling Activities in "Manor" Skyrocket Through the Earlier Temple Loan.**

27.     Within three weeks of Plaintiffs Vodicka/Aubrey's additional commitment of $500,000.00 in the Manor Loan, Vodicka/Aubrey's Temple Loan payments became delinquent. On or about July 10, 2007, Vodicka and Aubrey raised concerns to Lahr and Barlin regarding the status of occupancy for the apartment complex that was the subject and purpose of the Temple Loan. To lull Plaintiffs into a false sense of security in the Manor Loan (Plaintiffs had just transferred $500,000 to Barlin), Lahr and Barlin blamed the "problems" with the Temple Loans on the failures of non-party Lisa Caufmann (**"Caufmann"**), a mortgage broker for CFS. This diversion gave Barlin and Lahr time to continue Barlin's dumping of his worthless ownership interest in the Manor Loan to other unsuspecting victims – all through fictitious assignments papered by Lahr's shell entity, Creative Lending Concepts. On or about July 10, 2007, Barlin and Lahr misrepresented to Vodicka/Aubrey that this was the first time any of Lahr's customers had experienced any similar problems, and that they would cover any loss Vodicka/Aubrey

---

[5] Those material misrepresentations that are fully set out in the RICO Statement filed concurrently herewith and which are incorporated herein by reference. This chronology can be found in the RICO Statement at page 21, paragraph 2 through the top of page 23.

might incur in connection with the Temple Loan. Lahr again falsely represented that the property's value was sufficient to cover all of the liens on the property.

28.     On July 25, 2007, at a second meeting with the Temple lenders Vodicka, Ben and Ingrid Edwards (**"Edwards"**), and Dovie Hayden executed a Forbearance and Profit Sharing Agreement concerning all three Temple loans. During this time period, Lahr, as Plaintiffs' agent and fiduciary, and Caufmann, as Edwards's agent and fiduciary, failed to disclose and concealed the true asbestos-laden condition of the property and its true value. Gunn/CFS had in their possession the actual appraisal of the property, which reflected the asbestos-laden value of only $135,000.00, yet Gunn/CFS continued to falsely represent to Vodicka/Aubrey that its value was exceeded $400,000.00. On January 31, 2008, Lahr sent Vodicka an e-mail confirming the promises made in Barlin's living room six (6) months prior,[6] claiming he would guaranty any deficiency in the Temple loan. Lahr further falsely represented, "I will either get you a new 1st TD lender for $100,000 at 12% interest and I'll make the payments or I will pay you 12% interest monthly with interest beginning from 2-1-08."

## IV. PATTERN AND PRACTICE OF FRAUDULENT CONDUCT

### A.     NAT's Pattern and Practice of Fraudulent Conduct Including, without Limitation, Falsifying HUD-1 Settlement Statements.

29.     NAT, through its agent, Williams, and at the direction of Gunn, Lahr, Barlin, Zaretsky and Borokhovich, was the lynchpin in creating and perpetuating the pattern of racketeering and the Scheme to defraud Plaintiffs and hundreds of other victims. NAT filed falsified Deeds of Trust, diverted money, and fraudulently concealed the diverted money with falsified records, including falsified HUD-1 settlement statements and falsified internal Single Ledger Balance Reports. NAT/Williams acted as the escrow agent, closing agent, title company,

---

[6] *See* RICO Statement at page 20.

broker, banker and notary for over twenty-six (26) separate transactions. NAT further aided and abetted Zaretsky, Borokhovich, and Turner, by, among other things, failing to comply with basic recording of federal and state income tax obligations. Each of the fraudulent HUD-1 settlement statements is material to Plaintiffs' claims and was prepared by NAT, by and through its agent Williams, at the direction of Gunn, Lahr, Barlin, Zaretsky, and Borokhovich.[7]

**B.** **The Fraudulent Closing of CFS Loan No. 2.**

30.    Lahr, Barlin, and Gunn artificially inflated the amount of the new $4 million CFS Loan No. 2 by flipping a loan from a lender to the previously closed CFS Loan No. 1 to CFS Loan No. 2 without disclosing this to Vodicka/Aubrey. At the Closing, Turner also executed the $4 million Promissory Note, which formed CFS Loan No. 2. The Note indicated that only $3,300,000 had been funded; however, NAT's escrow account contained only $1,826,133.24. This was not disclosed to Plaintiffs Vodicka/Aubrey prior to the Closing. Defendants further failed to disclose to Vodicka/Aubrey the amount of fees and other costs related to CFS Loan No. 2.

31.    Turner executed a falsified Deed of Trust on the 414 acres, a separate falsified Deed of Trust on the 100 acres, a Note, and a HUD-1 settlement statement as part of the Closing. The Deed of Trust granted on the 414 acres was false because J&T did not own title to the land. The Deed of Trust on the 100 acres was false because J&T received no value. Turner also executed various other documents that were without authority and were fraudulent, including two different "security agreements" and UCC filings. Turner was paid $40,000 to execute these documents as well as the falsified HUD-1 settlement statement, prepared and certified by Williams on behalf of NAT. Further, Turner executed the Note for CFS Loan No. 2, and

---

[7] More specific detail regarding each of these can be found at pages 23 through 30 of the RICO Statement filed concurrently herewith, detail that is incorporated herein by reference.

specifically represented to the lenders that the Loan would be used for "business or commercial purposes" while simultaneously executing, with NAT's, Williams', Lahr's, and Gunn's knowledge, an Affidavit of Intended Use that represented the Property would be used for cattle.

**C.     Foreclosure of the 100 acres.**

32.     In January 2008, IBC accelerated its entire $8.2 million loan because, in part, it discovered that CFS' inferior lien violated the terms of its senior deed of trust. On February 3, 2009, Southside Bank (the successor to Fort Worth National Bank), foreclosed on the 100-acre tract in Wildhorse Ranch and took title to it for the amount of the indebtedness.

**D.     Other Victims of Defendants' Pattern of Racketeering and Further Evidence of Pattern.**

33.     Defendants repeatedly used the same perpetrators for the common purpose of inducing many victims, including Plaintiffs, into participating in numerous fraudulent transactions relating to the Properties.

***Al and Barbara Mokry.***

34.     On or about October 4, 2005, Zaretsky entered into another Unimproved Property Contract, purporting to sell 374 acres he did not own (though Sky Development Group's website stated otherwise) in Northeast Travis County, Texas, which included 124 acres of property owned by Al and Barbara Mokry (the **"Mokrys"**). The Mokrys were unaware of Zaretsky's efforts. Zaretsky later extorted $200,000 from the Mokrys under threat of physical violence.[8]

***Alexandra Krot.***

35.     In the Spring of 2006, the Wolfs, Zaretsky, and Borokhovich met with Alexandra Krot (**"Krot"**) to induce her into loaning money into the Scheme using a copy of a fake contract

---

[8] For additional details regarding the Mokrys and Zarketsky's extortion, see the RICO Statement at page 8, subparagraph b.1.

using a fictitious person as the seller and a fake earnest money check that was never negotiated. Based on these misrepresentations, Krot and her brother Alexander Krot loaned Wolf and Borokhovich $525,000 through four interstate wire transfers. Each of the Krots' wires was siphoned off by Defendants for personal gain before subsequent lenders, including Plaintiffs, were defrauded.

### _Tony Roper._

36.     On or about April 26, 2006, Roper, based upon the Wolfs' representations, executed a contract to purchase "871 approved lots" in Manor, Texas for $5,835,700. At that time, however, the "lots" were _**not**_ "approved." Turner, as Mayor of Manor, failed to execute the City of Manor Development Agreement in connection with these lots until May 3, 2006, and Manor's City Council did not "approve" the lots until approximately five (5) months later, after Roper decided to terminate the contract. Zaretsky and Turner later used this Agreement to induce a bank into loaning Zaretsky & Sons LP $2.5 million on these same tracts of land, despite Roper's earlier termination of the contract.

### _Waterfall Gallery's Involvement in the Scheme._

37.     On October 6, 2006, J&T entered into an illegal property flipping transaction to sell 200 acres in Wildhorse Ranch to Waterfall Gallery of Texas (**"Waterfall Gallery"**), another related entity, at an artificially inflated value of $88,000 per acre. J&T had purchased the same property thirty-nine (39) days prior for $31,500 per acre.

38.     In an effort to perpetuate the Scheme, Waterfall Gallery obtained an $11 million loan to purchase this property from J&T. The closing by the title company included two (2) false versions of the settlement statement and a non-existent $8.5 million payment to J&T. This new $11 million loan was used to pay off prior debts and mortgages on acreage in Wildhorse Ranch

---

to perpetuate the Scheme. This transaction included an "off-the-books" $1.5 million wire transfer to the IOLTA account of Wolf's New York City attorney, Boris Serebro, which Turner authorized. Immediately, Serebro transferred this amount to Borokhovich's personal account. With these proceeds, Borokhovich then made six (6) wires from his personal account in late October and early November 2006 to NAT, Wild Horse Investments, Ltd., and others.

39.    On October 17, 2007, the $11 million loan to Waterfall Gallery went into default, leading to the Scheme's collapse. Nevertheless, despite knowledge that Zaretsky, Turner, Borokhovich and the Zeltser Brothers[9] never intended to repay J&T's $2 million loan to Fort Worth National Bank secured by the 100 acre tract, Turner executed J&T's Modification, Renewal, and Extension of Note and Lien of this $2 million loan on November 20, 2007. After the Scheme's collapse, Vodicka/Aubrey discovered that Turner attempted to conceal his fraud by executing and filing a falsified back-dated Deed of Trust for the 414 acres on December 14, 2007, with the effective date of February 1, 2007. Finally, Zaretsky executed Manor North East 167 LP's Renewal, Extension and Modification of Independent Bank's $3.25 million loan on December 27, 2007.

