# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION

## Case No. 18-cv-61117-BLOOM/Valle

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

     *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

     *Defendants.*
_____/



# PLAINTIFFS' RESPONSE TO ROBERT L. ERMATINGERS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW[1]

---

[1] Defendant Robert L. Ermatinger, Jr.'s legal capacity in this action changes upon his retirement from the City of Dallas, Dallas Police Department in November 2016. Plaintiffs' defamation claims againt Robert L. Ermatinger, Jr. ("Ermatinger"), Individually, arise from his February 2017 interview with D Magazine and are addressed in this response. A separate response addresses the City Defendants, including Ermatinger in his capacity as a City of Dallas employee.

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................... 1

II.  BACKGROUND ........................................................................ 2

III. ARGUMENT and AUTHORITY................................................. 6

    A.   Ermatinger is subject to personal jurisdiction in Florida ......................... 6

        1.   Ermatinger established Florida minimum contacts ......................... 6

        2.   Ermatinger opinions and fabricated evidence violates
           City of Dallas policy ................................................................... 6

        3.   Ermatinger instigated harassment in Florida ................................ 8

        4.   Florida Long Arm Statute establishes personal jurisdiction .............. 9

        5.   Plaintiffs' Due Process ............................................................. 9

             a)   Relatedness ................................................................... 10

             b)   Purposeful Availment ..................................................... 11

             c)   Fair Play and Substantial Justice ...................................... 11

    B.   Florida venue is proper ................................................................... 13

        1.   Florida events gave rise to the claim ........................................ 13

        2.   Events essential to the existence of the claim ............................. 14

    C.   Florida claims brought in Florida, where the injury occurred ................... 16

IV.  STATED CLAIMS FOR EACH COUNT ....................................... 16

    A.   Counts I, XV, and XVI—Defamation ................................................ 16

    B.   Count XXI—Conspiracy Liability .................................................... 17

    V.   CONCLUSION ........................................................................... 17

Plaintiffs Steven B. Aubrey ("Aubrey") and Brian E. Vodicka ("Vodicka"), (collectively "Plaintiffs"), respond to the motion to dismiss ("Motion") filed by Robert L. Ermatinger, Jr. ("Ermatinger"), Individually, as follows:

## I. INTRODUCTION

This case is about crooked Texas cops that botched a Texas murder investigation.  To solve crimes, the crooked cops found "the end justifies the means" method was their favorite but it was not working well for them in this case.  The crooked cops typically started an investigation with fraudulent affidavits loaded with probable cause.  Defendants Robert Ermatinger ("Ermatinger") and Scott Sayers ("Sayers") would commit aggravated perjury, get the unlawful search warrants they needed to bust right through people's right to privacy and hope they might stumble into something.   The crooked cops instincts were off this time, they continued using fraudulent affidavits but they were not finding anything of value.

The crooked cops were frustrated so they conspired with The County cops to really unleash on the Plaintiffs because in Texas, the gays are treated just like the blacks.  Together, the band of Texas cops committed multiple criminal offenses against Plaintiffs, but still no evidence.

Ermatinger and Sayers had already been through Plaintiffs' apartment two times, with search warrants.  For reasons unknown, they waited for Aubrey to leave the apartment and then broke into Plaintiffs residence and illegally trespassed into the residence, without a warrant. That and repeated aggravated assaults by Ermatinger's thug friends was all Plaintiffs could stand, they had their fill of Dallas and moved to Florida.  The crooked cops were not quite ready to see their favorite targets leave so the police cops contacted the local police in Florida and the sheriff cops called the Broward County sheriff's department ensuring Plaintiffs would be harassed when they arrived in South Florida. (*See* Ex. A, Decl. of Vodicka at ¶¶ 2 and 8)

Defendants City of Dallas, Scott Robert Sayers ("Sayers") and Robert L. Ermatinger, Jr. (collectively "Ermatinger") published two (2) of their fraudulent search warrant affidavits, in D Magazine's May 2017 online article, further defameing and injuring Plaintiffs in Florida. Ermatinger's flagrant use of unlawful search warrants against Plaintiffs and others, garners national recognition.[1]   (*See* Exs. C and D, Sayers' fraudulent affidavits published by D Magazine)

## II. BACKGROUND

Plaintiffs had planned to move to Florida from Austin in early 2016.   Ira Tobolowsky teamed up with his lawyer/partner, Defendant Stephen Schoettmer ("Schoettmer") to file a frivolous defamation suit against Plaintiffs in Dallas, as they had done to others over the years. Plaintiffs' plans to move to Florida were short circuited by the lawsuit and Schoettmer's frequent and harassing settings for hearings that required travel to Dallas. Plaintiffs decided to move to Dallas for one year expecting the lawsuit against them would be over with a July 2016 setting for trial.   They were wrong.   After moving to Dallas, where Aubrey was born and raised, Schoettmer's judicial gamesmanship became less of a burden to Plaintiffs.   Months after moving to Dallas, Ira Tobolowsky was murdered.

---

[1] On September 6, 2018, Dallas police Officer Amber Guyger shot and killed Botham Jean (26), who was unarmed and in his own apartment.   Dallas Police Department's reaction to the incident was to criminalize the victim, and on the following day, a search warrant was issued for collection of evidence in the murder victim's apartment, including narcotics.   The warrant listed several items found inside the apartment, including 10 grams of pot and a metal marijuana grinder, among other things. The Washington Post, September 14, 2018 article, *Dallas police shooting: Search for marijuana in victim's home was attempt to 'smear' him,* attorneys say, by Meagan Flynn stated:  "[Jean] was not only never convicted of a crime, he was never even accused of a crime, never arrested," Merritt told The Washington Post. "It took a white Dallas police officer to break into his home and shoot him to death for him to become painted as a criminal."

