# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

### Case No. 18-cv-61117-BLOOM/Valle

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

     *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

     *Defendants.*

_____/



FILED BY _____ D.C.

OCT - 2 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## PLAINTIFFS' RESPONSE TO CITY DEFENDANTS'[1] MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

---

[1] Defendant Robert L. Ermatinger, Jr.'s legal capacity in this action changes upon his retirement from the City of Dallas, Dallas Police Department in November 2016. Plaintiffs' defamation claims againt Robert L. Ermatinger, Jr. ("Ermatinger"),Individually, arise from his February 2017 interview with D Magazine and are addressed in a serperate response.   This Response addresses the City Defendants, including Ermatinger in his capacity as a City of Dallas employee.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.    BACKGROUND ................................................................. 2

III.    ARGUMENT and AUTHORITY.............................................. 5

    A.   City Defendants are subject to personal jurisdiction in Florida ................. 5

        1.   The City established Florida minimum contacts ........................... 5

        2.   The City violated their own policy, releasing opinions and fabricated evidence. ......................................................... 6

        3.   The City instigated harassment in Florida .................................. 8

        4.   Florida Long Arm Statute establishes personal jurisdiction .............. 9

        5.   Plaintiffs' Due Process ....................................................... 10

            a)   Relatedness ........................................................... 10

            b)   Purposeful Availment ............................................... 11

            c)   Fair Play and Substantial Justice ................................. 11

    B.   Florida venue is proper ....................................................... 13

        1.   Florida events gave rise to the claim ....................................... 13

        2.   Events essential to the existence of the claim .............................. 14

    C.   Florida claims brought in Florida, where the injury occurred ................... 15

IV.    STATED CLAIMS FOR EACH COUNT ..................................... 16

    A.   Counts I, XV, and XVI—Defamation ....................................... 16

    B.   Count II—Unreasonable Searches and Seizures ............................. 16

    C.   Count III—Excessive Force ................................................... 19

    D.   Count IV—Private Property Taken for Public Use ........................... 19

E. Count V—Deprived of Liberty without Due Process of Law ................... 19

F. Count VI—Due Process and Equal Protection .................................... 19

G. Count VII—Presumption of Innocence ............................................ 19

H. Count VIII—Persons Under Color of Law Liability ............................. 19

I. Count IX—Americans with Disabilities Act ...................................... 20

J. Count X—Conspiracy Against Rights Under Color of Law.................... 20

K. Count XI—Abuse of Process ........................................................ 21

L. Count XII—Invasion of Privacy–Misappropriation ............................. 21

M. Count XIII—Invasion of Privacy—Public Disclosure .......................... 21

N. Count XIV - Invasion of Privacy – Intrusion ..................................... 22

O. Count XVII—False Arrest ........................................................... 22

P. Count XVIII—Assault and Battery ................................................. 23

Q. Count XIX—False Imprisonment ................................................... 23

R. Count XX—Foreseeable Zone of Risk ............................................ 23

S. Count XXI—Conspiracy Liability .................................................. 23

T. Count XXII—Emotional Distress, Intentional Infliction ....................... 24

U. Count XXIII—Negligent Infliction of Emotional Distress ..................... 24

V. CONCLUSION ............................................................................... 24

Plaintiffs Steven B. Aubrey ("Aubrey") and Brian E. Vodicka ("Vodicka"), (collectively, "Plaintiffs"), respond to the Motion to Dismiss ("Motion") filed by the City of Dallas, Scott Robert Sayers ("Sayers") and Robert L. Ermatinger, Jr. ("Ermatinger") (collectively, "The City"), as follows:

## I. INTRODUCTION

This case is about crooked Texas cops that botched a Texas murder investigation. To solve crimes, the crooked cops found "the end justifies the means" method was their favorite but it was not working well for them in this case. The crooked cops typically started an investigation with fraudulent affidavits loaded with probable cause. Defendants Robert Ermatinger ("Ermatinger") and Scott Sayers ("Sayers") would commit aggravated perjury, get the unlawful search warrants they needed to bust right through people's right to privacy and hope they might stumble into something. The crooked cops instincts were off this time, they continued using fraudulent affidavits but they were not finding anything of value.

The crooked cops were frustrated so they conspired with The County cops to really unleash on the Plaintiffs because in Texas, the gays are treated just like the blacks. Together, the band of Texas cops committed multiple criminal offenses against Plaintiffs, but still no evidence.

Ermatinger and Sayers had already been through Plaintiffs' apartment two times, with search warrants. For reasons unknown, they waited for Aubrey to leave the apartment and then broke into Plaintiffs residence and illegally trespassed into the residence, without a warrant. That and repeated aggravated assaults by Ermatinger's thug friends was all Plaintiffs could stand, they had their fill of Dallas and moved to Florida. The crooked cops were not quite ready to see their favorite targets leave so the police cops contacted the local police in Florida and the sheriff

cops called the Broward County sheriff's department ensuring Plaintiffs would be harassed when they arrived in South Florida. (*See* Ex. A, Decl. of Vodicka at ¶¶ 2 and 7)

Plaintiffs were living in Florida when The City released two (2) of their fraudulent affidavits for search warrants to be published online and further injure Plaintiffs, in Florida. The City's flagrant use of unlawful search warrants against Plaintiffs and others, garners national recognition.[1] (*See* Exs. C and D, Fraudulent affidavits published by D Magazine)

## II. BACKGROUND

Plaintiffs had planned to move to Florida from Austin in early 2016.   Ira Tobolowsky teamed up with his lawyer/partner, Defendant Stephen Schoettmer ("Schoettmer") to file a frivolous defamation suit against Plaintiffs in Dallas, as they had done to others over the years. (*See* Ex. A, Decl. of Vodicka at ¶ 10) Plaintiffs' plans to move to Florida were short circuited by the lawsuit and Schoettmer's frequent and harassing settings for hearings that required travel to Dallas. Plaintiffs decided to move to Dallas for one year expecting the lawsuit against them would be over with a July 2016 setting for trial.   They were wrong.   After moving to Dallas, where Aubrey was born and raised, Schoettmer's judicial gamesmanship became less of a burden to Plaintiffs.  Months after moving to Dallas, Ira Tobolowsky was murdered.

---

[1] On September 6, 2018, Dallas police Officer Amber Guyger shot and killed Botham Jean (26), who was unarmed and in his own apartment.  Dallas Police Department's reaction to the incident was to criminalize the victim, and on the following day, a search warrant was issued for collection of evidence in the murder victim's apartment, including narcotics.  The warrant listed several items found inside the apartment, including 10 grams of pot and a metal marijuana grinder, among other things. The Washington Post, September 14, 2018 article, *Dallas police shooting: Search for marijuana in victim's home was attempt to 'smear' him*, attorneys say, by Meagan Flynn stated:  "[Jean] was not only never convicted of a crime, he was never even accused of a crime, never arrested," Merritt told The Washington Post. "It took a white Dallas police officer to break into his home and shoot him to death for him to become painted as a criminal." Plaintiffs" allege these acts form a pattern and practice of The City.

Because the relationships between Plaintiffs, Schoettmer and Ira Tobolowsky were typical of opposing parties, following the murder, the Tobolowsky family was reported to have no idea who, including Plaintiffs, might have wanted to harm Mr. Tobolowsky, stating:

> The detective asked Debbie: "Do you think this was an accident, or could someone have done this?" "What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband. (*See* Doc. 56-2, Decl. of Earnshaw at p.16)

> Before the flight, Michael had learned the fire might have been set intentionally. The thought infused his grief with rage. Cramped in his window seat, Michael felt his hands aching and realized both fists were clenched. All he could think about was *"Who?"* (*See* Doc. 56-2, Decl. of Earnshaw at p.16)

Michael Tobolowsky ("Michael") and his brothers were on vacation in Florida when they receiver the horrific news about their father. (*See* Doc. 56-2, Decl. of Earnshaw at pp. 17 & 19) At the same time they were on a flight back to Texas wondering "who," the first story about the fire appeared online at 9:32 am, insinuating Plaintiffs' connection to the crime, stating: "His law partner told the station that Tobolowsky had recently been involved in contentious litigation."

Without motive and without anything connecting Plaintiffs to the crime except a lawsuit, Schoettmer, who knows less about Plaintiffs than almost anybody, told the media and investigators that he believed Plaintiffs were very angry and were responsible. Schoettmer also fabricated that Ira Tobolowsky had recently received a death threat email, which also turned out to be false. Schoettmer has a history of scandalous and unethical behavior and he directed much of his hate at the LGBT community and at Plaintiffs. Schoettmer seized the opportunity that the murder presented, took center stage and began holding press conferences and giving interviews interjecting himself and the lawsuit into the tragic murder.

Schoettmer's finger pointing, followed by Defendant Eric Moye's ("Moye") announcement that he believed Aubrey murdered Ira Tobolowsky, triggered epic events and epic defamatory attacks on Plaintiffs, which continue today. The City bungled the investigation and

3

focused all of their manpower and search warrants on Plaintiffs instead of persons with likely motives, despite Vodicka's advice to Ermatinger; "follow the money." Frustrated with The City's failed attempt to investigate the crime, the Tobolowsky family began their own investigation and with nothing but Moye's accusation and the constant media attack, they grew to believe misinformation about Plaintiffs, like millions of others in Texas and across the country. Plaintiffs have never been convicted, indicted, charged with, arrested or even named suspects for the murder of Ira Tobolowsky and they never will be, because they had nothing to do with it.

