**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No. 18-cv-61117-BLOOM/Valle**



FILED BY _____ D.C.

OCT - 9 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

     *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

     *Defendants.*

_____/

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO**
**THE MOTION TO DISQUALIFY HAYNES AND BOONE, LLP**

Plaintiffs Steven B. Aubrey ("Aubrey") and Brian E. Vodicka ("Vodicka"), (collectively,

"Plaintiffs"), file this reply to Defendants D Magazine Partners, L.P. f/k/a Magazine Limited

Partners, L.P., Allison Media, Inc. and Jamie Thompson (collectively, "Defendants") response in

opposition to disqualify Haynes and Boone, LLP ("Response"), (ECF No. 79), as follows:

Defendants' Response begins with the following introduction: "When Haynes and Boone **BRIEFLY** represented Plaintiffs in 2013, Ira Tobolowsky was still alive. (emphasis added) More than two years after the representation ended, Mr. Tobolowsky died in a suspicious fire in his garage, and a year after that, D Magazine published an article about the death and ensuing homicide investigation." (*See* Response, ECF No. 79 at p. 2)

In fact, the article was not "about the death and ensuing homicide investigation." Plaintiffs were the subjects of this article as their names printed and reprinted 140 times. Published in D Magazine's "CRIME" section, the article suggests that Plaintiffs are reprehensible degenerates; therefore, they must have committed the murder. The article even included a picture of Plaintiffs, tagged as suspects, with a caption underneath that describes the photo as all of the evidence to solve the mystery of who killed Ira Tobolowsky. (*See* ECF No. 56-2, Earnshaw Decl. p. 41) The Response's introduction is just another example of Defendants' thirst to defame Plaintiffs and at the same time, it attempts to deflect from the *brief* period of time that Haynes and Boone, LLP ("H&B") represented Plaintiffs.

Defendants' Response stated that H&B only "advised" during its *brief* representation of Plaintiffs and for only $14,208.54 in legal fees. The Response established the following peculiar conflict-of-interest facts: Ira Tobolowsky died in a suspicious fire more than two years after H&B represented Plaintiffs; the representation was brief; the representation was for advise; the legal fees were $14,208.54; defamation claims are different from RICO claims; Plaintiffs sold their house because they invested in a Ponzi scheme; Plaintiffs had a home equity loan; Plaintiffs spent more money with other law firms; Plaintiffs lost everything and had unpaid legal fees; H&B did not represent Plaintiffs when Aubrey was deposed; and Defendants' article about the "death and ensuing homicide investigation" "briefly mentions the RICO Lawsuit," the Ponzi

scheme, the sale of Plaintiffs' house, their legal fees and how much they owed. (*See* Response, ECF No. 79 at pp. 4-5)

However, Defendants' Response fails to establish that any of the above facts are elements to be considered in the disqualification of H&B. The Response does not establish a legal definition for "brief" representation or that H&B's representation of Plaintiffs for nine (9) months is not enough time to be considered in a conflict-of-interest analysis. (*See* Motion, April 2013 Agreement, ECF No. 69 at p. 15) (*See* Response, January 2014 Final Invoice, ECF No. 79 at p. 3) The Response does not establish a basis that $14,208.54 in legal fees is too low of an amount to be considered for conflict-of-interest. It does not determine the number of years between a law firm's representations needed to establish conflict-of-interest waiver. The Response's statements about large legal fees, unpaid legal fees, home sales, home equity loans, depositions and even death in a suspicious fire are not legally sufficient elements to support conflict-of-interest waiver. All of the above facts better serve as Defendants' proof that Plaintiffs absolutely deserve to be defamed.

To establish grounds for disqualification, there must be proof of the existence of a previous attorney/client relationship. Plaintiffs sent an email to all counsel or parties of record to conference them about Plaintiffs' Motion to Disqualify H&B ("Motion"). The email explained that Plaintiffs had previously retained H&B and possessed a signed and dated confidential agreement with H&B. On the same day, Defendant Stephen Schoettmer, who has a history of defaming Plaintiffs, sent a return email that copied the same counsel or parties of record, stating:

> I don't trust your representation. I've known the two of you too long to accept such a representation. Odds of getting such a document from our Plaintiffs: 0%. Wait and see. (*See* **Exhibit A**, Schoettmer email)

Defendant Schoettmer did not have to wait long. (*See* Motion, ECF No. 69 at pp. 10-15)

## ARTICLE ALLEGES PREVIOUS LAWSUIT CAUSED MURDER

Defendants' article alleges that Plaintiffs' former lawsuit caused Plaintiffs to "come unhinged."    The article's sequence of defamatory information ultimately concluded that Plaintiffs' former lawsuit, in which H&B represented Plaintiffs, served as the motive to murder Ira Tobolowsky.