40.    It was never disclosed to Plaintiffs that J&T did not own the 414 acre tract in Wildhorse Ranch, or other acreage that had been, or would be, flipped to J&T's sister entities, all of which were owned or controlled by the same people. Despite J&T's sale of these tracts for over twenty-three (23) million dollars, *__no cash was ever paid to J&T__* and no closing was ever recorded on J&T's books, records, or bank accounts because none existed.

---

[9] The Zeltser Brothers are non-party wrongdoers who were concealed members of J&T Development Group, LP, which executed fraudulent contracts for real property in the Wildhorse Ranch.

## *The Lahr/Barlin "Parking" Scheme and "Side Deal" – All Concealed from Plaintiffs*

41.     Lahr and Barlin continued to engage in a pattern of fraudulent conduct related to the loans for the Properties. On the same day as the Vodicka/Aubrey Closing on February 1, 2007, Barlin directly loaned almost $1 million in a separate loan evidenced by a wire transfer in the amount $996,000 that was sent to the title company, NAT, "f/b/o J&T Development Group." However, this was concealed by "papering" Barlin's position with a fictitious loan to Lahr. Barlin's fictitious loan to Lahr was based on two pieces of collateral that did not exist:  (1) Lahr's non-existent $1.175 million position in CFS Loan No. 1; and (2) Lahr's non-existent, unrecorded grant deed to the apartment complex in New Braunfels.  Lahr did not own title to the apartment complex in New Braunfels in which to convey to Barlin.  Barlin kept this loan secret to hide his true financial relationship with Zaretsky, including a kickback scheme.

42.     Barlin, Lahr and Zaretsky also reached another agreement regarding the fees to be paid in a secret side-deal (the **"Side-Deal"**).  Specifically, they entered into a separate $2.5 million bank loan to Zaretsky & Sons, LP from First State Bank Central Texas, which was also handled by NAT through NAT's File No. TX066650368. The Side-Deal was never disclosed on any HUD-1 settlement statement. From this file Barlin was paid $30,000, and Lahr's shell, CLC, was paid $87,500. PWP Properties was paid $37,500 as well. The Side-Deal also involved a kickback scheme between Zaretsky, Barlin, and Lahr using Plaintiffs' loan proceeds shuffled through a simultaneously closing file of First State Bank Central Texas that had also made a simultaneous multi-million dollar loan to Zaretsky & Sons LP to develop a separate 267-acre tract in Manor, Texas, known as "Sky Village."

---

## V.  TOLLING OF STATUTES OF LIMITATIONS

### A.  Fraudulent Concealment.

43.     Plaintiffs timely filed their causes of action. On January 31, 2011, Vodicka/Aubrey filed suit in state court against NAT for fraud, conspiracy and other causes of action (the **"State Court Action"**). Tutor filed his RICO claims on May 14, 2012, and Vodicka/Aubrey filed their RICO claims in this Court on July 12, 2012.

44.     Due to the fraudulent concealment by Defendants of their records and actions, Plaintiffs did not know, and in the exercise of due diligence, could not have known of Defendants' RICO violations until, at least, mid-2012, after obtaining the records of NAT, Citibank (Brooklyn), and Hemphill. In March 2013, 6,281 documents related to closings that occurred from August 2006 to October 2006 were finally obtained from Fidelity (another title company), documents it had previously sworn it did not have.  Additionally, the very structure of the Scheme itself was inherently self-concealing.  Finally, as Plaintiffs herein have alleged conspiracy, the acts of concealment of one co-conspirator are attributable to all co-conspirators. In this case, with an inherently self-concealing fraud, any acts of fraudulent concealment are attributable to all co-conspirators.

45.     On June 13, 2008, Zaretsky filed in the J & T bankruptcy proceedings a Motion to Sell Free and Clear of All Liens to further obscure whether Plaintiffs had suffered or would suffer any injury. This Motion was predicated on a newly obtained purchase contract to sell the various tracts in the Wildhorse Ranch to Atlantic Ventures, a new third party purchaser. Zaretsky filed two false SOFAs in J&T's bankruptcy in 2008,[10] along with statements of assets and

---

[10] *See* RICO Statement at page 16, subheading "bankruptcy fraud."

liabilities, including Schedule A-Real Property with values exceeding Plaintiffs' claims, further obscuring any possible injury to Plaintiffs.

46.     Plaintiffs exercised due diligence in investigating whether an injury had been sustained and the underlying facts that support a claim under RICO. *See, e.g.,* Paragraphs 48 and 49 below. Moreover, Zaretsky, Turner, Lahr, NAT and Barlin fraudulently concealed these facts from Plaintiffs. It was only years later that Plaintiffs discovered that the SOFAs contained false representations.

47.     Moreover, NAT fraudulently concealed material facts from Plaintiffs by creating two sets of books. The nine falsified HUD-1s generated one set of books and the actual wires from Union State Bank, Florence, Texas, to Borokhovich's Brooklyn, New York Citibank account, constituted the other set of "actual" books. Plaintiffs could not discover the Scheme to defraud until both sets of books were revealed.

48.     Before filing the State Court Action, Plaintiffs requested their closing file from NAT multiple times. On or about October 20, 2010, Vodicka/Aubrey went to NAT's Round Rock, Texas branch office, in person, and requested their closing file. NAT refused. Instead Williams referred Vodicka/Aubrey to NAT's Vice President George Stablien. Vodicka/Aubrey then contacted Stablien, who also refused their request. In November 2010, Vodicka and Tutor went to NAT's Round Rock, Texas, branch office again, and Tutor requested his closing file. Once again, NAT refused. In January 2011, Tutor sent a written request to NAT for his file, NAT ignored it. Thereafter, Vodicka/Aubrey filed the State Court Action to obtain these records.

49.     In September 2011, Vodicka/Aubrey sought records from NAT through the subpoena process, but this Court granted NAT's Motion to Quash. After the filing of a Motion to Reconsider, this Court reversed itself in December 2011. NAT then produced the records over a

five month period beginning in January 2012. These records revealed the flow of money among and between the various Defendants and provided knowledge regarding previously unknown and unknowable claims against NAT and other Defendants. In the end, it took 19 months and the filing of a lawsuit to obtain NAT's records.

**B.**     **Defendants' Spoliation of Documents Also Tolls Limitations.**

50.     Defendants NAT, Williams, Lahr, Gunn and Barlin have destroyed, concealed, or "lost" material evidence. These acts constitute spoliation of evidence and obstruction of justice and serve to toll limitations.  NAT and Williams' notary records for the transaction described in this complaint have "disappeared." Section 406.014 of the TEXAS GOVERNMENT CODE requires that these records be maintained and be made available to the public.

51.     Lahr destroyed all of his e-mails relating to the activities described herein. Given the extensive litigation over the course of the last decade with CFS's predecessor-in-interest, CA Holdings Inc. d/b/a Capital Advantage, Lahr and Gunn were on notice that these records were material evidence of Defendants' fraudulent activity. Gunn knew the FBI was investigating the operations of Lahr and Caufmann's Capital Advantage. Moreover, Lahr and Gunn destroyed or concealed three different CFS Investment Summaries of the "Manor Loan" and other documents used to induce at least eight (8) lenders into loaning money to the Scheme.

52.     Gunn further altered CFS internal records to conceal Barlin's involvement and his secret financial relationship with Zaretsky in connection with the "parking" scheme. Moreover, Barlin destroyed or concealed the unrecorded deed from Lahr used by Barlin and Lahr to create the fictitious Barlin "Loan-to-Lahr" part of CFS Loan No. 2.  Barlin also destroyed and concealed ASC management records of communications from ASC to Sky Group of Texas, Zaretsky, Hemphill, Borokhovich and Victor Wolf's New York attorney, Serebro, on January 8,

2007, detailing impending collapse of the Scheme four days prior to Barlin's initial solicitation of Vodicka. NAT destroyed its copies of these January 8, 2007 communications, as well as four separate letters, all dated January 19, 2007, pinpointing NAT's knowledge that J&T did not own the 414 acre tract. These letters, and the information contained in them, are vital: just thirteen days later, NAT and Turner granted Plaintiffs a phony deed of trust.

53. The foregoing acts constitute an active attempt to cover up Defendants' wrongdoing through fraudulent concealment of their activities.

## VI. RICO PREDICATE ACTS

### A. ACTS OF RACKETEERING (PREDICATE ACTS).[11]

54. Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

**Extortion.**

55. Zaretsky engaged in extortion in violation of 18 U.S.C. § 1951 by wrongfully obtaining the property of Al and Barbara Mokry, which was taken with their consent but under inducement by the wrongful use of actual or threatened force, violence, or fear.

**Mail and Wire Fraud.**

56. Defendants Barlin, Lahr, and Zaretsky engaged in multiple acts of mail and wire fraud as defined in 18 U.S.C. §§ 1341, 1343, and 1344. Each of the Defendants could foresee that the U.S. Postal Service and interstate wires would be used for the purpose of advancing, furthering, executing, conducting, participating in or carrying out the Scheme.

---

[11] Additional detail regarding each of the predicate acts committed by Defendants is set forth in the RICO Statement filed concurrently herewith and incorporated herein by reference as if fully stated herein.

57.     By engaging in the illicit Scheme of soliciting fraudulent loans from Plaintiffs Vodicka, Aubrey, and Tutor by using false and fraudulent promotional materials that were forwarded via interstate wire communication by Defendants in furtherance of their Scheme, and by directing – either in person or via wire communication – Vodicka and Aubrey to wire funds with the intent to immediately misappropriate same, Defendants Barlin, Lahr, and Zaretsky intentionally participated in management and control of various enterprises, using interstate wires, to defraud Vodicka, Aubrey, and Tutor by means of material misrepresentations. Vodicka, Aubrey and Tutor reasonably relied on misrepresentations made in the promotional documents that were provided to them by Barlin, Lahr, and Zaretksy, in furtherance of the fraudulent Scheme.  Vodicka and Aubrey further reasonably relied on in-person misrepresentations made solely and intentionally for the purpose of inducing them to wire money in furtherance of the fraudulent Scheme.  Vodicka, Aubrey and Tutor suffered a direct injury as the result of this fraud in the amounts of money Defendants obtained from Plaintiffs thereby.  Through the foregoing conduct, Barlin, Lahr, and Zaretsky, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs and signals for the purpose of executing such scheme and artifice to defraud, in violation of 18 U.S.C. Section 1343. Many additional acts of mail and wire fraud are set out in the concurrently filed RICO Statement.