Because the relationships between Plaintiffs, Schoettmer and Ira Tobolowsky were typical of opposing parties, following the murder, the Tobolowsky family was reported to have no idea who, including Plaintiffs, might have wanted to harm Mr. Tobolowsky, stating:

> The detective asked Debbie: "Do you think this was an accident, or could someone have done this?" "What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband. (*See* Doc. 56-2, Decl. of Earnshaw at p.16)

> Before the flight, Michael had learned the fire might have been set intentionally. The thought infused his grief with rage. Cramped in his window seat, Michael felt his hands aching and realized both fists were clenched. All he could think about was *"Who?"* (*See* Doc. 56-2, Decl. of Earnshaw at p.16)

Michael Tobolowsky ("Michael") and his brothers were on vacation in Florida when they receiver the horrific news about their father.  (*See* Doc. 56-2, Decl. of Earnshaw at pp. 17 & 19) At the same time they were on a flight back to Texas wondering "who," the first story about the fire appeared online at 9:32 am, insinuating Plaintiffs' connection to the crime, stating: "His law partner told the station that Tobolowsky had recently been involved in contentious litigation."

Without motive and without anything connecting Plaintiffs to the crime except a lawsuit, Schoettmer, who knows less about Plaintiffs than almost anybody, told the media and investigators that he believed Plaintiffs were very angry and were responsible.  Schoettmer also fabricated that Ira Tobolowsky had recently received a death threat email, which also turned out to be false.  Schoettmer has a history of scandalous and unethical behavior and he directed much of his hate at the LGBT community and at Plaintiffs.  Schoettmer seized the opportunity that the murder presented, took center stage and began holding press conferences and giving interviews interjecting himself and the lawsuit into the tragic murder.

Schoettmer's finger pointing, followed by Defendant Eric Moye's ("Moye") announcement that he believed Aubrey murdered Ira Tobolowsky, triggered epic events and epic defamatory attacks on Plaintiffs, which continue today.  Ermatinger bungled the investigation

3

and focused all of their manpower and search warrants on Plaintiffs instead of persons with likely motives, despite Vodicka's advice to Ermatinger; "follow the money." Frustrated with Ermatinger's failed attempt to investigate the crime, the Tobolowsky family began their own investigation and with nothing but Moye's accusation and constant media innuendo, they grew to believe misinformation about Plaintiffs, just like millions of others in Texas and across the country. Plaintiffs have never been convicted, indicted, charged with, arrested or even named suspects for the murder of Ira Tobolowsky and they never will be, because they had nothing to do with it.

For 50 plus years, Plaintiffs were highly respected by business associates, friends and acquaintances. Ermatinger conspired with others to completely destroy Plaintiffs' reputations in Texas and in Florida. The defendants' war on Plaintiffs and the life-threatening assaults caused Plaintiffs to move several months before their planned departure and they relocated to South Florida. (*See* Exs. A & B, Plaintiffs' Decl. at ¶ 1)

When life had been much better to Plaintiffs, they had owned a second home on Miami Beach. They were more than eager to return to South Florida, catch up with great friends they had known for many years and begin to enjoy life again, on the beach like before. The drive to Florida in a U-haul rental was tough but the moment Plaintiffs crossed the Texas border into Louisiana, there was a overwhelming feeling of freedom and safety. Expecting they would never return, Plaintiffs believed they were leaving the darkness of Dallas behind.

But those good feelings and hope for a brighter future only lasted the few days it took to drive to South Florida because Ermatinger had called ahead and poisoned the well. Ermatinger had successfully destroyed Plaintiffs' reputations in Broward County before they arrived by

4

passing the baton to local law enforcement who continued the harassment on behalf of Ermatinger.

Upon arriving, police officers and sheriff deputies took turns parking directly in front of the house Plaintiffs' rented, or one house removed, an unfamiliar practice for the quiet neighborhood. The new routine/harassment lasted approximately three (3) weeks and frightened the neighbors. Plaintiffs' next-door neighbors, who were verbally excited to have a new neighbor on the day they arrived, have not spoken a word to Plaintiffs since, now almost two years. Local law enforcement made sure to let Plaintiffs know they were not welcome here and that they were being watched, very closely.

While Plaintiffs were invited to one set of friend's house for Thanksgiving and another for Christmas, within three months of their arrival, Plaintiffs decade-long friendships vanished because of the defamation on the Internet. Plaintiffs' fears were quickly realized. Defamatory publications on the Internet are like an aggressive cancer that is sure to cause damage sooner rather than later. The family Plaintiffs spent Christmas and New Years with sold their house and moved without telling Plaintiffs and without any forwarding information. They have toddlers and they likely feared for their safety after reading the articles published on the Internet, here in Florida.

### III.  ARGUMENT and AUTHORITY

**A.      Ermatinger is subject to personal jurisdiction in Florida.**

>    **1.      Ermatinger established Florida minimum contacts.**

Plaintiffs' injuries arose from Ermatinger's conduct that caused injury in Florida. Ermatinger released Plaintiffs' personal and confidential information, which is protected by the constitutional right to privacy and the Texas Government Code.    Most of the information released by Ermatinger was completely fabricated, made to appear truthful and legitimate, to attract D Magazine, who published the material in Articles 2 and 3 (the "Articles").[2]   The Articles were distributed to, and accessed in, Florida. (*See* Ex. A, Decl. of Vodicka at ¶ 6) Ermatinger's false and defamatory information, about Florida residents, was published on D Magazines' website and was accessible and accessed in Florida, thereby constituting the commission of the tortious act of defamation within Florida under section 48.193(1)(b). Plaintiffs, Florida residents, are the main subject of Article-2 as their proper names were printed 120 times. Under section 48.193(1)(a)2.  Under section 48.193(1)(a)2, Ermatinger's acts subject him to this Court's jurisdiction because he committed a tortuous act within this state.