For 50 plus years, Plaintiffs were highly respected by business associates, friends and acquaintances. The City conspired with others to completely destroy Plaintiffs' reputations in Texas and in Florida. The defendants' war on Plaintiffs and the life-threatening assaults caused Plaintiffs to move several months before their planned departure and they relocated to South Florida. (*See* Ex. A, Decl. of Vodicka at ¶¶ 1, 6)  (*See* Ex. B, Decl. of Aubrey at ¶ 1)

Years prior, when life had been better to Plaintiffs, they owned a second home on Miami Beach. They were more than eager to return to South Florida, catch up with great friends they had known for many years and begin to enjoy life again, on the beach like before. The drive to Florida in a U-haul rental was tough but the moment Plaintiffs crossed the Texas border into Louisiana, there was a overwhelming feeling of freedom and safety. Expecting they would never return, Plaintiffs believed they were leaving the darkness of Dallas behind.

But those good feelings and hope for a brighter future only lasted the few days it took to drive to South Florida because The City had called ahead and poisoned the well. The City had successfully destroyed Plaintiffs' reputations in Broward County before they arrived by passing the baton to local law enforcement who continued the harassment on behalf of The City.

Upon arriving, police officers and sheriff deputies took turns parking directly in front of the house Plaintiffs' rented, or one house removed, an unfamiliar practice for the quiet neighborhood. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 7)  The new routine/harassment lasted approximately three (3) weeks and frightened the neighbors.  Plaintiffs' next-door neighbors, who were verbally excited to have a new neighbor on the day they arrived, have not spoken a word to Plaintiffs since, now almost two years.  Local law enforcement made sure to let Plaintiffs know they were not welcome here and that they were being watched, very closely.

Plaintiffs were invited to one set of friend's house for Thanksgiving and another for Christmas, but within three months of their arrival, Plaintiffs decade-long friendships vanished as a result of the defamation on the Internet. Plaintiffs' fears were realized.   Defamatory publications on the Internet are like an aggressive cancer that is sure to cause damage sooner rather than later.  The family Plaintiffs spent Christmas and New Years with sold their house and moved without telling Plaintiffs and without any forwarding information.   They have toddlers and they likely feared for their safety after reading the articles published on the Internet, here in Florida.

### III.  ARGUMENT and AUTHORITY

Plaintiffs concede that the Dallas Police Department should be dismissed because it is not an independent legal entity capable of being sued.

**A.      The City is subject to personal jurisdiction in Florida.**

**1.      The City established Florida minimum contacts.**

Plaintiffs' injuries arose from The City's significant events in Texas as well as significant events in Florida.  The City released Plaintiffs' personal and confidential information, which was protected by the constitutional right to privacy and the Texas Government Code.  Most of the

information released by The City were completely fabricated, made to appear truthful and legitimate, to attract D Magazine, who published the material in Articles 2 and 3 (the "Articles").[2] The Articles were distributed to, and accessed in, Florida. (*See* Ex. A, Decl. of Vodicka at ¶ 6)  The City's false and defamatory information, about Florida residents, was published on D Magazines' website and was accessible and accessed in Florida, thereby constituting the commission of the tortious act of defamation within Florida under section 48.193(1)(b).   Plaintiffs, Florida residents, are the main subject of Article-2 with their proper names reprinted 120 times. Under section 48.193(1)(a)2.   Under section 48.193(1)(a)2, The City's acts subject them to this Court's jurisdiction because they committed a tortuous act within this state.

**2.     The City violated their own policy, releasing opinions and fabricated evidence.**

The City's conduct violates established federal statutory and/or constitutional rights of which a reasonable person would have known. *Cruz v. Davidson*, 552 F. App'x 865, 867 (11th Cir. 2013) (quoting *Keating*, 598 F.3d at 762).   When The City conspired with D Magazine to publish false and defamatory material regarding Plaintiffs, they were in direct conflict with Section 323.04B.2. of the Dallas Police Department General Order, which forbids the release of such information, stating:

---

[2] <u>Article-2</u>: April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the online version of D Magazine's feature story designed to reach their online digital media audience, sell subscriptions and solicit advertisers. (*See* Motion, Doc. 56-2, Decl. of Earnshaw Tabs 2) <u>Article-3</u>: April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the print version of the feature story that was published it the May 2017 magazine with the cover title: "*Scene of the Crime: Ira Tobolowsky was burned alive in his North Dallas garage.  The family is convinced they know who did it*" (*See* Motion, Doc. 56-2, Decl. of Earnshaw Tab 1) D Magazine ships the magazine to customers in multiple states, including Florida. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at ¶ 10)

"INFORMATION WILL NOT BE RELEASED PERTAINING TO ANY OF THE

FOLLOWING: PERSONAL OPINIONS ABOUT THE SUSPECT OR EVIDENCE."

(Emphasis added) (*See* Ex. E, Section 323.04B.2.)

In violation of the Dallas Police Department General Order, The City released personal opinions

about Plaintiffs and evidence, including:

> Ermatinger would have to wait for crime scene technicians to search the men's
> computers and process the juice bottle found in the garage for fingerprints.
> (*See* Doc. 56-2, Decl. of Earnshaw at p. 32)

> Detective Ermatinger, now retired, says the men remain primary suspects; no one
> else on their list came close. He says detectives executed more search warrants on
> the Tobolowsky case-roughly 18-than on any other case he'd worked. Most of
> those dealt with Aubrey and Vodicka; others were for cell tower dumps. "They
> are suspects, and they are strong ones," Ermatinger says. "But I had no evidence
> to arrest them."(*See* Doc. 56-2, Decl. of Earnshaw at p. 42)

> "Ermatinger says Aubrey had red marks on both arms. But a SWAT doctor
> couldn't definitively say what the marks were from. "The doctor explained to us
> that it could be from the flash of a fire, it could be burns, or it could just be a
> sunburn," Ermatinger says. He says too much time had passed."
> (*See* Doc. 56-2, Decl. of Earnshaw at p. 31)

The City violated Section 323.04B.2 when releasing these comments and he failed to explain that

it had been only six (6) days since the fire/murder and Aubrey's arms still had hair on them and

the hair was not singed.

> Ermatinger didn't have any physical evidence linking them to the crime scene. But
> the men remained strong suspects. They did not have good alibis, telling
> detectives that at the   time of the fire, they were at their apartment.
> (*See* Doc. 56-  2, Decl. of Earnshaw at p. 31)

Plaintiffs "did not have good alibis" because detectives learned they were home at 7:30 am on

the day of the fire, indicating that every morning of every day, Plaintiffs do not have good alibis.

> "Detectives began monitoring the men's credit card transactions and discovered
> that Aubrey's card had been used that day to book a room at the Crowne Plaza
> hotel in Dallas under the name Alexandra Krot (a friend who did spend the
> night at the hotel, police later learned)." (*See* Doc. 56-2, Decl. of Earnshaw   at
> p. 30)

"They had good circumstantial evidence against Aubrey, but nothing that placed him at the house on May 13."  (*See* Doc. 56-2, Decl. of Earnshaw at p. 42)

"Detectives sent the juice bottle to Quantico for analysis."
(*See* Doc. 56-2, Decl. of Earnshaw at p. 46)

As seen above, the detective's circumstantial evidence was pathetic.  Ermatinger went a step further and released an undeniably fabricated and false statement, stating:

"Phone records, detectives told the Tobolowsky family, showed no activity on the men's cellphones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. The records did show cell activity before and after that time period."
(*See* Doc. 56-2, Decl. of Earnshaw at pp. 31-2)

Here, Ermatinger lied to create suspicion where there should be none.  Though it was a violation for Ermatinger to release any information, true or false, he knew the statement about phone records was a lie because had subpoenaed Plaintiffs' phone records, which indicate that Vodicka made five (5) calls and Aubrey made two (2) calls before noon on the day of the murder.  (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 12)

### 3.    The City instigated harassment in Florida.

The City was not satisfied with just chasing Plaintiffs out of Dallas and out of Texas.  For approximately three (3) weeks, local police officers took turns parking directly in front of the house Plaintiffs rented, frightening the neighbors. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 7) Plaintiffs' next-door neighbors, who were verbally excited to have a new neighbor that first day, have not spoken a word to Plaintiffs since, now almost two years.

Upon information and belief, Ermatinger contacted local law enforcement to instigate harassment against Plaintiffs upon their arrival to their new home.  Ermatinger claims in his declaration that he has never contacted any person in Florida, including any Florida police department or law enforcement personnel regarding Plaintiffs.  Plaintiffs allege that Ermatinger's

undeniably fraudulent affidavits for search warrants and his provably false statements in the Articles published by D Magazine stand as proof that he is dishonest and nothing he says can be trusted.   And if any person could be recognized as the most interested and dedicated to Plaintiffs' harassment, it would likely be the same one who illegally trespassed into Plaintiffs residence without a warrant and who freely released information, about an ongoing murder investigation, to the media to harass Plaintiffs, that person would be Ermatinger.  His vendetta against Plaintiffs is obvious because he has shown that he will go the extra mile to injure them. If not him, one of the John Does is behind it and minimal discovery here in Florida should quickly identify the Dallas contact, Ermatinger.