The article's first six (6) pages describe the morning of the fire, the family's discovery of the fire and death, and the family's reaction to the news.   (*See* Article, ECF No. 56-2 at pp.13-19)   Though the Response represents the article is "about the death and ensuing homicide investigation," the following seven (7) pages ("7-Pages") do not mention anything about the ensuing investigation.   These pages were dedicated to all things Aubrey. (*See* Article, ECF No. 56-2 at pp.19-26) They describe his life as hardly worth living, because everything in Aubrey's life was tragic.   The article detailed how Aubrey's life grew worse and worse, until he finally reached the end and became unhinged. (*See* Article, ECF No. 56-2 at pp.19-26)

The 7-Pages failed tell its readers why so much of the story was devoted to Aubrey and failed to state that he was a person of interest in the murder investigation.  In fact, the 7-Pages do not make a single reference to the fire or the death.  The 7-Pages could have easily been an entirely different article, titled after the well-known song from the Broadway hit Avenue Q: "It sucks to be me."  The very first sentence about Aubrey in the entire article states:

> Steven Aubrey, middle son of a Dallas orthodontist who died in 2004, was fighting an inheritance battle with his mother, who believed he'd come unhinged.

The 7-Pages tells Aubrey's life story from high school in 1979 through 2017.  It is a short story but full of misery.  It details nasty Aubrey family fights regarding Aubrey's older brother ("Buck") who stole $5 million in assets from the family's Trust.  The 7-Pages do not explain that

Aubrey never wanted or asked for any money and was only filing lawsuits to have the Trust assets returned to the Trust, which primarily benefited his mother, Betsy Aubrey ("Betsy"). Aubrey also wanted to have his elderly mother removed as trustee and have a court appoint a professional trustee from a banking institution because his mother was not capable of handling a multi-million dollar trust, or Buck or Ira Tobolowsky. (*See* Vodicka Decl. **Exhibit D** at ¶ 6)  The 7-Pages do not explain that for financial gain, Buck and Ira Tobolowsky grossly manipulated Aubrey's mother, ultimately causing her to turn on Aubrey.

The 7-Pages goes into great detail about the Aubrey family feud, including nasty letters written between Aubrey and Betsy.  It reveals that Betsy's house was broken into and she suspected it was Aubrey.  Though Aubrey has never been known by anybody to be violent in any way, the 7-Pages takes a leap of faith and implies Aubrey is violent.  It states:

> Over the years, the feud grew more heated, and Betsy came to fear her son.
> (*See* Article, ECF No. 56-2 at p. 20)

That is an untrue statement.  Betsy has never feared Aubrey.  The article also falsely represented:

> Betsy and Buck told the court that they thought Aubrey might hurt them, and a judge issued peace bonds forbidding Aubrey from contacting them for one year.
> (*See* Article, ECF No. 56-2 at p. 21)

Defendant Jamie Thompson ("Thompson"), the article's author, basically accused Aubrey of criminality when she knew different because she and Aubrey had exchanged emails about the peace bond issue.  Aubrey explained to Thompson that Betsy and Buck were not afraid of Aubrey.  They hired a lawyer to gag Aubrey and stop him from emailing intimate details to extended family members.  The unethical lawyer implemented false facts into Betsy and Buck's affidavits to alarm the judge to get the peace bonds, much like Defendants Robert Ermatinger and Scott Sayers did to alarm the judge to get search warrants, much like Thompson does in her article, to alarm its readers and sell more subscriptions.  In deposition testimony, Betsy and Buck

both admitted their affidavits were fraudulent, they were not afraid of Aubrey, they had never known him to be violent and the purpose of the peace bonds was to keep their secrets, secret. (*See* Betsy Aubrey Depo, **Exhibit B** at 154:19-21; 155:18-21 and Buck Aubrey Depo, **Exhibit C** at 82:3-7)  Thompson knew she was publishing defamatory information about Plaintiffs when she purposefully misrepresented the truth.

Next, the 7-Pages attempted to make Aubrey appear anti-Semitic because he did not know the dates that Rosh Hashanah is observed.  Aubrey is not and has never been anti-Semitic and he hopes those who practice Judaism, Hinduism, Buddhism and Islam are not offended when Aubrey does not know anything about their religious holidays or when they are celebrated. (*See* Aubrey Decl., ECF No. 83 at p. 41 ¶ 13)

The 7-Pages of all things bad about Aubrey finally culminated with Thompson's portrayal of Vodicka attending his deposition five (5) weeks before the fire. (*See* Article, ECF No. 56-2 at pp. 25-6) Thompson's story indicates that Plaintiffs become "unhinged" as a result of the Ponzi scheme lawsuit (the "H&B Lawsuit").  H&B represented Plaintiffs in the H&B Lawsuit.  Thompson summarized the 7-Pages as follows:

> **It had been a bruising couple of years for the couple.** They had been involved in another contentious lawsuit in Austin, after they'd invested hundreds of thousands of dollars in a real estate deal that turned out to be a Ponzi scheme. They had to sell their $1 million house, and they moved to an apartment in Dallas. They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees.  (emphasis added)

It comes as no surprise that Thompson's Declaration and Defendants' Response both left out the one sentence that sets up the H&B Lawsuit: "It had been a bruising couple of years for the couple." (*See* Thompson Decl., ECF No. 79-3 at ¶ 4 and Response, ECF No. 79 at p. 5) The purposeful statement sets up the most meaningful events that Defendants believe form the basis of Plaintiffs becoming unhinged and murdering Ira Tobolowsky.  H&B's Lawsuit caused

Plaintiffs to sell their house and move into an apartment, spend millions of dollars in legal fees, and go into enormous debt, owing $400,000 in legal fees.  Defendants allege the H&B Lawsuit was the straw that broke the camel's back and drove Plaintiffs to commit murder.