58.     Direct financial benefits inured to Defendants from their repeated acts of racketeering.  NAT, Williams, and Zaretsky wasted no time misappropriating Tutor's money by wire on March 14, 2007.  On that date, payments of loan proceeds in the amount of $892,553.00 were made to the Citibank account of Frontier Acquisitions, Zaretsky's and Borokhovich's

collapsing shell operated from a Brooklyn, New York post office box. Lahr, Gunn, and Barlin then paid themselves fees in the following amounts: (i) $56,033.75 to CFS; and (ii) $5,311.25 to Barlin. While Lahr and Caufmann represented to Tutor that his funds would be safe and used to discharge the first lien in the Wildhorse Ranch development, in reality CFS used these funds to line their own pockets and pay off other loans. None of this was ever disclosed to Tutor; in fact, this fraud was concealed.

59. Turner, Gunn, and NAT/Williams also created another Notice of Amendment, the second one for CFS Loan No. 1, which was filed in the Travis County Real Property Records as Instrument No. 2007050982. This amendment purported to add Tutor and another private lender, William "Dan" Huddock, as lenders. However, it was a false document. It listed Kenneth and Natalie Hardie of Virginia as having loaned money to J&T, which was false. The Hardies never loaned any money to J&T, nor did the loan provide any value to J&T under the Note. In fact, the Hardies' wire transfer statement indicates that $244,500 was wired from their bank account at Wachovia to an account owned by Oleg Zaretsky in New Jersey. Oleg Zaretsky was Vitaly Zaretsky's father. Additional benefits inuring to Defendants through improper and illegal wire or mail transfers of funds are detailed in the RICO Statement filed concurrently herewith.

**Interstate Transportation of Stolen Property.**

60. Zaretsky, Borokhovich, Williams, NAT and Turner (and their co-conspirators and agents) devised and intended to devise a scheme or artifice to defraud and obtain Plaintiffs' and other lenders' money by false pretenses, representations or promises, and transported, caused to be transported, and induced persons to travel and be transported in interstate commerce in the execution or concealment of the Scheme or artifice to defraud in violation of 18 U.S.C. § 2314.

**Financial Institution Fraud.**

61.     Zaretsky, Borokhovich, Williams, NAT and Turner (and their co-conspirators including, but not limited to, Barlin, Lahr, and Gunn) knowingly executed a scheme or artifice to obtain the moneys, funds, credits, assets or other property under the custody or control of various financial institutions by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1344 in a manner more fully described in the RICO Statement.

**Obstruction of Justice.**

62.     Wolf, Zaretsky, Borokhovich, Williams, NAT, Lahr, Gunn, Barlin, and Turner (and their co-conspirators) knowingly altered, destroyed, mutilated, or concealed records and information with intent to impair the integrity or the availability of records and information and to prevent their use in a pending or foreseeable official proceeding in violation of 18 U.S.C. § 1512 in a manner more fully described in the RICO Statement.

**Bribery.**

63.     Zaretsky, Borokhovich, Williams, and NAT, intentionally or knowingly offered, conferred, or agreed to confer on Turner a benefit as consideration for Turner's decision, opinion, recommendation, vote or exercise of discretion as a public servant or otherwise violated TEXAS PENAL CODE (Title 8 – Offenses Against Public Administration) § 36.02, which constitutes an act of racketeering pursuant to 18 U.S.C. § 1961(1)(A). Details regarding the bribes set out in the RICO Statement.

**Bankruptcy Fraud.**

64.     Zaretsky knowingly and fraudulently concealed from the U.S. Trustee, as well as from creditors (including Plaintiffs) property belonging to the estate of the J&T debtor in connection with the J&T bankruptcy in violation of Title 18 U.S.C. §§ 152, which prohibits the

knowing and fraudulent concealment of a debtor's assets from creditors or the United States Trustee. Zaretsky further made false or fraudulent representations in connection with the J&T bankruptcy for the purpose of executing or concealing a scheme or artifice to defraud. Additionally, on September 4 and December 18, 2008, Lahr knowingly and fraudulently filed false proofs of claim in the J&T bankruptcy proceeding for the purpose of attempting to execute or conceal a scheme or artifice to defraud in violation of Title 18 U.S.C §§ 152, thereby making false oaths in violation of the statute.

65. Moreover, on February 12, 2008, IBC's attorney, Roy Snodgrass, informed Savrick that IBC had also posted the 414 acres of Wildhorse Ranch for foreclosure. To stay the foreclosure proceedings on March 3, 2008, CFS bankruptcy attorney Mark Taylor filed involuntary petitions of bankruptcy against both J&T and J-Tail. Further details regarding this bankruptcy fraud can be found in the RICO Statement.

**Additional Acts of Mail Fraud/Wire Fraud in Furtherance of Scheme to Defraud**

66. Defendants committed the following additional acts of mail and wire fraud in furtherance of their scheme to defraud. The purpose of these acts was to conceal the fraud and place the fruits of the fraud beyond the ability of Plaintiffs to reach them by judgment.

A.     **NAT and Williams – 18 U.S.C. § 1956(a)(1)(A)(i) and (B).**

67. NAT and Williams' intentional diversion of Vodicka and Aubrey's escrowed property deposited with NAT on or about February 2 to 15, 2007, to Frontier Acquisitions, First State Bank Central Texas loan transaction, and others, together with the diversion of Tutor's escrowed property deposited with NAT to the Brooklyn bank account of Borokhovich's post office box, which acts directly injured Plaintiffs, promoted the carrying on of unlawful activity, the mail and/or wire fraud alleged in this Complaint, as well as other acts of racketeering.

---

**B.      NAT, Williams, and Zaretsky – 18 U.S.C. § 1956(a)(1)(A)(i) and (B).**

68.      NAT and Williams' converted a $1.1 million wire from Zaretsky to Minerva in its escrow account on June 21, 2007, which was not associated with any real estate closing, a minimum requirement under the Texas Insurance Code. This money was paid in connection with the transfer from AIF (Charles Nichols) to G.S. Real Estate Investments, L.P., a company controlled by Gennady Schulman (**"Schulman"**). The payment from Zaretsky to Minerva concealed the true source of funds from Schulman to AIF. NAT, Williams, and Zaretsky knew that the 40-acre tract was being optioned to AIF, and they concealed the lack of title to the entire 414 acres from Plaintiffs.  NAT and Williams also failed to report the transfer to the appropriate taxing authorities as required by law.

**C.      NAT, Williams, Turner, and the Topfers – 18 U.S.C. § 1956(a)(11)(A)(i) and B).**

69.      NAT, Williams, Turner, and the Topfers knowingly made a $517,671.28 payment to A.R. Homes on or about November 17, 2006, on account of a fictitious lien, using the funds of Independent Bank's (funded) $1.5 million loan knowing that this transaction was designed, in whole or in part, to conceal the nature, source, ownership, and control of the proceeds of bank fraud. NAT, Williams, Turner, and the Topfers knew that this property was involved in a financial transaction (the 67 acres) representing the proceeds of unlawful activity with the intent to carry on the Scheme (financial institution fraud).

**D.      Barlin, Lahr, Zaretsky, NAT, and Williams – 18 U.S.C. § 1956(a)(1)(A)(i) and (B).**

70.      Barlin, Lahr, and Zaretsky's secret Side-Deal, alleged at paragraphs 41 and 42 herein and incorporated by reference for all purposes, was concealed by three different NAT

---

certified HUD-1 settlement statements. The Side-Deal was concealed from Vodicka/Aubrey's HUD-1, Tutor's HUD-1, and First State Bank Central Texas' HUD-1.

**E.** **Barlin and Lahr – 18 U.S.C. § 1956(a)(1)(A) and (B).**

71. The following three (3) transactions each constitute further evidence of money laundering: (i) the assignment by Lahr to Vodicka related to Aubrey's $500,000 check to Barlin for Lahr's fictitious ownership position in CFS Loan No. 2; (ii) the assignment by Lahr of his fictitious ownership position in CFS Loan No. 2 to CLC for no consideration; and (iii) the four collateral limited assignments by CLC to Martin and Gay McNair, Jim Williams, Maria Sideman, and Larry Chaney, which concealed the true nature, location, source, ownership, and control of CFS Loan No. 2 by Barlin.

72. CLC's two falsified proofs of claim filed by or at the direction of Lahr further concealed the true source, ownership, and nature of CFS Loan No. 2 by Barlin. The payments were not made to Lahr, but to Barlin. The promissory note, two (2) deeds of trust, agreement with falsified CFS internal records, falsely reflected Lahr as the owner – concealing Barlin. By receiving payments directly from Aubrey ($500,000), Martin and Gay McNair ($125,000), and Chaney ($200,000), and indirectly from Williams ($85,000) and Snider ($75,000), Barlin and Lahr intended to promote and carry on the Scheme and these financial transactions represented proceeds of unlawful activity that concealed their true nature, source, ownership, and control of the proceeds by Barlin.