>    **2.      Ermatinger opinions and fabricated evidence violates City of Dallas policy.**

Ermatinger's conduct violates established federal statutory and/or constitutional rights of which a reasonable person would have known. *Cruz v. Davidson*, 552 F. App'x 865, 867 (11th

---

[2] Article-2: April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the online version of D Magazine's feature story designed to reach their online digital media audience, sell subscriptions and solicit advertisers. (*See* Motion, Doc. 56-2, Decl. of Earnshaw Tabs 2) Article-3: April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the print version of the feature story that was published it the May 2017 magazine with the cover title: "*Scene of the Crime: Ira Tobolowsky was burned alive in his North Dallas garage. The family is convinced they know who did it*" (*See* Motion, Doc. 56-2, Decl. of Earnshaw Tab 1) D Magazine ships the magazine to customers in multiple states, including Florida. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at ¶ 10)

Cir. 2013) (quoting *Keating*, 598 F.3d at 762).   When Ermatinger conspired with D Magazine to publish false and defamatory material regarding Plaintiffs, they were in direct conflict with Section 323.04B.2. of the Dallas Police Department General Order, which forbids the release of such information, stating:

> "INFORMATION WILL NOT BE RELEASED PERTAINING TO ANY OF THE FOLLOWING: PERSONAL OPINIONS ABOUT THE SUSPECT OR EVIDENCE." (Emphasis added) (*See* Ex. E, Section 323.04B.2.)

In violation of the Dallas Police Department General Order, Ermatinger released his personal opinions about Plaintiffs and evidence, including:

> Ermatinger would have to wait for crime scene technicians to search the men's computers and process the juice bottle found in the garage for fingerprints. (*See* Doc. 56-2, Decl. of Earnshaw at p. 32)
> Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close. He says detectives executed more search warrants on the Tobolowsky case-roughly 18-than on any other case he'd worked. Most of those dealt with Aubrey and Vodicka; others were for cell tower dumps. "They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them."(*See* Doc. 56-2, Decl. of Earnshaw at p. 42)
>
> "Ermatinger says Aubrey had red marks on both arms. But a SWAT doctor couldn't definitively say what the marks were from. "The doctor explained to us that it could be from the flash of a fire, it could be burns, or it could just be a sunburn," Ermatinger says. He says too much time had passed."
> (*See* Doc. 56-2, Decl. of Earnshaw at p. 31)

Ermatinger violated Section 323.04B.2 when releasing this information and he failed to explain that it had been only six (6) days since the fire/murder and Aubrey's arms still had hair on them and the hair was not singed.

> Ermatinger didn't have any physical evidence linking them to the crime scene. But the men remained strong suspects. They did not have good alibis, telling detectives that at the   time of the fire, they were at their apartment.
> (*See* Doc. 56- 2, Decl. of Earnshaw at p. 31)

Plaintiffs "did not have good alibis" because detectives learned they were home at 7:30 am on the day of the fire, indicating that every morning of every day, Plaintiffs do not have good alibis.

> "Detectives began monitoring the men's credit card transactions and discovered that Aubrey's card had been used that day to book a room at the Crowne Plaza hotel in Dallas under the name Alexandra Krot (a friend who did spend the night at the hotel, police later learned)." (*See* Doc. 56-2, Decl. of Earnshaw at p. 30)

> "They had good circumstantial evidence against Aubrey, but nothing that placed him at the house on May 13." (*See* Doc. 56-2, Decl. of Earnshaw at p. 42)

> "Detectives sent the juice bottle to Quantico for analysis."
> (*See* Doc. 56-2, Decl. of Earnshaw at p. 46)

As seen above, the detectives circumstantial evidence was pathetic. Ermatinger went a step further and released an undeniably fabricated and false statement, stating:

> "Phone records, detectives told the Tobolowsky family, showed no activity on the men's cellphones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. The records did show cell activity before and after that time period."
> (*See* Doc. 56-2, Decl. of Earnshaw at pp. 31-2)

Here, Ermatinger lied to create suspicion where there should be none. Though it was a violation for Ermatinger to release any information, true or false, he knew the statement about phone records was a lie because had subpoenaed Plaintiffs' phone records, which indicate that Vodicka made five (5) calls and Aubrey made two (2) calls before noon on the day of the murder. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 12)

### 3.   Ermatinger instigated harassment in Florida.

Ermatinger was not satisfied with just chasing Plaintiffs out of Dallas and Texas. Upon information and belief, he contacted the local police department and caused local officers to harass Plaintiffs. For approximately three (3) weeks, local police officers took turns parking directly in front of the house Plaintiffs rented, frightening the neighbors. Plaintiffs' next-door neighbors, who were verbally excited to have a new neighbor that first day, have not spoken a

word to Plaintiffs since, now almost two years.  Whatever Ermatinger communicated to local law enforcement caused and continues to cause injury to Plaintiffs.

### 4.    Florida Long Arm Statute establishes personal jurisdiction.

Plaintiffs' claim fits squarely within the provisions of Florida's long-arm statute to give this Court personal jurisdiction over Ermatinger.

Plaintiffs resided in Florida when Ermatinger released information concerning Plaintiffs to be published in the Articles.  Upon publication in Florida, the information released by Ermatinger, injured Plaintiffs and continues to injure Plaintiffs, in Florida, thereby sufficient for long-arm jurisdiction over Ermatinger.  *Honus Wagner Co. v. Luminary Group LLC*, No. 17-cv-61317-Bloom/Valle, 2017 WL 6547899, *12 (S.D. Fla. Dec. 21, 2017):

> Fla. Stat. § 48.193(1)(a)(1), (2), & (6). "The reach of Florida's long-arm statute `is a question of Florida law,' and this Court is required to apply the statute as would the Florida Supreme Court.'" *Louis Vuitton,* 736 F.3d at 1352 (quoting *United Techs.,* 556 F.3d at 1274). Under § 48.193(1)(a)(2), a defendant commits a tortious act within Florida when that act causes injury in Florida. *See Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1217 (11th Cir. 1999) (holding that the Eleventh Circuit's "firmly established precedent . . . interprets subsection [48.193(1)(a)(2)] to apply to defendants committing tortious acts outside the state that cause injury in Florida").

> *Nida Corp. v. Nida,* 118 F. Supp. 2d 1223, 1228 (M.D. Fla. 2000)   ("The act is considered to take place within the state for purposes of the long-arm statute if the injured party resides in Florida, regardless of where the acts were actually committed.")