### 4.    Florida Long Arm Statute establishes personal jurisdiction.

Plaintiffs' claim fits squarely within the provisions of Florida's long-arm statute to give this Court personal jurisdiction over The City.

Plaintiffs resided in Florida when The City released information concerning Plaintiffs to be published in the Articles.  Upon publication in Florida, the information released by The City, injured Plaintiffs and continues to injure Plaintiffs, in Florida, thereby sufficient for long-arm jurisdiction over The City.  *Honus Wagner Co. v. Luminary Group LLC*, No. 17-cv-61317-Bloom/Valle, 2017 WL 6547899, *12 (S.D. Fla. Dec. 21, 2017):

> Fla. Stat. § 48.193(1)(a)(1), (2), & (6). "The reach of Florida's long-arm statute `is a question of Florida law,' and this Court is required to apply the statute as would the Florida Supreme Court.'" *Louis Vuitton,* 736 F.3d at 1352 (quoting *United Techs.,* 556 F.3d at 1274). Under § 48.193(1)(a)(2), a defendant commits a tortious act within Florida when that act causes injury in Florida. *See Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1217 (11th Cir. 1999) (holding that the Eleventh Circuit's "firmly established precedent . . . interprets subsection [48.193(1)(a)(2)] to apply to defendants committing tortious acts outside the state that cause injury in Florida").

> *Nida Corp. v. Nida,* 118 F. Supp. 2d 1223, 1228 (M.D. Fla. 2000)   ("The act is considered to take place within the state for purposes of the long-arm statute if the injured party resides in Florida, regardless of where the acts were actually committed.")

The City's tortuous act, illegal release of information and fabrication of information for purposes of publication in the Articles, caused Plaintiffs' injuries in Florida. Plaintiffs know a Florida resident who did access D Magazine's website and read the material on it. (*See* Ex. A, Decl. of Vodicka at ¶ 9)

### 5.    **Plaintiffs' Due Process.**

The City could have reasonably anticipated it would be subject to suit here in Florida. They purposefully released information to D Magazine for publication in Article-2 to be accessed on the World Wide Web, by anyone, including residents in Florida. As well, The City could have reasonably anticipated they might be subject to suit in Florida because of their direct contact with local law enforcement that caused the harassment to continue.. *Honus Wagner Co. v. Luminary Group LLC*, No. 17-cv-61317-Bloom/Valle, 2017 WL 6547899, *12 (S.D. Fla. Dec. 21, 2017):

> The Constitution prohibits the exercise of personal jurisdiction over a nonresident defendant unless its contacts with the state are such that it has "fair warning" or could have "reasonably anticipated" that it may be subject to suit there. *Licciardello,* 544 F.3d at 1284 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)); *Burger King,* 471 U.S. at 472 (quoting *International Shoe,* 326 U.S. at 316). "This `fair warning' requirement is satisfied if the defendant has `purposefully directed' [its] activities at residents of the forum and the litigation results from alleged injuries that `arise out of or relate to' those activities." *Licciardello,* 544 F.3d at 1284. (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). In         addition, the Court must also examine whether the exercise of jurisdiction comports with "fair play and substantial justice." *Licciardello,* 544 F.3d at 1284 (11th Cir. 2008) (quoting *International Shoe,* 326 U.S. at 320).

### a)    **Relatedness**

Plaintiffs' claim arose from The City's contact with Florida, through publication of the Articles in Florida, defaming Florida residents and from their influence with local law enforcement.   In *Honus*:

"[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum.'" *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir. 2010) (quoting *Oldfield,* 558 F.3d at 1222 (some internal quotation marks omitted)). The "inquiry must focus on the direct causal relationship between the defendant, the forum, and the litigation." *Fraser,* 594 F.3d at 850 (internal quotation marks omitted) (quoting *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872).

### b)   Purposeful Availment

The City aimed their intentional tort at Plaintiffs who lived in Florida and were injured in Florida, which satisfies the *Calder* effects test for personal jurisdiction.  Additionally, they contacted the local police department, causing injury.  In *Honus:*

> Under the effects test articulated by the Supreme Court in *Calder v. Jones,* a nonresident defendant's single tortious act can establish purposeful availment even if a defendant does not have any additional contacts with the forum state. *See Licciardello,* 544 F.3d at 1285 (citing *Calder v. Jones,* 465 U.S. 783 (1984). This occurs when the tort was: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* (citations omitted).

Plaintiffs' allegations satisfy the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum." *Licciardello,* 544 F.3d at 1287-88 (11th Cir. 2008).

### c)   Fair Play and Substantial Justice

The City aimed his intentional tort at Plaintiffs who lived in Florida and were injured in Florida, which satisfies the *Calder* effects test for personal jurisdiction.  Additionally, he contacted the local police department causing more injury. Plaintiffs have suffered glaring judicial abuse in North Texas, indicating Florida jurisdiction is proper so the playing field is level for all parties.  In *Honus:*

> Defendants bear the burden of establishing that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice. *See Louis Vuitton,* 736 F.3d at 1355. This inquiry requires consideration of the following factors: (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the [interstate] judicial

system's interest in resolving the dispute." *Mighty Men,* 102 F. Supp. 3d at 1275 (quoting *Licciardello,* 544 F.3d at 1288).

(1) <u>Burden on the defendant</u>.  The defendants' own acts disqualify their preferred Texas jurisdiction and/or venue.  Defendant Eric Moye gathered the media in his courtroom and announced to the world that Aubrey murdered Ira Tobolowsky and because Aubrey was so dangerous, he was recusing himself from the case. (*See* Motion, Doc. 56-2, Decl. of Earnshaw at p. 29)  For Plaintiffs, there is no chance for a fair trial or an impartial jury pool in Texas.  The City's assertions about their burden is disingenuous.  (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 14)

(2) <u>Forum's interest in adjudicating the dispute</u>.  Plaintiffs pray this Court takes interest in helping Florida residents who continue to be injured by Texas defendants.  The defendants have not been able to resist continually availing themselves to Florida's jurisdiction.  Plaintiffs should have the same rights as others, to live peacefully and without the fear of being harmed by those who are supposed to protect them.   The defendants successfully ran Plaintiffs out of Dallas and now continue to make life miserable for them in South Florida.  This is an opportunity for this Florida Court to send a message to Texas that their continued harassment and influence in Florida is not welcome.

(3) <u>Plaintiff's interest in obtaining convenient and effective relief</u>.   Plaintiffs are only capable of ***affordable*** and effective relief.  Plaintiffs cannot afford the expense of travel, lodging and time away from work if this case was in a venue further than a half day's drive from Fort Lauderdale.  Jurisdiction in Texas would guarantee injustice and ineffective relief. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 4)

(4) <u>The interstate judicial system's interest in resolving the dispute</u>. The most efficient resolution to this controversy includes, among other things, considerations of witness location and evidence location.  Here, the main witnesses are Plaintiffs; local police John Does; Broward

County Sheriff deputy John Does; and Plaintiffs' neighbors.  The evidence establishing Florida jurisdiction is the Articles themselves, which are everywhere because they are published on the World Wide Web. (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 6)  Plaintiffs have a copy of Article-3, the magazine, here in Florida.  The interstate judicial system's interest in resolving this case most efficiently is best served by adjudicating this case in Florida, where the injury occurred.  The facts here demonstrate that exercise of jurisdiction by a Texas court offends traditional notions of fair play and substantial justice.

**B.      Florida venue is proper.**

**1.      Florida events gave rise to the claim.**

Plaintiffs were residing in the State of Florida when D Magazine published The City's defamatory content in the Articles, causing Plaintiffs' injuries and giving rise to their claim. Ermatinger contacted the local police department, causing the continuation of the harassment against Plaintiffs; beginning the very day Plaintiffs arrived in South Florida.  The Articles were published after Plaintiffs had become residents in Florida, they caused damage and continue to cause damage to Plaintiffs, as does the harassment, therefore Florida venue is proper. "A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *See* 28 U.S.C. § 1391(b)(2). The injury caused by The City was realized by Plaintiffs here, in Florida and it has been significant.   *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005)

> ("[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere."); *First of Mich. Corp. v. Bramlet,* 141 F.3d 260, 263 (6th Cir. 1998) *See Estate of Abtan v. Blackwater Lodge & Training Ctr.,* 611 F. Supp. 2d 1, 8 (D.D.C. 2009) ("In tort cases, when determining whether a substantial part of the events or omissions giving rise to the plaintiff's claim occurred . . . in a particular district for purposes of § 1391(b)(2), . . . courts focus on . . . the place where the allegedly tortious

actions occurred and the place where the harms were felt." (internal quotations and citations omitted)).

For purposes of § 1391(b)(2), Florida is where Plaintiffs have suffered harm from The City's released and published statements, information and misinformation and is where Plaintiffs continue to suffer from harassment.

### 2.     Events essential to the existence of the claim.

The events giving rise to the claim include the publication of The City's comments published in the Articles in Florida their contact with the local police department to perpetuate the furtherance of his harassment here in Florida. (*See* Exs. A & B, Plaintiffs' Decl. at ¶ 7)

*Perdue v. Miami Herald Publishing Company, 291 So.2d 604 (Fla. 1974)*:

In 1967 the Florida Legislature responded to the above decision by enacting Chapter 67-52 which in pertinent part became F.S. § 770.05, F.S.A. (limiting a damages claim founded upon any single publication to only one choice of venue) and F.S. § 770.07, F.S.A., (providing that the cause of action shall be deemed to have accrued at the time of the first publication in this state).