The article implied that the H&B Lawsuit caused Plaintiffs to come unhinged and their behavior at the deposition was the proof.  With an abrupt end to the 7-Pages, Thompson's article launched into it's next subject, the funeral, completely unrelated to the 7-Pages about Aubrey.

Thompson downplays the H&B Lawsuit in her Declaration, classifying it as "background in the Article."  (*See* Thompson Decl., ECF No. 79-3 at ¶4)  Likewise, the Response also tries to downplay the H&B Lawsuit, referring to it as "background regarding Aubrey and Vodicka." (*See* Response, ECF No. 79 at p. 5)  The assertions by Thompson and the Response are false. When Plaintiffs are referenced in the article, those references are false and/or defamatory and are designed to frame Plaintiffs for murder.   Thompson did not use the H&B Lawsuit for background and she certainly did not consider Plaintiffs' constitutional rights to presumption of innocence.  Instead, her article elevated the H&B Lawsuit and alleges its effects are the most relevant motive that caused Plaintiffs to commit murder.

## ARGUMENT AND AUTHORITY

Glaring conflict in this case became evident in the Response when H&B argued on behalf of Defendants, against Plaintiffs, that the article's portrayal of the H&B Lawsuit was not defamatory and was based on information that had been widely disseminated and should be considered generally known. Not only were the statements regarding the H&B Lawsuit defamatory, the defamatory information was not public information, was not filed in any case and was not filed with any court. However, the Response (ECF No. 79), filed by H&B, alleges all of the content concerning the H&B Lawsuit was available to the public. (*See* Decl, of

Plaintiffs, Exhibits D and E at ¶¶ 4)  It is grossly unethical for H&B to argue, for its current client, that the H&B Lawsuit does not defame Plaintiffs while its former clients, Plaintiffs, argue that it did.

Insurmountable conflict arises from the inflated $2.3 million in legal fees, which Thompson alleges created even more cause for Plaintiffs to become unhinged and commit murder.  Defendants' false $2.3 million representation defamed Plaintiffs, who can prove that figure is false. In truth, Plaintiffs spent $1 million in legal fees, of which part was paid to H&B for its representation of Plaintiffs.  H&B learned extensive private financial information about Plaintiffs when it represented the H&B Lawsuit, including the fact that Plaintiffs could not spend an over $1 million in legal fees. (*See* Plaintiffs' Decl, Exhibits D and E at ¶¶ 5)   H&B was paid to represent Plaintiffs for nine (9) months; Defendants published an article that falsely states Plaintiffs spent $2.3 million in legal fees; and now H&B is obligated to argue that Defendants' $2.3 million figure is the correct and truthful number.   In fact, H&B must now argue that everything in the article is true, when it knows it is not.  Every time H&B agues the $2.3 million figure is truthful, it will knowingly make false representations to this Court. The conflict is already affecting this case and the conflict will only worsen.

Professional liability insurers and risk management professionals continually stress the importance of a conflict-checking system in law firms to help identify potential conflicts at the time the attorney-client relationship is established. Consistently, it has been shown that a check for conflicts-of-interest that does not include the use of a thorough list or database will leave the firm vulnerable to an embarrassing, and potentially negligent conflict-of-interest problem.

H&B is a giant law firm with 550 lawyers, $400 million in revenue, and sixteen (16) offices all over the world, including locations in Shanghai, London and Mexico City.  It was

H&B's duty to ensure that conflicts of interest were identified and resolved *prior* to engagement. It is likely that H&B identified the conflict in this case prior to signing an agreement with D Magazine. But it is certain that on July 26, 2018, H&B received Plaintiffs' email warning about the conflict problems in this case. However, H&B chose to tempt fate and move forward without addressing the issue. (*See* Email, ECF No. 69 at p. 19)

In their Response, Defendants rely on *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F. Supp. 2d 1334, 1337 (S.D. Fla. 2001):

> Because the law firm obtained in advance informed consent permitting the concurrent representation, the motion to disqualify counsel is DENIED. It is undisputed that each of the companies agreed to this waiver.

> Examining first the issue of consent, to avoid disqualification when attorneys represent adverse interests, attorneys are required to fully disclose the adverse effects of the representation and obtain the consent of the parties. *Fisons,* 1990 WL 180551, at *4 (citing *Cinema 5,* 528 F.2d at 1386). The burden of proving full disclosure and consent is on the attorney seeking to represent adverse interests. *Fisons,* 1990 WL 180551, at *4.

However, *Gen. Cigar Holdings* only supports Plaintiffs' position because H&B did not disclose the adverse effects of the representation and it did not obtain the consent of the parties.

> ("The burden of proof initially is on the moving party to establish grounds for disqualification."). A movant bears the burden of proving (i) the existence of a previous attorney/client relationship and (ii) that the matters in the pending suit are substantially related to the prior representation. *Brown*, 2011 WL 11532078, at *4.

Plaintiffs met their burden to prove the existence of a previous attorney/client relationship. (*See* Agreement, ECF No. 69 at pp. 10-15) And Plaintiffs proved the matters are much more than related, Defendants made Plaintiffs' previous lawsuit a primary subject in its publication and they allege the lawsuit was the motive behind the murder.