**F.** **Wolf, Zaretsky, Borokhovich, and Turner - 18 U.S.C. § 1956.**

73. These Defendants took wired funds from the Krots for the Wildhorse Ranch and then transferred the proceeds to the Sky Group of Texas Citibank account in Brooklyn, New York to be paid as follows: (i) Serebro for an insufficient funds check in the amount of

$10,455.00; (ii) ABC Bank to Zaretsky & Sons for past due interest of $7,361 on Sky Village Manor; (iii) $52,000 unknown cash withdrawals; (iv) $1,500 to Jeff Turner; (v) American Express debit withdraws totaling $11,334.01; (vi) ABC Bank received $9,360; (vii) Sky Development's earnest money deposit of $20,000 to Diane and Denis Jasek for 170 acres of farm land near Coupland, Texas; and (viii) $5,000 to Turner and others.

### G.    Turner – 18 U.S.C. § 1956.

74.    As part of the Bernard National Loan Investors $11 million RICO injury, on October 17, 2006, Turner executed a written letter, on J&T letterhead, that listed Turner's home address in Manor, Texas. The letter directed Fidelity National Title Insurance Company (**"Fidelity"**) to pay Serebro's IOLTA account $1,578,765.57, a payment that was not reflected on the settlement statement dated October 16, 2006, regarding the closing of the transaction whereby J&T sold 200 acres of Wildhorse Ranch to Waterfall Gallery. Turner also executed falsified settlement statements used in this transaction.

## VII. CAUSES OF ACTION

### A.    COUNT ONE:  VIOLATIONS OF RICO PURSUANT TO 18 U.S.C. § 1962(c).
*(Against Zaretsky, Borokhovich, Williams, NAT, and Turner)*

75.    Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

### *The Enterprises*

76.    The following legal entity constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c): J&T Development Group, LP.

    (a) Zaretsky, Borokhovich, Williams, NAT, and Turner are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or

participated in the conduct of said enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).

(b) Zaretsky, Borokhovich, Williams, NAT and Turner's pattern of racketeering activity consisted of, but was not limited to, the acts of extortion (described in ¶¶ 55 herein and at page 8 of the RICO Statement), mail and wire fraud (described in ¶¶ 56 – 59 herein and pages 9 – 11 of the RICO Statement), interstate transportation of stolen property (described in ¶ 60 herein and pages 11 – 12 of the RICO Statement), bank fraud (described in ¶ 61 herein and pages 12 – 14 of the RICO Statement) , obstruction of justice (described in ¶ 62 herein and page 14 of the RICO Statement), and bribery (described in ¶ 63 herein and page 14 -16 of the RICO Statement).

77.     In the alternative to paragraph 76, the following legal entity constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c): NAT.

(a) Zaretsky, Borokhovich, Williams, and Turner are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of said enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).

(b) Said pattern of racketeering activity consisted of, but was not limited to, the acts of extortion (described in ¶ 55 herein and at page 8 of the RICO Statement), mail and wire fraud (described in ¶¶ 56 – 59 herein and pages 9 – 11 of the RICO Statement), interstate transportation of stolen property (described in ¶ 60 herein and pages 11 – 12 of the RICO Statement), bank fraud (described in ¶ 61 herein and pages 12 – 14 of the RICO Statement) , obstruction of justice (described in ¶ 62 herein and page 14 of the

RICO Statement), and bribery (described in ¶ 63 herein and page 14 -16 of the RICO Statement).

78.     In the alternative to paragraphs 76 and 77, the following individual constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c): Williams.

(a) Zaretsky, Borokhovich, and Turner are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Williams through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).

(b) Said pattern of racketeering activity consisted of, but was not limited to, the acts of extortion (described in ¶ 55 herein and at page 8 of the RICO Statement), mail and wire fraud (described in ¶¶ 56 – 59 herein and pages 9 – 11 of the RICO Statement), interstate transportation of stolen property (described in ¶ 60 herein and pages 11 – 12 of the RICO Statement), bank fraud (described in ¶ 61 herein and pages 12 – 14 of the RICO Statement , obstruction of justice (described in ¶ 62 herein and page 14 of the RICO Statement), and bribery (described in ¶ 63 herein and page 14 -16 of the RICO Statement).

79.     In the alternative to paragraphs 76 through 78, the following individuals and entities (or any combination thereof) constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Group Enterprise"): Zaretsky, Borokhovich, Williams, NAT, J&T, Blue Buff Ventures LLC, and Turner.

(a) Zaretsky, Borokhovich, Williams, NAT, and Turner are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated

in, engaged in, and operated and managed the affairs of the Group Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).

(b) The members of the Group Enterprise shared the common purpose of (among other things) defrauding Plaintiffs and other lenders of money or property provided to Wildhorse Ranch. The members of the Group Enterprise were related in that they were all direct or indirect agents of Zaretsky and all participated in orchestrating the transactions at issue. The Group Enterprise possessed sufficient longevity for the members to carry out their purpose(s) in that the Group Enterprise existed from 2005 through, at least, 2008, and achieved their goal of defrauding Plaintiffs.

(c) Said pattern of racketeering activity consisted of, but was not limited to, the acts of extortion (described in ¶ 55 herein and at page 8 of the RICO Statement), mail and wire fraud (described in ¶¶ 56 – 59 herein and pages 9 – 11 of the RICO Statement), interstate transportation of stolen property (described in ¶ 60 herein and pages 11 – 12 of the RICO Statement), bank fraud (described in ¶ 61 herein and pages 12 – 14 of the RICO Statement , obstruction of justice (described in ¶ 62 herein and page 14 of the RICO Statement), and bribery (described in ¶ 63 herein and page 14 -16 of the RICO Statement). Each of Wolf, Zaretsky, Borokhovich, Williams, NAT, J&T, Blue Buff Ventures LLC, and Turner poses or posed a continuous threat of engaging in these racketeering acts.

80. At all relevant times, the enterprises alleged in paragraphs 76 through 79 (*supra*) were engaged in, and their activities affected, interstate commerce and foreign commerce.

*Pattern of Racketeering*

81.     Defendants' acts of racketeering were related in that their purpose was to defraud Plaintiffs and others who were fraudulently induced to transfer money to unlawfully benefit Defendants.  The acts of racketeering had the same result for all victims, *i.e.,* all victims never saw their money again.   The acts of racketeering were committed by the same participants including Zaretsky, Borokhovich, Williams, NAT, Turner, Lahr, Gunn, and Barlin.  The victims were all similar in that they were individuals who were seeking safe and relatively low risk opportunities.   The methods of commission were the same with regard to all victims, *e.g.,* Defendants fraudulently concealed how the victims' funds would truly be disbursed and falsely represented the nature of the property and opportunity presented by it.

82.     Defendants' acts of racketeering were also sufficiently continuous. Defendants' acts extended over a substantial period of time, beginning in, at least, December 2004, and continuing through, at least, October 2010. In the alternative, the continuity was open-ended because the criminal conduct threatened to extend indefinitely into the future at the time it was occurring.  Defendants have repeatedly demonstrated an ability to evolve and modify their scheme to defraud as circumstances warrant.  All of this demonstrates that, unless stopped by law enforcement or the courts, Defendants' acts of racketeering have become a regular way in which the Defendants do business and threatened to continue indefinitely. If some or all of these Defendants are no longer engaged in the acts of racketeering described herein, it is only because their Scheme has been fortuitously interrupted by investigations, lawsuits, or other legal actions. The fortuitous interruption of a pattern of racketeering activity by law enforcement or litigation does not obviate the threat of indefinite duration otherwise posed by the acts of racketeering.

*RICO Damages*

83.      As a direct and proximate result of, and by reason of, the activities of Zaretsky, Borokhovich, Williams, NAT, and Turner, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages, and Defendants were enriched, to the extent that Zaretsky, Borokhovich, Williams, NAT and Turner fraudulently induced them into loaning money and defrauded them of their money. Plaintiffs are, therefore, entitled to recover treble damages they sustained together with disgorgement of all profits of the Scheme, the costs of the suit, including costs, reasonable attorney's fees, costs of investigation, and reasonable experts' fees.

**B.      COUNT TWO:  VIOLATIONS OF RICO PURSUANT TO 18 U.S.C. § 1962(d).**
***(Against Zaretsky, Borokhovich, Williams, NAT, Turner, and Lahr)***

84.      Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

85.      Borokhovich, Williams, NAT, and Turner conspired with Zaretsky to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra* ¶¶ 76 - 79) through a pattern of racketeering activity (*see supra* ¶¶ 29 - 42 and 55 - 74) in violation of 18 U.S.C. § 1962(d). In particular, Borokhovich, Williams, Turner, and NAT intended to further an endeavor of Zaretsky which, if completed, would satisfy all of the elements of a substantive RICO criminal offense under 18 U.S.C. § 1962(c), and adopted the goal of furthering or facilitating the criminal endeavor, as evidenced by Borokhovich's, Williams', Turner's, and NAT's actions in furtherance of Zaretsky's violation of section 1962(c).

86.      In the alternative, Borokhovich and Turner conspired with Williams/NAT to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra* ¶¶ 76 - 79) through a pattern of racketeering activity (*see supra* ¶¶ 29 - 42 and 55 - 74) in

violation of 18 U.S.C. § 1962(d). In particular, Borokhovich and Turner intended to further an endeavor of Williams'/NAT's which, if completed, would satisfy all of the elements of a substantive RICO criminal offense under 18 U.S.C. § 1962(c), and adopted the goal of furthering or facilitating the criminal endeavor, as evidenced by Borokhovich's and Turner's actions in furtherance of Williams' violation of section 1962(c).

87.     Further in the alternative, Barlin, Lahr, and Gunn conspired with Zaretsky, Williams, NAT and Turner to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra* ¶¶ 76 - 79) through a pattern of racketeering activity (¶¶ 29 – 42 and 55 - 74) in violation of 18 USC § 1962(d). In particular, Barlin, Lahr, and Gunn intended to further an endeavor of Zaretsky's and the other Defendants' which, if completed, would satisfy all of the elements of a substantive RICO criminal offense pursuant to 18 USC § 1962(c), and adopted the goal of furthering or facilitating the criminal endeavor, as evidenced by the other Defendants' actions in furtherance of Zaretsky's violation of 18 USC § 1962(c).