Ermatinger's tortuous act, illegal release of information and fabrication of information for purposes of publication in the Articles, caused Plaintiffs' injuries in Florida.  Plaintiffs know a Florida resident who did access D Magazine's website and read the material on it. (*See* Ex. A, Decl. of Vodicka at ¶ 9)

### 5.    Plaintiffs' Due Process.

Ermatinger could have reasonably anticipated he would be subject to suit here in Florida. He purposefully released information to D Magazine for publication in Article-2 to be accessed

on the World Wide Web, by anyone, including residents in Florida. As well, Ermatinger could

have reasonably anticipated he might be subject to suit in Florida because of his direct contact

with local law enforcement that caused the harassment to continue. *Honus Wagner Co. v.*

*Luminary Group LLC*, No. 17-cv-61317-Bloom/Valle, 2017 WL 6547899, *12 (S.D. Fla. Dec.

21, 2017):

> The Constitution prohibits the exercise of personal jurisdiction over a nonresident defendant unless its contacts with the state are such that it has "fair warning" or could have "reasonably anticipated" that it may be subject to suit there. *Licciardello,* 544 F.3d at 1284 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)); *Burger King,* 471 U.S. at 472 (quoting *International Shoe,* 326 U.S. at 316). "This `fair warning' requirement is satisfied if the defendant has `purposefully directed' [its] activities at residents of the forum and the litigation results from alleged injuries that `arise out of or relate to' those activities." *Licciardello,* 544 F.3d at 1284. (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). In       addition, the Court must also examine whether the exercise of jurisdiction comports with "fair play and substantial justice." *Licciardello,* 544 F.3d at 1284 (11th Cir. 2008) (quoting *International Shoe,* 326 U.S. at 320).

> The Eleventh Circuit has distilled the due process analysis into a three-part test: "(1) whether the plaintiffs claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "`traditional notions of fair play and substantial justice.'" *Louis Vuitton,* 736 F.3d at 1355 (citation omitted). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, `a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249, 1267 (11th Cir. 2010)).

### a)   Relatedness

Plaintiffs' claim arose from Ermatinger's contact with Florida, through publication of the

Articles in Florida, defaming Florida residents and from his influence with local law

enforcement. In *Honus*:

"[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum.'" *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir. 2010) (quoting *Oldfield,* 558 F.3d at 1222 (some internal quotation marks omitted)). The "inquiry must focus on the direct causal relationship between the defendant, the forum, and the litigation." *Fraser,* 594 F.3d at 850 (internal quotation marks omitted) (quoting *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872).

### b)   Purposeful Availment

Ermatinger aimed his intentional tort at Plaintiffs who lived in Florida and were injured in Florida, which satisfies the *Calder* effects test for personal jurisdiction.   Additionally, he contacted the local police department, causing injury.  In *Honus*:

> Accordingly, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* (citing Burger King, 471 U.S. at 478). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the `random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* (quoting *Burger King,* 471 U.S. at 475).

> Under the effects test articulated by the Supreme Court in *Calder v. Jones,* a nonresident defendant's single tortious act can establish purposeful availment even if a defendant does not have any additional contacts with the forum state. *See Licciardello,* 544 F.3d at 1285 (citing *Calder v. Jones,* 465 U.S. 783 (1984). This occurs when the tort was: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* (citations omitted).

Plaintiffs' allegations satisfy the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum." *Licciardello,* 544 F.3d at 1287-88 (11th Cir. 2008).

### c)   Fair Play and Substantial Justice

Ermatinger created such a hostile environment for Plaintiffs in North Texas that the possibility of justice and a fair trial in that area has become impossible. Plaintiffs have suffered

11

glaring judicial abuse in North Texas, indicating Florida jurisdiction is proper so the playing field is level for all parties. In *Honus*:

> Defendants bear the burden of establishing that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice. *See Louis Vuitton,* 736 F.3d at 1355. This inquiry requires consideration of the following factors: (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the [interstate] judicial system's interest in resolving the dispute." *Mighty Men,* 102 F. Supp. 3d at 1275 (quoting *Licciardello,* 544 F.3d at 1288).
>
> (1) <u>Burden on the defendant</u>.  The defendants' own acts disqualify their preferred Texas jurisdiction and/or venue.   Defendant Eric Moye gathered the media in his courtroom and announced to the world that Aubrey murdered Ira Tobolowsky and because Aubrey was so dangerous, he was recusing himself from the case. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at p. 29)  For Plaintiffs, there is no chance for a fair trial or an impartial jury pool in Texas.  Ermatinger's allegation about his burden is disingenuous.   (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 14)
>
> (2) <u>Forum's interest in adjudicating the dispute</u>.  Plaintiffs pray this Court takes interest in helping Florida residents who continue to be injured by Texas defendants.   The defendants have not been able to resist continually availing themselves to Florida's jurisdiction.  Plaintiffs should have the same rights as others, to live peacefully and without the fear of being harmed by those who are supposed to protect them.   The defendants successfully ran Plaintiffs out of Dallas and now continue to make life miserable for them in South Florida.  This is an opportunity for this Florida Court to send a message to Texas that their continued harassment and influence in Florida is not welcome.

(3) <u>Plaintiff's interest in obtaining convenient and effective relief</u>.   Plaintiffs are only capable of ***affordable*** and effective relief.   Plaintiffs cannot afford the expense of travel, lodging and time away from work if this case was in a venue further than a half day's drive from Fort Lauderdale.   Jurisdiction in Texas would guarantee injustice and ineffective relief. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 4)

(4) <u>The interstate judicial system's interest in resolving the dispute</u>. The most efficient resolution to this controversy includes, among other things, considerations of witness location and evidence location.  Here, the main witnesses are Plaintiffs; local police John Does;  Broward County Sheriff deputy John Does; and Plaintiffs' neighbors.   The evidence is the Articles themselves, which are everywhere as they are published on the World Wide Web.  Plaintiffs have a copy of Article-3, the magazine, here in Florida.  The interstate judicial system's interest in resolving this case most efficiently is best served by adjudicating this case in Florida, where the injury occurred. The facts here demonstrate that exercise of jurisdiction by a Texas court offends traditional notions of fair play and substantial justice.