In the Firstamerica Development Corporation case, supra, this Court relied upon F.S. § 46.04, F.S.A. as then worded,[3] which permitted (and still permits as present § 47.051) litigation against corporations in any county in which the cause of action arose. The Court held that venue could properly be laid in any county where the newspaper was published.

The City's false and/or defamatory statements were published in Florida and caused injury in Florida, therefore, the events in Florida are significant.    The City caused local law enforcement to continue harassing Plaintiffs causing ongoing injury in Florida for twenty-three (23) months, which is significant.

Ermatinger claims in his declaration that he did not know at the time of his interview with D Magazine whether or not D Magazine was "marketed or sold in the State of Florida." (*See* Decl. of Ermatinger, Doc. 53-1 at ¶10)  In Sayers declaration, he qualifies that he has never given an interview to D Magazine "concerning Mr. Tobolowsky's murder." (*See* Decl. of

Sayers, Doc. 53-2 at ¶9)  However, the multiple fraudulent affidavits, with sworn and "verified facts," signed by Ermatinger and Sayers prove their credibility holds no value and their affinity for perjury is great.  Plaintiffs suffered enormous injury as a result of the detective's perjury.

Ermatinger, a computer savvy detective, seized Plaintiffs' two computers in 2016 with unlawful search warrants and he used another one of his fraudulent affidavits to gain access Plaintiffs' email accounts. It is very likely that Ermatinger knows how computers and the Internet work.  As well, Ermatinger is something of a television star after his appearances on The First 48, also accessible in Florida.  It would be naïve for Ermatinger to think his performances on television only aired in Dallas as it would be naïve for him to think that his interview with D Magazine would not be published everywhere, including in Florida.  Though Sayers claims he did not give an interview to D Magazine, the Articles indicate otherwise:

> A homicide detective named Scott Sayers arrived at the house wearing a button-down and tie. The detective asked Debbie: "Do you think this was an accident, or could someone have done this?" (*See* Doc. 56-2, Decl. of Earnshaw at p.16)

The event that gives rise to the claim was the publication of Ermatinger and Sayers released information about Plaintiffs in Florida, which was accessed and caused Plaintiffs' injuries. The only proper venue is in Florida.  (*See* Exs. A & B, Plaintiffs' Decl. at ¶¶ 3)

**C.    Florida claims brought in Florida, where the injury occurred.**

Plaintiffs were residents of Florida when The City caused them significant injury, in Florida.  There were no state claims against The City prior to the events that injured Plaintiffs in Florida, which were caused by The City. Plaintiffs bring federal and Florida state-law causes of action for events that took place in Florida.

15

All of The City's assertions about "claims barred" and "waiver of sovereign immunity" under the Texas Tort Claims Act are irrelevant as the state claims are subject to Florida state law. (*See* Motion, Sec. C. at pp. 13-15)

## IV. STATED CLAIMS FOR EACH COUNT

**A.    Counts I, XV, and VI—Defamation.**

The events giving rise to these counts for defamation occurred in Florida. Florida state law is applicable to Plaintiffs' Florida injuries.   Texas law is not applicable to the Florida claims.   Plaintiffs were Florida residents when D Magazine published its Articles that caused Plaintiffs' injuries.   The City released defamatory information that was published in Florida, about Plaintiffs and evidence from an ongoing murder investigation. The City directly violated Dallas Police Department General Order Section 323.04B.2 when it released the information.

**B.    Count II—Unreasonable Searches and Seizures.**

Because Plaintiffs had nothing to do with the murder, Ermatinger and Sayers fabricated probable cause in their fraudulent affidavits for search warrants to convince various judges to issue search warrants that violated Plaintiffs' constitutional and rights to privacy.   Regardless of the officers who made the false arrests, Ermatinger and Sayers' perjury caused the event.   The Motion states: "Second, Plaintiffs have failed to allege a lack of probable cause because they do not allege a material falsehood or omission in the presumptively valid search warrants used to effect the searches and seizures."   (*See* Motion, Doc. 53 at p. 20) This is a false statement as Plaintiffs clearly allege Ermatinger and Sayers committed aggravated perjury in their fraudulent affidavits. (*See* Complaint, Doc. 1 at ¶¶ 126-129)

The Motion incorrectly states: "Plaintiffs fail to allege facts sufficient to plead excessive force, particularly in the face of Ermatinger's and Sayers's qualified immunity."   However, the

facts are sufficient.  The search warrants *were not* arrest warrants and they only instructed authorities to retrieve fingerprints and photographs only.  The City arranged and executed a "Stake-outs and High Risk Apprehension Operation" detailed in Dallas Police Department General Order Section 313.07. (*See* Ex. F)  Section 313.07A.1. states:

> Stake-out: an operation in which officers assume concealed or covert positions in anticipation of a criminal act for the purpose of apprehending the persons involved.

Section 313.07D.1 and 2 provide:

> Requests for Tactical Division Assistance during Stake-Out and High-Risk Apprehension of Suspects. Officers receiving information that a violent crime is likely to occur will notify their supervisor who will notify the Tactical Division. Examples of the types of offense situations to which the Tactical Division will respond and have primary command responsibility are armed robbery, hostage situations, barricaded persons, kidnapping or any other violent crime involving an armed suspect. Routine stakeouts, surveillance, drug raids, and Fugitive Squad apprehensions, for example, do not require that the Tactical Division be called. (*See* Ex. F)

Plaintiffs allege The City used excessive force to retrieve Plaintiffs fingerprints and photographs. The Motion cites *Horn v. Barron*, 720 F. App'x 557, 563 (11th Cir. 2018) (quoting *Nolin v. Isbell*, 207 F.3d 1253, 1257–58 (11th Cir. 2000)).  However, In *Horn*, the arrestee was not subjected to a Tactical Division covert operation in anticipation of a criminal act.  Her arresting officer used a soft hands technique instead a loaded firearms pointed at Plaintiffs' heads.

Proof that one lie leads to another, Ermatinger and Sayers fabricated probable cause by using the same lie in multiple affidavits for search warrants.  The false statement:

> "[i]t was alleged in the lawsuit that Steven Aubrey threatened 'Jihad' the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135."  (*See* Motion at p. 23)

The statement is provably false because it was NEVER *alleged* in the lawsuit.  The Motion purports Plaintiffs are confused by the statement because of the word *alleged*.  Plaintiffs are not

17

confused.  The lawsuit never *alleged* Jihad threats against anyone's life.  The detectives needed to fabricate probable cause to get search warrants against Plaintiffs.[3]

The City could have located and identified the statement about a Jihad threat against someone's life, reprinted the statement in the Motion, cite it or attach the document with the statement as an exhibit to the Motion.  But The City could not do any of the above because *no such allegation existed;* so they tried to deceive this Court instead, stating:

> A Texas court of appeals has specifically found the statement concerning "jihad" "accurately states allegations in Tobolowsky's lawsuit." *Vodicka v. A.H. Belo Corp.*"

Not only does The City have difficulty understanding the meaning of "alleged," it appears to not understand the subtle difference between use of the words "the" and "a."   The City deceptively stated:  "A Texas court of appeals has specifically found *__the__* statement…" when it should have stated:  "A Texas court of appeals has specifically found *__a__* statement…"  The court of appeals did not analyze "the statement" that The City appears to reference (because it does not exist).  The court of appeals ruled on "a statement" that was not "the statement" that The City purported to validate.

In truth, the court of appeals found that Schoettmer's lawsuit was ripe with "Jihad" allegations but there were no allegations about Jihad threats against someone's life.  If the court of appeals had validated such a statement, The City could have just located and identified that court of appeals statement, reprinted it in the Motion and cite it.   Like the affidavits of Ermatinger and Sayers, The City's pleadings cannot be trusted.

---

[3] Additionally, it would be improper for The City to take allegations from a lawsuit and include them in an affidavit with "verified facts" to support probable cause.  Allegations are merely allegations and are not "verified facts." Here, what The City did was even worse, they fabricated an allegation that did not exist.

**C.**     **Count III—Excessive Force.**

*Wilson v. Arkansas*, 514 U.S. 927 (1995), is a United States Supreme Court decision in which the Court held that police officers must "knock and announce" before entering a house to serve a warrant.  Officers sworn to abide by the law (and wishing to avoid civil liability) must comply with knock-notice and use of Tactical Division covert operations does not comply the constitutionally required knock and announce before entering to serve a warrant. The City could not allege Plaintiffs were dangerous or armed. See Count II.

**D.**     **Count IV—Private Property Taken for Public Use.**

Plaintiffs allege they have sought to have their unlawfully seized property returned.

**E.**     **Count V—Deprived of Liberty without Due Process of Law.**

Plaintiffs concede that the claims arising from the unconstitutional searches and seizures are subject to the Fourth Amendment, therefore, Count V should be dismissed.

**F.**     **Count VI—Due Process and Equal Protection.**

Plaintiffs allege that others in Dallas, Texas, with warrants to be detained for examination, have been treated more favorably by The City.  In fact, The City cannot have enough manpower to serve all of its search warrants on persons *not* known to be dangerous or violent, with Tactical Division covert operations in anticipation of a criminal act. Same-sex harassment is sex discrimination under Title VII of the Civil Rights Act of 1964.