## CONCLUSION

H&B represented Plaintiffs, for nine (9) months and learned extensive private financial information about Plaintiffs. (*See* Plaintiffs' Decl, Exhibits D and E at ¶¶ 5) Defendants have

proven their hunger for Plaintiffs' financial information and would likely publish that information if H&B gives it to them.  H&B may no longer have any recollection of Plaintiffs' information, but the law presumes it does.     Defendants' article used Plaintiffs' lawsuit, represented by H&B, and alleged it was the motive that caused Plaintiffs to commit murder. Defendants published false representations about the finances surrounding the lawsuit, in which H&B represented Plaintiffs.   H&B was warned about the conflict issues in this case but it ignored the warning.   If H&B is not disqualified from this case, it will begin defending its current clients' misrepresentations and will file knowingly false documents with this Court.

H&B's prior representation of Plaintiffs is not substantially related to the present matter; it literally is the present matter.   Defendants defamed Plaintiffs using the lawsuit in which H&B represented Plaintiffs, for nine (9) months.

FOR THESE REASONS, Plaintiffs respectfully request that the Court Grant Plaintiffs' Motion to Disqualify Haynes and Boone, LLP. and such other and further relief to which they may be entitled at or in equity.

Respectfully submitted,

By: _____

Steven Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: _____

Brian Vodicka, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com

## CERTIFICATE OF SERVICE

This is to certify that on October 9, 2018, the undersigned has served the foregoing by USPS regular mail, Email, or through the CM/ECF docketing system. Therefore, the undersigned upon information and belief certifies that all counsel or parties of record will receive a copy of these papers.

Steven Aubrey

Brian Vodicka

## SERVICE LIST

**Via CM/ECF Notice:**
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Jason P. Bloom
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
COUNSEL FOR DEFENDANTS:
D MAGAZINE PARTNERS, L.P. f/k/a
MAGAZINE LIMITED PARTNERS, L.P.,
ALLISON MEDIA, INC.
JAMIE L. THOMPSON

**Via CM/ECF Notice:**
Dana J. McElroy
THOMAS & LOCICERO PL
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Peter L. Harlan
DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE

133 N. Riverfront Blvd., LB 19
Dallas, Texas 75207
**COUNSEL FOR DEFENDANTS:**
**DALLAS COUNTY, TEXAS**
**DALLAS COUNTY SHERIFF'S DEPARTMENT**
**MELINDA CHRISTINE URBINA**


***Via CM/ECF Notice:***
Eric P. Hockman
WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
**LOCAL COUNSEL FOR DEFENDANTS:**
**CITY OF DALLAS**
**DALLAS POLICE DEPARTMENT**
**SCOTT ROBERT SAYERS**
**ROBERT L. ERMATINGER, JR**


***Via CM/ECF Notice:***
Tierman Cole
OFFICE OF ATTORNEY GENERAL OF FLORIDA
110 SE 6th St., Fl 10
Fort Lauderdale, FL. 33301-5001
Demetri Anastasiadis
OFFICE OF ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711
**COUNSEL FOR DEFENDANT:**
**ERIC VAUGHN MOYE**


***Via Email: steve.schoettmer1@gmail.com***
Stephen Charles Schoettmer
4305 W Lovers Ln
Dallas, TX 75209-2803
**DEFENDANT PRO SE**

# Exhibit  A

 Gmail

**Vodicka & Aubrey <defamationperse@gmail.com>**

---

## Re: Conference: 18-CV-61117-BLOOM-VALLE

1 message

---

**Steve Schoettmer** <steve.schoettmer1@gmail.com>                                     Fri, Sep 14, 2018 at 11:41 AM
To: Vodicka & Aubrey <defamationperse@gmail.com>
Cc: Dana McElroy <DMcElroy@tlolawfirm.com>, Demetri Anastasiadis <Demetri.Anastasiadis@texasattorneygeneral.gov>,
Eric Hockman <ehockman@wsh-law.com>, Gwendolyn Hinton <gwendolyn.hinton@myfloridalegal.com>, "Jason P. Bloom"
<jason.bloom@haynesboone.com>, Joseph Serota <jserota@wsh-law.com>, Martine Legagneur
<martine.legagneur@myfloridalegal.com>, Richard Rosengarten <rrosengarten@wsh-law.com>, Stephen Schoettmer
<steve.schoettmer1@gmail.com>, Tiernan Cole <tiernan.cole@myfloridalegal.com>

I don't trust your representation.   I've known the two of you too long to accept such a representation. If you have a
signed agreement, Forward it and then I'll give you a decision.

Odds of getting such a document from our Plaintiffs:  0%.  Wait and see.