88.     Plaintiffs were injured by Zaretsky's, Borokhovich's, Williams', NAT's, Turner's, Barlin's, Lahr's, and Gunn's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which consisted of, but were not limited to, the acts of extortion (described in ¶ 55 herein and at page 8 of the RICO Statement), mail and wire fraud (described in ¶¶ 56 – 59 herein and pages 9 – 11 of the RICO Statement), interstate transportation of stolen property (described in ¶ 60 herein and pages 11 – 12 of the RICO Statement), bank fraud (described in ¶ 61 herein and pages 12 – 14 of the RICO Statement) , obstruction of justice (described in ¶ 62 herein and page 14 of the RICO Statement), and bribery (described in ¶ 63 herein and page 14 -16 of the RICO Statement).

89.     As a direct and proximate result of, and by reason of, the activities of Zaretsky, Borokhovich, Williams, NAT, Turner, Barlin, Lahr, and Gunn and their conduct in violation of

18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages to the extent that Zaretsky, Borokhovich, Williams, NAT, Turner, Barlin, Lahr, and Gunn defrauded them of money. Plaintiffs are, therefore, entitled to recover treble damages they sustained together with disgorgement of all profits of the Scheme, the cost of the suit, including costs, reasonable attorneys' fees, costs of investigation and reasonable experts' fees.

C.  **COUNT THREE: NEGLIGENCE AND GROSS NEGLIGENCE.**
    *(Tutor's Claim Against NAT)*

90.    Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

91.    NAT and Williams owed a duty of care to Tutor. NAT and Williams breached their duty of care, which proximately caused Plaintiffs' injuries.

92.    The harm with respect to which Plaintiffs seek recovery results from fraud or gross negligence. Plaintiffs seek judgment against NAT and Williams for actual damages, exemplary damages, disgorgement of all profits of the Scheme, court costs, investigative costs, attorneys' fees, pre- and post-judgment interest, and an accounting.

D.  **COUNT FOUR:  BREACH OF FIDUCIARY DUTIES.**
    *(Against Lahr, and Gunn)*

93.    Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

94.    Defendants Lahr and Gunn owed fiduciary duties to Plaintiffs as their loan brokers. The fiduciary duties owed by Defendants included duties of loyalty, candor, fair dealing, and full disclosure. As detailed in herein and in the RICO Statement, Defendants

breached such duties by reason of each misrepresentation, nondisclosure, and act of deception and fraud carried out against Plaintiffs.

95. Such breaches of fiduciary duties proximately caused Plaintiffs to suffer damages. Defendants are jointly and severally liable to Plaintiffs for actual damages and disgorgement of all fees and compensation obtained from Plaintiffs by Defendants, and disgorgement of all profits of the Scheme. Defendants are also liable to Plaintiffs for exemplary damages.

E.    **COUNT FIVE:  BREACH OF FIDUCIARY DUTIES.**
     ***(Tutor's Claim Against NAT and Williams)***

96. Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

97. As the closing and escrow agent for Tutor, NAT and Williams owed Tutor fiduciary duties, including but not limited to loyalty, honesty, candor, full disclosure, and to conserve money and pay it only to those persons entitled to receive it. NAT and Williams breached their fiduciary duties to Tutor by, among other things, failing to comply with the closing instructions, disbursing the loan proceeds contrary to instructions and/or persons other than the borrower as indicated on the wiring instructions, preparing incorrect settlement statements, amending settlement statements well after the close of the transaction without authorization according to state law and industry standards, creating false documents, allowing the other Defendants and J&T to use the escrow accounts as a *de facto* bank, and transferring the loan proceeds to third parties other than J&T for uses other than payment of the first lien.

98. Said breaches caused damage to Tutor and/or resulted in improper benefit to NAT and Williams. Plaintiffs seek judgment against NAT and Williams for actual damages, exemplary damages, disgorgement of benefit, disgorgement of all profits of the Scheme, court costs, investigative costs, attorneys' fees, pre- and post-judgment interest, and an accounting.

F.   **COUNT SIX:   AIDING AND ABETTING LIABILITY FOR BREACH OF FIDUCIARY DUTY.**
     *(Against Barlin, NAT, and Williams Only)*

99.    Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

100.    Lahr and Gunn breached their fiduciary duties to Plaintiffs in connection with their loans, which caused damage to Plaintiffs and/or resulted in improper benefit to Barlin, NAT, and Williams, as well as Lahr and Gunn. Barlin knowingly participated in said breaches and therefore is jointly and severally liable with Lahr and /or Gunn. Further, NAT and Williams knowingly participated and aided Lahr's and Gunn's breaches of their fiduciary duties, and therefore they are also jointly and severally liable.

101.    Plaintiffs seek recovery against Barlin for their actual damages, exemplary damages, disgorgement of benefits, disgorgement of all profits of the Scheme, court costs, attorneys' fees, and pre- and post-judgment interest.

G.   **COUNT SEVEN: COMMON-LAW FRAUD/FRAUDULENT INDUCEMENT.**
     *(Against Gunn, Lahr, and Barlin Only)*

102.    Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

103.    As detailed above and in the RICO Statement at pages 17 - 23, Gunn, Lahr and Barlin made numerous false representations to Plaintiffs. More specifically, Lahr, Barlin, and Gunn solicited Plaintiffs to loan money for the development of Wildhorse Ranch. These Defendants made numerous representations/omissions to Plaintiffs. The following false statements/omissions, among others, were made to Plaintiffs, or their agents: (i) Plaintiffs would be part of a loan with other lenders; (ii) Plaintiffs were loaning money to Zaretsky and Turner; (iii) Zaretsky and Turner owned the land within the Wildhorse Ranch, including the 100-acre and

414-acre tracts; and (iv) J&T pledged the 414-acre tract as security for the loan. All of these representations were false.

104.    Moreover, it was also not disclosed to Plaintiffs a 40-acre tract out of the original 414 acres of the Wildhorse Ranch had been optioned away to AIF, a company related to Wildhorse Investments, the original seller. Further, it was not disclosed that the 40-acre tract had been burdened by a multi-million dollar obligation to AIF.  Had these facts been disclosed to Plaintiffs, they would not have loaned any money to J&T.

105.    Gunn, Lahr and Barlin made the following misrepresentations to Plaintiffs: (i) providing false promotional materials to Plaintiffs including the Investment Summary that was later destroyed; (ii) representing that the loans would be over-collateralized by acreage (100 and 414) within the Wildhorse Ranch, which was untrue; (iii) failing to disclose that Zaretsky paid CFS, Gunn, Lahr, and Barlin for bringing Plaintiffs and other lenders to J&T; (iv) providing Lahr and Gunn with false real estate appraisals; (v) directing Lahr and Gunn to transmit the false appraisals and other documents to lenders; and (vi) failing to disclose kickback schemes.

106.    As detailed hereinabove and in the RICO Statement, Defendants failed to disclose material information to Plaintiffs when they had a duty to do so. Specifically, Lahr and Barlin had a duty to disclose information to Plaintiffs because: (a) of the existence of a fiduciary or special relationship of trust and confidence with the Plaintiffs; (b) they discovered new information that made their earlier representations misleading or untrue; (c) they created a false impression by making a partial disclosure; and/or (d) they voluntarily disclosed some information and therefore had a duty to disclose all of it.

107.    All Defendants benefited by not disclosing the falsity of their misrepresentations. Gunn, Lahr and Barlin each made these false representations or promises, or failed to disclose

information when they had a duty to do so, for the purpose of inducing Plaintiffs to loan money. Each of these representations or promises was material in that a reasonable person would attach importance to and be induced to act on the information in determining whether to enter into a mortgage loan transaction.

108. At the time these representations were made, Gunn, Lahr and Barlin either knew the representations were false, or made the representations recklessly, as a positive assertion, and without knowledge of their truth. The representations were made with the intent that Plaintiffs act upon them. Plaintiffs did in fact actually and justifiably rely upon these representations, which caused them to suffer injuries.

109. Each of these omissions was material in that a reasonable person would have considered the omitted information important in deciding the course of action to take. Reliance is presumed since a reasonable investor would have considered this information important in deciding whether to invest. Plaintiffs actually and justifiably relied on this information in that they would not have invested had they known the true ownership of the investments

110. Specifically, in reliance on Lahr's, Barlin's, and Gunn's misrepresentations, Vodicka/Aubrey wired $415,133.24 on January 30, 2007, to NAT for the purpose of funding their loan to J&T. This loan was pooled with other lenders in CFS Loan No. 2. Gunn, on behalf of CFS, directed Vodicka/Aubrey, and Tutor to wire their money to NAT "f/b/o J&T Development Group" and gave Plaintiffs wiring instructions. NAT's guaranty File No. was 14565-07-00031. Had the true facts regarding this transaction been disclosed to Plaintiffs, they would not have loaned any money to the non-existent straw entity J&T.

111. Moreover, in reliance on Caufmann's and Lahr's representations, Tutor caused three wires totaling $600,000 on March 12, 2007, to NAT for the purpose of funding his loan to

J&T. Tutor's loan was to be pooled with other lenders in CFS Loan No. 1. Gunn, on behalf of

CFS, also instructed Tutor to wire his money to NAT "f/b/o J&T Development Group" and gave

Tutor wiring instructions. Had the true facts regarding this transaction been disclosed to Tutor,

he would not have loaned any money to the non-existent straw entity J&T.

112.    The representations and promises made by Gunn, Lahr and Barlin were made

directly to Plaintiffs. Alternatively, these representations and promises were made indirectly to

Plaintiffs, and Gunn, Lahr and Barlin intended Plaintiffs to hear and act upon these

representations and promises. Plaintiffs relied upon these representations in entering into the loan

contracts, which proximately caused them injuries.