**B.    Florida venue is proper.**

**1.    Florida events gave rise to the claim.**

Plaintiffs were residing in the State of Florida when D Magazine published Ermatinger's defamatory content in the Articles, causing Plaintiffs' injuries and giving rise to their claim. Ermatinger contacted the local police department, causing the continuation of the harassment against Plaintiffs; beginning the very day Plaintiffs arrived in South Florida.  The Articles were published after Plaintiffs had become residents in Florida, they caused damage and continue to cause damage to Plaintiffs, as does the harassment, therefore Florida venue is proper. "A civil

action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *See* 28 U.S.C. § 1391(b)(2).

The injury caused by Ermatinger was realized by Plaintiffs here, in Florida and it has been significant.   *See, e.g., Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005) ("[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere."); *First of Mich. Corp. v. Bramlet,* 141 F.3d 260, 263 (6th Cir. 1998)   *See Estate of Abtan v. Blackwater Lodge & Training Ctr.,* 611 F. Supp. 2d 1, 8 (D.D.C. 2009) ("In tort cases, when determining whether a substantial part of the events or omissions giving rise to the plaintiff's claim occurred . . . in a particular district for purposes of § 1391(b)(2), . . . courts focus on . . . the place where the allegedly tortious actions occurred and the place where the harms were felt." (internal quotations and citations omitted)).   For purposes of § 1391(b)(2), Florida is where Plaintiffs have suffered harm from Ermatinger's released and published statements, information and misinformation and is where Plaintiffs continue to suffer from harassment.   Plaintiffs have no other claims against Ermatinger individually, except these Florida claims that arose from the injury caused by Ermatinger, in Florida.

### 2.    Events essential to the existence of the claim.

The events giving rise to the claim include the publication of Ermatinger's comments published in the Articles in Florida his contact with the local police department to perpetuate the furtherance of his harassment here in Florida. (*See* Exs. A & B, Plaintiffs' Decl. at ¶ 7)

*Perdue v. Miami Herald Publishing Company, 291 So.2d 604 (Fla. 1974):*

In 1967 the Florida Legislature responded to the above decision by enacting Chapter 67-52 which in pertinent part became F.S. § 770.05, F.S.A. (limiting a damages claim founded upon any single publication to only one choice of venue) and F.S. § 770.07,

14

> F.S.A., (providing that the cause of action shall be deemed to have accrued at the time of the first publication in this state).
>
> In the Firstamerica Development Corporation case, supra, this Court relied upon F.S. § 46.04, F.S.A. as then worded,[3] which permitted (and still permits as present § 47.051) litigation against corporations in any county in which the cause of action arose. The Court held that venue could properly be laid in any county where the newspaper was published.

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 433 (2d Cir. 2005) ("When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue."); *Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1371 (11th Cir. 2003) ("Only the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered [for determining venue].").  Ermatinger's false and/or defamatory statements were published in Florida and caused injury in Florida, therefore, the events in Florida are significant. Ermatinger caused local law enforcement to continue harassing Plaintiffs causing ongoing injury in Florida for twenty-three (23) months, which is significant.

Ermatinger claims in his declaration that he did not know at the time of his interview with D Magazine whether or not D Magazine was "marketed or sold in the State of Florida." (*See* Decl. of Ermatinger, Doc. 53-1 at ¶10)  Though Ermatinger's affinity to perjure himself is high, it is plausible that he would have paid little attention to D Magazine's marketing efforts. But, the clever detective certainly knows about computers and how the Internet works. Ermatinger seized Plaintiffs' two computers in 2016, with unlawful search warrants and he used another of his fraudulent affidavits to gain access Plaintiffs' email accounts.  As well, Ermatinger is something of a television star after his appearances on The First 48, also accessible in Florida.  It would be naïve for Ermatinger to think his performances on television only aired in Dallas as it would be

naïve for him to think that his interview with D Magazine would not be published everywhere, including in Florida.

The event that gives rise to the claim was the publication, in Florida, of the information Ermatinger released about Plaintiffs. Plaintiffs suffered injuries in Florida, the only proper venue for the claims against Ermatinger.   (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 3)

**C.     Florida claims brought in Florida, where the injury occurred.**

Plaintiffs were residents of Florida when Ermatinger caused them significant injury, in Florida.  There were no state claims against Ermatinger prior to the events that injured Plaintiffs in Florida, which were caused by Ermatinger. Plaintiffs bring federal and Florida state-law causes of action for events that took place in Florida.

All of Ermatinger's claims regarding "claims barred" and "waiver of sovereign immunity" under the Texas Tort Claims Act are irrelevant as the state claims are subject to Florida state law. (*See* Motion, Sec. C. at pp. 13-15)

## IV.  STATED CLAIMS FOR EACH COUNT

**A.     Counts I, XV, and VI—Defamation.**

The events giving rise to these counts for defamation occurred in Florida. Florida state law is applicable for injuries to Plaintiffs, Florida residents.   Texas law is not applicable to the Florida claims.   Plaintiffs were Florida residents when D Magazine published its Articles. Ermatinger admits that he gave his interview for the Articles in February 2017, also a time when Plaintiffs were Florida residents. (*See* Doc. 53-1, Decl. of Ermatinger at ¶9)    Statements released, given or fabricated by Ermatinger were a direct violation of the Dallas Police Department General Order Section 323.04B.2.

16

**B.**     **Count XXI—Conspiracy Liability.**

Ermatinger conspired with D Magazine and The City to publish his released information about Plaintiffs and evidence that is part of an ongoing murder investigation. Ermatinger violated the Dallas Police Department General Order Section 323.04B.2, which states: "Information will not be released pertaining to any of the    following: Personal opinions about the suspect or evidence."

## V. CONCLUSION

The facts here demonstrate that the only events causing Plaintiffs' injuries arise out of Ermatinger's contacts with the forum, Florida. Following Ermatinger's retirement from the City of Dallas, he gave an interview to D Magazine and released information that was published everywhere, including Florida. Ermatinger admits he gave the interview in February 2017, several months after Plaintiffs relocated to South Florida. While it is unusual for a detective to retire and then release information about an ongoing murder investigation, Ermatinger's acts directly violated Dallas Police Department General Order Section 323.04B.2. Ermatinger also fabricated false facts that were published and accessed in Florida. Ermatinger did not injure Plaintiffs when he was interviewed. Plaintiffs suffered their injuries when the information Ermatinger released was published and became accessible in Florida.