**G.**     **Count VII—Presumption of Innocence.**

Plaintiffs concede dismissal of Count VII is appropriate for all defendants except Eric Vaughn Moye.

**H.**     **Count VIII—Persons Under Color of Law Liability.**

Plaintiffs bring this cause of action under 42 U.S.C. Section 1983.

## I.    Count IX—Americans with Disabilities Act

Vodicka is a qualified individual under the Americans with Disabilities Act.  The City of Dallas signed the City of Dallas Title VI. Nondiscrimination Policy, stipulating in part: "Dallas assures nondiscrimination in all of its programs, activities and services, whether those programs, activities and services are federally funded or not." (See Ex. A., Decl. of Vodicka at ¶ 16) Not only did The City violate their own policy and discriminate against Vodicka with the services of their police department, they went far beyond discrimination and violated Vodicka's Fourth Amendment right to privacy.

On October 26, 2016, Ermatinger and Sayers waited for Aubrey to leave Plaintiff's residence before breaking and entering into the residence.  Without a warrant, they illegally trespassed into the residence and encountered Vodicka, and attempted to use his disability as an excuse for a "welfare check."  The Nondiscrimination Policy, which The City committed to uphold and Vodicka's Fourth Amendment right to privacy and freedom from unreasonable intrusions by the government have been grossly violated by The City.  The City has repeatedly used Vodicka's disability against him as detailed in Counts I, II, III, IV, VI, VIII, X, XI, XII, XIII, XIV, XVII, XVIII, XIX, XX, XXI, XXII, and XXIII.

## J.    Count X—Conspiracy Against Rights Under Color of Law.

Multiple detectives using the exact same false facts in their affidavits to get unlawful search warrants is evidence of conspiracy under color of law to violate Plaintiffs' civil rights. Coordination between the police, sheriff's dept. and the Tactical Division to use covert operations for purposes of serving warrants on Plaintiffs is also evidence of conspiracy under color of law to violate Plaintiffs' civil right.

### K.    Count XI—Abuse of Process.

The elements of an abuse of process claim are: (1) "that the defendant willfully used process after it [was] issued in a manner not contemplated by law; [(2)] that the defendant acted to satisfy an ulterior motive; and [(3)], that damages resulted from the defendant's use of perverted process." *Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1044 (Md. Ct. Spec. App. 2004).   Here, The City's use of the Tactical Division to violently serve warrants on Plaintiffs was for a motive other than serving the warrants and the events resulted in false arrests and false imprisonment of Plaintiffs, which caused damage.

### L.    Count XII—Invasion of Privacy–Misappropriation.

For the purpose of fabricating probable cause, The City began by passing around photos of Aubrey in the George Allen Sr. Courts Building in Dallas, telling judges and court staffers to "be on the lookout" as though Aubrey was a criminal on the run or he was hiding in the courthouse or for reasons unknown.   The City was pretending they could not locate Plaintiffs. But they were looking in all the wrong places because Plaintiffs were home, sitting in their living room watching the extraordinary story unfold on the 6:00 news with all of the media now using Plaintiffs' names because earlier in the day, Defendant Moye accused Aubrey for the murder.

Another misappropriation was The City's release of information about Plaintiffs to D Magazine.    The City knowingly violated Dallas Police Department General Order Section 323.04B.2 but realized the benefit of continued harassment of Plaintiffs.   D Magazine misappropriated Plaintiffs' names to sell publications.

### M.    Count XIII—Invasion of Privacy—Public Disclosure.

Not only did The City release information about Plaintiffs, which was not public information and not a matter of public concern, they released information to D Magazine that

violated their own policies detailed in the Dallas Police Department General Order Section 323.04B.2.

**N.     Count XIV - Invasion of Privacy – Intrusion.**

To be actionable, the "intrusion" that is the subject of an invasion-of-privacy claim must have been "unreasonable, unjustified, or unwarranted." *Mobile Video Tapes*, 43 S.W.3d at 48. It was unreasonable, unjustified, and unwarranted for The City to violate the policies of Section 323.04B.2. and publically offer their opinions about Plaintiffs and the evidence related to the murder investigation. It also violated the Texas Government Code of confidential information during the pendency of a murder investigation. Ermatinger, a retired detective, exhibited unconscionable behavior when he released confidential information about an ongoing murder investigation to D Magazine.  His egregious act is analogous to a chemist who works for *Coca Cola,* retires, and in his/her retirement  releases the formula for *Coca Cola.*

**O.     Count XVII—False Arrest**

First and foremost, The City did not have arrest warrants for Plaintiffs, but they did arrest them.   Without probable cause, The City's warrants for Plaintiffs' fingerprints and photos were based on The City's fraudulent affidavits that violated Plaintiffs' rights.  The Fourth Amendment protects the right to be free from unreasonable searches and seizures; provides that warrants shall issue only upon probable cause, supported by oath or affirmation.  Plaintiffs' were ambushed with loaded firearms pointed at their heads, placed in handcuffs, held against their will and their pockets were searched.  John Does 1-10 were the arresting officers.

**P.      Count XVIII—Assault and Battery.**

Plaintiffs never alleged Ermatinger and Sayers were the arresting officers or that they had physical contact with them.  John Does 1-10 ambushed Plaintiffs and physically forced them to the ground and pointed loaded firearms at their heads.

**Q.      Count XIX—False Imprisonment.**

As with Count XVIII—Assault, The City did not have probable cause to arrest or imprison Plaintiffs against their will.   The Fourth Amendment protects against false imprisonment and illegal detention.  *Eberle v. City of Anaheim*, 901 F.2d 814 (9th Cir. 1990).

**R.      Count XX—Foreseeable Zone of Risk.**

The City's use of the Tactical Division and covert operations to serve Plaintiffs warrants put Plaintiffs in a dangerous situation unnecessarily.   Men in plain clothes ambushed Plaintiffs, screaming at them with weapons drawn and putting Plaintiffs in a dangerous situation.  Initially, Plaintiffs did not know who was attacking them and had they resisted, the already dangerous situation would have been drastically elevated.  Warrants for fingerprints and photos do not require such elevated force, shock and danger to the community.

**S.      Count XXI—Conspiracy Liability.**

A plaintiff states a claim of conspiracy under 42 U.S.C. § 1985(3), if he establishes "(1) a conspiracy of two or more persons, (2) . . . motivated by a specific class-based, invidiously discriminatory animus to (3) deprive [him] of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir.1985); *see also Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)  See Count X—Conspiracy Against Rights Under Color of Law.

**T.**     **Count XXII—Emotional Distress, Intentional Infliction.**

The Motion alleges Count XXII should be dismissed because Plaintiffs fail to allege Ermatinger and Sayers individually seized Plaintiffs in the May 19 event. However, Plaintiffs allege it was John Does 1-10 who unnecessarily caused Plaintiffs' injuries.

**U.**     **Count XXIII—Negligent Infliction of Emotional Distress.**

The Motion states that Count XXIII should be dismissed because this cause of action does not exist in Texas. However, Plaintiffs do not have any Texas claims in the complaint.

## V. CONCLUSION

The facts here demonstrate that significant events causing Plaintiffs' injuries took place in Texas and the facts here also demonstrate that significant events causing Plaintiffs' injuries took place in Florida.

Plaintiffs Florida injuries arise out of The City's contacts with the forum. The City released information that was published everywhere by D Magazine, including Florida. The City's published information was accessed by residents in Florida, causing Plaintiffs' Florida injuries. Additionally, The City directly contacted local Florida law enforcement, evidenced by its extraordinarily abusive treatment directed at Plaintiffs upon their arrival in South Florida. The City's contacts with Florida caused Plaintiff's injuries that are ongoing.

The potential for two (2) qualifying forums is reduced to just one when considering that defendants have already had a trial by media in North Texas that found Plaintiffs guilty of capital murder. The trial by media was conducted in the defendants' forum of choice so that another trial cannot be conducted there. Exercise of jurisdiction by a Texas court offends traditional notions of fair play and substantial justice and venue in Texas would not be proper due to the

24

glaring and prevalent prejudice towards Plaintiffs.  This Court's jurisdiction over The City and Florida venue are proper and fair to all parties.

Finally, the Dallas Police Department and Count V should be dismissed from this case and Count VII should be dismissed for all defendants except Eric Vaughn Moye.

By: _____
Steven Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: _____
Brian Vodicka, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com

25

## CERTIFICATE OF SERVICE

This is to certify that on October 1, 2018, the undersigned has served the foregoing by USPS regular mail, Email, or through the CM/ECF docketing system. Therefore, the undersigned upon information and belief certifies that all counsel or parties of record will receive a copy of these papers.