Sent from my iPad
Steve Schoettmer
214 228 8792

On Sep 14, 2018, at 10:01 AM, Vodicka & Aubrey <defamationperse@gmail.com> wrote:

> Dear Counsel:
>
> We plan to file a motion to disqualify Haynes and Boone, LLP as we formerly
> retained this firm and signed a "Privileged and Confidential" agreement that
> codifies the representation.
>
> Haynes and Boone, LLP's representation of the D Magazine defendants
> violates Rule 4-1.7 of the Florida Rules of Professional Conduct.
>
> Please respond and indicate if you would agree with or be opposed to this
> motion.
>
> Thank you,
>
> Steve Aubrey and Brian Vodicka

Exhibit B

1                    CAUSE NO. PR-14-01486-3

2     STEVEN B. AUBREY,          )      IN THE PROBATE COURT
      Beneficiary of the Trust  )
3     created in the Will of     )
      Richard Buck Aubrey,       )
4     Deceased; STEVEN B. AUBREY, )
      Individually               )
5                                )
      VS                         )                      NO. 3
6                                )
      BETSY STIRRATT AUBREY,     )
7     Independent Executor of    )
      the Estate of Richard Buck )
8     Aubrey, Deceased, and as   )
      Trustee of the Testamentary )
9     Trusts created under the   )
      Will of Richard Buck       )
10    Aubrey, Deceased           )      DALLAS COUNTY, TEXAS

11

12    _____

13                    ORAL DEPOSITION OF

14                       BETSY AUBREY

15                     DECEMBER 8, 2014

16    _____

17

18          ORAL DEPOSITION OF BETSY AUBREY, produced as

19    a witness duly sworn by me at the instance of the

20    Plaintiff, was taken in the above styled and numbered

21    cause on the 8th day of December, A.D., 2014 from

22    10:09 a.m. to 2:55 p.m., before Kellie L. Rowbotham,

23    CSR in and for the State of Texas, reported by

24    stenographic means, at the offices of Esquire

25    Deposition Solutions, located at 1700 Pacific Avenue,



1       Q    How long have you been the trustee of the
2   Aubrey Family Trust?
3       A    Since my husband's death and the trust was
4   set up.
5       Q    When was that?
6       A    It's in 2004.
7       Q    Okay.  Do you understand what it means to be
8   a fiduciary?
9       A    No.
10      Q    Do you understand that as sole trustee of
11  the Aubrey Family Trust you act in a fiduciary
12  capacity to the trust?
13      A    Not if I don't know what the word means.
14      Q    Okay.  Has the Aubrey Family Trust ever had
15  a bank account?
16      A    Yes.
17      Q    When?
18      A    I think it has a bank account for rental and
19  expenses.
20      Q    Where is that bank account held?
21      A    It's either at Capital or Wells Fargo.  I
22  don't know which.
23      Q    Are you -- do you receive the bank
24  statements?
25      A    I see the bank statements.


ESQUIRE
SOLUTIONS

```
1        Q    Did you and him drive down to Austin to see
2    the property?
3        A    (Witness nods head up and down.)   Yes.
4        Q    Why did you go to see it?
5             MR. TOBOLOWSKY:   Objection, form of the
6    question.
7        A    To see its condition.
8        Q    Where did the closing of the Austin property
9    take place?
10            MR. TOBOLOWSKY:   Objection, form of the
11   question.
12       A    I don't know.
13       Q    Did it take -- did the closing take place at
14   a title company?
15            MR. TOBOLOWSKY:   Objection, form of the
16   question.
17       A    I don't know all the particulars.
18       Q    How did you come to execute the documents --
19            MR. TOBOLOWSKY:   Objection, form of the
20   question.
21       Q    -- to transfer the property?
22            MR. TOBOLOWSKY:   Objection, form of the
23   question.
24       A    Well, I don't know.   I don't remember.
25       Q    Did -- who were the attorneys that -- strike
```



1   that.  Isn't it true that Faith Burk assisted you in

2   that transaction?

3              MR. TOBOLOWSKY:  Objection, form of the

4   question.

5      A   I know she's a title attorney, but I suppose

6   she drew it up.

7      Q   Who did you sell the Austin property to?

8              MR. TOBOLOWSKY:  Objection, form of the

9   question.

10     A   I didn't sell the Austin property.

11     Q   What did you do?

12     A   I gave it to Buck.

13     Q   You gave it to Buck.  Did Buck give you any

14  money back for that?

15             MR. TOBOLOWSKY:  Objection, form of the

16  question.

17     A   No.  It was in payment for his work on the

18  property.

19     Q   What work did he do on the property to

20  account for the total consideration paid?

21             THE WITNESS:  Do I answer that?

22             MR. TOBOLOWSKY:  (Nods head up and

23  down.)

24     A   It was contaminated for one thing.  He had

25  to deal with an environmental attorney to get the



1    the information you get in this case to this case

2    only?

3                    MR. STEVEN AUBREY:  Let's go off the

4    record.  This is ridiculous.

5                    MR. VODICKA:  Yeah.  Why don't we go

6    off the record.

7                    MR. TOBOLOWSKY:  Well, do you want to

8    take a lunch break then?

9                    MR. VODICKA:  I think we need to take a

10   break and discuss --

11                   MR. STEVEN AUBREY:  And go to lunch.

12   That's fine.

13                   MR. VODICKA:  And go to lunch, yeah.

14                   (Off the record at 12:25 p.m.)

15                   (Lunch recess.)

16                   (Back on the record at 1:35 p.m.)

17        Q   Okay, Ms. Aubrey.  Can you turn to Exhibit

18   Number 9, please?

19        A   (Witness complies.)

20                   MR. TOBOLOWSKY:  I think she had a

21   comment that she had made some misstatement.