113.    Lahr and Barlin knew the Plaintiffs did not know this information and did not

have an equal opportunity to discover this information. Defendants deliberately failed to inform

Plaintiffs of these facts, and in so doing intended to induce Plaintiffs into taking some action or

refraining to act. Plaintiffs were injured as a result of acting without knowledge of these facts.

114.    Gunn, Lahr, and Barlin are jointly and severally liable to Plaintiffs for actual

damages, exemplary damages, pre- and post-judgment interest, disgorgement of all profits of the

Scheme, and court costs.

**H.      COUNT EIGHT: NEGLIGENT MISREPRESENTATION.**
         (*Against Barlin, Lahr, & Gunn*)

115.    Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully

set forth herein.

116.    Defendants further made representations set forth herein and in the RICO

Statement. These representations were made in the course of those certain Defendants' business

and/or in a transaction in which those certain Defendants had an interest. These representations

were false and were supplied for the guidance of Plaintiffs. Pleading in the alternative to the

extent necessary, those certain Defendants did not exercise reasonable care or competence in obtaining this information. Plaintiffs in fact relied upon said representations in deciding to invest, and said reliance was reasonable and justified. Plaintiffs were injured as a proximate result of said representations and their reliance thereupon. Defendants are jointly and severally liable to Plaintiffs for actual pecuniary damages, consequential damages, exemplary damages, disgorgement of all profits of the Scheme, pre and post-judgment interest, and court costs.

I. **COUNT NINE: VIOLATIONS OF THE TEXAS SECURITIES ACT (TEX. REV. CIV. STAT. ART. 581-1, *et seq.*)**
**(*Against Barlin, Lahr, and Gunn Only*)**

117.    In the alternative to Plaintiffs' RICO claims, Vodicka/Aubrey's Temple Loan, Manor Loan, and Long Beach Loan each constitutes a security within the meaning of the Texas Securities Act, TEX. REV. CIV. STAT. ART. 581-1, *et seq.* (the **"Texas Securities Act"**).

118.    Defendants sold securities by means of a scheme to defraud and through false statements of material facts and/or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The representations and omissions were material because they would have significantly affected the investment decisions of a reasonable investor, and a reasonable investor would consider such information important in deciding whether to invest.

119.    Vodicka/Aubrey seek to recover damages in excess of $2 million from three injuries: (1) the Temple Loan of $120,000; (2) the Manor Loan of $915,000; and (3) the Long Beach Loan of $140,000. Vodicka/Aubrey made these loans either by purchasing loan positions from CFS (acting through Lahr and Barlin, and under Gunn and Lahr's direction and control) or by purchasing existing loan positions already held by Lahr and/or Barlin. Lahr and Gunn exercised control over CFS, and Lahr and Barlin acted as agents of CFS in committing the fraud

(through affirmative misrepresentation, omission, and deceptive conduct). Plaintiffs were induced into the three loans by material misrepresentations and omissions that failed to correct material misrepresentations specifically related to each loan.

120. As persons selling securities, these Defendants were required to register as broker-dealers or registered representatives under the Texas Securities Act, and were required to register the securities sold to Vodicka/Aubrey. They did neither. Therefore, Defendants are liable for statutory rescission or damages, including interest, as well as costs, attorneys' fees, and post-judgment interest.

121. Accordingly, Defendants are liable to Vodicka/Aubrey for statutory rescission or damages, including interest. In addition, Defendants are liable for costs and attorneys' fees, as well as for exemplary damages and disgorgement of all profits of the Scheme. Vodicka/Aubrey further seek recovery of post-judgment interest. Finally, Gunn and Lahr controlled the entities that sold securities to Vodicka/Aubrey. Therefore, Gunn and Lahr are jointly and severally liable for these claims. Defendant Barlin directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aided Lahr and Gunn in the sale of securities. Therefore, Barlin is jointly and severally liable with Lahr and Gunn for these claims.

### *Defendants Failed to Register as Broker-Dealers or Registered Representatives.*

122. Defendants Barlin, Lahr and Gunn sold the securities in and from Texas to persons residing and domiciled in Texas and outside of Texas. These Defendants were required to register as broker-dealers or registered representatives under the Texas Securities Act.

123. Pursuant to the Texas Securities Act, a person who is not registered to sell securities as required by law cannot sell securities in or from Texas. A person who violates this proscription is liable to the buyer of the security for rescission or damages.

*Defendants Failed to Register the Securities*

124.   Defendants Barlin, Lahr, and Gunn failed to register the securities sold to Plaintiffs.  Pursuant to the Texas Securities Act, securities must be registered before they can be sold.  A person cannot sell unregistered securities in or from Texas.

125.   The securities were not registered. Therefore, Defendants are liable to the buyers of the security for statutory rescission or damages, including interest. Defendants are further liable to Vodicka/Aubrey for costs and attorneys' fees. Vodicka/Aubrey also seek recovery of post-judgment interest.

*Primary Violations – Untrue Statements of Material Fact or Failing to State a Material Fact Necessary to Clarify Otherwise Misleading Statements.*

126.   Moreover, pursuant to the Texas Securities Act, a person who offers or sells a security by means of a scheme to defraud and/or an untrue statement of material fact and/or an omission to state a material fact that is necessary in order to make the statements, in the light of the circumstances under which they are made, not misleading, is liable to the buyer for rescission or damages. No intent, reliance, loss causation, due diligence, or that the loss could not have been avoided under the Texas Securities Act is required, only a showing of materiality.

127.   Specifically, Lahr, Gunn, and CFS created, packaged, and along with the assistance of Barlin and others, marketed and sold a series of mortgage loans purportedly backed by real estate and other valuable collateral to Plaintiffs and other third parties. Many of the Defendants also had relationships with another one of Lahr's entities, Capital Advantage. In fact, Lahr was the principal broker and controlled Capital Advantage, and he was also a borrower. Gunn was a defrauded lender, and Barlin was also a lender. [12]

---

[12] Lahr and Barlin have been friends for over 20 years. When Lahr is in Austin, Lahr resides in Barlin's guest-quarters. From this relationship as well as his involvement in the Austin business

128.    Lahr and Gunn (while her lawsuit against Lahr's Capital Advantage was still pending) subsequently formed new companies to carry on the same Scheme as Capital Advantage. On August 8, 2003, Gunn created CFS. Gunn controlled CFS at all relevant times as owner, and later, as co-owner with Koons. Gunn was President, registered agent, disbursement agent of monies instructing the attorney in preparing loan documents, issuer of Form 1099s to various promoters, such as Lahr, Caufman, Koons and herself (curiously not including Barlin), and made strategic decisions on not taking title insurance on property promoted at $49 million, not obtaining an Abstract of Title for $300, not obtaining tax returns or account verifications, and not obtaining credit reports for $50/month. Lahr also controlled CFS, as he received 85% of compensation of loan referral fees. Lahr, along with Gunn, made all decisions regarding loans would be created, packaged, marketed, and offered by CFS.

129.    Lahr and Gunn, both acting through and as control persons of CFS, used the services of persons such as Barlin to assist them with locating lenders and borrowers, and they compensated these people with finder's fees paid from proceeds of the loans.

130.    The operations of CFS were essentially identical to the former Capital Advantage. CFS advertised itself as a one-stop-shop that would locate, vet, and service lending opportunities for persons such as Plaintiffs. Despite the name change to CFS, Gunn and Lahr simply continued

---

community, Barlin became intimately familiar with Lahr's business and investment opportunities as well as the lawsuits against Lahr and Capital Advantage brought by defrauded investors. In addition, Barlin often participated in the investments directly as an investor or indirectly as a lender to Lahr, who in turn served as the investor. Unlike other investors, however, Barlin was given preferential treatment in the form of better returns and security. Unlike the other investors, neither Barlin nor any of Barlin's relatives lost money on Lahr-brokered deals because they had the inside-track on information from Lahr about when to jump out of the investment, or Lahr personally absorbed the loss to protect the relationship with Barlin. Lahr assisted Barlin and his family in moving out of investments that were no longer attractive or secure. Lahr and Barlin simply palmed off the investments on unsuspecting new investors such as Plaintiffs by trumpeting the virtues of the investment which they no longer though prudent enough for themselves.

---

**PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT**

to use the same business model and advertisements of Capital Advantage. For example, Capital Advantage published documents representing that: (1) Capital Advantage specialized in providing short-term financing to professional real estate developers; (2) its clients – lenders such as Vodicka/Aubrey/Tutor – were fully collateralized by Trust Deeds that did not exceed attractive loan-to-value ratios (50%-65%); (3) Capital Advantage conducted extensive due diligence on the borrowers and the lending opportunities (including personally inspecting the collateral property and surrounding area to corroborate the appraisal and the borrower's plan for the loan, obtain and review all documents related to the property/loan, etc.) to determine they were sound; and (4) the loans were secured by Trust Deeds against real property. Gunn and Lahr caused CFS to make all of these same representations, both orally and in writing. CFS, Barlin, Lahr (acting on behalf of himself), and Gunn, made these representations to Vodicka/Aubrey and they relied upon them to their detriment as set forth herein below.