Media savvy Ermatinger, who has appearances on a television series, knows better than most how media is distributed and that D Magazine's online Article-2 would be accessible to a worldwide audience and to residents in Florida.

Ermatinger claims in his declaration that he has never contacted any person in Florida, including any Florida police department or law enforcement personnel regarding Plaintiffs. Plaintiffs allege that Ermatinger is not truthful as he is not in his fraudulent affidavits for search

17

warrants or in the Articles published by D Magazine.  Of all people, the one most driven to harass Plaintiffs in South Florida would likely be the same one who illegally trespassed into Plaintiffs residence without a warrant and who freely released information about Plaintiffs and an ongoing murder investigation to the media, Ermatinger.  He has demonstrated that he has a vendetta against Plaintiffs and that he is willing to go that extra mile to injure them.  Simple discovery here in Florida would quickly find the Dallas source, Ermatinger, who caused the ongoing injury here in Florida.

Ermatinger established the necessary contacts with the forum through the publication of the Articles. This Court has personal jurisdiction over Ermatinger, Individually, and Florida is the proper venue for the injuries he caused.

Respectfully submitted,

By: _____

Steven Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: _____

Brian Vodicka, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com

18

## CERTIFICATE OF SERVICE

This is to certify that on October 1, 2018, the undersigned has served the foregoing by USPS regular mail, Email, or through the CM/ECF docketing system. Therefore, the undersigned upon information and belief certifies that all counsel or parties of record will receive a copy of these papers.

Steven Aubrey

Brian Vodicka


## SERVICE LIST

**Via CM/ECF Notice:**
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Jason P. Bloom
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
COUNSEL FOR DEFENDANTS:
D MAGAZINE PARTNERS, L.P. f/k/a
MAGAZINE LIMITED PARTNERS, L.P.,
ALLISON MEDIA, INC.
JAMIE L. THOMPSON

**Via CM/ECF Notice:**
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Peter L. Harlan
DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE
133 N. Riverfront Blvd., LB 19
Dallas, Texas 75207
COUNSEL FOR DEFENDANTS:
DALLAS COUNTY, TEXAS

DALLAS COUNTY SHERIFF'S DEPARTMENT
MELINDA CHRISTINE URBINA


***Via CM/ECF Notice:***
Eric P. Hockman
WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
LOCAL COUNSEL FOR DEFENDANTS:
CITY OF DALLAS
DALLAS POLICE DEPARTMENT
SCOTT ROBERT SAYERS
ROBERT L. ERMATINGER, JR


***Via CM/ECF Notice:***
Tierman Cole
OFFICE OF ATTORNEY GENERAL OF FLORIDA
110 SE 6th St., FI 10
Fort Lauderdale, FL. 33301-5001
Demetri Anastasiadis
OFFICE OF ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711
COUNSEL FOR DEFENDANT:
ERIC VAUGHN MOYE


***Via Email: steve.schoettmer1@gmail.com***
Stephen Charles Schoettmer
4305 W Lovers Ln
Dallas, TX 75209-2803
DEFENDANT PRO SE

Exhibit  A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 18-cv-61117-BLOOM/Valle

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

      *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

      *Defendants.*
_____/

## DECLARATION OF BRIAN E. VODICKA

1.    My name is Brian E. Vodicka.   I am more than 21 years old and I have never been

convicted of a felony or crime of moral turpitude.  I am fully competent to make this

declaration and all of the facts set forth herein are based on my personal knowledge and are

true and correct.

2.    I have been a resident and citizen of the State of Florida since November 15, 2016.

3.   I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4.   I cannot afford the expense of travel and lodging to attend hearings set by a court in Texas.

5.   Defendants Robert Ermatinger and Scott Sayers signed multiple affidavits for search warrants that contained material false representations of purported "verified facts."

6.   I have accessed Defendants' Article-2, on multiple occasions its publication, which began in April 2017.  Articles-2 is published on D Magazine's commercial interactive website, which solicits all viewers to subscribe or advertise by clicking on  "Subscribe" or "Contact Us," located under the "ADVERTISE" section found at the end of the web page.  As well, D Magazine's commercial interactive website features a red lettered "SUBSCRIBE" feature that remains visible and accessible at the top of the website's window.  This feature is on D Magazine's website used to publish Article-2 and solicit subscribers and advertisers: https://www.dmagazine.com/

7.   Upon arrival in Florida, and for approximately three (3) weeks following, local law enforcement officers regularly parked in front of my residence and/or in front of my next door neighbors home, alarming my new neighbors.

8.   Two persons, who identified themselves as agents for the Tobolowsky family and working with Defendant Robert Ermatinger, physically assaulted me in the private parking area of my residence. One of the two agents openly carried a firearm, which was forbidden on the private property. The Tobolowsky agents illegally trespassed to gain access to the property and to harass, threaten and assault me. On the days that followed, the same agents continued to trespass onto private property and the male agent, approximately 30 feet away, screamed at me "You're in danger." This same scenario occurred on multiple occasions. In

fear of my personal safety, I hurriedly moved away from Dallas and gun violence. The Tobolowsky gun-carrying agents trespassed onto private property with open firearms in violation of the License to Carry handgun laws under the Texas Penal Code § 42.06, 46.02, 46.035.

9.   I have personally witnessed two Florida residents access Defendants' Article-2 and read the published content of the article.