Steven Aubrey

Brian Vodicka

## SERVICE LIST

***Via CM/ECF Notice:***
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Jason P. Bloom
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
COUNSEL FOR DEFENDANTS:
D MAGAZINE PARTNERS, L.P. f/k/a
MAGAZINE LIMITED PARTNERS, L.P.,
ALLISON MEDIA, INC.
JAMIE L. THOMPSON

***Via CM/ECF Notice:***
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Peter L. Harlan
DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE
133 N. Riverfront Blvd., LB 19
Dallas, Texas 75207
COUNSEL FOR DEFENDANTS:

DALLAS COUNTY, TEXAS
DALLAS COUNTY SHERIFF'S DEPARTMENT
MELINDA CHRISTINE URBINA


***Via CM/ECF Notice:***
Eric P. Hockman
WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
LOCAL COUNSEL FOR DEFENDANTS:
CITY OF DALLAS
DALLAS POLICE DEPARTMENT
SCOTT ROBERT SAYERS
ROBERT L. ERMATINGER, JR


***Via CM/ECF Notice:***
Tierman Cole
OFFICE OF ATTORNEY GENERAL OF FLORIDA
110 SE 6th St., FI 10
Fort Lauderdale, FL. 33301-5001
Demetri Anastasiadis
OFFICE OF ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711
COUNSEL FOR DEFENDANT:
ERIC VAUGHN MOYE


***Via Email: steve.schoettmer1@gmail.com***
Stephen Charles Schoettmer
4305 W Lovers Ln
Dallas, TX 75209-2803
DEFENDANT PRO SE

# Exhibit  A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 18-cv-61117-BLOOM/Valle

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

     *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

     *Defendants.*
_____/

## DECLARATION OF BRIAN E. VODICKA

1.    My name is Brian E. Vodicka.   I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude.  I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2.    I have been a resident and citizen of the State of Florida since November 15, 2016.

3.  I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4.  I cannot afford the expense of travel and lodging to attend hearings set by a court in Texas.

5.  Defendants Robert Ermatinger and Scott Sayers signed multiple affidavits for search warrants that contained material false representations of purported "verified facts."

6.  I have accessed Defendants' Article-2, on multiple occasions its publication, which began in April 2017. Articles-2 is published on D Magazine's commercial interactive website, which solicits all viewers to subscribe or advertise by clicking on "Subscribe" or "Contact Us," located under the "ADVERTISE" section found at the end of the web page. As well, D Magazine's commercial interactive website features a red lettered "SUBSCRIBE" feature that remains visible and accessible at the top of the website's window. This feature is on D Magazine's website used to publish Article-2 and solicit subscribers and advertisers: https://www.dmagazine.com/

7.  Upon arrival in Florida, and for approximately three (3) weeks following, local law enforcement officers regularly parked in front of my residence and/or in front of my next door neighbors home, alarming my new neighbors.

8.  Two persons, who identified themselves as agents for the Tobolowsky family and working with Defendant Robert Ermatinger, physically assaulted me in the private parking area of my residence. One of the two agents openly carried a firearm, which was forbidden on the private property. The Tobolowsky agents illegally trespassed to gain access to the property and to harass, threaten and assault me. On the days that followed, the same agents continued to trespass onto private property and the male agent, approximately 30 feet away, screamed at me "You're in danger." This same scenario occurred on multiple occasions. In

2

fear of my personal safety, I hurriedly moved away from Dallas and gun violence. The Tobolowsky gun-carrying agents trespassed onto private property with open firearms in violation of the License to Carry handgun laws under the Texas Penal Code § 42.06, 46.02, 46.035.

9.   I have personally witnessed two Florida residents access Defendants' Article-2 and read the published content of the article.

10.  Ira Tobolowsky and Stephen Schoettmer filed a defamation action against his former client, Judy Brauman in Cause No. 10-09803 in the 116th Judicial District Court, Dallas County, Texas, *Tobolowsky v. Bruaman.*

11.  I was never in hiding following the murder of Ira Tobolowsky.  The fraudulent affidavit used against me stated: "It is believed that whoever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives."  Detectives did their level best to make it appear as though I was "hiding from the public" to fabricate probable cause for the unlawful search warrants.  If they had wanted to find me, they could have knocked on my door.  My credit card statements indicate that I used my credit card in six (6) different public restaurants and grocery stores from May 13 - May 18, 2016, the day Defendant Ermatinger signed the fraudulent affidavits.    Additionally, a friend from out of town came to visit us for three (3) days during the week before I was examined for burns.  I did everything but hide from the public.  Ermatinger admitted in his affidavits that he had been tracking my credit cards, therefore he knew his representation that I was hiding was false.

12.  Ermatinger made statements about my phone habits on the day of the murder that were published in D Magazine's Articles.  He said there was "no activity on the men's

cellphones from about 9 pm the night before the fire until the next afternoon. The records did show cell activity before and after that time period." That was a lie. I have copies of my phone records, which Ermatinger claims he accessed, and they indicate I made five (5) calls on May 13, 2016, at 9:17am, 9:18am, 10:51am, 10:52am and 11:16am.

13. Ermatinger's fraudulent affidavits included what may be considered an accusation of religious prejudice directed at me. The affidavits, fraught with untruths, state: "Ira Tobolowsky is of Jewish descent and felt Jihad was an anti-Semitic statement." At a minimum, the bizarre statement that had no corollary or connection to anything else, at least insinuates that I am anti-Semitic. I am not nor have I ever been anti-Semitic. Although I am a Christian, I have been a devout follower of Rabbi Harold Kushner and have proudly read most, if not all, of his books. Ira Tobolowsky and his lawyer, Defendant Schoettmer, used the term "Jihad" in their pleadings ad nauseam with a total of at least 97 Jihad references in 14 court filings. Their affinity for "Jihad" does not comport with Ermatinger's affidavits of "verified facts."

14. The defendants in this case have made their bed and now need to lie on it. By their own hands, the trial by media already reached a verdict, "guilty" of capital murder. The defendants' actions make it impossible for me to get a fair trial in North Texas.

15. Steve Aubrey has never suffered any burns on his body in the twenty-three (23) years I have known him. On May 20, 2016, the day after Steve Aubrey and I were taken to police headquarters and photographed, I took many photos of Steve's arms, in the bright sunlight outside and in front of that day's newspaper, for time stamp purposes. I still have the photos and they prove Steve Aubrey's arms were not burned and they still had hair on them.

16.     I am a qualified individual under the Americans with Disabilities Act and I am promised

protections under the City of Dallas Title VI. Nondiscrimination Policy.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the 6th day of October 2018.

Brian Vodicka

5

# Exhibit  B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No. 18-cv-61117-BLOOM/Valle**

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

      *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

      *Defendants.*
_____/

## DECLARATION OF STEVEN AUBREY

1. My name is Steven Aubrey. I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude. I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2. I have been a resident and citizen of the State of Florida since November 15, 2016.

3. I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4.  I cannot afford the expense of travel and lodging to attend hearings set by a court in Texas.

5.  Defendants Robert Ermatinger and Scott Sayers signed multiple affidavits for search warrants that contained material false representations of purported "verified facts."

6.  I have accessed Defendants' Article-2, on multiple occasions its publication, which began in April 2017. Articles-2 is published on D Magazine's commercial interactive website, which solicits all viewers to subscribe or advertise by clicking on "Subscribe" or "Contact Us," located under the "ADVERTISE" section found at the end of the web page. As well, D Magazine's commercial interactive website features a red lettered "SUBSCRIBE" feature that remains visible and accessible at the top of the website's window. This feature is on D Magazine's website used to publish Article-2 and solicit subscribers and advertisers: https://www.dmagazine.com/

7.  Upon arrival in Florida, and for approximately three (3) weeks following, local law enforcement officers regularly parked in front of my residence and/or in front of my next door neighbors home, alarming my new neighbors. My next door neighbor who upon my arrival was very verbally excited about having a new neighbor has never spoken another word to me since that first day, approximately 23 months ago.

8.  In October 2016, two persons, who identified themselves as agents for the Tobolowsky family and working with Defendant Robert Ermatinger, physically assaulted me in the private parking area of my residence. One of the two agents openly carried a firearm, which was forbidden on the private property. The Tobolowsky agents illegally trespassed to gain access to the property and to harass, threaten and assault me. On the days that followed, the same agents continued to trespass onto private property and the male agent, approximately 30 feet away, screamed at me "You are in danger." This same scenario occurred on multiple

2

occasions. In fear of my personal safety, I hurriedly moved away from Dallas and gun violence. The Tobolowsky gun-carrying agents trespassed onto private property with open firearms in violation of the License to Carry handgun laws under the Texas Penal Code § 42.06, 46.02, 46.035.

9. Ira Tobolowsky and Stephen Schoettmer filed a defamation action against his former client, Judy Brauman in Cause No. 10-09803 in the 116th Judicial District Court, Dallas County, Texas, *Tobolowsky v. Bruaman.*

10. I have never been burned by fire, ever.  On May 19, 2016, six (6) days following the murder, I was examined and photographed by Det. Ermatinger.  I was not burned and the hair on my arms was not missing or singed, proof I had not been burned.   The following day, Brian Vodicka took many pictures of my arms to serve as proof that I had not suffered from any burns.

11. I was never in hiding following the murder of Ira Tobolowsky.  In fact, on May 13, 2016, the morning of the murder, I was shopping at Trader Joe's.  A few hours later, I went to my dermatologist for a scheduled appointment at approximately 12:30pm. The fraudulent affidavit used against me stated: "It is believed that whoever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives."  Detectives did their level best to make it appear as though I was "hiding from the public" to fabricate probable cause for the unlawful search warrants.  They even passed my photo around the courthouse and warned court personnel to be on the lookout, while I was at home in our apartment with the same address as was on my driver's license.  If they had wanted to find me, they could have knocked on my door.  My credit card statements indicate that I used my credit card in ten

(10) different public restaurants and stores from May 13 - May 18, 2016, the day Defendant Robert Ermatinger signed the fraudulent affidavits. Three (3) of the 10 credit cards expenditures were on May 13, 2016, the same day as the murder, the same day as the dermatologist appointment. Additionally, a friend from out of town came to visit us for three (3) days during the week before I was examined for burns. We were doing everything but hiding from the public. Ermatinger admitted in his affidavits that he had been tracking our credit cards, therefore he knew his representation that we were hiding was false.