22                   Did you not?

23                   THE WITNESS:  Oh, yeah.  You mean about

24   the -- in the Trust?

25                   MR. TOBOLOWSKY:  And the Trust account



```
 1   or whatever.  Whatever you wanted to say, go ahead
 2   and say it.
 3               THE WITNESS:  Well, I don't remember
 4   what I said about the Trust.
 5               But the Trust doesn't have a bank
 6   account, and the Trust's properties are Fishburns and
 7   the Garland property and the beach house.
 8      Q   Thank you, Ms. Aubrey, for clarifying that.
 9   So can you say that again so I can understand?
10               MR. TOBOLOWSKY:  You don't mean
11   Fishburns.
12               THE WITNESS:  Well, what it is now, you
13   mean?
14               MR. VODICKA:  Forest Lane.
15               THE WITNESS:  Mattress Firm and --
16               MR. TOBOLOWSKY:  No.  What's in the
17   Trust right now is the beach house and the Garland
18   property.
19               THE WITNESS:  Oh, everything is LLC.
20      Q   Okay.  Is Garland Joe Field?
21      A   No.
22      Q   So Joe Field is not part of the Trust?
23      A   No.
24      Q   Garland is.
25      A   Garland is.
```



```
 1        Q    Do you know what JFJV is?
 2        A    No.  Joe Field, I guess.
 3        Q    Okay.  Does he get a commission on Joe
 4   Fields Joint Venture.
 5        A    Yes.
 6        Q    Does Buck get a commission on 6029 Forest
 7   Lane?
 8        A    Yes.
 9        Q    On March 1st, 2006 did he get a commission
10   on the Austin property?
11        A    Yes.
12        Q    Okay.  Did you ever have any written
13   agreement with Buck Aubrey concerning his
14   commissions?
15        A    Not that I remember.
16        Q    Did you ever have a written agreement with
17   Buck Aubrey concerning his management fees?
18        A    No.  It was --
19        Q    How did that come about?
20        A    Just word of mouth and an arrangement
21   between us.
22        Q    So it was an oral agreement?
23        A    Yes.
24        Q    How do you distinguish between the
25   commissions and the management fees?
```



1          MR. TOBOLOWSKY:  Objection, form of the

2    question.

3      A   I thought it was the same thing.

4      Q   How much total management commission fees

5    was Buck paid in 2007?

6      A   I don't have the numbers.

7      Q   Who does have the numbers?

8      A   Buck has the numbers.

9      Q   How much commissions and management fees did

10   Buck get paid in 2008?

11         MR. TOBOLOWSKY:  Objection, form of the

12   question.

13     A   Same answer.  I don't know.

14         MR. STEVEN AUBREY:  Could we go on

15   break for just a second?

16              (Off the record at 1:40 p.m.)

17              (Short recess.)

18              (Back on the record at 1:41 p.m.)

19     Q   Can we go back to the first page, the

20   commission and management fees from March 1, 2006 to

21   August 1, 2006?  Did you personally pay a check to

22   Buck Aubrey for the commission in Garland?

23     A   I don't remember.  I don't think so.  I

24   don't remember.

25     Q   Did you ever pay Buck by check any of these



1    MR. RICHARD AUBREY, JR.:  Can you show

2    us that in the deposition?

3                MR. STEVEN AUBREY:  Yes.

4                MR. VODICKA:  Yes.  If you want to go

5    off the record, we can because we --

6                MR. TOBOLOWSKY:  Let's go -- we can do

7    a lot of things after 5:00.  Let's just get through.

8                MR. VODICKA:  I read the whole

9    deposition, and it took two days, and I promise you

10    those words were used.

11                MR. TOBOLOWSKY:  Okay.  Well, let's

12    keep going.

13        Q   So, Ms. Aubrey, did the -- to your

14    knowledge, did the records of the Aubrey Family, LLC

15    company agreement ever exist?

16        A   I don't know anything about it.

17        Q   Did you ever sign a form with the Texas

18    Secretary of state for the Aubrey Family, LLC?

19        A   I don't know.

20        Q   Do you know who would know?

21        A   No.

22        Q   Did you ever sign a signature card at

23    Compass Bank?

24        A   I don't remember.

25        Q   Did you ever sign a signature card at Wells



1    Fargo?

2        A    I don't remember.

3        Q    Did y'all close the Compass Bank account?

4        A    I don't know.

5        Q    Who would know?

6        A    Buck would know.

7        Q    Buck would know.  Okay.  Was there ever a

8    document entitled "Acknowledges Regarding Aubrey

9    Family, LLC"?

10       A    I don't know.

11       Q    Do you know whether that exists or not?

12       A    I don't know anything about it.

13       Q    Then it says, The LLC's CPA is instructed to

14   prepare a 2011 Form 1065 or an amended 2011 Form 1065

15   to correctly reflect 405 membership interest of

16   Aubrey Family Trust and 60% membership ownership by

17   Betsy and eliminate any incorrect statement that any

18   of the sons has any ownership or partnership interest

19   of any kind in the LLC.  Was that ever done?

20       A    I don't know.

21       Q    Okay.  If you could turn to Exhibit 14, can

22   you look down there at the signature of Richard B.

23   Aubrey, Jr.?  Is that the signature of Richard B.

24   Aubrey, Jr.?

25       A    As far as I know.  I don't ever see it



1    question.