131. Vodicka/Aubrey seek to recover damages in excess of $2 million from three such injuries: (1) the Temple Loan of $120,000; (2) CFS Loan No. 2 (a/k/a the "Manor" Loan) of $915,000; and (3) the Long Beach Loan of $140,000.[13] Vodicka/Aubrey made these loans either by purchasing loan positions from CFS (acting through Lahr and Barlin, and under Gunn and Lahr's direction and control) or by purchasing existing loan positions already held by Lahr

---

[13] Vodicka/Aubrey purchased other loans created, packaged, marketed, and sold by Defendants. Plaintiffs do not make claims for these loans. The absence of damages from these loans should not be interpreted as validating their legitimacy. Vodicka and Aubrey did not avoid any loss, as their principal was recycled into other Lahr, CFS, and Barlin promoted mortgage loans. For example, Lahr re-cycled Plaintiff's Vodicka and Aubrey from of a purported loan on Six Flags Mall to pay Barlin the additional $500,000 in Manor – CFS Loan No. 2. Six Flags Mall and its multi-million dollar myriad of real estate loans collapsed into bankruptcy shortly thereafter, wiping out all CFS customers' loans. Years later, Plaintiffs learned their CFS borrower and operator of Six Flags Mall, who worked with Lahr in various other North Texas real estate loans, was convicted real estate felon Thomas E. Morris. Then, to top it off, Plaintiff's later learned the metes and bounds legal description of their prior Six Flags Mall loan was, in actuality, a totally separate government-condemned and demolished mall in Arlington, Texas – Forum 303.

and/or Barlin. Lahr and Gunn exercised control over CFS, and Lahr and Barlin acted as agents of CFS in committing the fraud (through affirmative misrepresentation, omission, and deceptive conduct). All players received windfall compensation for their efforts in furtherance of the Scheme. Both Barlin and Lahr obtained secret commissions and kickbacks from the loans for referrals of borrowers and lenders. Gunn received outsized compensation directly from the transactions, as well as for purported servicing of the loans.

132.    As detailed herein, Plaintiffs Vodicka/Aubrey were lured into the three loans at issue by material misrepresentations and omissions specifically related to each loan. However, well before Vodicka/Aubrey made the first of the three loans, Barlin and Lahr made initial misleading statements and outright misrepresentations that drew Vodicka/Aubrey into their fraudulent Scheme in the first place.

133.    Barlin and Lahr acted with scienter when they made the misrepresentations regarding the three loans as part of a device, artifice, and/or scheme to defraud – namely, a Ponzi scheme. Barlin knew that Lahr's customers had lost money in the past and had filed lawsuits. During the pendency of those suits, Lahr lived and received mail at Barlin's home in Austin, Texas, and attempts were made to serve subpoenas on Lahr at Barlin's home. More fundamentally, Barlin and Lahr had been friends and business partners for over twenty years, using the same business address on real property records filed with the Travis County Clerk. Barlin knew that Lahr controlled and was the principal broker for Capital Advantage—the entity that no fewer than seven prior lenders had sued. Gunn knew Special Agent Evan Rae of the FBI was investigating the operations of Capital Advantage. Furthermore, Lahr later admitted that he did not personally meet with borrowers or personally inspect the properties that served as collateral on the loans. These facts, combined with the personal benefits that Lahr and Barlin

stood to receive, raise a strong inference that Barlin and Lahr intentionally deceived, or at least were highly reckless in deceiving, Vodicka/Aubrey.

134.    Vodicka/Aubrey actually and justifiably relied on these initial misrepresentations and omissions in deciding to make each of the three loans at issue. That is, Vodicka/Aubrey would not have participated in any of Lahr's loans had they known that Lahr's past customers had not only lost money but had sued Capital Advantage for exactly the type of fraud that Lahr would later perpetrate on them. Further, had they known that Lahr—the supposed expert in Texas and California real estate—would not conduct basic due diligence on the borrowers and collateral, they would have declined the "safe and sound" opportunity, much less advance more than $1 million in his real estate loan program.

### *The Temple Loan.*

135.    The Temple Loan was created, packaged, and offered by CFS (at the direction of Lahr and Gunn) and promoted and sold by Lahr and Barlin as the agents of CFS. The loan was purportedly secured by a second lien position against an apartment complex in Temple, Texas. Vodicka/Aubrey purchased the $70,000 initial tranche directly from Lahr, who assigned his personal interest to Vodicka/Aubrey. They purchased the $50,000 second tranche from CFS through Lahr. Vodicka/Aubrey suffered damages of no less than $75,896 on this loan.

136.    In justifiable reliance on material representations set forth in paragraph 142, Vodicka/Aubrey wrote Lahr a $70,000 check to purchase his existing second lien position in Temple property, and agreed to close by wire to the title company an additional $50,000 loan against the property on June 9, 2006.

137.    Lahr personally benefitted from his misrepresentations and omissions in several ways. Most obviously, he successfully unloaded onto Vodicka/Aubrey his personal position in

the Temple Loan, which he knew was not viable. In fact, although Lahr sold his interest to them for $70,000, he purportedly only had a position of $50,000. However, Lahr likely did not even have a $50,000 position. Therefore, not only did Lahr avoid the losses that Vodicka/Aubrey would later suffer, he also made $50,000 off the top by charging them for his position which never existed. Of course, Lahr obtained multiple other benefits as well: (1) he received tens of thousands of dollars in commissions from re-cycling the loan to Vodicka/Aubrey; (2) he received brokerage fees; and (3) by distributing their loan proceeds to other lenders on unrelated loans in default, he was able to maintain the illusion that his Private Trust Deed loan program was legitimate and successful.

138.    Lahr made each misrepresentation/omission with the requisite scienter because he knew his representations were false or misleading at the time he made them. He knew the apartment complex was not fully renovated because he had physically observed the complex and discussed it with the borrower. Moreover, Lahr knew the property was plagued with asbestos, as evidenced by a March 8, 2005 asbestos summary that Lahr had in his possession. Lahr also knew the complex was not income producing because the borrower was already in default on his obligations to first and second lienholders, including Lahr.

139.    Likewise, Lahr knew that the proceeds of Vodicka/Aubrey's loan would not be used to pay the outstanding invoices related to the renovation because it was CFS who directed the title company to disburse the proceeds to pay off lenders on unrelated loans in default. Lahr also reviewed and approved the preliminary settlement statement identifying the distribution of the proceeds. In short, Lahr decided how the proceeds of the loans by Vodicka/Aubrey would be distributed.

140.    Lahr also knew that the appraised value of the apartment complex was not $465,000, as he had represented, but instead had been appraised at just $135,000. Not only had Lahr viewed this lower appraisal, but it was prepared at Lahr's direction by Lone Star Appraisals & Realty Inc., a company partially owned previously by Lahr. These facts, combined with the multiple benefits that Lahr obtained by inducing Vodicka/Aubrey to close the Temple Loan, create a strong inference that Lahr intentionally deceived Plaintiffs or was highly reckless in doing so.

141.    Vodicka/Aubrey actually and justifiably relied on each of the material misrepresentations and omissions that Lahr made on June 5, 2006, in deciding to make the Temple Loan. That is, Vodicka/Aubrey would not have closed the Temple Loan had they known any of the following facts: (1) that the apartment complex was vacant, dilapidated, and plagued with asbestos issues, and also lacked a permanent certificate of occupancy, rather than being fully renovated and ready for immediate leasing; (2) that their loan proceeds were to be distributed to other lenders on unrelated loans already in default, rather than used to pay off existing invoices for renovations; (3) that the appraised value of the apartment complex was $135,000, or just 29% of the $465,000 value that Lahr represented; (4) that the borrower on the Temple Loan was already in default at the time Lahr induced Vodicka/Aubrey to loan money.

142.    Like Lahr, Gunn obtained multiple benefits from Vodicka/Aubrey's Temple Loan. She received a split with Lahr on the brokerage fees earned by CFS, as well as outsized and unreasonable book-keeping fees for servicing the loan. Additionally, Vodicka/Aubrey's additional lending tranche allowed Gunn to pay money out to other lenders on unrelated loans already in default, which kept the illusion of another lending opportunity alive so that the

previous lenders would roll the money into yet another CFS-brokered Trust Deed loan with more commissions and fees to her.

143. Gunn was in charge of CFS, owed fiduciary duties to Vodicka/Aubrey, and had knowledge about substantial risks regarding the Temple Loan. By failing to disclose these risks, she obtained significant benefits for herself. These facts create a strong inference that Gunn, at the very least, acted with extreme recklessness in failing to disclose the material facts listed above.

144. Lahr's misrepresentations and omissions, and Gunn's omissions, proximately caused Vodicka/Aubrey's losses in excess of $70,000. Essentially, Lahr's and Gunn's fraudulent conduct concealed two material risks. First, their conduct concealed the risk that the value of the collateral was insufficient to secure their loan in the event of default. Second, they concealed the high risk that the borrower would, and in fact already had, defaulted on the Temple Loan. Both of these risks materialized to cause Vodicka/Aubrey's loss when the borrower defaulted and they could not look to the collateral for repayment of their loan.

145. As with the Temple Loan, however, the representations Lahr made regarding the Manor Loan—both at the house and during the driving tour—were false or materially misleading. Lahr was not alone in making false representations during the driving tour. Zaretsky also made a material false statement when he told Vodicka/Aubrey that he owned the land under the City of Austin pumping station and that his lease with the city was a "gold mine."[14] In truth, Zaretsky did not own the land and had no such lease with the city.

146. Vodicka/Aubrey actually and justifiably relied on these misrepresentations in making both of their tranches in the Manor Loan. That is, they would not have become involved

---

[14] Zaretsky also made this misrepresentation to Tutor, in the presence of Lahr and Caufmann, during his physical inspection of the property.

in the Manor Loan at all had they known the truth about any one of Lahr or Zaretsky's misrepresentations described above.

### *The Long Beach Loan*

147.    With respect to the Long Beach Loan, Lahr made several misrepresentations and omissions set forth in paragraphs 137-144 with scienter. Lahr had actual knowledge that he had, in fact, never worked with the Long Beach developer, as evidenced by the fact that neither Lahr nor Capital Advantage had any records of any prior business relationship with the developer. Lahr also had actual knowledge that the proceeds of the Long Beach Loan would not be used to pay for renovations of the collateral because Lahr directed the title company to distribute the escrowed proceeds without verifying the funds had been used in a workmanlike manner.