10.  Ira Tobolowsky and Stephen Schoettmer filed a defamation action against his former client, Judy Brauman in Cause No. 10-09803 in the 116th Judicial District Court, Dallas County, Texas, *Tobolowsky v. Bruaman.*

11.  I was never in hiding following the murder of Ira Tobolowsky.  The fraudulent affidavit used against me stated: "It is believed that whoever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives."  Detectives did their level best to make it appear as though I was "hiding from the public" to fabricate probable cause for the unlawful search warrants.  If they had wanted to find me, they could have knocked on my door.  My credit card statements indicate that I used my credit card in six (6) different public restaurants and grocery stores from May 13 - May 18, 2016, the day Defendant Ermatinger signed the fraudulent affidavits.    Additionally, a friend from out of town came to visit us for three (3) days during the week before I was examined for burns.  I did everything but hide from the public.  Ermatinger admitted in his affidavits that he had been tracking my credit cards, therefore he knew his representation that I was hiding was false.

12.  Ermatinger made statements about my phone habits on the day of the murder that were published in D Magazine's Articles.  He said there was "no activity on the men's

cellphones from about 9 pm the night before the fire until the next afternoon. The records did show cell activity before and after that time period." That was a lie. I have copies of my phone records, which Ermatinger claims he accessed, and they indicate I made five (5) calls on May 13, 2016, at 9:17am, 9:18am, 10:51am, 10:52am and 11:16am.

13. Ermatinger's fraudulent affidavits included what may be considered an accusation of religious prejudice directed at me. The affidavits, fraught with untruths, state: "Ira Tobolowsky is of Jewish descent and felt Jihad was an anti-Semitic statement." At a minimum, the bizarre statement that had no corollary or connection to anything else, at least insinuates that I am anti-Semitic. I am not nor have I ever been anti-Semitic. Although I am a Christian, I have been a devout follower of Rabbi Harold Kushner and have proudly read most, if not all, of his books. Ira Tobolowsky and his lawyer, Defendant Schoettmer, used the term "Jihad" in their pleadings ad nauseam with a total of at least 97 Jihad references in 14 court filings. Their affinity for "Jihad" does not comport with Ermatinger's affidavits of "verified facts."

14. The defendants in this case have made their bed and now need to lie on it. By their own hands, the trial by media already reached a verdict, "guilty" of capital murder. The defendants' actions make it impossible for me to get a fair trial in North Texas.

15. Steve Aubrey has never suffered any burns on his body in the twenty-three (23) years I have known him. On May 20, 2016, the day after Steve Aubrey and I were taken to police headquarters and photographed, I took many photos of Steve's arms, in the bright sunlight outside and in front of that day's newspaper, for time stamp purposes. I still have the photos and they prove Steve Aubrey's arms were not burned and they still had hair on them.

16.   I am a qualified individual under the Americans with Disabilities Act and I am promised

protections under the City of Dallas Title VI. Nondiscrimination Policy.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the ⎯1st⎯ day of October 2018.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Brian Vodicka

Exhibit  B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No. 18-cv-61117-BLOOM/Valle**

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

       *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

       *Defendants.*
_____/

## DECLARATION OF STEVEN AUBREY

1. My name is Steven Aubrey.  I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude.  I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2. I have been a resident and citizen of the State of Florida since November 15, 2016.

3. I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4. I cannot afford the expense of travel and lodging to attend hearings set by a court in Texas.

5. Defendants Robert Ermatinger and Scott Sayers signed multiple affidavits for search warrants that contained material false representations of purported "verified facts."

6. I have accessed Defendants' Article-2, on multiple occasions its publication, which began in April 2017. Articles-2 is published on D Magazine's commercial interactive website, which solicits all viewers to subscribe or advertise by clicking on  "Subscribe" or "Contact Us," located under the "ADVERTISE" section found at the end of the web page.  As well, D Magazine's commercial interactive website features a red lettered "SUBSCRIBE" feature that remains visible and accessible at the top of the website's window.  This feature is on D Magazine's website used to publish Article-2 and solicit subscribers and advertisers: https://www.dmagazine.com/

7. Upon arrival in Florida, and for approximately three (3) weeks following, local law enforcement officers regularly parked in front of my residence and/or in front of my next door neighbors home, alarming my new neighbors. My next door neighbor who upon my arrival was very verbally excited about having a new neighbor has never spoken another word to me since that first day, approximately 23 months ago.

8. In October 2016, two persons, who identified themselves as agents for the Tobolowsky family and working with Defendant Robert Ermatinger, physically assaulted me in the private parking area of my residence. One of the two agents openly carried a firearm, which was forbidden on the private property.  The Tobolowsky agents illegally trespassed to gain access to the property and to harass, threaten and assault me. On the days that followed, the same agents continued to trespass onto private property and the male agent, approximately 30 feet away, screamed at me "You are in danger." This same scenario occurred on multiple

occasions. In fear of my personal safety, I hurriedly moved away from Dallas and gun violence. The Tobolowsky gun-carrying agents trespassed onto private property with open firearms in violation of the License to Carry handgun laws under the Texas Penal Code § 42.06, 46.02, 46.035.

9. Ira Tobolowsky and Stephen Schoettmer filed a defamation action against his former client, Judy Brauman in Cause No. 10-09803 in the 116th Judicial District Court, Dallas County, Texas, *Tobolowsky v. Bruaman*.

10. I have never been burned by fire, ever.  On May 19, 2016, I was examined by Ermatinger six (6) days following the murder.  I was not burned and hair on my arms was not missing or singed, proof I had not been burned.

11. I was never in hiding following the murder of Ira Tobolowsky.  In fact, on May 13, 2016, the morning of the murder, I was shopping at Trader Joe's.  A few hours later, I went to my dermatologist for a scheduled appointment at approximately 12:30pm. The fraudulent affidavit used against me stated: "It is believed that whoever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives."  Detectives did their level best to make it appear as though I was "hiding from the public" to fabricate probable cause for the unlawful search warrants.  They even passed my photo around the courthouse and warned court personnel to be on the lookout, while I was at home in our apartment with the same address as was on my driver's license.  If they had wanted to find me, they could have knocked on the door.  My financial statements indicate that I used my credit card in ten (10) different public restaurants and stores from May 13 - May 18, 2016, the day Defendant Robert Ermatinger signed the fraudulent affidavits.  Three (3) of the 10 credit cards expenditures

were on May 13, 2016, the same day as the murder, the same day as the dermatologist appointment. Additionally, a friend from out of town came to visit us for three (3) days during the week before I was examined for burns. We were doing everything but hiding from the public. Ermatinger admitted in his affidavits that he had been tracking our credit cards, therefore he knew his representation that we were hiding was false.