12. Ermatinger made statements about my phone habits on the day of the murder that were published in D Magazine's Articles. He said there was "no activity on the men's cellphones from about 9 pm the night before the fire until the next afternoon. The records did show cell activity before and after that time period." That was a lie. I have copies of my phone records, which Ermatinger claims he accessed, and they indicate I made two (2) calls on May 13, 2016, at 10:51am and 10:53am.

13. Ermatinger's fraudulent affidavits included what may be considered an accusation of religious prejudice directed at me. The affidavits, fraught with untruths, state: "Ira Tobolowsky is of Jewish descent and felt Jihad was an anti-Semitic statement." At a minimum, the bizarre statement that had no corollary or connection to anything else, at least insinuates that I am anti-Semitic. I have never been anti-Semitic. Ira Tobolowsky and his lawyer, Defendant Schoettmer used the term "Jihad" in their pleadings ad nauseam with a total of at least 97 Jihad references in 14 court filings. Their affinity for "Jihad" does not comport with Ermatinger's affidavits of "verified facts."

4

14.   The defendants in this case have made their bed and now need to lie on it.  By their own

hands, the trial by media already reached a verdict, "guilty" of capital murder.   The

defendants' actions make it impossible for me to get a fair trial in North Texas.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the ___1st___ day of October 2018.

Steven Aubrey

# Exhibit  C

## AFFIDAVIT FOR SEARCH WARRANT

| | | |
|---|---|---|
| STATE OF TEXAS | § | Residence located at |
| | § | ███ Southwestern Blvd ███ |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at ███ Southwestern Blvd ███ Dallas, Dallas County, Texas. The residence is an apartment complex called The ██████████████████located in the Village apartment comunity. The Apartment in question is located on the first floor and is a red brick structure with the top floors being gray wood. The number ███ is to the right of the door.

2. There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense: Any combustable liquids or empty containers that are similar to the items found at the crime scene. Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3. Said suspected place and premises are in charge of and controlled by each of the following persons: StevenBenton Aubrey W/M 10/11/60 who uses this location for business purposes to meet clients and give massage therapy. Brian Vodicka who is steve Aubreys boyfriend stated in an interview that the apartment is used for this purpose.

4. It is the belief of Affiant, Detective Scott Sayers #7157 who is employed by the Dallas Police Department for 21 years and who has been assigned to the Homicide unit does hereby charges and accuses that:  the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing,

blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene. ███ Southwestern Blvd ███ Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at ███████████, Dallas, Dallas County, Texas.  Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.  During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.  Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.  It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding. Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson Investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.  Detectives went to the location of ████████████████ and knocked on the door of ████ to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Detectives executed a search warrant on Steven Aubrey and Brian Vodicka's Apartment located at ████████████████ on May 19th 2016. After searching the apartment detectives received information from the complainants family about some holes that were drilling in the complianants fence so that someone could observe the complainant coming and going from his residence without being seen.  The holes were located on the far southeastern part of the fence and gave a clear hidden view from the Alley of the complainants garage. Detective Richardson remembers seeing a dril and dril bits inside the apartment at the time of the execution of the warrant but

detectives had not received the information about the suspicious holes till after the warrant was executed.  It is believed that the drill and drill bits need to taken for examination purposes  to determine if in fact it was used to drill the suspicious holes in the complainants fence.  Steven Aubrey was finally located coming out of █████ Southwestern Blvd █████ and was taken to Dallas Headquarters to be photographed and interviewed.  The apartment that he came out of was never searched for the above listed items.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____
AFFIANT

Subscribed  and  sworn  to  before  me  by  the  said  affiant  on  this  $25^{72}$ day  of _____ , 201█ .

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

Exhibit  D

## AFFIDAVIT FOR SEARCH WARRANT

STATE OF TEXAS       §       Residence located at
                     §       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
COUNTY OF DALLAS     §       Dallas, Dallas County, Texas

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dallas, Dallas County, Texas. The residence is an apartment complex called Tonti Lakeside Apartments. The Apartment in question is located on the second floor and is a red brick structure the number ▮▮▮▮ located on the top center of the door.

2. There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense: Any combustable liquids or empty containers that are similar to the items found at the crime scene. Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3. Said suspected place and premises are in charge of and controlled by each of the following persons: StevenBenton Aubrey W/M 10/11/60 and Brian Edward Vodicka W/M 08/09/59 who are on the lease argeemnet for the address listed in this warrant. The lease agreement was dated on 2/07/16.

4. It is the belief of Affiant, Detective Scott Sayers #7157 who is employed by the Dallas Police Department for 21 years and who has been assigned to the Homicide unit does and he hereby charges and accuses that: the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing, blood,shoes,weapons of any kind.  Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any ignitable liquids or evidence of any ignitable liquids

that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene. ███████████████████Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at███████████ Dallas, Dallas County, Texas. Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson Investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.   During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.  It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding. Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson Investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.   Detectives went to the location of██████████████████ and knocked on the door of ███████to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Detectives executed a search warrant on Steven Aubrey and Brian Vodicka's Apartment located at ███████████████ on May 19th 2016. After searching the apartment detectives received information from the complainants family about some holes that were drilling in the complianants fence so that someone could observe the complainant coming and going from his residence without being seen.  The holes were located on the far southeastern part of the fence and gave a clear hidden view from the Alley of the complainants garage. Detective Richardson remembers seeing a drill and drill bits inside the apartment at the time of the execution of the warrant but detectives had not received the information about the suspicious holes till after the warrant was executed.  It is believed that the drill and drill bits need to taken for

examination purposes to determine if in fact it was used to drill the suspicious holes in the complainants fence.


Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____
AFFIANT

Subscribed and sworn to before me by the said affiant on this 25TH day of _____May_____ , 20 16

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

265TH    Bennett

# Exhibit  E



# Dallas Police Department General Order

## 323.00 Press Relations

**DAVID M. KUNKLE**
**CHIEF OF POLICE**

Revised 01/30/07

**323.00    PRESS RELATIONS**

**323.01    News Media Requirements and Privileges**

A.    Members of the media must display appropriate press credentials prior to being admitted to restricted areas.
B.    Members of the media may not resist, obstruct, or oppose an officer in the lawful execution of his/her duty.  However, the mere presence of a newsperson, the taking of pictures, or the asking of questions does not constitute unlawful interference.  Officers will refrain from making judgments on the relevancy of reporters' questions.
C.    Officers will not restrict movement of newspersons, unless their actions clearly and directly interfere with police operations or investigations.
D.    Members of the media are not exempt from any federal, state, or local law.  They will be dealt with in the same manner as any other violator, if arrested.
    1.    No member of the media shall have any property confiscated or threatened with confiscation without due process of law.  This includes cameras, film, notes, etc.
    2.    Officers who experience extreme difficulties in dealing with individual members of the media at the scenes of incidents should report such circumstances through their chain of command to the Public Information Office.

**323.02    Major Incidents**

A.    Media representatives who possess employer issued identification, a Department of Public Safety press pass, or other form of valid media identification will be allowed immediate access to the area adjacent to the Department's Command Post.  The ranking officer will determine further access, making every effort to accommodate the media's need to be as close as possible to the incident.  The commanding officer will be especially aware of photographer's needs in regards to proximity to the incident.  On more routine incidents where no Command Post is established, the ranking officer will not unduly restrict the movement of members of the media.
B.    In no case will members of the media be denied access to areas where the public is allowed to be present.
C.    At the scene of an incident in which the Dallas Fire Department has the primary responsibility, the ranking police officer at the scene will allow media representatives access to the Fire Department Command Post unless otherwise notified by the Fire Department. The Fire Department will determine further media access.
D.    The ranking officer at the scene of a police incident will provide timely *situation briefings* to members of the media.  This responsibility may be delegated to a knowledgeable member of the ranking officer's staff.  In extreme cases, personnel from the Public Information Office may be summoned to the scene to conduct the media briefings.  If a member of the Public Information Office is summoned to the scene, he/she will assume the role of media coordinator and brief the media when requested by the officer in charge.

**323.03    Crime Scenes**

Media members will be given guided access to crime scenes as soon as determined practical by the ranking investigative officer, except in the following situations:
A.    When the crime scene is on private property and the person responsible for the property requests the media to leave.
B.    When the presence of media members might adversely affect the preservation of the crime scene or interfere with an investigation.
C.    When the presence of the media members would interfere with an operation.