2         A    I don't know.

3         Q    Did Buck Aubrey personally pay Philip Ray

4    his legal fees?

5              MR. TOBOLOWSKY:   Objection, form of the

6    question.

7         A    I don't know.

8         Q    Did you have an engagement agreement with

9    Philip Ray?

10        A    What does that mean?

11        Q    Did you have a contractual legal

12   representation agreement with Philip Ray?

13        A    Well, I didn't know how much it was going to

14   cost.  Is that what you mean?  No.  I hired him to...

15        Q    I mean, did you ever sign an engagement

16   agreement?

17        A    I don't remember if I did or not.

18        Q    What did you hope to accomplish with

19   issuance of a peace bond against Steve Aubrey?

20        A    Just to get him out of my life hopefully.

21        Q    How were you going get him out of your life?

22        A    By not letting him come near me.

23        Q    Is that what the peace bond did?

24              MR. TOBOLOWSKY:   Objection, form of the

25   question.



```
 1        A    It's supposed to for a year.
 2        Q    Did you ever testify in the peace bond
 3   hearing?
 4        A    No.
 5        Q    Did Steve Aubrey ever testify in the peace
 6   bond hearing?
 7        A    No.
 8             MR. TOBOLOWSKY:  Madam Court Reporter,
 9   will you repeat that last question?
10             (Reporter read last question.)
11             MR. TOBOLOWSKY:  Objection, form of the
12   question.
13        Q    Did Tom Aubrey ever testify in the peace
14   bond hearing?
15             MR. TOBOLOWSKY:  Objection, form of the
16   question.
17        A    No.
18        Q    During the last fifty years have you ever
19   seen Steve involved -- Steven Aubrey involved in any
20   type of physical altercation?
21        A    No.
22        Q    During the last fifty years have you ever
23   seen Steven Aubrey personally key a car?
24        A    Personally?  No.
25        Q    Has the Internal Revenue Service sent you
```



Exhibit C

```
 1                    CAUSE NO. D-1-GN-14-000010

 2    STEVEN B. AUBREY              )         IN THE DISTRICT COURT
                                   )
 3    VS.                          )         419TH JUDICIAL DISTRICT
                                   )
 4    RICHARD BUCK AUBREY, JR.     )         TRAVIS COUNTY, TEXAS

 5

 6                   _____

                              ORAL DEPOSITION OF
 7                          RICHARD BUCK AUBREY, JR.
                               AUGUST 14, 2014
 8                   _____

 9

10

11              ORAL DEPOSITION OF RICHARD BUCK AUBREY, JR., produced

12    as a witness at the instance of the Plaintiff, and duly sworn,

13    was taken in the above-styled and numbered cause on the 14th day

14    of August, 2014, from 1:43 p.m. to 7:58 p.m. before Amy C.

15    Kofron, CSR in and for the State of Texas, reported by machine

16    shorthand, at the offices of Esquire Deposition Solutions, 100

17    Congress Avenue, Suite 200, Austin, Texas 78701 pursuant to the

18    Texas Rules of Civil Procedure and the provisions stated on the

19    record or attached hereto.

20

21

22

23

24

25
```



 1    And --

 2         A.   But my affidavit was the 24th.

 3         Q.   You're correct.  What was the purpose of coming all

 4    the way to Austin to get a peace bond against me?

 5         A.   Because of your harassing e-mails to family, friends,

 6    people that we don't even hardly know, anybody you could find in

 7    mom's e-mail address book or e-mails.  You were sending out

 8    false statements.

 9         Q.   Do you feel like everything in your affidavit is a

10    true statement?

11         A.   I gave it to the attorney and he wrote up the

12    affidavit and I signed it.

13         Q.   Did you read it before you signed it?

14         A.   I glanced over it.

15         Q.   Was that at your -- did your attorney recommend that

16    you probably should read it very carefully because this is

17    subject to perjury to a court if it's incorrect?

18                   MR. NIAS:  Object as to form and don't answer

19    that because it calls for attorney/client privilege.

20         Q.   Did you feel like you should read it, knowing that it

21    was a sworn statement?

22         A.   It looked in order to me.

23         Q.   So you do agree with everything that's in it?

24         A.   If there's a typo or something I may have missed,

25    that's a possibility, but generally it's very accurate.



1  could possibly be, and you mention bodily injury.  You mention
2  assault, but in your "jihad" you're talking about e-mails and
3  transferring deeds.
4       A.   Well, your e-mail about the bodily injury to those
5  kids, to me that opens up a-whole-nother level.  You're a big,
6  strong, very athletic guy.  You could do bodily injury to
7  anybody in this room.
8       Q.   Okay.
9       A.   So if you wanted to get aggressive, we'd be scared of
10 you.
11      Q.   Have you ever known me to get into a physical
12 confrontation with anybody, ever?
13      A.   I don't know if you have or haven't.
14      Q.   So you don't know that I have?
15      A.   I don't know that you haven't.
16      Q.   Right.  Okay.  This thing that you -- your fear of the
17 children that I was talking about, that was an occurrence that
18 had just happened, and this was a couple of days after my own
19 mother, who I had treated better than most would have for 50
20 years, cut me out of her will.  And I want you to read what
21 you've written here and tell me how you think that it makes me
22 look dangerous.
23      A.   Where?
24      Q.   It's on the third page of the affidavit.  It's middle
25 of the way down.  And right here.  If you'd read that, please.