148.    Furthermore, Lahr knew of the true escrow instructions as Capital Advantage supervised the closing. In fact, Lahr had no other purpose in making the statement of his experience with the developer, or in fabricating false escrow instructions, other than to induce Vodicka/Aubrey to make the loan in the Scheme. Finally, Lahr knew that the borrower attempted to use a false corporate identity because he received the fax from the title company informing him that the borrower, B-Good, Inc., was a non-existent entity. These facts, combined with Lahr's direct pecuniary gain (i.e. commissions and fees earned on the transaction) establish the requisite element of scienter.

149.    Lahr further failed to disclose his use of a fictitious address for the operations of Capital Advantage, as indicated on his 2004 federal income tax return. The address, 3411 Foothill Terrace, Austin, Texas 78731 was and is the true residence of Fred and Lisa Fletcher.[15]

---

[15] Lahr used this fictitious address to obtain two different bank loans from Fort Worth National Bank, a $1,080,000 loan to Onion 89, Inc. on November 2, 2005 and a $815,000 loan on March 6, 2006 to Pioneer-at-Walnut-Creek LP. Discovery in this matter revealed that one of Plaintiff's

Had Plaintiffs known Lahr himself was using a fictitious address as part of his Trust Deed program, Plaintiffs would have never participated in the first place.

150.    Vodicka/Aubrey actually and justifiably relied on Lahr's misrepresentations and omissions in closing the Long Beach Loan. Had they known that the developer had no reliable track record and operated through a fictitious corporate entity, they would not have closed the Long Beach Loan. Likewise, had they received accurate escrow instructions that revealed the true nature of the transaction, they would not have made the Long Beach Loan.

151.    Lahr's misrepresentations and omissions proximately caused Vodicka/Aubrey's loss on the Long Beach Loan. Specifically, by failing to disclose the borrower's use of a non-existent corporate entity and misrepresenting his experience with the developer, Lahr concealed the risk that the collateral would be developed and that the repairs would not be performed in a good and workmanlike manner. These risks materialized when the borrower defaulted, and Vodicka/Aubrey could not look to the poorly and insufficiently renovated collateral for repayment of their loan.

152.    Defendants sold securities by means of untrue statements of material facts and/or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. These untrue statements and omissions are detailed herein and in the RICO Statement.  The representations and omissions were material because there is an appreciable likelihood that it could have significantly affected the investment decisions of a reasonable investor, and a reasonable investor would consider such information important in deciding whether to invest.

---

prior Lahr loans to Pioneer-at-Walnut Creek that was later re-cycled into other loans was never recorded with the Travis County clerk, concealing this indebtedness from Fort Worth National Bank in its Renewal of Pioneer's $815,000 loan. Lahr attributed this "mistake" to Austin area attorney Bruce Morrison, who served as the escrow agent for Plaintiff's loan.

153.     Accordingly, Defendants are liable to Vodicka/Aubrey for statutory rescission or damages, including interest. In addition, Defendants are liable for costs and attorneys' fees, as well as for exemplary damages and disgorgement of all profits of the Scheme. Vodicka/Aubrey further seek recovery of post-judgment interest.

154.     Finally, Gunn and Lahr controlled the entities that sold securities to Vodicka/Aubrey. Therefore, Gunn and Lahr are jointly and severally liable for these claims.

**J.     COUNT TEN: VIOLATIONS OF THE TEXAS SECURITIES ACT (TEX. REV. CIV. STAT. ART. 581-1, *et seq.*) – AIDING AND ABETTING (Sec. 33(F)(2) and/or Sec. 33-1(E)(2))**
***(Against Barlin, Lahr, and Gunn Only)***

155.     Plaintiffs re-allege and restate Paragraphs 118 through 154 of this Complaint as if fully set forth herein.

156.     In the alternative to Plaintiffs' RICO claims, Vodicka/Aubrey's Temple Loan, Manor Loan, and Long Beach Loan each constitutes a security within the meaning of the Texas Securities Act, TEX. REV. CIV. STAT. ART. 581-1, *et seq.*(the **"Texas Securities Act"**).

157.     One or more Defendants materially aided one or more of the other Defendants named in this Count in the selling of a security, namely, the loans identified herein, with the intent to deceive or defraud or with reckless disregard for the truth.  He or they did so by the means and methods identified in Count Nine hereinabove, all of which were material, which means and methods are incorporated into this Count as if fully set out verbatim.

158.     Gunn, Lahr, and/or Barlin are jointly and severally liable for these claims. Additionally, Defendants are liable to Vodicka/Aubrey for statutory rescission or damages, including interest. In addition, Defendants are liable for costs and attorneys' fees, as well as for exemplary damages and disgorgement of all profits of the Scheme. Vodicka/Aubrey further seek recovery of post-judgment interest.

---

**K.    COUNT ELEVEN: CONSPIRACY TO COMMIT FRAUD AND BENEFICIARY OF THE FRAUD BY NAT.**
(*By Tutor Only Against NAT*)

159.    Plaintiff Tutor re-alleges and restate the preceding paragraphs of this Complaint as if fully set forth herein.

160.    NAT and non-party J&T, along with other members of the Scheme, conspired to commit fraud against Plaintiffs in connection with their mortgage loans. NAT, J&T, and/or other Defendants had this fraud as the object to be accomplished, and they had a meeting of the minds on the object or course of action. One or more unlawful, overt acts were undertaken in furtherance of this purpose. Plaintiff Tutor suffered damages as a proximate result. NAT further knowingly accepted benefits resulting from this fraud.

161.    Plaintiff Tutor seeks judgment against NAT for actual damages, exemplary damages, disgorgement of all fees and benefits, disgorgement of all profits of the Scheme, court costs, pre and post-judgment interest and court costs.

## VIII.   DAMAGES AND RELIEF

162.    Plaintiffs re-allege and restate the preceding paragraphs of this Complaint as if fully set forth herein.

163.    Plaintiffs seek recovery of the following damages, court costs, attorneys' fees, and all other expenses related to bringing this action including investigation expenses:  a) actual damages; b) consequential damages; c) exemplary damages; d) rescission or rescissionary damages; e) costs of court; f) reasonable and attorneys' fees for the prosecution of this matter and all appeals; g) pre-judgment and post-judgment interest at the highest rate allowable; h) expert witness fees; i) deposition costs; j) statutory treble damages; k) out-of-pocket losses; l) lost profits; m) disgorgement of all profits of the Scheme, forfeiture of benefits, and damages for

---

the deepening insolvency of the debtor; m) accounting of funds by Defendants; n) uncapped exemplary damages; o) loss of credit reputation.

164.    Moreover, the exemplary damages cap does not apply in this case against NAT. In closing the transactions described in ¶¶ 22 – 24 herein and at pages 16 through 24 of the RICO Statement filed concurrently herewith and incorporated herein, NAT knowingly violated the following provisions of the TEXAS PENAL CODE: (i) Section 32.21 – Forgery in preparing the HUD-1 settlement statements; (ii) Section 32.45 – Misapplication of Fiduciary Property; (iii) Section 32.46 – Securing Execution of Document by Deception; (iv) Section 37.10 – Tampering with Governmental Records; and (v) intentionally destroyed or concealed notary books in violation of Texas Penal Code § 37.10(a)(3).

165.    Further, the exemplary damages cap does not apply in this case against Barlin because of the following TEXAS PENAL CODE violations: (i) Section 31.03 – Theft; (ii) Section 32.46 – Securing Execution of Document by Deception; and (iii) Section 37.10 – Tampering with Governmental Records.

166.    Pursuant to common law and statute, Plaintiffs seek recovery of exemplary damages. The statutory cap on exemplary damages is inapplicable because the conduct complained of herein constitutes applicable offenses and violations of the TEXAS PENAL CODE the punishment level for which is a felony of the third degree or higher, which NAT, Williams, Lahr, and Barlin committed knowingly or intentionally.

167.    Pursuant to TEX. CIV. PRAC. & REM. CODE 41.005, NAT is liable for the criminal acts of Williams because (i) she is an employee of NAT; (ii) NAT authorized the doing and the manner of the act; (iii) Williams was employed in a managerial capacity and was acting in the scope of employment; and/or (iv) NAT or a manager of NAT ratified or approved the acts.

---

## IX.  JURY DEMAND

168.    Plaintiffs hereby demand a jury and tender the appropriate fee with the Court.

FOR THESE REASONS, Plaintiffs request that a judgment be entered against Defendants and in favor of Plaintiffs awarding Plaintiffs all relief requested herein as well as such other and further relief both general and special at law or equity, to which Plaintiffs may be otherwise justly entitled.

Respectfully submitted,

ZIMMERMAN, AXELRAD, MEYER, STERN & WISE, P.C.

By:    */s/ Brian W. Zimmerman*
Brian W. Zimmerman
State Bar No. 00778746
Federal ID. 18979
3040 Post Oak Blvd., Suite 1300
Houston, Texas  77056-3813
(713) 552-1234 Telephone
(713) 963-0859 Facsimile
**ATTORNEYS FOR PLAINTIFFS
VODICKA/AUBREY**

GRISSOM & THOMPSON, L.L.P.

By:    */s/ Donald H. Grissom*
Donald H. Grissom
State Bar No. 08511550
William W. Thompson, III
State Bar No. 19960050
509 West 12th Street
Austin, Texas 78701
512/478-4059
512/482-8410 Fax
**ATTORNEYS FOR PLAINTIFF
TUTOR**

---

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this date served the foregoing on the Court's electronic docketing system or via Certified Mail Return Receipt Requested to any Pro Se defendants. Therefore, the undersigned upon information and belief certifies that all counsel of record and Pro Se defendants, as noted below, will receive a copy of these papers through the Court's electronic notice system or US Mail Certified Return Receipt Requested.

This 21st day of December 2013.

*/s/ Brian W. Zimmerman*
Brian W. Zimmerman

---