12. Ermatinger made statements about my phone habits on the day of the murder that were published in D Magazine's Articles. He said there was "no activity on the men's cellphones from about 9 pm the night before the fire until the next afternoon. The records did show cell activity before and after that time period." That was a lie. I have copies of my phone records, which Ermatinger claims he accessed, and they indicate I made two (2) calls at 10:51am and 10:53am.

13. Ermatinger's fraudulent affidavits included what may be considered an accusation of religious prejudice directed at me. The affidavits, fraught with untruths, state: "Ira Tobolowsky is of Jewish descent and felt Jihad was an anti-Semitic statement." At a minimum, the bizarre statement that had no corollary or connection to anything else, at least insinuates that I am anti-Semitic. Ira Tobolowsky and is lawyer, Defendant Schoettmer used the term "Jihad" in their pleadings ad nauseam with a total of at least 97 Jihad references in 14 court filings. Their affinity for "Jihad" does not comport with Ermatinger's affidavits of "verified facts."

14. The defendants in this case have made their bed and now need to lie on it. By their own hands, the trial by media has already reached a verdict, which is "guilty" of capital murder. The defendants' actions render that it is impossible for me to get a fair trial in North Texas.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the _____1st_____ day of October 2018.


Steven Aubrey

Exhibit  C

<u>AFFIDAVIT FOR SEARCH WARRANT</u>

| | | |
|---|---|---|
| STATE OF TEXAS | § | Residence located at |
| | § | ▉ Souhwestern Blvd ▉ |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at ▉ Southwestern Blvd ▉ Dallas, Dallas County, Texas.  The residence is an apartment complex called The ▉▉▉▉▉▉▉▉▉▉located in the Village apartment comunity. The Apartment in question is located on the first floor and is a red brick structure with the top floors being gray wood.  The number ▉ is to the right of the door.

2. There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense:  Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases.  Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind.  Tools or drills and drill bits that could be used to drill a hole in a wood fence.  Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3. Said suspected place and premises are in charge of and controlled by each of the following persons: StevenBenton Aubrey W/M 10/11/60 who uses this location for business purposes to meet clients and give massage therapy. Brian Vodicka who is steve Aubreys boyfriend stated in an interview that the apartment is used for this purpose.

4. It is the belief of Affiant, Detective Scott Sayers #7157 who is employed by the Dallas Police Department for 21 years and who has been assigned to the Homicide unit does hereby charges and accuses that:  the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing,

blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor that can be sent to a laboratory and compared to evidence found at the scene. ████ Southwestern Blvd ████ Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts: On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at ████████████, Dallas, Dallas County, Texas. Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle. He was pronounced dead at the scene. Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder. During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him. Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey. It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding. Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement. It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives. Detectives went to the location of ████████████ and knocked on the door of ████ to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained. No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Detectives executed a search warrant on Steven Aubrey and Brian Vodicka's Apartment located at████████████ on May 19th 2016. After searching the apartment detectives received information from the complainants family about some holes that were drilling in the complianants fence so that someone could observe the complainant coming and going from his residence without being seen. The holes were located on the far southeastern part of the fence and gave a clear hidden view from the Alley of the complainants garage. Detective Richardson remembers seeing a dril and dril bits inside the apartment at the time of the execution of the warrant but

detectives had not received the information about the suspicious holes till after the warrant was executed.  It is believed that the drill and drill bits need to taken for examination purposes to determine if in fact it was used to drill the suspicious holes in the complainants fence.  Steven Aubrey was finally located coming out of ███ Southwestern Blvd ███ and was taken to Dallas Headquarters to be photographed and interviewed.  The apartment that he came out of was never searched for the above listed items.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____
AFFIANT

Subscribed and sworn to before me by the said affiant on this 25ᵗʰ day of
___M-7___ , 2014.

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS
265TH Bennett

# Exhibit  D

## AFFIDAVIT FOR SEARCH WARRANT

STATE OF TEXAS        §        Residence located at
                      §        ███████████████████
COUNTY OF DALLAS      §        Dallas, Dallas County, Texas

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at ███████████████ Dallas, Dallas County, Texas. The residence is an apartment complex called Tonti Lakeside Apartments. The Apartment in question is located on the second floor and is a red brick structure the number ██████ located on the top center of the door.

2. There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense: Any combustable liquids or empty containers that are similar to the items found at the crime scene. Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3. Said suspected place and premises are in charge of and controlled by each of the following persons: StevenBenton Aubrey W/M 10/11/60 and Brian Edward Vodicka W/M 08/09/59 who are on the lease argeemnent for the address listed in this warrant. The lease agreement was dated on 2/07/16.

4. It is the belief of Affiant, Detective Scott Sayers #7157 who is employed by the Dallas Police Department for 21 years and who has been assigned to the Homicide unit does and he hereby charges and accuses that: the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing, blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any ignitable liquids or evidence of any ignitable liquids

that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene. ████████████████Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at███████████████ Dallas, Dallas County, Texas. Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson Investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.   During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.  It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.  Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson Investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.   Detectives went to the location of███████████████ and knocked on the door of █████to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Detectives executed a search warrant on Steven Aubrey and Brian Vodicka's Apartment located at███████████████ on May 19th 2016. After searching the apartment detectives received information from the complainants family about some holes that were drilling in the complianants fence so that someone could observe the complainant coming and going from his residence without being seen.  The holes were located on the far southeastern part of the fence and gave a clear hidden view from the Alley of the complainants garage. Detective Richardson remembers seeing a drill and drill bits inside the apartment at the time of the execution of the warrant but detectives had not received the information about the suspicious holes till after the warrant was executed.  It is believed that the drill and drill bits need to taken for

examination purposes to determine if in fact it was used to drill the suspicious holes in the complainants fence.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____
AFFIANT

Subscribed and sworn to before me by the said affiant on this 25TH day of _May_ , 20 16

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

265TH  Bennett