**323.04    Release of Information**

A.    Upon request, the ranking officer at the scene of an incident will, as soon as possible, provide media members with factual information pertaining to any of the following:
    1.    The facts and circumstances of arrest, including the time and place of arrest, resistance, pursuit, and any use of weapons.  The race, sex, age, and occupation of the suspect also may be released but the name and address of the suspect must remain confidential until the suspect has been booked in a jail or formal charges have been filed.  For the purposes of this order, the filing of charges is defined as that point when prosecution reports and other necessary paperwork have been forwarded to the Legal Services Section.
    2.    The identity of the investigating and arresting officer, if such disclosure does not compromise an undercover operation, or unless conditions arising from the incident would expose the officer involved to a higher than normal risk of retaliation.
    3.    A general description of the evidence seized.  Officers will avoid providing specific descriptions of evidence that would tend to hinder or prejudice the investigation.
    4.    The nature, substance or text of a charge, including a brief description of the offense or incident.
B.    Information will not be released pertaining to any of the following:
    1.    The contents of a statement or even the mere existence of an admission or confession.
    2.    Personal opinions about the suspect or evidence.
    3.    Statements concerning anticipated testimony or the truthfulness of witnesses.
    4.    The results of fingerprint, polygraph, ballistics, or laboratory tests.
    5.    The names of victims until next of kin have been notified.  This applies to both citizens and to Police Officers killed or injured.
    6.    The fact that a member of the Department possesses, was wearing, or may be wearing a ballistic vest.

# Exhibit  F

**Dallas Police Department General Order**
**313.00 Arrest Policies - Adults**

Revised 08/04/09

    d.   Citation number
    e.   Date and Time of Issuance
    f.   Charge on citation
    g.   Location of offense
    h.   Justification in acknowledgement section – "Refused", "Released to Appear" or "Filed at Large"

2. All citations without a violator's signature will be reviewed by an administrative supervisor to confirm they are complete and were approved by a field supervisor. The reviewing supervisor will initial the lower left corner of these citations after review. The administrative supervisor will ensure each of these citations is entered into the division database.
3. A copy of each citation will be made and forwarded to the issuing officer's direct supervisor. The officer's supervisor will review related offense, arrest or other reports to ensure all information is consistent with charges filed.
4. Field supervisors are responsible for reviewing their assigned personnel in the divisional citation database on a monthly basis to identify trends or indications of possible abuse. Supervisors will notify the division commander by memo if any trends or possible abuse are identified.
5. The Division Commander will provide a report, monthly, to the Bureau Commander on all "Filed At Large" Citations. This report is not required for divisions who are not assigned field operations.

**313.05   Public Inebriate Program**

A. General Information
   1. The facility is located at 1600 Chestnut.
   2. Prisoners will be received on a 24-hour basis.
   3. Prisoners will be held a minimum of four hours before any type of release is allowed.
   4. Checks will be made on all prisoners that are to be taken to the Public Inebriate Detention Center (PIDC). The check may be made over the radio if necessary.
B. Admission Policy - The processing of persons at PIDC will be in accordance with the procedures established by the City Marshal's Office and approved by the Chief of Police. These procedures will be posted at the Center and available for reference. Any questions will be referred to an on-duty Patrol Operations Division supervisor.
C. When an arrest is rejected by a PIDC supervisor, a police supervisor from the arresting officer's division will be notified. The police supervisor will determine what should be done with the arrested person (i.e., released to relative, mental evaluation) and the facts documented in an offense/incident report.

**313.06   Drug Evaluation and Classification Process**

A. Only officers with current Drug Recognition Expert (D.R.E.) certification will conduct D.R.E. post-arrest evaluations on suspects.
B. All D.R.E. evaluations will be conducted according to the current Drug Evaluation and Classification S.O.P., which will be available for review at the jail.
C. D.R.E. officers may be requested to conduct drug evaluations at Lew Sterrett. Drug evaluations may be conducted at other bureaus throughout the department, if the D.R.E. approves of the testing area.
D. In general, a drug evaluation will not be conducted on suspects with a breath alcohol concentration of 0.08 or above or when blood tests are given and alcohol is the only suspected cause of impairment.
E. A D.R.E. officer may request a urine specimen from a suspect who has been evaluated, in addition to any other specimen which would be prudent to request, depending on the crime. All Dallas police officers may request a urine specimen, in addition to a blood specimen in D.W.I. cases, when no D.R.E. evaluation is performed and the officer believes the impairment is caused by substances other than alcohol.

**313.07   Stake-outs and High Risk Apprehension Operations**

A. Definitions
   1. Stake-out: an operation in which officers assume concealed or covert positions in anticipation of a criminal act for the purpose of apprehending the persons involved.
   2. Surveillance: the continuous observation of persons, places and things for the purpose of gathering information.
   3. High Risk Apprehension: any planned arrest in which there is good reason to believe that the person to be arrested may be armed and intent upon resistance.
B. Objectives
   1. To apprehend the suspect with a minimum risk to persons and property.
   2. To obtain information concerning the activities and identities of individuals.
   3. To protect any informant who may be involved.
C. Procedures
   1. All surveillance, stakeouts, and high-risk apprehensions must have prior approval of a supervisor.
   2. The supervisor in charge will develop a plan for the operation. This plan will include but not be restricted to the following:
      a. Staffing with sufficient personnel to ensure safety of all persons involved and successful completion of the objective.
      b. Briefing of all personnel as to the objectives, and fully informing them of the nature of their assignment and their individual responsibilities.
      c. Ensuring that all personnel are familiar with any specialized equipment to be used.
      d. Ensuring, when necessary, that all personnel have distinctive and/or protective clothing available if an arrest/confrontation is necessary.
      e. Arranging for uniformed police officers to be available if an arrest or pursuit is anticipated.

**Dallas Police Department General Order**
**313.00 Arrest Policies - Adults**

Revised 08/04/09

   f. Providing for adequate communication capabilities for all units and personnel involved.
   g. Providing relief for personnel if the operation is prolonged.
   h. Remaining aware of and providing for the safety of all persons involved.
  3. Unless there is a clear possibility of compromising the operation, the following organizations will be notified:
   a. Communications Section.
   b. Patrol Operations Division where the operation is to take place.
   c. Any other departmental unit which may be involved/affected by the operation.
  4. This notification should include the nature of the operation, number of personnel involved, supervisor in charge, vehicles involved (if possible), dress of officers involved, and any other information necessary for the safety of the officers involved and any other officers who may respond as back-up in an emergency situation.
 D. Requests for Tactical Division Assistance during Stake-Out and High-Risk Apprehension of Suspects
  1. Officers receiving information that a violent crime is likely to occur will notify their supervisor who will notify the Tactical Division.
  2. Examples of the types of offense situations to which the Tactical Division will respond and have primary command responsibility are armed robbery, hostage situations, barricaded persons, kidnapping or any other violent crime involving an armed suspect. Routine stakeouts, surveillance, drug raids, and Fugitive Squad apprehensions, for example, do not require that the Tactical Division be called.
  3. Any supervisor may request the presence of Tactical Division personnel in situations other than the extreme instances of D.2. Supervisors may request assistance in conducting routine stakeouts and surveillance. In these instances, the requesting bureau/ division/section will retain command responsibility.
  4. Consideration of such factors as type of information, the time element involved, risk of persons involved, anticipated length of operation, etc., will be made by the requesting supervisor to determine if a situation warrants requesting Tactical Division assistance.
 E. Procedure
  1. If the Tactical Division is needed, a supervisor in that division will be notified.
  2. When the Tactical Division responds to a request, it will be the responsibility of the Tactical Division to coordinate the efforts of the operation.
   a. The requesting division will be in charge of the scene until the Tactical Division arrives.
   b. Upon their arrival, Tactical Division personnel will take charge of the scene, except in those instances in D.3 where command responsibility remains with the requesting unit.
  3. Informants
   a. Sole responsibility for dealing with any informants involved rests with the requesting unit personnel who originally developed the information.
   b. Tactical Division personnel will be provided information about informants only on a need-to-know basis. The identity of an informant does not necessarily have to be revealed.
 F. Where applicable these procedures will be incorporated into division Standard Operating Procedures, along with any additional special considerations unique to a particular division.

**313.08 Field Warning Procedure**

 A. Arresting officers are not required to provide *Miranda* rights to persons in custody unless they are going to interrogate them. If it becomes necessary to interrogate an arrested subject, the officer must provide the *Miranda* rights before any questioning occurs.
 B. If the subject invokes any of the *Miranda* rights, the officer will note it in the arrest report and provide specific information on the rights invoked, such as the right to remain silent, right to have an attorney present, etc.
 C. Field warnings are not required under the following circumstances:
  1. When no questioning or interrogation will occur.
  2. During general questioning of persons present at a criminal offense scene, and the investigation has not centered upon the individual as a suspect in the case.
  3. Ordinary City Ordinance violations.
  4. Class C misdemeanors.
  5. Ordinary traffic violations.
 D. Arresting officers should refrain from questioning arrested persons in offense incidents where immediate follow-up will be conducted by a detective. In these circumstances, the detective will warn the arrested person of his/her rights at the appropriate time

**313.09 Field Release of Handcuffed Subjects**

 A. Handcuffed subjects will be field released in the following instances when sworn police personnel determine that:
  1. An arrest made (on or off-duty) is erroneous, improper, or otherwise inappropriate prior to book-in at the Jail or Public Inebriate Detention Center (PIDC).
  2. A subject who has been handcuffed for officer safety is not going to be arrested and charged with an offense.
 B. The releasing officer will:
  1. Field release the subject at the original arrest location or contact site.
  2. Document the facts and circumstances necessitating and justifying the release in an M.I.R. (MDC-generated or handwritten).
  3. List the subject as the complainant on the M.I.R. and include the subject's telephone number and address.
  4. Notify a supervisor and document the notification in the M.I.R.
  5. Forward a copy of the M.I.R. through the chain-of-command to his/her Organizational Commander.