Exhibit  D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No. 18-cv-61117-BLOOM/Valle**

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

       *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

       *Defendants.*

_____/

## <u>DECLARATION OF BRIAN E. VODICKA</u>

1.    My name is Brian E. Vodicka.   I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude.  I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2.    I have been a resident and citizen of the State of Florida since November 15, 2016.

3.     I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4.     I have never seen a copy of Steven Aubrey's March 17, 2016 Deposition until Thompson filed an excerpt of several pages, attached to her Declaration filed on October 1, 2018.  The deposition excerpt represents eight (8) pages with Defendant Stephen Schoettmer grilling Aubrey about our personal finances instead of questions about defamation, the basis for the lawsuit. (*See* Depo Excerpt, ECF No. 79-3 at pp. 18-26)  Aubrey's answer of $2.3 million was not money spent in legal fees but was the total spent in the case, $1.3 million loss of investment and $1 million in legal fees.

5.     Haynes and Boone LLP represented my interests in the lawsuit that is discussed in the D Magazine article at issue.  During the 9 months of representation that began in April 2013, I shared very personal financial information with Haynes and Boone lawyer, Leslie Thorne, at her office, during lunches, and over the telephone.  Steve Aubrey and I informed her that we had spent close to $1 million in legal fees and were running out of money.  We spoke about the possibility of her firm taking our case on a contingency basis.  Ms. Thorne later informed me that she checked with her firm's partners and they would not be able to represent us on a contingency basis.

6.     On December 8, 2014, I represented Plaintiff Steven Aubrey in conducting the deposition of Betsy Aubrey.  Betsy Aubrey is Steven Aubrey's mother and is Trustee of the Aubrey Family Trust.  During the deposition, I asked Ms. Aubrey if she understood what it means to be a fiduciary.  She answered no.  (*See* Exhibit B, Depositon at 17:7-13) I asked Ms. Aubrey if she knew which bank held the account for the Trust properties. She guessed and gave two banks as possible holders of the account. (*See* Ex. B 17:14-22) I asked Ms. Aubrey if she knew where the recent closing took place when she gifted another trust property to Aubrey's brother.  She did not know. (*See* Ex. B 36:8-17) After a lunch break, the deposition resumed and Ms. Aubrey's lawyer, Ira Tobolowsky, stated on the record that Ms. Aubrey needed to comment on some misstatements.  During the lunch break, Ms. Aubrey remembered that the Trust did not even have a bank account.  She was unable to

remember which Trust properties were still in the Trust and finally Ira Tobolowsky testified about the properties for her . (*See* Ex. B 113:20-25; 114:1-19) After more coaching, she finally concluded that all of the Trust properties were moved out of the Trust and into an LLC managed and controlled by her other son, Buck Aubrey. (*See* Ex. B 114:19)  The trust properties generate several hundred thousands in annual income that goes into a bank account managed and controlled by Buck Aubrey  Ms Aubrey testified that the hundreds of thousands of income all go to Aubrey's brother to pay him commissions and management fees (and legal fees).  (*See* Ex. B 116:12-25; 117:1-13)  Ms. Aubrey did not know which bank was being used or even if she had signing privileges at the bank. (*See* Ex. B 146:22-25; 147:1-13)

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the  8th  day of October 2018.

Brian E. Vodicka

Exhibit  E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No. 18-cv-61117-BLOOM/Valle**

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

       *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

       *Defendants.*

_____/

## DECLARATION OF STEVEN AUBREY

1. My name is Steven Aubrey.   I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude.  I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2. I have been a resident and citizen of the State of Florida since November 15, 2016.

3. I suffered injury as a result of Defendants' publication of the Articles while residing in Florida.

4.  I have never seen a copy of my March 17, 2016 Deposition until Thompson filed an excerpt of several pages, attached to her Declaration filed on October 1, 2018. I have never seen it because I was never sent a copy with an errata sheet to make corrections. If I had been sent the depostion with an errata sheet, I would have clarified my answer to the question about how much cash Brian Vodicka and I put into the case. My answer included the investment of $1.3 million and $1 million in legal fees. I have never tried to represent that we spent $2.3 million in legal fees and if I had been given the opportunity to clarify my answer in the deposition, I would have. The deposition excerpt is eight (8) pages of Defendant Stephen Schoettmer grilling me about our personal finances instead of questions about defamation, the basis for the lawsuit. (*See* Depo Excerpt, ECF No. 79-3 at pp. 18-26)

5.  Haynes and Boone LLP represented my interests in the lawsuit that is discussed in the D Magazine article at issue. During the 9 months of representation that began in April 2013, I shared very personal financial information with Haynes and Boone lawyer, Leslie Thorne, at her office, during lunches, and over the telephone. Brian Vodicka and I informed her that we had spent close to $1 million in legal fees and were running out of money. We spoke about the possibility of her firm taking my case on a contingency basis. Ms. Thorne later informed us that she checked with her firm's partners and they would not be able to represent us on a contingency basis.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the 8th day of October 2018.

Steven Aubrey