# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

### Case No. 18-cv-61117-BLOOM/Valle

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

     *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P. d/b/a
D MAGAZINE; MAGAZINE
LIMITED PARTNERS, L.P.; ALLISON
MEDIA, INC.; JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; DALLAS POLICE
DEPARTMENT; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY SHERIFF'S
DEPT.; DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

     *Defendants.*

_____/

FILED BY _____ D.C.

OCT 2 2 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## PLAINTIFFS' MOTION FOR LEAVE
## TO FILE FIRST AMENDED COMPLAINT

     Plaintiffs Steven B. Aubrey ("Aubrey") and Brian E. Vodicka ("Vodicka"), (collectively,

"Plaintiffs"), file this motion for leave to file first amended complaint as follows:

     In the interest of justice Plaintiffs request leave to amend their Complaint ECF No. [1]

pursuant to Federal Rule of Civil Procedure 15(a)(2) states in part: "The court should freely give

leave when justice so requires."

## CERTIFICATION OF CONFERENCE

Pursuant to S.D. FLA. L.R. 7.1(a)(3), Plaintiffs hereby certify that prior to filing this motion, they conferred with all parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

Respectfully submitted,

By: _____
Steve Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: _____
Brian Vodicka, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on October 22, 2018, I filed the foregoing document with the Clerk of the Court and trust that the foregoing document is being served this day on all counsel or parties of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing. Therefore, the undersigned upon information and belief certifies that all counsel or parties of record will receive a copy of these papers.

*<u>Via Facsimile</u>*
Stephen C. Schoettmer
4305 W Lovers Ln
Dallas, TX 75209-2803
[Tel.] (214) 228-8792
[Fax] (214) 352-0662
**Defendant Pro Se**

Steve Aubrey

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No. 18-cv-61117-BLOOM/Valle**

STEVEN BENTON AUBREY, and
BRIAN EDWARD VODICKA,

       *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P.,
ALLISON MEDIA, INC.; JAMIE L.
THOMPSON; ROBERT L.
ERMATINGER, JR.; SCOTT
ROBERT SAYERS; STEPHEN
CHARLES SCHOETTMER; ERIC
VAUGHN MOYE; CITY OF DALLAS;
MELINDA CHRISTINE URBINA;
DALLAS COUNTY, TEXAS;
and DOES 1-10, all whose true names
are unknown,

       *Defendants.*

_____/

**FIRST AMENDED COMPLAINT**

      Plaintiffs Steven B. Aubrey and Brian E. Vodicka file this First Amended Complaint

against Defendants D Magazine Partners, L.P., Allison Media, Inc., Jamie L. Thompson, Robert

L. Ermatinger, Jr., Scott Robert Sayers, Stephen Charles Schoettmer, Eric Vaughn Moye, City of

Dallas, Melinda Christine Urbina, Dallas County, Texas, and Does 1-10, all whose true names

are unknown, alleging as follows:

# TABLE OF CONTENTS

Table of Contents ...................................................................... ii

Overview ............................................................................... 1

Parties ................................................................................. 2

Jurisdiction ........................................................................... 3

Venue .................................................................................. 5

Agency/Respondeat Superior ..................................................... 6

Facts ................................................................................... 7

      A.    The Murder ........................................................... 8

      B.    Schoettmer's False Report ........................................ 9

      C.    Moye's Extrajudicial Murder Accusation ....................... 12

      D.    Deception and Aggravated Perjury ............................... 17

      E.    Unreasonable Searches and Seizures ............................ 21

      F.    Tactical Division Covert Operations - Excessive Force ........ 22

      G.    Unlawful Leaks ..................................................... 27

      H.    City and County Defendants Cause Injuries in Florida ......... 35

      I.    D Magazine Causes Injuries in Florida (targets Florida) ........ 38

      J.    Due Process, Fair Play and Substantial Justice ................. 50

Causes of Action ..................................................................... 52

      Count I - Florida State-Law Defamation ................................. 52

      Count II - Florida State-Law Defamation Per Quod ..................... 55

      Count III - Florida State-Law Defamation Per Se ....................... 56

Count IV - Unreasonable Searches and Seizures ……………….…….     58

Count V - Excessive Force ……………………….….….……….     59

Count VI - Conversion ……………………………………...…....     60

Count VII - Deprived of Liberty without Due Process of Law …….     62

Count VIII - Due Process Equal Protection …………………..…..     63

Count IX - Presumption of Innocence ……………………..…….     64

Count X - Persons Under Color Law Liability …………….…..…..     65

Count XI - American Disabilities Act ……………...…….…...…..     66

Count XII - Conspiracy Under Color Law ………..…….……..…..     67

Count XIII - Abuse of Process ……………………………..…….     68

Count XIV - Invasion Privacy - Misappropriation …………………     69

Count XV - Invasion Privacy - Public Disclosure ………………….     71

Count XVI - Invasion Privacy - Intrusion ……………………...…..     72

Count XVII - False Arrest …………………………..…....…....     73

Count XVIII -Assault and Battery …………….…….……….….     75

Count XIX -False Imprisonment …………….…………..…..…….     78

Count XX -Foreseeable Zone of Risk …………………….…...…..     79

Count XXI -Conspiracy Liability …………………..………….....     81

Count XXII -Emotional Distress, Intentional Infliction ………….....     82

Count XXIII -Emotional Distress, Negligent Infliction …………….     85

Prayer ……………………………………..…..………………     88

Certification and Close …………………………..……………….     90

## OVERVIEW

1.      Florida defamation law underpins many of the plaintiffs' claims in this civil action.   The plaintiffs sustained injuries while living in Florida as Florida residents.

2.      The plaintiffs seek damages against the defendants for committing acts under color of law, depriving the plaintiffs their rights secured under the Constitution and laws of the United States and for defaming the plaintiffs.

3.      Certain defendants, while acting in their capacities as police officers, deputies and a civil judge, deprived the plaintiffs' their liberties without due process of law, executed unreasonable searches and seizures of the plaintiffs and their properties and deprived the plaintiffs of their property without due process of law, thereby depriving the plaintiffs of their rights, privileges and immunities guaranteed by the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

4.      The defendants leaked sealed information involving a capital murder investigation to news sources, made official public murder accusations and conducted a trial by media that shaped the public's opinion to permanently damage the plaintiffs' reputations. The defendants conspired with one another and with discriminatory intent targeted the plaintiffs because of their sexual orientation.

5.      Under color of law, the defendants committed police brutality and official misconduct and deprived the plaintiffs their rights under the Constitution, federal law and federal statutes. The defendants committed numerous torts under Florida and Texas state law. They maliciously and proximately caused injury to the plaintiffs, including but not limited to personal humiliation, mental suffering, impairment of reputations and lost earnings capacity.

1

## PARTIES

1.      Plaintiff Steven B. Aubrey ("Aubrey") is a resident of Broward County, Florida and is before this Court for all purposes.

2.      Plaintiff Brian E. Vodicka ("Vodicka") is a resident of Broward County, Florida and is before this Court for all purposes.

3.      Defendant D Magazine Partners, L.P. is a Texas limited partnership whose principal place of business is Dallas County, Texas and is before this Court for all purposes.

4.      Defendant Allison Media, Inc. is a Texas corporation whose principal place of business is Dallas County, Texas and is before this Court for all purposes.

5.      Defendant Jamie L. Thompson ("Thompson") is a resident of Montgomery County, Maryland and is before this Court for all purposes.

6.      Defendant Stephen Charles Schoettmer ("Schoettmer") is a resident of Dallas County, Texas and is before this Court for all purposes.

7.      Defendant Eric Vaughn Moye ("Moye") is a resident of Dallas County, Texas and is before this Court for all purposes.

8.      Defendant Robert L. Ermatinger, Jr. ("Ermatinger") is a resident of Ellis County, Texas and is before this Court for all purposes.

9.      Defendant Scott Robert Sayers ("Sayers") is a resident of Collin County, Texas and is before this Court for all purposes.

10.     Defendant City of Dallas ("Dallas") is a covered governmental agency of the State of Texas within the definition of 42 U.S.C. § 12101 *et seq.* and is before this Court for all purposes.

11.     Defendant Dallas County, Texas ("Dallas County") is a covered governmental entity of the United States within the definition of 42 U.S.C. § 12101 *et seq.* and is before this Court for all purposes.

12.     Defendant Melinda Christine Urbina ("Urbina") is a resident of Dallas County, Texas and is before this Court for all purposes.

13.     Upon information and belief, Does 1-10 (the "Individual Defendants"), are individuals whose names and addresses of residences are unknown. They include Dallas police officers and/or employees, Dallas County deputies and/or employees and Dallas County District Attorneys and/or employees.

14.     Aubrey and Vodicka are referred to collectively as "Plaintiffs."

15.     Magazine Partners, L.P., Allison Media, Inc. and Thompson are referred to collectively as "D Magazine."

16.     Ermatinger, Sayers and The City are referred to collectively as "City Defendants."

17.     Dallas County and Urbina are referred to collectively as "County Defendants."

18.      Schoettmer, Moye, D Magazine, City Defendants, County Defendants and Does 1-10 are referred to collectively as "Defendants."

## JURISDICTION

19.     This Court has subject matter jurisdiction under 18 U.S.C. §242 because this is an action asserting claims based on deprivation of rights protected by the Constitution or laws of the United States under color of law.

20.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action asserting claims based on federal law.

21.    This Court has personal jurisdiction over the Defendants because they caused Plaintiffs' injuries in Florida, where the injuries are ongoing.

22.    This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because damages exceed $75,000.00 and Defendants are from different states.

23.    This Court has jurisdiction pursuant to 28 U.S.C. §1343 because this is an action asserting claims based on the deprivation of civil rights due to color of law and/or conspiracy under 28 U.S.C. Section 1343(a)(b).

24.    This Court has subject matter jurisdiction under 28 U.S.C. §1367(a) because Plaintiffs' state-law claims are so related to the federal claims in this action that they form part of the same case or controversy.

25.    This Court has jurisdiction pursuant to 42 U.S.C. §§1981(a); 1982; 1985; 1986; and 1988 because this is an action asserting deprivation of Plaintiffs' rights.

26.    This Court has jurisdiction pursuant to 42 U.S.C. §1983 regarding deprivation of constitutional rights under the I, IV, VI, and XIV Amendments, acting under color of law.

27.    This Court has jurisdiction pursuant to 42 U.S.C. §1985 regarding the power to prevent a conspiracy, depriving Plaintiffs' rights.

28.    Plaintiffs, a gay couple, are protected members of a minority class for civil rights violations under the Mathew Sheppard and James Byrd, Jr. Hate Crime Act, which includes violations based on Plaintiffs' sexual orientation, and the American with Disabilities Act.

29.    Each and all of the acts (or threats of acts) alleged herein were done by defendants, or their officers, agents, and employees, under color and pretense of the statutes, ordinances, regulations, customs and usages of the City of Dallas, Dallas County, State of Texas, within the meaning of 42 U.S.C. §1943.

4

## VENUE

30.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 as a substantial part of the events giving rise to the claim occurred in May 2017, when Plaintiffs resided in Florida and because Defendants' intentional, tortious and unlawful conduct substantially occurred, and continues to occur, within this judicial district and Plaintiffs, who reside in and transact their principal business within this judicial district, have suffered tortious injuries within this district as a result of Defendants' conduct.

31.     The Court has personal jurisdiction over the Defendants pursuant to *Fla. Stat.* § 48.193(1)(b) as Defendants have entered into the State of Florida with sufficient minimal contacts and committed intentional torts in relation to Plaintiffs, or in the alternative, have committed tortious conduct outside of the State of Florida with the specific intent and knowledge that an injury would occur in the State of Florida.  D Magazine publishes their content in Florida and solicits new subscriptions and advertisers in Florida.

32.     This case cannot maintain venue in Texas, where Defendants reside, as they caused a tsunami of publications and broadcasts that defamed Plaintiffs. The defamation was/is so severe and saturated that tens of millions of Texas citizens have been exposed to the Defendants' defamation of Plaintiffs.

33.     Additionally, Plaintiffs are not financially viable to pursue any kind of travel. Texas venue would cause Plaintiffs to suffer material injustice considering their limited financial ability and their inability to get a fair trial in the forum.

34.     Weighing the factors affecting the convenience of litigants, the only proper venue for this case, the Southern District of Florida.

## AGENCY/RESPONDEAT SUPERIOR

35.    As used herein, whenever it is alleged in this Complaint that Thompson performed an act or made a statement, Plaintiffs intend that said act or statement was done or made together with, and/or on behalf of Magazine Partner and/or Allison Media, or as an authorized agent of Magazine Partner and/or Allison Media, or that Thompson did the act or made the statement under the authority of Magazine Partner and/or Allison Media, via express, implied, apparent and/or some other authority, pursuant to *Respondeat Superior*.

36.    Upon information and belief, at all times relevant herein, Thompson, Magazine Partner, and Allison Media acted jointly with regard to the actions asserted.

37.    As used herein, whenever it is alleged in this Original Complaint that Ermatinger performed an act or made a statement prior to December 1, 2016, a date which approximates Ermatinger's retirement/termination from the Dallas Police Department ("DPD"), Plaintiffs intend that said act or statement was done or made together with, and/or on behalf of Dallas, or as an authorized agent of Dallas, or that Ermatinger did the act or made the statement under the authority of Dallas via express, implied, apparent and/or some other authority, pursuant to *Respondeat Superior*.

38.    Upon information and belief, at all times relevant herein, Ermatinger and Dallas acted jointly with regard to the actions asserted. Ermatinger retired from the DPD (Dallas) in November 2016, and continued to leak governmental classified information that was part of a homicide investigation, violating Sections 323.04 and 323.05 of the Dallas Police Department General Order.

39.    As used herein, whenever it is alleged in this Original Complaint that Sayers performed an act or made a statement, Plaintiffs intend that said act or statement was done or

made together with, and/or on behalf of Dallas, or as an authorized agent of Dallas, or that Sayers did the act or made the statement under the authority of Dallas via express, implied, apparent and/or some other authority, pursuant to *Respondeat Superior*.

40.    Upon information and belief, at all times relevant herein, Sayers and Dallas acted jointly with regard to the actions asserted.

41.    As used herein, whenever it is alleged in this Original Complaint that Urbina performed an act or made a statement, Plaintiffs intend that said act or statement was done or made together with, and/or on behalf of Dallas County, or as an authorized agent of Dallas County, or that Urbina did the act or made the statement under the authority of Dallas County via express, implied, apparent and/or some other authority, pursuant to *Respondeat Superior*.

42.    Upon information and belief, at all times relevant herein, Urbina and Dallas County acted jointly with regard to the actions asserted.

## FACTS

43.    Plaintiffs Steven Aubrey and Brian Vodicka, a gay married couple, have been partners for twenty-three years.[1]

44.    In the early 1990s, Vodicka was a nationally recognized teacher at the University of Texas at Austin McCombs School of Business.

45.    Vodicka is part of a rare group of people who have survived with AIDS for over thirty years.

46.    Due to health limitations, Vodicka has been unable to work a regular job for over twenty years and he survives primarily on Social Security Disability income.[2]

---

[1] Plaintiffs became partners in 1994, before the successful combination drug treatment known as the "AIDS cocktail." At that time, gay seropositive/seronegative couples, like Plaintiffs, were extremely rare because negative men were terrified to be in relationships with positive men.

47.    Aubrey has been Vodicka's caregiver, financially and otherwise.

48.    As a self-employed contractor, Aubrey's ability to support their family has been significantly diminished because of Defendants' unrelenting, egregious, false and discriminatory Internet publications, which remain accessible in Florida.

49.    To supplement his disability income, Vodicka works part-time as a reading tutor for minority foster children.

## A.  <u>The Murder</u>

50.    On May 13, 2016, early in the morning, Ira Tobolowsky died in a suspicious fire at his home.

51.    Authorities approached the incident as a potential homicide and immediately began investigating it as such.

52.    Media sources reported that the Tobolowsky family had no idea who may have wanted to harm Ira Tobolowsky. D Magazine's April 26, 2017 online publication, *A Place Where Something Evil Happened* (the "Article"), stated:

> The detective asked Debbie: "Do you think this was an accident, or could someone have done this?"
>
> "What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband.
>
> Michael Tobolowsky woke in a haze to the sound of his older brother, Jonathan, screaming. A half-hour after their father had been found dead Jonathan had gotten a call from his fiancée. Ira's three sons were at a beach in Destin, Florida, for Jonathan's bachelor party. The sons quickly booked return flights to Texas.

---

[2] Pursuant to 42 U.S.C.§ 421 *et seq.*, Vodicka is a covered/qualified person within 42 U.S.C. §300ff, the Ryan White CARE Act (enacted into law by President G.H.W. Bush, as amended by President Barack Obama), 42 U.S.C. §300ee, and 42 U.S.C. §12101 *et seq.,* the Americans with Disabilities Act of 1990. In addition to his constant challenges of living with AIDS, Vodicka also suffers from depression and bipolar disorder and is prescribed medications detailed in 21 U.S.C. §353(b)(1)(A) & (B) and 21 U.S.C. §355.

Before the flight, Michael had learned the fire might have been set intentionally. Cramped in his window seat, Michael felt his hands aching and realized both fists were clenched. All he could think about was Who? (*See* Article, attached as **Exhibit A**.)

## B. Schoettmer's False Report

53.     Though the Tobolowsky family could not think of anyone who might want to hurt Ira Tobolowsky, there was one opportunist lawyer who had lost his job and he turned the tragedy into his opportunity.  Defendant Schoettmer literally seized the moment to make himself, and Plaintiffs, locally famous and win his long-standing grudge match against Plaintiffs.

54.     While the fire that killed Mr. Tobolowsky was still blazing, his partner, Schoettmer was at the scene of the crime, for unknown reasons, commanding the attention of authorities and the media with tales about a "high-profile" defamation lawsuit that served as the motive for murder.[3]

55.     Schoettmer's excitement over the attention caused him to commit a criminal offense. Texas Penal Code §42.06(a)(1) states: "A person commits an offense if he knowingly initiates, communicates or circulates a report of a present, past, or future bombing, fire, offense, or other emergency that he knows is false or baseless and that would ordinarily cause action by an official or volunteer agency organized to deal with emergencies."

56.     On May 13, 2016, at 9:32 am, only one hour and forty-two minutes after the fire department received the call for help, at 7:50 am, Schoettmer caused to be published online, the first of many stories that would be published about the suspicious fire.  The Dallas Morning News article, *Fire that killed Dallas lawyer from prominent Tobolowsky family may have been*

---

[3] Schoettmer has a documented history of filing frivolous lawsuits; just like the action he filed against Plaintiffs, to collect legal fees.  Schoettmer filed the suit against Plaintiffs on behalf of Mr. Tobolowsky, falsely alleging defamation. The frivolous suit was the ONLY connection between Plaintiffs, Schoettmer and Mr. Tobolowsky. The media could not have been more pleased with Schoettmer's fantastic fabrication about a lawyer killed because of a lawsuit.

*arson,* was literally online before the fire was extinguished, stating: "His law partner told the station that Tobolowsky had recently been involved in contentious litigation."

57.    For a brief period, Schoettmer's fanciful story made him the media darling in the region.  He was granting and conducting many private interviews and interviews to big gatherings of print and television media, fabricating special knowledge about Plaintiffs and his "high-profile" defamation lawsuit.

58.    Addicted to the attention, Schoettmer felt pressure to give his attentive audience something more than his belief that his lawsuit and Plaintiffs were responsible for the murder, so he fabricated a false fact about a recent email that was sent to Mr. Tobolowsky, stating: "I am going to kill you."  Schoettmer realized that his claim about the death threat email would backfire on him and though he never mentioned it again, the media republished his lie several times.

59.    Without basis, Schoettmer's story morphed into one about how the Plaintiffs were crazy and unbelievably angry.  On May 15, 2016, the CBS article, *Judge Receives Added Security After Lawyer's Death,* included Schoettmer's salacious quote:

> "To say that they are crazed in some way and in many ways, and the, I mean the anger was just unprecedented."

On May 18, 2016, Moye assembled a media circus in his courtroom to publically accuse Aubrey for the murder.  Following that disaster, the media circus was outside the courtroom interviewing Schoettmer and Dallas Morning News, ABC News, FOX 4 News, and NBC News each ran stories quoting Schoettmer who, without basis, claimed that Aubrey was a security risk to everyone, stating:

> "The judge was appropriately concerned about security and the judge has been in the courtroom with Mr. Aubrey on multiple occasions and all of us want to be careful."

With calm quiet demeanors, Plaintiffs are very rarely angry about anything. Schoettmer had only been in their physical presence a couple of times during official courtroom settings where everyone, including Schoettmer, is calm and well behaved. Schoettmer never elaborated on why he thought Plaintiffs were so angry or what happened in the courtroom with Aubrey that caused everyone concern.

60.     It did not matter how many hate publications defamed Plaintiffs, how many discrimination-based attacks were launched against Plaintiffs, or how many illegal search warrants certain defendants would execute on Plaintiffs, none of it would help solve the crime because Plaintiffs had nothing to do with the murder Ira Tobolowsky. Plaintiffs have never been convicted, indicted, charged, arrested or even named suspects for the murder of Ira Tobolowsky, because they did not do it.

61.     Schoettmer always disrespected Plaintiffs. Schoettmer is a macho ex-college football player kind of guy who has no tolerance for gay people. Twice a the end of a telephone call with Schoettmer, Aubrey heard him end the conversations with "OK faggot" immediately before hanging up the call.[4] His behavior remains of no consequence to Plaintiffs.

62.     Schoettmer's unfounded, fabricated, and without basis opinions grabbed the attention of the forever-hungry media circus for a brief period. After Schoettmer's five (5) minutes of fame ran its course, he changed his tune and in an attempt to distance himself from his previous claims, he stated in his November 15, 2016 affidavit:

> "I have never filed a Police Report with regard to Mr. Tobolowsky's murder. I did not give a False Report to homicide/investigators/detectives."

---

[4] In Cause No. PR-14-01486-3 Dallas County, Texas Probate Court No. 3, Ira Tobolowsky revealed his discriminatory feelings about gay people in the January 23, 2015 Hearing on Motions, 63:14-16: "And the problem is the son [Aubrey] and his lawyer [Vodicka] are roommates, and I think they're married. And Your Honor, and as such it's compounded the problem…"

"I have never said to an investigating detective that Mr. Aubrey committed a murder, as I have no personal knowledge of same."

"I did not state that Mr. Aubrey physically threatened Mr. Tobolowsky, as I did not witness any such physical threat."

## C.  Moye's Extrajudicial Murder Accusation

63.     On May 13, 2016, the same day as the murder, Moye was driving in Dallas when he pointed his loaded firearm at a woman driver next to him, an aggravated assault offense and a second-degree felony.  Specifically, Moye, who lives in South Dallas and works in Downtown Dallas, was driving on the "North" Dallas Tollway, in North Dallas, the same part of Dallas where Ira Tobolowsky lived and was murdered, on the same morning of the murder, when he became agitated enough to point his gun at a woman driving next to him.

64.     His victim, a woman scared for her life, took a picture of Moye in his Mercedes and posted it on Facebook asking for the public to help identify the gunman.  (Moye's well-known previous assault on another judge did not reach the same level of criminality because it did not include threats with a loaded gun.)

65.     Moye, the gunman, was in the middle of his reelection campaign and this felony offense instantly put his job in danger.  The look is supposed to be that of a *levelheaded* state court judge, not of some gun-yielding maniac, terrorizing women on the streets of Dallas.  When the picture of him in his car was posted on Facebook for the world to see, immediately after he committed his felony offense, Moye needed to resort to extraordinary measures to save his seat on the bench, and he did.

66.     With his re-election was in jeopardy, street-smart Moye called in some favors to the City Defendants, insuring they would ignore the victim's request for help.  The victim posted the following enty with the picture of Moye in his Mercedes: "So SOMEONE has to know this

12

person!  Pulled a gun on me on the tollway…Dallas Police Department can't do anything about it."

67.      Moye's backroom deal with the Dallas Police Department ("DPD")  did prevent his being arrested and thrown in jail, but that only took care of one half of the problem, and possibly created another.

68.      The public basically witnessed Moye's aggravated assault and now DPD, whose job is to protect the public, was protecting the perpetrator.

69.      Moye needed to divert the public's attention away from his criminal offense and shift the focus to the bigger story, the Tobolowsky death.  Moye hatched a plan in which he played the victim and against all odds, it worked.

70.      Since Moye was the presiding judge over the defamation suit that Schoettmer transformed into a "high-profile" case, he could pretend that he was sensibly scared for his life because of the same lawsuit.  Since the media already bought into Schoettmer's craziness, they were likely to do it again.

71.      Completely contradicting his legal duty to protect Plaintiffs, Moye violated Plaintiffs' Sixth Amendment rights and he began systematically releasing statements to the thirsty media.  The clever statements released by members of Moye's re-election campaign portrayed that Moye was scared because of "a possible connection between the Tobolowsky death and litigation being handled by Moye's court" and he needed and was getting extra security from the Dallas County Sheriff's Department, Defendant Dallas County.  Released statements also informed the public that Moye was scared in his court, he had extra bailiffs to protect him and they were on high alert.

72.     On May 15, 2016, the Dallas Morning News article, *Dallas judge given extra security after attorney's death in suspicious fire*, stated, in part:

> "Members of "Moye's re-election campaign said the judge warned officials of a possible connection between Tobolowsky's death and litigation being handled by Moyé's court."

73.     On May 16, 2016, the NBC article, *Detectives Investigating Death of Dallas Attorney*, stated, in part:

> "He was involved in a high-profile, emotionally charged civil case. While it's unclear if the case is related to Tobolowsky's death, the presiding judge told the Dallas County Sheriff's Department he's now afraid for his personal safety.[5]
>
> Deputies patrolled the judge's neighborhood Sunday night, but a sheriff's department spokeswoman said extra patrols would not continue Monday. His courtroom staff and bailiffs remain on high alert."

74.     Plaintiffs have never been known to be violent, have never been known to carry weapons and have no criminal history whatsoever.  Though Plaintiffs have never physically threatened anybody, including Ira Tobolowsky and Moye, the media resonated with the continuation of the lawsuit that killed and was satisfied with Moye's released statements. Releasing statements was Moye's scheme to have information useful to his situation precisely published without ever having to answer the media's questions about the incident with the gun and the woman he assaulted.

75.     Moye's coup de gras was his May 18, 2016 personally released statement. Moye assembled the media circus in his courtroom and during a hearing, he accused Aubrey for the murder of Ira Tobolowsky, though authorities had not yet determined if Ira Tobolowsky's death was criminal or an accident.   Acting under color of law, Moye said:

> "…with the allegations which have been made related to Mr. Aubrey and his implication in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case."

---

[5] Moye later changed his story and began stating it was the law enforcement authorities that warned him that he might be in danger, not the other way around.

Judges do not make murder accusations, in civil or criminal courts. Moye's outrageous act was extrajudicial and not part of any judicial proceeding. He acted outside his capacity as judges cannot accuse a party for murder and allege the party's criminality is an excuse for the judge's recusal.

76.     Again, Moye created a situation where he would not be questioned. After Moye's murder accusation, the media circus was only left to interview Schoettmer outside of Moye's courtroom.

77.     Before Moye made his shocking accusation, the media never used Plaintiffs' names in their stories about Schoettmer's "high-profile" case. That changed the moment Moye accused Aubrey for the murder (not yet classified as a murder). Moye's incomprehensible statement did as Moye intended: It took the heat off of his publically committed felony by causing a media circus feeding frenzy that forever injured Plaintiffs and shredded their lives.

78.     Two mainstream media giants, the Washington Post and ABC News, did not take the bait Moye fed to the others. Their stories about the murder of Ira Tobolowsky, never referred to Plaintiffs by their names. On May 19, 2016, ABC stated, in part:

> "WFAA News 8 is not naming the defendants in the civil suit because no one has been charged in connection with Tobolowsky's death."

79.     The day after Moye's murder accusation, "members of Moye's re-election campaign" released a ludicrous statement claiming that law enforcement instructed him to arm himself before traveling, an extraordinary policy not found in the Dallas Police Department General Order. On May 19, 2016, The New York Daily News article, *Dallas lawyer was victim of 'hit' in suspicious death: friend,* stated, in part:

> "Civil District Judge Eric Moye said in a statement that law enforcement told him to arm himself before traveling anywhere."

80.   Moye strategically and successfully marketed his self-fabricated safety concern and rode the media wave all the way to national television. With approximately 4.5 million viewers, The Today Show's Matt Lauer hosted a segment about the fire/murder and featured several of Moye's statements and pictures.  Approximately 26,000 Broward County residents viewed Moye's national television appearance.   Moye's television appearances and other out-of-court statements about pending litigation to the press

81.   First, Moye fabricated his own security concerns and shared that with the public through released statements.  Then, for the benefit of saving his re-election, Moye publically accused Aubrey for the murder of Ira Tobolowsky, causing catastrophic damage to Plaintiffs' reputations to satisfy Moye's pecuniary interest in his re-election.

82.   Moye's judicial duties never included making capital murder accusations. Moye's statement was made outside his official capacity and outside the scope of his judicial immunity.  Plaintiffs do not bring a defamation claim against Moye.  Moye's actions deprived Plaintiffs due process of law and deprived them of equal protection.  Moye's acted under color of law when he made his malicious murder accusation and violated Plaintiffs' rights to an impartial jury.

83.   Ultimately, Moye's court can only assume power over a claim, which it is authorized to hear.   Moye wishes he could marry the murder accusation to his recusal but just like his assault on his fellow judge, though it occurred in the judge's chambers where official judicial functions do take place, Moye's assault was not a claim which he was authorized to hear, therefore there was a clear absence of subject matter jurisdiction and lose of immunity.  In that case Moye could not claim he assaulted Judge Cortez for purposes of recusal and here, Moye

cannot claim his murder accusation was necessary for his recusal. Moye had a clear absence of subject matter jurisdiction when he accused Aubrey of murder and he lost his immunity.

84.    Moye pecuniary interest to be re-elected to his position as a judge was satisfied.

**D.   Deception and Aggravated Perjury**

85.    Schoettmer and Moye's reckless and malicious statements quickly subjected Plaintiffs to a trial by media and the court of public opinion.

86.    The media fell in love with Schoettmer's fantastic story about his lawsuit and a fiery death.   The defamatory publications and broadcasts clearly indicated growing intense public hatred towards Plaintiffs.

87.    The media were pounding on Plaintiffs' front door at all hours, hunting for more red meat because Schoettmer's stories were lean on detail.

88.    Plaintiffs were traumatized when they read the Dallas Morning News on May 15, 2016, online publication, *Dallas judge given extra security after attorney's death in suspicious fire,* that was followed by a section with blog comments posted by the article's readers. Blog comments included:

> *"Is Steven Aubrey out of the country? ...Is he gay?...."*

> *"Aubrey and Vodicka are both slimy cowards and they are both in contempt of court with attachment orders to arrest likely to be issued soon. These two Buffalo Bill imitators can run, but they will be caught. They are both persons of interest in a capital murder now."*

> *"I just heard that Steven Aubrey may be on the run."*

> *"Can't wait until they catch him and his wife."*

> *"Guess what Mr/Ms Aubrey/Vodicka, you're in Dallas County now, not Travis - you might want to bend over and grab your ankles, again (a familiar position for you I'm sure), & face the reality that your move here was the beginning of the final end for you. Good luck in TDC."*

17

89.     Plaintiffs researched online about interviewing with police and learned the overwhelming recommendation was that no matter how innocent, NEVER agree to be interviewed by a detective without an attorney present. Plaintiffs agreed with each other and had every intention to follow the advice.

90.     Plaintiffs plan to not speak with authorities created two problems for the City Defendants who had a murder to solve.  Though Schoettmer told the authorities that Plaintiffs committed the murder, City Defendants had no useful evidence from the crime scene and Plaintiffs were not interested in being interviewed.

91.     When the authorities realized Plaintiffs did not want to participate in their drama, City Defendants concocted a scheme to fabricate probable cause so that they could search Plaintiffs, their apartments and all of their belongings, confiscate their computers, phones and impound their cars.  City Defendants banked on Schoettmer's intuition and were confident the end would justify the means.

92.     City Defendants scheme to defraud state court judges began with Ermatinger and Sayers spending several days acting as though they were trying but could not locate Plaintiffs and make it appear as though Plaintiffs were either hiding or "on the run." On May 18, 2016, NBC's online article, *Dallas County Judge Recuses Self Over Safety Concerns, Connects Defendant in Civil Case to Suspicious Death,* stated, in part:

> "…detectives on Monday went to the courthouse and handed out Aubrey's photo to Dallas judges and court staffers and told them to remain on high alert if they spotted him."

93.     While Plaintiffs were sitting in their apartment, Ermatinger and Sayers were busy starring in their own drama at the courthouse "looking for Plaintiffs," when they could have just knocked on their door.

94.     Ermatinger and Sayers drafted fraudulent Affidavits for Search Warrants that included misleading innuendo and outright lies.  Ermatinger signed the first three (3) fraudulent affidavits for search warrants, which basically misrepresented that Plaintiffs could not be found and were in hiding.

95.     Ermatinger's affidavit on Aubrey, attached as **Exhibit G**, stated: "the affiant in this case requests to examine and photograph the body of Steven Benton Aubrey within accepted practices. Additionally, affiant requests to fingerprint subject Aubrey to verify his identity, as well as compare to any latent prints from the crime scene."   The affidavit also included a statement about "Jihad" that would be altered in the third affidavit. This affidavit stated: "It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court docket number 15-08135…"

96.     Ermatinger added the words "and against his life" to the "Jihad" statement in his affidavit to search Plaintiffs' apartment, attached as **Exhibit H**.  The added words materially changed the meaning of the statement and made the statement blatantly false.   The statement now read:

> **"It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, <u>and against his life</u> which was filed in court docket number 15-08135…"**   (emphasis added)

Ermatinger, under penalty of perjury, added words that indicate there existed an allegation, in Ira Tobolowsky and Schoettmer's "high-profile" lawsuit, that Aubrey threatened Jihad against Mr. Tobolowsky's life.  However, there is no such allegation in any of the petitions, original or amended.  Ermatinger lied in his affidavit and perjured himself when he lied to the judge who relied on Ermatinger's lie when she issued the search warrant.

97.     Sayers, who signed affidavits for search warrants against Plaintiffs, adopted Ermatinger's same lies and also committed perjury each time he submitted one of his fraudulent affidavits to a judge.   Sayers affidavit, attached as **Exhibit I**, makes the exact same false representation as follows:

> **"It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, <u>and against his life</u> which was filed in court docket number 15-08135..."** (emphasis added)

Sayers lied in his affidavit and perjured himself when he lied to the judge who relied on Sayers' lie when she issued the search warrant.

98.     Ermatinger and Sayers created probable cause where there was none so they could repeatedly violate Plaintiffs' constitutional rights, including the right to privacy guaranteed under the Fourth and Fourteenth Amendment Rights to the U.S. Constitution.   The detectives used the same fraudulent affidavits to obtain the warrants on Plaintiffs email providers, phone providers and others to continually harass and punish Plaintiffs because they are a gay couple.

99.     Not only has Steven Aubrey never threatened anybody's life, *nobody* has ever alleged Steven Aubrey threatened a life with Jihad or anything else.

100.     Ermatinger and Sayers' Aggravated Perjury was felony offense, each time they presented their sworn affidavits with "verified facts" to a judge in connection with the issued Search Warrants.

101.     As well, Ermatinger and Sayers falsified affidavits stated, as a true and "verified" fact: "Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey..."

102.    That was false. In fact, over one month after the crooked detectives signed their affidavits, family members stated in a June 23, 2016 Dallas Morning News article, *Family of slain Dallas attorney Ira Tobolowsky offers $20,000 reward for tips*;

> "Though some have said Tobolowsky may have been killed because of his legal work, his sons said Thursday that they don't know if that was likely. Tobolowsky's family has said he didn't express fear or concern in the days leading up to his death."

103.    Ermatinger and Sayers tendered copies of their fraudulent affidavits and unlawful search warrants to the media for publication, including D Magazine's Article; ensuring their false statements would be read by millions, including those in South Florida, causing injury to Plaintiffs. *See* copies of the Affidavits and Search Warrants digitally embedded in D Magazine's May 2017 online Article. (*Id.* Exhibit B)

## E.  Unreasonable Searches and Seizures

104.    On May 18, 2016, Ermatinger committed aggravated perjury when he presented his fraudulent affidavits to Judge Jeanine Howard, presiding judge of the Criminal District Court No. 6, Dallas County, Texas, who issued Search Warrants on Plaintiffs, their residence and their personal property after she relied on Ermatinger's affidavits.

105.    Ermatinger acted under color of law when he unlawfully searched Plaintiffs and their residence and unlawfully seized their personal property including clothes, electronics, phones, computers and automobiles.

106.    On May 23, 2016, Sayers committed aggravated perjury when he presented his fraudulent affidavits to Judge Jennifer Bennett, presiding judge of the 265th Criminal District Court, Dallas County, Texas, who issued Search Warrants on Plaintiffs, their residence and their personal property after she relied on Sayers' false affidavits.

107.     Sayers acted under the color of law when he unlawfully searched Plaintiffs'
residences and unlawfully seized their personal property.

108.     On October 24, 2016, Aubrey filed a detailed complaint with the Public Integrity
Unit whose mission "is to investigate and prosecute those who have misused the trust placed in
them by State licensing boards. Independence and Transparency are paramount to a process that
is fair to both law enforcement and the citizens of this County."

109.     Sgt. Dotson, a "Public Integrity Unit" lawyer, called Aubrey and said that he had
a meeting with the perpetrator, DPD, and together they determined DPD had done nothing
wrong.

**F.   Tactical Division Covert Operations and Excessive Force**

110.     Two of Ermatinger's May 18, 2016 fraudulent affidavits asked for searches and
seizures of Aubrey and Vodicka personally.  Ermatinger's false representation to Judge Howard
caused her to issue unlawful search warrants. The Search Warrant for Aubrey stated, in part:

"...examine, photograph and fingerprint said Steven Aubrey within accepted practices."
The Search Warrant for Vodicka stated, in part:

"...examine, photograph and fingerprint said Brian Vodicka within accepted practices."

111.     City Defendants are required to follow legal procedures when executing search
warrants, irrespective of the validity of the warrant.  Ermatinger and Sayers grossly violated
Plaintiffs' rights when they maliciously ignored the U.S. Constitutional stipulations for executing
the warrants on Plaintiffs and, without cause, unnecessarily risked Plaintiffs' lives.

112.     Knock-and-announce requires City Defendants to announce their presence and
provide residents with an opportunity to open the door prior to a search.

113.    The only exceptions to the knock-and-announce if doing so could endanger officers, permit escape, or cause the destruction of evidence, otherwise, the procedure is constitutionally required.

114.    On May 19, 2016, there was no basis for the officers to believe knocking on Plaintiff's door could cause them danger.  Plaintiffs were in their mid-50's and both had clean records with no arrests or charges for any type of violence.

115.    As well, City Defendants could not claim that knocking would risk destruction of evidence, as Plaintiffs were the evidence.  However,  Ermatinger and Sayers do not like to knock on doors.  They would not knock on Plaintiffs' door when they "could not find" Plaintiffs and they did not knock on Plaintiffs door to serve their search warrants.

116.    As an alternative to knocking, City Defendants conspired with County Defendants and requested the assistance of the Tactical Division for a Stake-Out and High-Risk Apprehension of Suspects.  The Dallas Police Department General Order Section 313.07A.1. defines the operation as follows:

1. Stake-out: an operation in which officers assume concealed or covert positions in anticipation of a criminal act for the purpose of apprehending the persons involved.

2. Surveillance: the continuous observation of persons, places and things for the purpose of gathering information.

3. High Risk Apprehension: any planned arrest in which there is good reason to believe that the person to be arrested may be armed and intent upon resistance.

The Dallas Police Department General Order Sections 313.07D.1 and 2 stipulate:

> Requests for Tactical Division Assistance during Stake-Out and High-Risk Apprehension of Suspects. Officers receiving information that a violent crime is likely to occur will    notify their supervisor who will notify the Tactical Division. Examples of the types of   offense situations to which the Tactical Division will respond and have primary       command responsibility are armed robbery, hostage situations, barricaded persons,      kidnapping or any other violent crime involving an armed suspect. Routine stakeouts, surveillance, drug raids, and Fugitive Squad apprehensions, for example, do not require that the Tactical Division be called.

But City and County Defendants had no information that a violent crime was likely to occur. The General Order is in need of an amendment.   Section 313.07D.1 and 2 should provide that the Tactical Division shall be engaged upon receiving information that a violent crime is likely to occur or if the persons being apprehended are gay.  The only risk City and County Defendants incurred was potentially receiving advice on how to improve their appearances.

117.    On May 19, 2016, City and County Defendants blocked off a large section of Plaintiffs' apartment community for their elaborate no-basis ambush, terrifying Plaintiffs' neighbors and the apartment community management.

118.    City and County Defendants waited, in hiding, all day until approximately 3:30 pm, when Plaintiffs exited their apartment to go eat a late lunch.[6]

119.    At approximately 3:30 pm, Plaintiffs, then residents of Dallas, Texas, lawfully walked from their apartment to Aubrey's parked vehicle, lawfully occupied Aubrey's vehicle and lawfully began backing the vehicle from a legal parking space.

---

[6]   City Defendants stake out is proof they never believed Plaintiffs were hiding or were not at home, despite all of the pagentry the previous few days.

120.    Plaintiffs' vehicle car moved only a few feet when suddenly; Plaintiffs were under attack with multiple unmarked cars, traveling at incredibly high speeds, headed for them from every direction.

121.    The unmarked cars slammed on their brakes before hitting Plaintiffs' vehicle and the drivers, in plain clothes, jumped out of the unmarked cars screaming at Plaintiffs to get out of their car and get down on the ground as they aggressively rushed towards Plaintiffs, weapons drawn and ready to fire.

122.    Plaintiffs were aggressively forced down on the concrete with firearms literally touching their heads.  Plaintiffs feared they would be shot and killed for a few seconds and the they began to see some signs that the gunmen were associated with the City and County Defendants.  Plaintiffs feared for their lives because the gunmen did not indicate they were officials of any kind and they ambushed them in unmarked cars and street clothes.

123.    City and County Defendants have made it very clear they do not like gays.  One of the unidentified gunmen hovering over , said in a low voice, "You know what you did, faggot."

124.    It is reasonable to assume that City and County Defendants' use of an undercover tactical division to apprehend Plaintiffs to get their fingerprints was for reasons other than getting their fingerprints.  It is reasonable to assume that City and County Defendants orchestrated the ambush without identifying themselves, hoping for the possibility that Plaintiffs might resist arrest and try to defend themselves or even try to break free from the attack. giving    It is reasonable to assume that had Plaintiffs resisted in any way, John Does 1-10 may have determined there was cause to use Plaintiffs for target practice.

125.    Plaintiffs, lucky to be alive, were arrested, handcuffed and hauled off to police headquarters, against their will.

126.    The unlawful search warrants very simply commanded Ermatinger to examine, photograph and fingerprint Plaintiffs within "accepted practices."  The search warrants *were not* arrest warrants. Ermatinger did not trick the judge into issuing arrest warrants.

127.     Plaintiffs allege City Defendants, County Defendants and Does 1-10 conspired with one another to use excessive force to falsely arrest and falsely imprison Plaintiffs for purposes of retrieving fingerprints and photographs.

128.    The apartment property managers and Plaintiffs' neighbors watched the incident in horror. The number of officers, deputies and agents and the method and force they used, resembled resources necessary to capture a drug lord like Pablo Escobar or Joaquin Guzman.

129.    The following day an eviction notice was on Plaintiffs' front door for the following violation of their Lease Agreement; "Arrested on Property."

130.    Taxpayer dollars were completely wasted on City and County Defendants' egregious, unlawful and brutal execution of the warrants, to get Plaintiffs' fingerprints and photos.

131.    City and County Defendants' gross misconduct and police brutality was based purely on discrimination and their hate for gays, gay couples and/or gays who had AIDS.

132.    Plaintiffs basic civil rights were stripped away and the City and County Defendants', supported in part by Plaintiffs' tax dollars, treated Plaintiffs like the worst of any criminals, without basis.

133.    Plaintiffs were further harassed when held against their will in DPD's interrogation rooms for over 9 hours, to be photographed and fingerprinted.

134.    DPD further punished Aubrey by letting him go hungry and withheld his access to a restroom for the 9-hour imprisonment.

135.    Vodicka was not able to take his physician prescribed strict regimen of life-sustaining medications.

136.    During most of the 9-hour unlawful detention, Aubrey sat alone in one interrogation room while the detectives lied to Vodicka about finding Aubrey's fingerprints at the crime scene and that Aubrey had third-degree burns on his body.

137.    The only results from Ermatinger's fraudulent affidavits, unlawful searches, day-long Tactical Division covert operation, brutality, false arrests and 9-hour false imprisonments resulted were two starving and brutalized Plaintiffs and a bunch of tired looking detectives and cops with failure written all over their faces.

138.    Plaintiffs don't believe City and County Defendants acted within "accepted practices" ordered by the judge.

139.    The brutal assault on Plaintiffs caused them to develop a deep distrust for City and County Defendants.

## G.  Unlawful Leaks

140.    Moye, Ermatinger, Sayers and Urbina conspired with one another to unlawfully leak information to the media about an ongoing homicide investigation.

141.    Beginning on the same day as the murder of Ira Tobolowsky, May 13, 2016, Plaintiffs were thrown to the wolves/media and on that day the Trial by Media began.

142.    The court of public opinion was quick to convict Plaintiffs and subject them to public hatred and scorn.

143.    Moye made multiple comments to the media regarding Plaintiffs and released multiple statements to the media regarding Plaintiffs.

144.    Under Moye's direction and control, the Judge Eric Moye Campaign improperly made comments to the press about pending or impending proceedings, which may come before the judge's court.

145.    Moye's comments and released statements were broadcast on national news stations.

146.    Moye's scheme began with his manipulation of the press to create a false sense of fear for his safety.

147.    Initially, Moye made announcements that *he warned officials* about a possible connection to the lawsuit and his personal security risk.

148.    The Dallas Morning News on May 15, 2016 published a story stating, "Members of Moye's re-election campaign said *the judge warned officials* of a possible connection between Tobolowsky's death and litigation being handled by Moye's court."

149.    Using all of the media outlets at his disposal, Moye gave statements or released statements including:

"…the judge warned officials of a possible connection…"

"…the presiding judge told the Dallas County Sheriff's Department he's now afraid for his personal safety."

"…he [Moye] expressed safety concerns after the death of Ira Tobolowsky…"

"…Moye…asked the Dallas County Sheriff's Department for protection…"

"…the presiding judge told the Dallas County Sheriff's Department he's now afraid for his personal safety."

"Judge Moye was concerned for his safety."

"There was never an actual threat made against Moye, but the patrols were simply a courtesy after he expressed safety concerns, officials said."

"Civil District Judge Eric Moyé said in a statement that law enforcement told him to arm himself before traveling anywhere."

150.    Though Moye had already had the above statements published, he changed his mind and determined that the "warning" would appear more legitimate if it came from law enforcement rather than from himself.

151.    So he flipped the story upside down and began releasing statements contrary to his many statements already released.

152.    Moye would combine his new version of *who warned whom* with an extraordinary explanation of the aggravated assault he committed two day prior.

153.    On May 15, 2016 Fox 4 news aired on television and published on their website, *Dallas judge warned to be on alert following death of prominent attorney,* stating:

"Police and the sheriff's office told the judge to be on alert. Hours after the warning, Moyé said someone followed him as he was on the Dallas North Tollway."

154.    Suddenly, it was the authorities warning Moye.

155.    On May 16, 2016, ABC's affiliate television station WFAA Channel 8 aired a story that was also published online, *Lawyer in suspected homicide case received email threatening to kill him,* also presenting the revised edition, stating:

"Hours after the warnings from authorities, Judge Moyé says he was driving on the Dallas North Tollway when he was tailgated by a vehicle that was 'within feet' of his car for 'several miles' and, at one point, it pulled up close alongside the vehicle."

156.    Irrespective of which story the public chose to believe, such warnings were not public information.

157.    May 2016 comments made by DPD and Sheriff officials, concerning nonpublic information during a suspected criminal homicide/arson investigation, were not about public information acquired in a judicial capacity, therefore the information was nonpublic.

158.    Urbina's statements regarding Moye's fabricated need for extra protection were made in such a way that the reader could not decipher who was doing the "warning."

159.    On May 15, 2016, Urbina was quoted in the Dallas Morning News' article, *Dallas judge given extra security after attorney's death in suspicious fire,* which stated:

> "Sheriff's officers were patrolling at Eric V. Moye's home because he was presiding over a high-profile civil case that prompted concerns for his safety, sheriff's spokeswoman Melinda Urbina said. Moye does not preside over criminal cases.
>
> Urbina said bailiffs also had been told to be on alert…"

160.    Urbina does not distinguish who determined there should be safety concerns because of the civil case she referred to as "high-profile," even though it was not and her statement also failed to identify who told the bailiffs to be on alert.

161.    The intentional lack of detail would tip the scales in the direction that Moye was the alarmist who told the bailiffs to be on alert.

162.    It is peculiar that Urbina had no information whatsoever about the felony offense Moye committed only two days prior. In the same May 15, 2016 article, she was quoted:

> "Urbina said she had no details about the tollway incident."

163.    On May 18, 2016, the final act of Moye's drama took place in open court.

164.    Moye, acting under color of law, before a circus parade of local television broadcast station reporters and camera crews, shockingly said:

> **"I think at this point with the allegations which have been made related to Mr. Aubrey and his implication in the death of Mr. Tobolowsky…"**

30

165.    When Moye made the public statement, he violated his legal duty owed to all persons, including Aubrey, and through association, Vodicka.

166.    Moye made the malicious accusation and then alleged it was an *official* statement. In fact, it was not. Most of the circus parade were fooled because Moye was cloaked with the garb of office, acting under color of law.

167.    In truth, the statement was Moye's cover for his criminal act.

168.    While Plaintiffs were at home, not hiding, DPD used the media for their nefarious purposes.

169.    Their plan was to make it appear as though Plaintiffs were "on the run." NBC's May 18, 2016 article, *Dallas County Judge Recuses Self Over Safety Concerns, Connects Defendant in Civil Case to Suspicious Death,* included the following:

> "Meanwhile, investigators are still trying to locate Aubrey, who was not in court on Wednesday to defend a motion he filed.
>
> But on Wednesday NBC 5 learned investigators have been trying for at least two days to track down Aubrey, who is nearly 6 feet 5 inches tall, to talk to him.
>
> A law enforcement source said detectives on Monday went to the courthouse and handed out Aubrey's photo to Dallas judges and court staffers and told them to remain on high alert if they spotted him.
>
> An NBC News crew stopped by Aubrey's known address in Austin but no one answered the door."

170.    Again, Plaintiffs were at home, in their apartment, at the same address indicated on both of their driver's licenses, in Dallas, not Austin.

171.    DPD's scheme to have the media publish its fabrications to create  probable cause is dirty, but leaking real information to the press violates DPD's own internal policies. Sections 323.04(B) and 323.05(A) of the Dallas Police Department's General Order, dictate the department's policies during an on-going criminal investigation. Department employees may not

give information from Police Department files to media members except for: (1) Accident Reports; (2) Page One of Offense Reports; (3) Page one of Arrest Reports; (4) Mug shots where records reflect previous convictions or where defendants have recently been charged; and (5) Previous convictions.

172.    Ermatinger had Judge Howard *Seal* his May 18, 2016 perjured Affidavits for Search Warrants and Sayers had Judge Bennett *Seal* his May 25, 2016 perjured Affidavits for Search Warrants so their lies about Plaintiffs would be hidden, at least temporarily.

173.    The orders sealing the affidavits stated the following reason for the order: "because public disclosure of the affidavit would jeopardize the safety of a witness."

174.    On May 27, 2016, only two days after Judge Bennett sealed the affidavits, the Dallas Morning News published, *Prominent Dallas lawyer's nasty lawsuit gets attention in his death,* describing in detail the unreasonable search and seizure that took place two days earlier, stating: "Dallas Police detectives and a marked crime scene vehicle were at the apartment where Vodicka lives on Glen America Drive on Wednesday morning."

175.    DPD acts as a *custodian* operating in the capacity as an agency of the State of Texas. Therefore, DPD did not have the discretion to make this information public. Every bit of Plaintiffs' private and personal information imaginable was illegally obtained and is now in custody of DPD, who releases such information without any constraint.

176.    That information includes approximately nine hours of Plaintiffs' recorded "voluntary" interview at DPD headquarters, Plaintiffs' credit card transactions, their personal cell phone records, photographs of their bodies, every file and document on their computer and anything else one can think of.

177.    Plaintiffs have absolutely no privacy left with regards to DPD.

178.    DPD unlawfully leaked Plaintiffs' information to the media, committing official misconduct and violating DPD internal procedures and Texas state law.

179.    After Ermatinger retired in November 2016, D magazine approached him for comments about the ongoing homicide investigation and Ermatinger surrendered to his uncontrollable urge defame Plaintiffs.    While Plaintiffs resided in Broward County, D Magazine's May issue was published online with the cover story title; "*A Place Where Something Evil Happened,*" proving Ermatinger propensity to lie, including the following:

> "Phone records, detectives told the Tobolowsky family, showed no activity on the men's cell phones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. The records did show cell activity before and after that time period.

> Ermatinger says Aubrey had red marks on both arms. But a SWAT doctor couldn't definitively say what the marks were from.

> " Detectives began monitoring the men's credit card transactions and discovered that Aubrey's card had been used that day to book a room at the Crowne Plaza hotel under the name Alexandra Krot."

> "They did not have good alibis, telling detectives that at the time of the fire, they were at their apartment."

180.    The Article was a vicious story defamed Plaintiffs by with lies and by implication. One flippant comment made by Aubrey was published in the Article to further make Aubrey look bad, as though he had no respect for authority. Aubrey has a lifetime of respecting respectful people. The Article included Aubrey's statement: "Ermatinger is a lying sack of shit." Plaintiffs have the proof that he is and will disclose the evidence that completely contradicts Ermatinger's malicious lies made to the public.

181.    Ermatinger's comment about the cell phones turned off until the next afternoon is a blatant lie.

182.    Plaintiffs' phone records, the same ones DPD had in their files from an unlawful search and seizure, prove that Aubrey placed calls at 10:51am and 10:53am. Vodicka placed calls at 9:17am, 9:18am, 10:51am, 10:52am and 11:16am. Aubrey stands by his comment about Ermatinger, with proof.

183.    The fabrication about the red arm is simply pathetic. As it happened, Aubrey had an appointment with his dermatologist on the same day Ira Tobolowsky was murdered, about four hours later. Plaintiffs are unfamiliar with the term "SWAT doctor" used by Ermatinger, but the individual who examined Aubrey did not seem intelligent enough to have gone to medical school.

184.    Ermatinger made it appear in his fraudulent affidavit the Aubrey booked a room under an alias name of a woman to further hide from DPD.

185.    DPD knew that Aubrey was home and was not checking into a hotel under a woman's name.

186.    And finally, DPD claimed that Plaintiffs did not have good alibis because they were asleep at 7:30 am.

187.    The only people with good alibis are not at home and are in public spaces where they are video taped as proof, therefore it can be assumed that probably more than one half of the human population do not have good alibis for their whereabouts at 7:30 am on May 13, 2016, including law enforcement officers not working at that hour.

188.    DPD tendered all of the previously sealed documents to D Magazine for publication, in furtherance of their harassment.  They also tendered the affidaivits, search warrants etc., documents that resulted in nothing, to Dallas Morning News to publish in its

34

October 13, 2016 article, *Dallas attorney Ira Tobolowsky was spied on before he was killed, police suspected,* which stated:

> "Dallas police have released documents that detail evidence they've sought in the slaying of prominent attorney Ira Tobolowsky."

189.    DPD's unlawful leaks concerning this murder investigation and the unlawful comments to the media by Ermatinger, a former DPD detective who was assigned to investigate the Ira Tobolowsky's murder, clearly indicate that DPD was trying this homicide case in the court of public opinion, to harass and defame Plaintiffs, because they had no evidence to bring Plaintiffs to trial, because they did not do it.

190.    Ermatinger admitted that detectives executed more search warrants on the Tobolowsky case than on any other he worked on and most were on Plaintiffs.

191.    Defendants had a burr underneath their saddle and they wanted badly to get anything they could on Plaintiffs.

192.    And because they could never find anything, because Plaintiffs did not murder Tobolowsky, Defendants continue to harass this gay couple, because they are gay, and because of their preconceptions that gays are prone to intrigue and murder.

193.    At the end of the day, after all of the unreasonable searches and seizures and after all the malicious leaks to the media, DPD's misconduct resulted in no formal charges.  Their only accomplishment was the destruction of Plaintiffs' lives.

**H.  Florida Injuries**

194.    In November 2016, Plaintiffs moved to South Florida in an attempt to escape Defendants' harassment, brutality, felony threats and relentless discriminatory persecution launched against them at the direction of Defendants.

195.    Defendants' blatant discrimination included ruthless defamation, criminal harassment, physical brutality and felony assaults against Plaintiffs.

196.    Plaintiffs packed everything they owned into a U-Haul truck to escape the abuse and after several days of hard travel, they arrived at their new rental property in a quiet and friendly Fort Lauderdale suburban neighborhood.

197.    For the first time in many months, Plaintiffs felt safe, but only for a minute.

198.    Plaintiffs' next-door neighbor stopped by and said how thrilled she was to see that she had new neighbors.

199.    Sadly, after that first day and for the next eighteen months, she would not speak with Plaintiffs.

200.    Beginning the first day of Plaintiffs' arrival and for approximately three weeks following, a parade of law enforcement vehicles took turns parking directly in front of Plaintiffs' new home, unexpected harassment caused by Defendants.

201.    The nonstop spectacle of law enforcement vehicles severely damaged Plaintiffs' reputations among their new neighbors.[7]

202.    Plaintiffs moved to South Florida to escape the suffocating discrimination they suffered in Dallas, Texas, hoping to start fresh and get back a small part of the peaceful lives they had known before moving to Dallas.[8]

---

[7] This is not Vodicka's first dance with discrimination because he is gay. He barely survived a gay bashing about 34 years ago when he was jumped by five men and severely beaten. With a broken jaw and covered in his own blood, Vodicka miraculously broke free and ran into the street in front of a fast-moving delivery truck. The truck came to a screeching stop, scaring away the following perpetrators.

[8] Prior to their 2016 move to Dallas, TX, Plaintiffs were very nearly set to retire after a long history of hard work and a conservative living. That all changed when Plaintiffs' very good friend, also Vodicka's former business partner, encouraged Plaintiffs to invest their savings and borrow against their $1.4M home (owned outright) into a global real estate Ponzi scheme, orchestrated by North Miami Beach Florida Russian organized crime fugitives on "WANTED BY THE FBI" posters. *See* "Wanted" posters

203.    On October 3, 2018, copies of thirteen (13) subpoenas duces tecum began trickling into Plaintiffs' mailbox via USPS. Schoettmer's signature was on all of the documents that were served for purposes of judgment debt collection.    In truth, the subpoenas represent Schoettmer's continued unlawful use of a civil lawsuit to further his misguided and unintelligible murder investigation.

204.    City Defendants previously gave Schoettmer information about the Tobolowsky murder investigation, which only they could have known. Schoettmer's list of thirteen (13) non-party witnesses, which includes Plaintiffs' old phone providers and old email accounts not used for many years, could only come from the City Defendants because that much of the information is  old and not publically available.    As well, the City Defendants unlawfully gave Plaintiffs' personal identification information to Schoettmer, including their social security numbers, causing further injury to Plaintiffs, in Florida.

205.    Each subpoena duces tecum, served by Schoettmer, represents fraudulent use of personal identification information, a felony offense.    Cloaked as instruments for debt collection, the subpoenas duces tecum were served on Plaintiffs' phone providers and email service providers demanding production of documents that cannot possibly lead to the collection of debt. The documents Schoettmer demands to be produced include: location records, historical GPS/mobile locate information, call/text/data, Cell-site and sector, date time, direction, duration, bytes up/down, all text messaging content, detail records, electronically stored records, voicemail, Dialed Digit searches, email, digital images, contact lists, video calling, web activity, domain accessed, data connections, Internet Service Providers, Internet protocol addresses, session data, designation data, bookmarks, data sessions, carrier key, cell site lists including

at www.fbi.gov/wanted/wcc/victor-wolff/. Years of litigation followed and while Plaintiffs received a favorable jury verdict for securities fraud in the Ponzi scheme, the million-dollar investment was gone.

switch, cell-site number, name,  physical address, longitude and latitude,  azimuth, and beam width  of each related sector, subscriber records, make, model, serial number, IMEI, ESN, MEID and MAC addresses associated with listed numbers and any other records or other evidence relating to the phone number.

206.    The subpoenas duces tecum demand records beginning on January 1, 2016, four and one half (4 ½) months prior to the murder of Ira Tobolowsky, proof that Schoettmer's unlawful use of information is for his murder investigation.

207.    Not even Schoettmer can explain how almost three (3) years worth of the text, email, GPS and data information would assist in the discovery non-existing financial assets.  The information City Defendants improperly gave to Schoettmer is being used against Plaintiffs here in Florida.  City Defendants and Schoettmer can't seem to stop establishing contacts in Florida.

208.    Since the beginning of the Tobolowsky murder investigation, City Defendants have improperly shared very private and confidential information with Schoettmer Under the Dallas Police Department General Order, the City Defendants are forbidden to release such information.

## I.    D Magazine targets Plaintiffs and the State of Florida

209.    In February 2017, the author of the impending cover story, Thompson, began contacting Aubrey regarding her alleged story about the unsolved murder of Ira Tobolowsky. The story was set to appear in D Magazine's May 2017 publication, designed to be distributed and be made accessible on the Internet immediately prior to the one-year anniversary of Ira Tobolowsky's murder.

210.    Thompson alleged she wanted to tell Plaintiffs' version of what happened. However, Plaintiffs were not interested after many other media publications proved the only

interest to use Plaintiffs as scapegoats for the murder.  The media is never interested in clearing a person's name.

211.    Thompson wanted to interview Aubrey and said that she could travel to Florida to meet in person.  Aubrey agreed to correspond with Thompson on a limited basis and only through email.

212.    In April and May 2017, over five (5) months after Plaintiffs became Florida residents, D Magazine published five (5) stories and posted one video on YouTube, all causing injury to Plaintiffs in Florida and the damage continues.   The defamatory publications include:

**Article-1:**

April 26, 2017, *Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky*, by Matt Goodman, was the first digital online publication, targeting a worldwide market, including Florida.  This publication does not identify Plaintiffs. Its purpose was to tease and grab attention and to insinuate that D Magazine's May 2017 issue would reveal who killed Ira Tobolowsky.  It was published on Frontburner, one of D Magazine's websites designed to reach their online digital media audience, sell subscriptions and solicit advertisers.   Article-1 encourages readers who want to know who killed Ira Tobolowsky, to purchase the hard copy magazine rather than access the story online for free. Article-1's subtitle misrepresents: *We're giving you a look inside the pages of our May issue weeks before the stories are published online.*   In truth, the feature story defaming Plaintiffs was accessible online the same day Article-1 was published.  (*See* **Exhibit A**)

**Article-2:**

April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the online version of D Magazine's feature story designed to reach their online digital media audience, sell subscriptions and solicit advertisers. (*See* **Exhibit B**)  D Magazine purports the story is about Ira Tobolowksy's death and ensuing homicide investigation.  In truth, D Magazine made Plaintiffs the subjects of this story as their names printed and reprinted 140 times.  Ira Tobolowsky's name only appears 92 times, 35% less than the names of Plaintiffs. Published in D Magazine's "CRIME" section, the article portrays Plaintiffs as reprehensible degenerates and therefore, the story alleges, Plaintiffs committed the murder.  The article even included a picture of Plaintiffs, tagged as suspects, with a caption underneath that describes the photo as all of the evidence to solve the mystery of who killed Ira Tobolowsky.  Article-2 may have the most defamatory content ever published in one story.  D Magazine accuses Plaintiffs of criminality, murder, which constitutes liability under Plaintiffs defamation per se claim.

**Article-3:**

April 26, 2017, *A Place Where Something Evil Happened,* by Jamie Thompson, was the print version of the feature story that was published it the May 2017 magazine with the cover title: "*Scene of the Crime: Ira Tobolowsky was burned alive in his North Dallas garage.  The family is convinced they know who did it.*"  D Magazine ships their magazine to customers in multiple states, including Florida.  (*See* **Exhibit C**)

40

**Article-4**:

May 3, 2017, *Who Murdered Ira Tobolowsky?*, is D Magazine's video post on YouTube.[9] The title indicates that D Magazine has the answer.  At the end of the video, two (2) statements flash onto the screen.  The first statement: "Who wanted Ira Tobolowsky dead?"  The second statement: "Read the story in *D Magazine's* May issue"  (*See* Screenshots of video attached as **Exhibit D**)

**Article-5**:

May 8, 2017, *The Unsolved Murder of Ira Tobolowsky, The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it*, by Tim Rogers was published on Frontburner to reach Defendants' online digital media audience, sell subscriptions and solicit advertisers.  This article is another online tease publication directing readers to Articles 2 and 3.  (See **Exhibit E**)

**Article-6**:

May 9, 2017, *Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit.*  (See **Exhibit F**)  The title indicates a story about a defamation suit, resulting in a $5.5 million judgment.  However, D Magazine used the opportunity and the trial to continue defaming Plaintiffs online, stating:

- "The sons had continued to pursue the case after their father's death. And they all believe that Aubrey killed Ira."

- Two judges had voluntarily recused themselves from the case after Ira's death…"

- "A key reason the family and police suspect Aubrey in the murder is the personal animosity he showed against Tobolowsky…"

---

[9] "This is a video.  Named "Article-4" for continuity. Link: https://www.youtube.com/watch?v=Sp6LCb5kweo

> - "'I wish the defendants were here,' Schoettmer said. 'What these two defendants do ... is that they sue people in order to destroy their lives.'" [10]

213.    One of the Article-6 readers, "ecstatist," shared his/her observations at the end of the online story in the comments section.  Ecstatist believed D Magazine's reporting was not balanced and that most Texas judges could not be impartial in dealing with the case.  Ecstatist stated:

> - "There was too much innuendo to call the reporting balanced."
>
> - "I fail to see how most Texas judges could be impartial dealing with the defamation of a fellow (dead) lawyer in the same generation as so many judges. Lawyers seldom criticize lawyers unless there is some money in it"
>
> - "The suspects certainly don't seem to be nice people but assume for a moment that they are actually innocent. And consider what their situation would be now if they were African- Americans!"  (*See* Ex. G, Article-6)

214.    D Magazine boasts its hard copy publication readership is 551,535, its "D Magazine social channels" have 1,298,565 followers and it has average digital monthly page views of 4,000,000+.

215.    Through implication, D Magazine's Articles 1-6 undeniably accuse that Plaintiffs are responsible for the murder of Ira Tobolowsky.

216.    D Magazine chose profits over truth thereby exposing Plaintiffs to public hatred, contempt, and ridicule, and caused them financial injury, and impeaching Plaintiffs' honesty, integrity, virtue and reputations, while Plaintiffs reside in Florida.

217.    The hungry publication pounced on Plaintiffs and defamed them per se with the aid and contribution of the other Defendants.

---

[10] Defendant Schoettmer flipped this fact upside down.  Schoettmer represented the Tobolowskys and brought the lawsuit against Plaintiffs to destroy their lives, using religious based hate speech in pleadings with 24 "Jihsd" references, one "Isis" reference and one "Muslim" reference in their (three) 3 petitions.

218.   D Magazine and the other Defendants conspired with one another to make Plaintiffs suffer through their trial by media, convincing the court of public opinion that Plaintiffs had committed capital murder.

219.   The articles were a combination of blatant false statements mixed with other statements, in such a way to suggest that Plaintiffs were deserving of public hatred and that they committed capital murder.

220.   In just one story, read by millions of people, D Magazine caused injury to Plaintiffs by publishing Aubrey's name ninety-three times and Vodicka's name twenty-seven times, each time a reference to something loathsome and deplorable. Of the millions of readers, some were in Florida, where Plaintiffs reside.[11]

221.   D Magazine and the other Defendants were reckless with regard for the truth. They maliciously published, or caused to be published, statements that defamed Plaintiffs together and individually, or caused to be published combinations of statements that together implied a defamatory meaning regarding Plaintiffs together and individually and with intent, ignored the truth or the results from their own investigations and instead published, or caused to be published, salacious, defamatory and/or false facts or conveyed false meaning or implication in the May 2017 Article, including but not limited to the following:

   a.   "Steven Aubrey, middle son of a Dallas orthodontist who died in 2004, was fighting an inheritance battle with his mother, who believed he'd come unhinged. He stood well over 6 feet tall and carried 220 pounds packed with muscle, which he flaunted in online ads for his services as a masseur."

   b.   "Betsy came to fear her son. "He has absolutely gone crazy and is on a rampage like no other," she wrote to a relative."

---

[11] Vodicka personally witnessed Florida residents access and read D Magazine's Article, *A Place Where Something Evil Happened.*

c. "Betsy and Buck told the court that they thought Aubrey might hurt them, and a judge issued peace bonds forbidding Aubrey from contacting them for one year."

d. "Over the years, the feud grew more heated, and Betsy came to fear her son."

e. "Eventually, Betsy sought help at a small law office on Lovers Lane run by Ira Tobolowsky."

f. "Ira had defeated Aubrey at every turn,"

g. "The next week, Aubrey tried to set a deposition for September 26, during Rosh Hashana. Ira thought Aubrey did it just to irritate him and asked for a date change."

h. "Ira showed Aubrey's pattern: he'd file a lawsuit and clog the court with motions. If rulings didn't go his way, he'd sue the judge and demand recusal. If that didn't work, he'd nonsuit and file in a different court."

i. "Steve Schoettmer…who worked at Thompson & Knight, to file a defamation suit against Aubrey in the summer of 2015."

j. "In February 2016, Judge Eric Moyé declared Aubrey a vexatious litigant and ordered him to pay his mother $250,000."

k. "It had been a bruising couple of years for the couple. They had been involved in another contentious lawsuit in Austin, after they'd invested hundreds of thousands of dollars in a real estate deal that turned out to be a Ponzi scheme. They had to sell their $1 million house, and they moved to an apartment in Dallas. They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees. Aubrey had become estranged from his family. Ira had defeated Aubrey at every turn…"

l. "'And it's over with, and I'm asking everybody to please leave,' Ira said. The men lingered, and Ira grew more stern. 'Steven and Brian, will you please vacate my office now. These are my offices, this is my property, and I'm asking you all to leave. … I'll be forced to have you escorted out of here.'"

m. "Sheriff's deputies had been patrolling Moyé's home that weekend and had instructed him to carry a gun, fearing that he, too, might be in danger."

n. "Sheriff's deputies had been patrolling Moyé's home that weekend and had instructed him to carry a gun, fearing that he, too, might be in danger."  It is not the policy of law enforcement to "instruct" citizens to carry a gun, especially one known to instigate physical assault on a fellow judge."

o. "But after talking to Ira's relatives and colleagues, detectives turned their focus to Aubrey and Vodicka. The level of hostility the men had displayed toward Ira—and

the fact that he'd recently defeated them in court—pushed the men to the top of their list."

p.  "Police officers eyed the crowd packed with judges and attorneys."

q.  "One of the suspects Dallas police detectives investigated following Ira Tobolowsky's murder" (caption underneath a photo of Aubrey)

r.  "The level of hostility the men had displayed toward Ira—and the fact that he'd recently defeated them in court—pushed the men to the top of their list."

s.  "On May 17, the Tuesday after the fire, detectives went to Aubrey and Vodicka's Dallas apartment. They planned to take the men in for interviews, according to search warrants. But no one answered the door. Two detectives noticed the blinds on a window were open and angled upward. When they returned later, the blinds were closed. Both men's cars were in the parking lot."

t.  (Article 2 -Imbedded images of the fraudulent affidavits for search warrants.)

u.  "The next day, Aubrey and Vodicka were scheduled to appear at a hearing in Ira's defamation case. Security was tight in the courtroom, as extra sheriff's deputies stood guard, but the men didn't show."

v.  "From the bench, Judge Moyé announced his recusal. 'I think at this point,' he said, 'with the allegations which have been made related to Mr. Aubrey and his implication in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case.'"

w.  "Vodicka had reactivated his law license and could file the lawsuits on his partner's behalf, sidestepping the need to get approval. Michael wanted to get Vodicka disbarred, to shut them down for good."

x.  "Later that day, detectives returned to the men's apartment. No answer. Aubrey's car was gone. Ermatinger called their phones and left messages and also sent them texts. No response."

y.  "Detectives began monitoring the men's credit card transactions and discovered that Aubrey's card had been used that day to book a room at the Crowne Plaza hotel in Dallas under the name Alexandra Krot."

z.  "Phone records, detectives told the Tobolowsky family, showed no activity on the men's cell phones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. To the contrary, however, Plaintiffs' phone records did show cell activity before and after that time period."

45

aa. "Aubrey declined an interview for this story but did respond to questions over email. "Ermatinger is a lying sack of shit," he wrote."

bb. That night, at 9:30, Ermatinger got a judge to sign search warrants to examine Aubrey and Vodicka for burns and search their apartment. He was looking for combustible liquids, empty containers, medical supplies to treat burns, and gas receipts, according to the warrants. No one was at the apartment when police arrived, but detectives seized an Apple desktop computer and paperwork for burner phones.

cc. "They needed to find the killer before any injuries had time to heal."

dd. "Plainclothes detectives watched and waited until about 3:30 pm, when they saw Aubrey and Vodicka get into their car, heading out for a late lunch. Police cars surrounded the men. Detectives jumped out with guns drawn and screamed, 'Get down on the ground!'.,,"

ee. "For the next nine hours, Aubrey was kept in an interrogation room…"

ff. "Aubrey refused to talk without a lawyer and said he couldn't afford one. Detective Ermatinger called Assistant District Attorney Gary McDonald, who helped find a public defender and also subpoenaed Aubrey to testify before a grand jury, a tactic prosecutors sometimes use when dealing with uncooperative witnesses. A few days later, the prosecutor questioned Aubrey before jurors. It would be a violation of law for anyone to reveal what exactly was said that day, but the proceedings didn't produce an indictment.

gg. "Ermatinger says Aubrey had red marks on both arms."

hh. "'The doctor explained to us that it could be from the flash of a fire, it could be burns, or it could just be a sunburn,' Ermatinger says. He says too much time had passed."

ii. "They did not have good alibis, telling detectives that at the time of the fire, they were at their apartment."

jj. "Michael saw a hole surrounded by what looked like black paint. It appeared to have been made recently. For someone of his height—the 6 feet and 4 inches that helped get him onto the team at Trinity—it provided a clear view to the garage where his father had died."

kk. "Detectives remembered seeing a drill at Aubrey and Vodicka's apartment and obtained warrants for another search. When they searched it the following week, they found an Apple MacBook in the process of having its hard drive wiped clean, according to a later search warrant. They seized it for testing. From the two apartments, they also collected a cordless drill and bits, two red gasoline containers,

a yellow propylene tank with a torch attachment, a blue propane torch, two cans of paint, and a couple of pairs of shorts and pants."

ll.    "Ermatinger would have to wait for crime scene technicians to search the men's computers and process the juice bottle found in the garage for fingerprints."

mm.   "Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close. He says detectives executed more search warrants on the Tobolowsky case—roughly 18—than on any other case he'd worked. Most of those dealt with Aubrey and Vodicka; others were for cell tower dumps. "They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them."

nn.    "Aubrey agreed to masturbation and sexual intercourse for $300."

oo.    "It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?'"

pp.    "Michael filled a whiteboard with evidence and photos of Aubrey and Vodicka. He still researched other suspects, but the more he learned about the two men, the more he believed they were responsible. Michael decided to keep representing Aubrey's mother and to move forward with his dad's defamation case."

qq.    "Most of the family thought Aubrey had killed Ira. But he was still free, living not far away in North Dallas."

rr.    "One afternoon Ira's sister saw Aubrey in Bed Bath & Beyond, and her knees buckled."

ss.    "In early October, Michael got an email from a pair of private investigators. "We are private investigators who simply have a low tolerance for scumbaggery and this case really bothers us," they wrote."

tt.    "One whiteboard lists 10 suspects in his dad's death. He has crossed off only two, his mother and neighbors. Like his mother, he fears police may not have done enough work to rule out any of the rest."

uu.    "Debbie had never been sued before, and she was frightened. Someone sent a blank piece of paper to her house, in an envelope with Aubrey's return address on it. To her, it seemed to be saying: I know where you live."

vv.    "While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects."

ww. "Family members also worry about the lack of physical evidence. While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects."

xx. "Late last year, they learned Aubrey and Vodicka had moved to Florida. The men live in a bungalow surrounded by palm trees."

yy. Debbie cried for two days. Michael worries about her. She has been living elsewhere, paralyzed about what to do next.

zz. With an arrest, with justice and closure, maybe Michael could move on. But not now. Because he can also hear his father saying, Get the bastard.

222.   Applicable Defendants conspired with one another for several months in preparation so that D Magazine could publish its May 2017 defamatory story about Plaintiffs. The multi-purpose story was designed to be pretrial publicity for the defamation case brought against Plaintiffs in Moye's court.  D Magazine's May 2017 article was published and the trial was conducted on the one-year anniversary of Ira Tobolowsky's murder.[12]   The conspirators worked together to publish D Magazine's Article that caused Plaintiffs injury Florida, as Florida is one of their target markets and the Article was accessed and read in Florida, where Plaintiffs reside.   (Id. Exhibit B at p. 19)

---

[12] The trial was conducted without a single document produced during discovery, without identification of a single defamatory statement and without a witness (he was deceased) to testify about injury.  At trial, the court found, "plaintiff has proven their case of defamation per se" without identifying or alleging a single statement, throughout the entirety of the trial.  Mr. Tobolowsky's sons only testified about how much they hated Plaintiffs, Aubrey was a prostitute, etc.; never about how Mr. Tobolowsky was damaged from defamation.  The court awarded $500,000 for mental anguish and damage to reputation though the one of the son's testified his father's business was so good that he was turning away business and D Magazine had interviewed Mr. Tobolowsky's legal assistant and stated in the article:   "Ira wondered aloud whether Aubrey was violent. But mostly he laughed about the case, Allen says."   Additionally, without any proof of actual damages, without evidence to support exemplary damages and with a statutory limitation of  $750,000 for noneconomic damages, Moye's court awarded $5 million in exemplary damages.

223.    D Magazine was the first to break the silence about the well hidden secret, there are other persons of interest that were investigated.

224.    D Magazine's articles disclosed gross amounts of Plaintiffs personal information, however, nothing about the other persons of interest is disclosed proof the Article is discriminatory, malicious, unbalanced, unfair and defamatory. D Magazine grossly discriminated against Plaintiffs and did not balance the story with any information about the others, not their names and certainly not their pictures, unlike Plaintiffs.

225.    The Article was an accumulation of every negative connotation and inference that the D Magazines could dig up and piece together, taking facts out of context and using them to defame Plaintiffs per se.  Though detectives admit they do not have even the smallest bit of evidence, D Magazine boldly infers that Plaintiffs were the only ones who could possibly have murdered Ira Tobolowsky.

226.    To further portray Aubrey as an evil human being, Articles 2 and 3 only indicate what Aubrey wrote in a response email to Michael Tobolowsky.  The articles do not fairly include the horrific things Michael Tobolowsky had previously written to Aubrey to cause the response.

227.    Article-2 only imbedded the fraudulent affidavits and search warrants used against Plaintiffs and does not include those used against other persons of interest.  D Magazine made Plaintiffs affidavits and search warrants a feature in the article even though none of them resulting in evidence connecting Plaintiffs to the crime.  The fraudulent affidavits and the unreasonable search warrants, that D Magazine eagerly published, failed because there is no evidence as Plaintiffs had nothing to do with the murder.

228.    The articles are not fair or balanced as D Magazine only includes nasty and hateful comments from a retired detective, the Tobolowsky family and the author, Thompson, who had the audacity to summarize the Tobolowsky family's thoughts, including:

> "While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects," and "Most of the family thought Aubrey had killed Ira."

229.    Aubrey tendered information to Thompson that reasonably explained the truth of some matters.  Though D Magazine could have easily discovered the truth with very little research, it intentionally printed false facts to defame Plaintiffs, or it was recklessly indifferent to the truth so that intent may be presumed.

230.    D Magazine willfully published and continues to publish the false, derogatory and defamatory statements regarding Plaintiffs, causing their injuries in Florida.  D Magazine admits it has Florida subscribers and ships print copies to Florida.   (*See* Earnshaw Declaration, ECF No. 56.2 at ¶ 10)  D Magazine publishes Articles 1, 2, 5 and 6 on the World Wide Web, making its target audience anybody in the world who has a computer and is able to access the content, including Florida residents.    Each of these articles solicits new subscribers and advertisers, anywhere, including Florida, where Plaintiffs reside and where they were injured.   (See "subscribe" and "advertise" features on the final pages of the articles at Exhibits A, B, E and F)

## J.    Due Process, Fair Play and Substantial Justice

231.    The Defendants brutal attack on Plaintiffs renders their ability to get a fair trial in North Texas, and possibly the entire State of Texas, impossible.  Schoettmer and Moye instigated media coverage that sparked a trial by media that is insurmountable in the North Texas region.

232.     Following Moye's aggravated assault, publically witnesses on May 13, 2016, he began strategically releasing statements to the media designed to set Aubrey up for murder and excuse his own criminality.  After Moye played the victim for one week, pretending to fear for his safety and asking for extra security, he assembled a media circus in his courtroom and publically accused that Aubrey was responsible for the murder of Ira Tobolowsky.

233.     Moye's murder accusation has been printed and reprinted many dozens of times and it continues to cause injury to Plaintiffs.  D Magazine reprinted the murder accusation in Articles 2 and 3.

234.     Moye alleges that his murder accusation is a judicial function relating to his recusal.  The nasty and overwhelming trial by media caused five (5) voluntary recusals of Dallas County judges.

235.     If an area judges did not recuse themselves from Plaintiffs' cases, they took the opportunity to punish Plaintiffs.  Moye's court conspired to conduct the defamation trial on the one-year anniversary of the murder.  The court's unconstitutional award against Plaintiffs for $5.5 million is proof that Plaintiffs cannot get a fair trial in North Texas.

236.     Seven (7) media giants published multiple defamatory stories online, in print and aired on television.  The Observer, Dallas Morning News, D Magazine, ABC WFAA, NBCDFW KXAS, CBS KTVT and FOX 4 KDFW post demographics readily available online, which total 247,613,913 potential reads/views.  There have been nearly ¼ of a billion opportunities for people read or view defamatory content using Plaintiffs' names in connection with the murder of Ira Tobolowsky.

237.     The readers and viewers of the media campaign launched against Plaintiffs includes judges and potential jurors in the region.

238.     Texas is a very hostile venue for Plaintiffs to live in much less seek a fair trial.  In the interest of fair play and substantial justice, Plaintiffs cannot exercise their rights to due process in Texas.

## CAUSES OF ACTION

239.     All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied.  All notices required have been provided or were waived, excused, or otherwise satisfied.

### COUNT I
### Defamation
### (Against Schoettmer, D Magazine, City Defendants and County Defendants)

240.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 239 above as though fully set forth herein.

241.     Defamation is any action alleging that forms of speech are false, have caused damage to reputation or emotional distress, have presented any person in a false light, or have resulted in criticism, dishonor, or condemnation of any person.

242.     Defamation is a tort provided by Florida Statute Chapter 770.  Texas law, Texas statute of limitations and Texas sovereign immunity under the Texas Tort Claim Act do not apply here.  Plaintiffs were injured in Florida and this is a Florida state-law claim.

243.     Ermatinger was a police officer employed by Dallas and was a representative of Dallas, acting under color of law, at all applicable times, until he retired in mid-November 2016, after which time he acted in his individual capacity.

244.     Sayers was and is a police officer employed by Dallas.

245.     Applicable Defendants demonstrated animosity and intentional discrimination toward gay citizens and maliciously made false statements about Plaintiffs, which are per se injurious as they accused Plaintiffs of criminal misconduct.

246.     The nature of the false statements is such that malice and actual damage are presumed.

247.     Applicable Defendants have intentionally, maliciously, and willfully made and published to third parties the foregoing defamatory per se statements as well as other defamatory per se statements about Plaintiffs, Plaintiffs' morality, Plaintiffs' integrity, and Plaintiffs' innocence. These malicious, intentional, and willful defamatory per se statements attacked not only Plaintiffs, but also Plaintiffs' reputations and Plaintiffs' honesty,

248.     The statements made by the Applicable Defendants were in writing and were defamatory per se, were made to injure Plaintiffs and Plaintiffs' reputations, and have exposed Plaintiffs to public hatred, contempt and ridicule. Applicable Defendants' defamatory per se statements suggest and attribute to Plaintiffs' moral turpitude, dishonesty, impropriety, as well as criminal activity.   Plaintiffs were residents in Florida when D Magazine published their defamatory article causing injury to Plaintiffs in Florida because D Magazine publishes their content on the Internet, therefore the content is available to a worldwide audience, including Florida residents.

249.     Ermatinger and Sayers provably false statements in their Affidavits for Search Warrants.  Both stated in their sworn affidavits:

> "It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document."

But no such allegation exists in any filed court document.  If it did, the City Defendants could cite the document and stop playing hide-and-go-seek.

250.   Ermatinger and Sayers' fraudulent representation that the court filings alleged Aubrey threatened Mr. Tobolowsky's life was material and caused the unlawful search warrants to be issued and served.  As well, Ermatinger and Sayers lied in their affidavits when they alleged Plaintiffs were trying to hide.  Plaintiffs allege they never stopped by their apartment.  In fact, rather than knock on the door, the detectives planned an extreme ambush when they truly wanted to speak with Plaintiffs.

251.   Applicable Defendants published the false statements to third-parties via posting the statements on the Internet.  Ermatinger gave undeniably false statements of fact to D Magazine regarding Plaintiffs' cell phone activity.  Sayers defames Plaintiffs in the D Magazine story stating they had good circumstantial evidence against Aubrey and his thoughts about the specific evidence are in print.

252.   The falsity of these statements injured Plaintiffs' reputation individually, in the business community and among Plaintiffs social community. Plaintiffs have for many years enjoyed excellent reputations and have further enjoyed excellent relations with associations, friends and the public.

253.   Plaintiffs would show that as a direct and proximate result of the deliberate, willful, and malicious defamatory per se statements made by the Applicable Defendants, jointly and severally, Plaintiffs have suffered substantial presumed damages, for which presumed damages Plaintiffs sue Applicable Defendants, jointly and severally.

254.   Because the acts and actions of the Applicable Defendants, and each of them, were intentional, willful, and malicious, and because the Applicable Defendants, and each of

them, have acted with specific intent to cause injury to Plaintiffs and to damage and destroy Plaintiffs' welfare and reputations, Plaintiffs hereby seek to recover against each Applicable Defendant punitive damages in the maximum amount permitted by law.

255.    By reason above, Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing substantial damage to Plaintiffs in the State of Florida.

## COUNT II
### Defamation-Per Quod
### (Against Schoettmer, D Magazine, City Defendants and County Defendants)

256.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 255 above as though fully set forth herein.

257.    This cause of action is a tort arising from defamatory statements and is under Florida law because the statements were published in Florida.

258.    Ermatinger was a police officer employed by DPD and was a representative of DPD and Dallas, acting under color of law, at all applicable times, until he retired in mid-November 2016, after which time he acted in his individual capacity.

259.    Sayers was and is a police officer employed by DPD and Dallas.

260.    Applicable Defendants' publications of the false, defamatory and injurious statements were not subject to any available publication or legal privilege.

261.    Plaintiffs have for many years enjoyed excellent reputations and have further enjoyed excellent relations with associations, friends and the public.

262.    Applicable Defendants' false, defamatory and injurious statements exposed Plaintiffs to distrust, hatred, contempt, ridicule and embarrassment and harmed the reputations of

Plaintiffs so as to lower Plaintiffs in the estimation of the community and to deter third-persons from associating or dealing with Plaintiffs.

263.    Applicable Defendants' false and defamatory statements were made with knowledge of their falsity or reckless disregard of the truth or falsity of the statements.

264.    Applicable Defendants directed the false and defamatory statements to Plaintiffs in the State of Florida, and elsewhere, with the specific intent and knowledge that the statements would damage Plaintiffs in the State of Florida.

265.    Applicable Defendants made the false and defamatory statements with actual malice toward Plaintiffs with the specific intent to damage and harm Plaintiffs.

266.    Plaintiffs suffered substantial damages in the State of Florida as a result of Defendant's actions and seek an award of exemplary and punitive damages in an amount to be proven at trial.

## COUNT III
### Defamation *Per Se*
### (Against Schoettmer, D Magazine, City Defendants and County Defendants)

267.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 266 above as though fully set forth herein.

268.    This cause of action is a tort arising from defamatory statements and is under Florida law because the statements were published in Florida.

269.    Applicable Defendants made false statements about Plaintiffs, which are *per se injurious* as they accuse the Plaintiffs of criminal misconduct.

270.    The nature of the false statements is such that malice and actual damage are presumed.

271.     Applicable Defendants contributed to D Magazines defamation per se articles. On April 26, 2017, D Magazine published online a teaser short Article-1 titled: *Sneak Peek: D Magazine's May Issue Which Explores Who Killed Ira Tobolowsky.* That was followed by Articles 2 and 3, which answer the question posed by D Magazine.  Plaintiffs are the subject of Articles 2 and 3 and D Magazine alleges they are the answer to who killed Ira Tobolowsky.

272.     Applicable Defendants have intentionally, maliciously, and willfully made and published to third parties the foregoing defamatory per se statements as well as other defamatory per se statements about Plaintiffs, Plaintiffs' morality, Plaintiffs' integrity, and Plaintiffs' innocence. These malicious, intentional, and willful defamatory per se statements attacked not only Plaintiffs, but also Plaintiffs' reputations and Plaintiffs' honesty,

273.     The statements made by the Applicable Defendants were in writing and were defamatory per se, were made to injure Plaintiffs and Plaintiffs' reputations, and have exposed Plaintiffs to public hatred, contempt and ridicule. Applicable Defendants' defamatory per se statements suggest and attribute to Plaintiffs' moral turpitude, dishonesty, impropriety, as well as criminal activity.

274.     Applicable Defendants published the false statements to third-parties via posting the statements on the Internet.

275.     The falsity of these statements injured Plaintiffs' reputation individually, in the business community and among Plaintiffs social community. Plaintiffs have for many years enjoyed excellent reputations and have further enjoyed excellent relations with associations, friends and the public.

276.     Plaintiffs would show that as a direct and proximate result of the deliberate, willful, and malicious defamatory per se statements made by the Applicable Defendants, jointly

and severally, Plaintiffs have suffered substantial presumed damages, for which presumed damages Plaintiffs sue Applicable Defendants, jointly and severally.

277.    Because the acts and actions of the Applicable Defendants, and each of them, were intentional, willful, and malicious, and because the Applicable Defendants, and each of them, have acted with specific intent to cause injury to Plaintiffs and to damage and destroy Plaintiffs' welfare and reputations, Plaintiffs hereby seek to recover against each Applicable Defendant punitive damages in the maximum amount permitted by law.

278.    Plaintiffs suffered substantial damages in the State of Florida as a result of Applicable Defendants actions.

**COUNT IV**
**Unreasonable Searches and Seizures**
**(Against City Defendants, County Defendants and Does 1-10)**

279.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 278 above as though fully set forth herein.

280.    By means of their unlawful detention of Plaintiffs and the malicious search warrants, Plaintiffs were deprived of their liberty in violation of U. S. Constitution Amendment IV and V and 42 U.S.C. 1983.

281.    Applicable Defendants conspired together and with others to cause unlawful search warrants to be executed on Plaintiffs.

282.    Under color and pretense of law, Applicable Defendants presented falsified affidavits for search warrants to Judge Jeanine Howard, who relied on the perjured affidavits and issued unlawful search warrants.

283.    Two of the search warrants were issued on Aubrey and Vodicka, personally, to gather their fingerprints and photograph their bodies.

284.    Judge Howard's orders stipulate that the warrants would be executed within "accepted practices."

285.    Applicable Defendants grossly violated Vodicka's rights guaranteed by ADA when on May 19, 2016, City Defendants, County Defendants and Does 1-10 utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs.

286.    The actions alleged above deprived Plaintiffs of the following rights under the Constitution: (a) Freedom from the use of excessive and unreasonable force; (b) Freedom from a deprivation of liberty without due process of law.

287.    Applicable Defendants subjected Plaintiffs to such deprivations by either malice or a reckless disregard of Plaintiffs' rights. By means of wholly unfounded search warrants, applicable defendants directly caused Plaintiffs' automobiles to be wrongfully and unlawfully impounded. These actions deprived each Plaintiff of the possession, use, and enjoyment of his automobile.

288.    The direct and proximate result of applicable defendants' acts are that Plaintiffs have suffered severe injuries including to mental health, were forced to endure great pain and mental suffering, and to incur medical and legal expenses, and were deprived of their physical liberty.

**COUNT V**
**Excessive Force**
**(Against City Defendants, County Defendants and Does 1-10)**

289.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 288 above as though fully set forth herein.

290.   By means of their unlawful detention of Plaintiffs and the malicious search warrants, Plaintiffs were deprived of their liberty in violation of U. S. Constitution Amendment IV and V and 42 U.S.C. 1983.

291.   Applicable Defendants grossly violated Vodicka's rights guaranteed by ADA when on May 19, 2016, City Defendants, County Defendants and Does 1-10 utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs.

292.   By reason of the above, the Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

293.   By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

294.   Law enforcement used force that was undeniably unreasonable and abusive. There was no reason to have loaded firearms pointed at Plaintiffs heads after forcing them down on the concrete.  Plaintiffs were no armed, they did not resist arrest, and the warrant did not instruct for Plaintiffs' arrest.  Law enforcement should not have handcuffed Plaintiffs as the warrant just stipulated examination of Plaintiffs' bodies and fingerprints.

## COUNT VI
### Conversion
### (Against City Defendants and Does 1-10)

295.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 294 above as though fully set forth herein.

296.    No person, including Plaintiffs, shall be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation under the U. S. Constitution Amendment V.

297.    Applicable Defendants intentionally interfered with personal property belonging to Plaintiffs.  Plaintiffs established four elements for their conversion claim:

- Plaintiffs owned the personal property in question at the time of the interference;

- Applicable Defendants intentionally interfered with Plaintiff's personal property and/or exercised "dominion and control" over it;

- The interference deprived Plaintiffs of possession or use of the personal property in question; and

- The interference caused damages to Plaintiffs.

298.    Applicable Defendants caused unreasonable searches and seizures and unlawfully took possession of Plaintiffs cars, computers, cell phones, clothing, auto parts, tools and other personal property, depriving Plaintiffs possession and use of the personal property causing damage to Plaintiffs.

299.    Applicable Defendants intentionally destroyed Plaintiffs' personal property after Ermatinger instructed Plaintiffs to leave the premises while they performed their illegal searches and seizures.

300.    By reason of the above, the Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

301.    Applicable Defendants gave the media details about their unreasonable searches and seizures to further injure Plaintiffs' reputations causing greater public scandal, disrepute, and disgrace, which resulted in emotional trauma and harm.

**COUNT VII**
**Deprived of Liberty without Due Process of Law**
**(Against Moye, City Defendants, County Defendants and Does 1-10)**

302.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 301 above as though fully set forth herein.

303.    No person, including Plaintiffs, shall be deprived of life, liberty, or property, without due process of law; without just compensation under the U. S. Constitution Amendment V.

304.    Applicable Defendants' intentional discrimination toward gay citizens caused unreasonable searches and seizures and took Plaintiffs cars, computers, cell phones and other personal property to be used for their enjoyment, which included gathering personal information to further harass Plaintiffs.

305.    Applicable Defendants circumvented due process of law thereby depriving Plaintiffs liberty.

306.    Applicable Defendants intentional discrimination toward gay citizens was exposed when they conspired together and with others to commit aggravated assaults, false arrest, and false imprisonment on Plaintiffs, without due process of law.

307.    By reason of the above, the Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their

characters and reputations, were prevented from attending to their usual duties and underwent

psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

308.   By reason of the above, Plaintiffs' reputations have been greatly injured and have

been brought into public scandal, disrepute, and disgrace, and have suffered great emotional

trauma and harm.

**COUNT VIII**
**Due Process and Equal Protection**
**(Against Moye, City Defendants, County Defendants and Does 1-10)**

309.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 308 above as

though fully set forth herein.

310.   No state shall deprive any person, including Plaintiffs, of life, liberty, or property,

without due process of law; nor deny to any person, including Plaintiffs, within its jurisdiction

the equal protection of the laws under the U. S. Constitution Amendments V and XIV Section 1

and all persons within the jurisdiction of the United States shall have the same right in every

State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the

full and equal benefit of all laws and proceedings for the security of persons and property under

42 U.S.C. § 1981(a).

311.   Applicable Defendants' gross misconduct and police brutality was based purely

on discrimination and their hate for gays, gay couples and gays who have AIDS, like Vodicka.

312.   As a result of Applicable Defendants' intentional discrimination toward Plaintiffs,

gay citizens, they effected unlawful searches and seizures and took Plaintiffs cars, computers,

cell phones and other personal property to be used for their enjoyment, which included gathering

personal information to further harass Plaintiffs.

313.     Instead of protecting Plaintiffs' lives, liberties, and property, and protecting them equally, Applicable Defendants targeted Plaintiffs for aggravated assault, false arrest and false imprisonment.

314.     Some of Plaintiffs' personal property was intentionally destroyed and remained in pieces on the floor for Plaintiffs to clean after DPD told them to leave the premises so they could perform the illgal search and seizure.

315.     Applicable Defendants' actions were done under color and pretense of law and they were oblivious to Plaintiffs' rights and to due process of law.

316.     Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

317.     By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

## COUNT IX
### Presumption of Innocence
### (Against All Defendants)

318.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 317 above as though fully set forth herein.

319.     All citizens shall be presumed innocent under U. S. Constitution Amendments V, VI and XIV and in all criminal prosecutions, the accused shall enjoy the right to an impartial jury

of the State and district wherein the crime shall have been committed under U. S. Constitution Amendment VI.

320.    Applicable Defendants conspired to have Plaintiffs endure trial by media, making them the targets for public ridicule and hatred.

321.    Plaintiffs have never been indicted, charged, arrested or even named as suspects for the Murder of Ira Tobolowsky, because they did not do it.

322.    Plaintiffs were not part of any criminal prosecution but the frustrated Applicable Defendants intentionally chose to punish Plaintiffs with brutality and public hatred.

323.    Applicable Defendants' saturation of defamation attacking Plaintiffs would have made it impossible for Plaintiffs to get a impartial jury if they have been responsible for a crime and in need of a fair trial.

**COUNT X**
**Persons Under Color of Law Liability**
**(Against Moye, City Defendants, County Defendants and Does 1-10)**

324.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 323 above as though fully set forth herein.

325.    All persons within the jurisdiction of the United States protected against impairment by nongovernmental discrimination and impairment under color of State law under 42 U.S.C. § 1981(c).

326.    Applicable Defendants' gross misconduct and police brutality was based purely on discrimination and their hate for gays, gay couples and gays who have AIDS, like Vodicka and they acted under color of law.

327.    Applicable Defendants under color of law abuse included: a) Moye's announcement in open court that Aubrey was guilty of capital murder; b) Ermatinger and Sayers

signing falsified affidavits for search warrants that cause illegal search warrants to be issued; c) Ermatinger and Sayers leaking information from sealed court records to the media for publication; and d) The Laws brutal aggravated assault, arrest, and imprisonment of Plaintiffs.

328.    Making matters worse, Applicable Defendants had been made by fully aware of Vodicka's physical disabilities and fragile condition.

329.    Applicable Defendants acted under color of law, together and with others, with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

330.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

### COUNT XI
### American Disabilities Act
### (Against City Defendants, County Defendants and Does 1-10)

331.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 330 above as though fully set forth herein.

332.    Americans with Disabilities Act (ADA) was intended to ensure that people living with disabilities, Vodicka, have access to all of the same opportunities as those without disabilities, provided under 42 U.S.C. § 12101, *et seq*.

333.    Vodicka is a qualified individual under the Americans with Disabilities Act. The City of Dallas signed the City of Dallas Title VI. Nondiscrimination Policy, stipulating in part:

"Dallas assures nondiscrimination in all of its programs, activities and services, whether those programs, activities and services are federally funded or not." Not only did Applicable Defendants violate their own policy by denying Vodicka equal treatment with police department services, they intentionally discriminated and literally committed criminal acts against Vodicka.

334.     Applicable Defendants had a duty to honor Dallas' Nondiscrimination Policy. Vodicka's Fourth Amendment right to privacy and freedom from unreasonable intrusions by the government have been grossly violated by Applicable Defendants and they repeatedly used Vodicka's disability against him, as detailed in Counts I, II, III, IV, VI, VIII, X, XI, XII, XIII, XIV, XVII, XVIII, XIX, XX, XXI, XXII, and XXIII.

335.     Schoettmer informed Applicable Defendants about Vodicka's fragile physical condition and his disabilities.

336.     Applicable Defendants grossly violated Vodicka's rights guaranteed by ADA when on May 19, 2016, City Defendants, County Defendants and Does 1-10 utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs.

## COUNT XII
### Conspiracy Against Rights Under Color of Law
### (Moye, City Defendants, County Defendants and Does 1-10)

337.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 336 above as though fully set forth herein.

338.     This claim is for conspiracy to violate Plaintiffs' Civil Rights under Section 1983.

339.     Defendants, acting in their individual capacities and under color of law, having conspired together and with others, reached a mutual understanding and acted to undertake a course of conduct that violated Plaintiffs' civil rights to wit:

a. Applicable Defendants agreed and acted to intentionally commit aggravated assaults on Plaintiffs under color and perception of law.

b. Applicable Defendants agreed and acted to intentionally fabricate and contrive falsified affidavits and submit them as testimony to support unlawful search warrants.

c. Applicable Defendants agreed and acted with others to threaten, use force that was excessive, and intimidate and terrorize Plaintiffs.

d. Applicable Defendants agreed and acted to intentionally falsely arrest and imprison Plaintiffs as aforedescribed.

e. Applicable Defendants agreed and acted with others to punish Plaintiffs because they are gay and Vodicka has AIDS.

340.    Applicable Defendants acted, together and with others, with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

341.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

### COUNT XIII
### Abuse of Process
### (Against Moye, City Defendants, County Defendants and Does 1-10)

342.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 341 above as though fully set forth herein.

343.    This cause of action is a tort arising from misuse of the court process, also a violation under 42 U.S.C. § 1981, equal rights under the law.

344.    This Court has pendant jurisdiction over this and other state law claims.

345.    Ermatinger and Sayers committed aggravated perjury and misused the court process when they each intentionally drafted materially falsified affidavits for search warrants and presented them to Judge Howard and Judge Bennett who acted on the falsified information and issued unlawful search warrants as a result.

346.    Additionally, Ermatinger and Sayers caused Judge Howard and Judge Bennett to sign orders sealing their affidavits but then leaked the information to the media for their consumption.

347.    Moye misused the court process when he grossly violated Plaintiffs' rights and acting under color of law, implicated Aubrey in the murder of Ira Tobolowsky in front of a courtroom full of hungry media, claiming the accusation was an excuse for him recuse himself from a case he presided over in his court.

348.    By reason of the above, the Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

349.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

### COUNT XIV
### Invasion of Privacy - Misappropriation
### (Against All Defendants)

350.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 349 above as though fully set forth herein.

351.    This claim arises from the appropriation of Plaintiffs identities and/or names in publications for benefit of others.

352.    Applicable Defendants began identifying Plaintiffs in publications and television broadcasts through description, thereby giving Schoettmer notoriety,  Moye a diversion from his criminal assault, and The Law, enjoyment from harassment lodged against Plaintiffs.  They described that Plaintiffs were part of a defamation case where Ira Tobolowsky was the plaintiff and Moye was the presiding judge, plenty of information disclosing Plaintiff's identity.

353.    On may 18, 2016, Moye appropriated Aubrey's name connecting it with the murder of Ira Tobolowsky, thereby deflecting the public attention he was getting from his May 13, 2016 aggravated assault.

354.    Moye, was acting under color and pretense of law when he defamed Plaintiffs.

355.    Following Moye's egregious act, declaring Aubrey was guilty of capital murder, most of the media pounced on the opportunity to continue their defamation campaigns, including D Magazine.

356.    D Magazine realized financial profits from their May 2017 defamatory cover story that destroyed Plaintiffs' reputation and caused public hatred and ridicule.

357.    DPD continually leaked information, some from sealed records, to the media for purposes of harassment.

358.    Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the states, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from

attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

**COUNT XV**
**Invasion of Privacy - Public Disclosure**
**(Against All Defendants)**

359.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 358 above as though fully set forth herein.

360.    A cause of action for this claim arises from the publication of matters concerning Plaintiffs' personal lives.

361.    Applicable Defendants publicized details found only in sealed court documents including the names of Plaintiff's friends, thereby connecting them to the murder of Ira Tobolowsky as well.

362.    Plaintiffs' credit card information, cell phone use and even personal private communications between family members were all published for the public's never ending hunger.

363.    DPD's publication of information that was sealed and Applicable Defendants' publication of private communications was/is highly offensive and certainly not of legitimate public concern.

364.    In fact, the information from certain court records was sealed specifically because it was not of public concern.

365.    Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the states, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation,

embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

**COUNT XVI**
**Invasion of Privacy - Intrusion**
**(Against All Defendants)**

366.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 365 above as though fully set forth herein.

367.     This claim arises from the intentional intrusion and publication of Plaintiffs' private affairs and is also a cause of action under 42 U.S.C. § 1985(3).

368.     Applicable Defendants publicized details found only in sealed court documents including the names of Plaintiff's friends, thereby connecting them to the murder of Ira Tobolowsky as well.

369.     Plaintiffs' credit card information, cell phone use and even personal private communications between family members were all published for profit, with total disregard for Plaintiffs' privacy.

370.     DPD's publication of information that was sealed and publication of names of Plaintiffs' friends was/is highly offensive and intrusive, and was/is unjustified, unreasonable, and/or unwarranted.

371.     In fact, the information from certain court records was sealed specifically because it was not of public concern and leaking that information so that it could be published, violated the court order and is illegal misconduct.

372.     Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the states, sustained deprivations of their

personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

**COUNT XVII**
**False Arrest**
**(Against City Defendants, County Defendants and Does 1-10)**

373.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 372 above as though fully set forth herein.

374.     This cause of action is a tort arising from being unlawfully restrained against your and the restraint was unreasonable under the circumstances.

375.     A notice of claim against DPD in this matter was served on the as County District Attorney's Internal Affairs Division on October 24, 2016, and was ignored.

376.     Applicable Defendants grossly violated Vodicka's rights guaranteed by ADA when on May 19, 2016, City Defendants, County Defendants and Does 1-10 utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs.

377.     Plaintiffs were falsely, unlawfully, without probable cause, and wrongfully, with force and without Plaintiffs' consent and against their will, handcuffed and arrested by Applicable Defendants.

378.     Applicable Defendants intentionally placed Plaintiffs in even greater danger by use of unmarked cars and plain clothes, hoping Plaintiffs might resist their advances to give them cause to fire their weapons.

379.    Without any visual or audible identification to suggest the Applicable Defendants were associated with law enforcement, Plaintiffs only knew they were being assaulted by angry men with guns rushing towards them.

380.    Plaintiffs were deprived of their liberty without cause, and taken to Dallas Police Department Headquarters, without giving consent.

381.    Because of Applicable Defendants' malicious actions, both Plaintiffs were held in interrogation rooms deprived of their liberty without cause for a period of approximately nine (9) hours.

382.    As a result of the trespass, assault, battery, and arrest and imprisonment, Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the Constitution of the United States, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

383.    Plaintiffs had never seen Ermatinger or Sayers at the time of the ambush and assume they were present.  At the very least, Plaintiffs allege Ermatinger and Sayers orchestrated the big event.

384.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

385.     Applicable Defendants actions have proximately resulted in material damages to Plaintiffs.

386.     Plaintiffs are entitled to recover compensatory damages, special damages and punitive damages.

**COUNT XVIII**
**Assault and Battery**
**(Against City Defendants, County Defendants and Does 1-10)**

387.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 386 above as though fully set forth herein.

388.     A cause of action for assault occurs when one unlawfully threatens by word or act to do violence to the person of another.

389.     A cause of action for battery occurs when one unlawfully uses force upon the person of another.

390.     The Court has pendent jurisdiction over this claim.

391.     A notice of claim against DPD in this matter was filed with the Internal Affairs Division on October 24, 2016 and was ignored.

392.     On May 19, 2016, at approximately 3:30 pm, Plaintiffs, then residents of Dallas, Texas, lawfully walked from their apartment to Aubrey's parked vehicle, lawfully occupied Aubrey's vehicle and lawfully began backing the vehicle from a legal parking space.

393.     Plaintiffs' vehicle car moved only a few feet when suddenly; Plaintiffs were under attack with multiple unmarked cars coming at them from every direction, traveling at incredibly high speeds.

394.     The unmarked cars came to screeching stops before hitting Plaintiffs' vehicle and the drivers, in plain clothes, jumped out of the unmarked cars screaming at Plaintiffs to get out of

their car and get down on the ground as they aggressively rushed towards Plaintiffs, weapons drawn and ready to fire.

395.    It was not until Plaintiffs were down on the concrete and guns were literally touching their heads with the gunmen's trigger fingers poised to end Plaintiffs' lives at any moment, that Plaintiffs realized the gunmen were employed by Dallas, DPD, Dallas County, and the Sheriff; the gunmen were the applicable defendants, acting under color and pretense of law. Plaintiffs were in mortal fear because the gunmen did not announce who they were and proceeded to ambush them in unmarked cars while wearing street clothes, likely hoping Plaintiffs would resist arrest, try to defend themselves, or try to escape, which would give Applicable Defendants cause, and the opportunity, to fire at and kill Plaintiffs.

396.    Plaintiffs were falsely, unlawfully, without probable cause, and wrongfully, with force and without Plaintiffs' consent and against their will, handcuffed and arrested by Applicable Defendants.

397.    Applicable Defendants intentionally placed Plaintiffs in even greater danger by use of unmarked cars and plain clothes, hoping Plaintiffs might resist their advances to give them cause to fire their weapons.

398.    Without any visual or audible identification to suggest the Applicable Defendants were associated with law enforcement, Plaintiffs only knew they were being assaulted by angry men with guns

399.    As a result of the trespass, assault, battery, and arrest and imprisonment, Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the Constitution of the United States, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil

rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

400.    Applicable Defendants assaulted Plaintiffs, when they unlawfully threatened, by word and by act, to fire their weapons at Plaintiffs to either wound and/or kill them.

401.    Applicable Defendants committed battery when they unlawfully used force upon Plaintiffs.

402.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

403.    Applicable Defendants actions have proximately resulted in material damages to Plaintiffs.

404.    Plaintiffs are entitled to recover compensatory damages, special damages and punitive damages.

405.    By reason of the above, the Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

## COUNT XIX
### False imprisonment
### (Against City Defendants, County Defendants and Does 1-10)

406.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 405 above as though fully set forth herein.

407.    A cause of action for false imprisonment occurs when someone wrongfully holds you against your will or takes you into their custody, also a violation of equal rights under 42 U.S.C. § 1981(c).

408.    A notice of claim against DPD in this matter was filed with the Internal Affairs Division on October 24, 2016 and was ignored.

409.    Applicable Defendants grossly violated Vodicka's rights guaranteed by ADA when on May 19, 2016, City Defendants, County Defendants and Does 1-10 utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs.

410.    Plaintiffs were deprived of their liberty under color and pretense of law without cause, and taken to Dallas Police Department Headquarters, without giving consent.

411.    Because of Applicable Defendants' malicious actions, both Plaintiffs were held in interrogation rooms deprived of their liberty without cause for a period of approximately nine (9) hours,

412.    As a result of the trespass, assault, battery, and arrest and imprisonment, Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the Constitution of the United States, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were

78

prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

## COUNT XX
### Foreseeable Zone of Risk
### (Against City Defendants, County Defendants and Does 1-10)

413.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 412 above as though fully set forth herein.

414.   This claim arises from Applicable Defendants' legal duty to protect Plaintiffs and Applicable Defendants' breach of that duty and injury or damage to the plaintiff caused by the breach of duty, actions that also violate 42 U.S.C. § 12101, et seq., the Americans with Disabilities Act.

415.   A notice of claim against DPD in this matter was filed with the Internal Affairs Division on October 24, 2016 and was ignored.

416.   Schoettmer knew most personal details about Vodicka's health from deposition testimony prior to May 13, 2016.

417.   When Ira Tobolowsky was murdered, the doors opened for Schoettmer to share Vodicka's private health information with anyone who would listen.

418.   Ermatinger and Sayers listened and despite their knowledge or because of their knowledge, DPD orchestrated the brutal felony aggravated assault and battery against Plaintiffs, two law abiding gay citizens.

419.   DPD's discriminatory, vicious and brutal attack was perpetrated in an unlawful manner to frighten Plaintiffs with mortal fear for their lives, more so for Vodicka because he was gay and immuno-compromised and DPD had knowledge of the same.

420.    On May 19, 2016, at approximately 3:30 pm, Plaintiffs, then residents of Dallas, Texas, lawfully walked from their apartment to Aubrey's parked vehicle, lawfully occupied Aubrey's vehicle and lawfully began backing the vehicle from a legal parking space.

421.    Plaintiffs' vehicle car moved only a few feet when suddenly; Plaintiffs were under attack with multiple unmarked cars coming at them from every direction, traveling at incredibly high speeds.

422.    The unmarked cars came to screeching stops before hitting Plaintiffs' vehicle and the drivers, in plain clothes, jumped out of the unmarked cars screaming at Plaintiffs to get out of their car and get down on the ground as they aggressively rushed towards Plaintiffs, weapons drawn and ready to fire.

423.    It was not until Plaintiffs were down on the concrete and guns were literally touching their heads with the gunmen's trigger fingers poised to end Plaintiffs' lives at any moment, that Plaintiffs realized the gunmen were employed by Dallas, DPD, Dallas County, and the Sheriff; the gunmen were the applicable defendants.

424.    Plaintiffs were in mortal fear because the gunmen did not announce who they were and proceeded to ambush them in unmarked cars while wearing street clothes, likely hoping Plaintiffs would resist arrest, try to defend themselves, or try to escape, which would give Applicable Defendants cause, and the opportunity, to fire at and likely kill Plaintiffs.

425.    One gunman, who had Vodicka pinned to the ground, said in a low voice, "You know what you did, faggot."

426.    Plaintiffs were falsely, unlawfully, without probable cause, and wrongfully, with force and without Plaintiffs' consent and against their will, handcuffed and arrested by Applicable Defendants.

80

427.     Applicable Defendants intentionally placed Plaintiffs in even greater danger by use of unmarked cars and plain clothes, hoping Plaintiffs might resist their advances to give them cause to fire their weapons.

428.     Without any visual or audible identification to suggest the Applicable Defendants were associated with law enforcement, Plaintiffs only knew they were being assaulted by angry men with guns rushing towards them.

429.     Plaintiffs were deprived of their liberty without cause, and taken to Dallas Police Department Headquarters, without giving consent.

### COUNT XXI
### Conspiracy Liability
### (Against All Defendants)

430.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 429 above as though fully set forth herein.

431.     The acts of the Applicable Defendants constituted numerous Section 1983 violations and/or violations of 42 U.S.C. § 421 and 18 U.S.C. § 242.

432.     This claim is arises from a conspiracy between two or more parties to do an unlawful act or to do a lawful act by unlawful means, the doing of some overt act in pursuance of the conspiracy, and damage to plaintiff as a result of the acts performed pursuant to the conspiracy.

433.     Schoettmer and Moye conspired with Ermatinger, Sayers, Urbina and John Does to falsely implicate Plaintiffs in the murder of Ira Tobolowsky.  The Applicable Defendants conspired to violate Plaintiffs' rights by causing materially falsified search warrant affidavits; unlawful search warrants procured by fraudulent means, including perjury by public officials; unlawful execution of governmental searches; unlawful governmental seizures; assault and

battery by governmental officials; false arrests; false imprisonment; defamation per se and conspired to inflict emotional distress.

434.    By reason of the above, the Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

435.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

## COUNT XXII
### Emotional Distress, Intentional Infliction
### (Against City Defendants, County Defendants and Does 1-10)

436.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 435 above as though fully set forth herein.

437.    This cause of action arises from emotional shock suffered by Plaintiffs resulting from the impact of Applicable Defendants' extreme and intentional aggravated assault on May 19, 2016, conduct that would be described as outrageous, causing Plaintiffs severe and ongoing emotional distress, conduct considered shocking or scandalous by an average member of the community and the claim is also a violation of the U. S. Constitution Amendment VI.

438.    Applicable Defendants presented falsified affidavits for search warrants to Judge Jeanine Howard, who relied on the perjured affidavits and issued unlawful search warrants.

439.    Two of the search warrants were issued on Aubrey and Vodicka, personally, to gather their fingerprints and photograph their bodies.

440.   Judge Howard's orders stipulate that the warrants would be executed within "accepted practices."

441.   On May 19, 2016, at approximately 3:30 pm, Plaintiffs, then residents of Dallas, Texas, lawfully walked from their apartment to Aubrey's parked vehicle, lawfully occupied Aubrey's vehicle and lawfully began backing the vehicle from a legal parking space.

442.   Plaintiffs' vehicle car moved only a few feet when suddenly; Plaintiffs were under attack with multiple unmarked cars coming at them from every direction, traveling at incredibly high speeds.

443.   The unmarked cars came to screeching stops before hitting Plaintiffs' vehicle and the drivers, in plain clothes, jumped out of the unmarked cars screaming at Plaintiffs to get out of their car and get down on the ground as they aggressively rushed towards Plaintiffs, weapons drawn and ready to fire.

444.   It was not until Plaintiffs were down on the concrete and guns were literally touching their heads with the gunmen's trigger fingers poised to end Plaintiffs' lives at any moment, that Plaintiffs realized the gunmen were employed by Dallas, DPD, Dallas County, and the Sheriff; the gunmen were the applicable defendants.

445.   Plaintiffs were in mortal fear because the gunmen did not announce who they were and proceeded to ambush them in unmarked cars while wearing street clothes, likely hoping Plaintiffs would resist arrest, try to defend themselves, or try to escape, which would give Applicable Defendants cause, and the opportunity, to fire at and likely kill Plaintiffs.

446.   Plaintiffs were falsely, unlawfully, without probable cause, and wrongfully, with force and without Plaintiffs' consent and against their will, handcuffed and arrested by Applicable Defendants despite the fact that Judge Howard did not issue an Arrest Warrant.

447.     Applicable Defendants intentionally placed Plaintiffs in even greater danger using unmarked cars and plain clothes, hoping Plaintiffs might resist their advances to give them cause to fire their weapons.

448.     Applicable Defendants prove the infliction was intention because they conspired together and with others to coordinate the brutal aggravated assault.

449.     Without any visual or audible identification to suggest the Applicable Defendants were associated with law enforcement, Plaintiffs only knew they were being assaulted by violent men with guns rushing towards them.

450.     Contradicting Applicable Defendants allegations to the media and the judges that Plaintiffs were hiding from them, in fact, Applicable Defendants were hiding from Plaintiffs, in street clothes and unmarked cars.

451.     Plaintiffs continue to suffer emotional shock, resulting from the impact of Applicable Defendants' aggravated assault.

452.     Plaintiffs were forced to witness the assaults on each other as they occurred simultaneously.

453.     Plaintiffs were deprived of their liberty without cause, and taken to Dallas Police Department Headquarters, without giving consent.

454.     Because of Applicable Defendants' malicious actions, both Plaintiffs were held in interrogation rooms deprived of their liberty without cause for a period of approximately nine (9) hours,

455.     As a result of the trespass, assault, battery, and arrest and imprisonment, Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the Constitution of the United States, sustained

deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, extreme shock and nervousness and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

456.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

457.    Applicable Defendants actions have proximately resulted in material damages to Plaintiffs.

458.    Plaintiffs are entitled to recover compensatory damages, special damages and punitive damages.

**COUNT XXIII**
**Emotional Distress, Negligent Infliction**
**(Against City Defendants, County Defendants and Does 1-10)**

459.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 458 above as though fully set forth herein.

460.    This cause of action arises from emotional shock suffered by Plaintiffs resulting from the impact of Applicable Defendants' aggravated assault on May 19, 2016.conduct that would be described as outrageous, shocking or scandalous by an average member of the community and the claim is also a violation of the U. S. Constitution Amendment VI.

461.    Applicable Defendants presented falsified affidavits for search warrants to Judge Jeanine Howard, who relied on the perjured affidavits and issued unlawful search warrants.

462.    Two of the search warrants were issued on Aubrey and Vodicka, personally, to gather their fingerprints and photograph their bodies.

463.    Judge Howard's orders stipulate that the warrants would be executed within "accepted practices."

464.    On May 19, 2016, at approximately 3:30 pm, Plaintiffs, then residents of Dallas, Texas, lawfully walked from their apartment to Aubrey's parked vehicle, lawfully occupied Aubrey's vehicle and lawfully began backing the vehicle from a legal parking space.

465.    Plaintiffs' vehicle car moved only a few feet when suddenly; Plaintiffs were under attack with multiple unmarked cars coming at them from every direction, traveling at incredibly high speeds.

466.    The unmarked cars came to screeching stops before hitting Plaintiffs' vehicle and the drivers, in plain clothes, jumped out of the unmarked cars screaming at Plaintiffs to get out of their car and get down on the ground as they aggressively rushed towards Plaintiffs, weapons drawn and ready to fire.

467.    It was not until Plaintiffs were down on the concrete and guns were literally touching their heads with the gunmen's trigger fingers poised to end Plaintiffs' lives at any moment, that Plaintiffs realized the gunmen were employed by Dallas, DPD, Dallas County, and the Sheriff; the gunmen were the applicable defendants.

468.    Plaintiffs were in mortal fear because the gunmen did not announce who they were and proceeded to ambush them in unmarked cars while wearing street clothes, likely hoping Plaintiffs would resist arrest, try to defend themselves, or try to escape, which would give Applicable Defendants cause, and the opportunity, to fire at and kill Plaintiffs.

469.    Plaintiffs were falsely, unlawfully, without probable cause, and wrongfully, with force and without Plaintiffs' consent and against their will, handcuffed and arrested by Applicable Defendants despite the fact that Judge Howard did not issue an Arrest Warrant.

470.    Applicable Defendants intentionally placed Plaintiffs in even greater danger using unmarked cars and plain clothes, hoping Plaintiffs might resist their advances to give them cause to fire their weapons.

471.    Applicable Defendants prove the infliction was negligent because they conspired together and with others to coordinate the brutal aggravated assault.

472.    Without any visual or audible identification to suggest the Applicable Defendants were associated with law enforcement, Plaintiffs only knew they were being assaulted by angry men with guns rushing towards them.

473.    Though The Law had been telling the public, and the judges, that Plaintiffs were hiding from them, in fact, it was The Law hiding from Plaintiffs, in street clothes and unmarked cars.

474.    Plaintiffs continue to suffer emotional shock, resulting from the impact of Applicable Defendants' aggravated assault.

475.    Plaintiffs were forced to witness each others assaults as they happened simultaneously.

476.    Plaintiffs were deprived of their liberty without cause, and taken to Dallas Police Department Headquarters, without giving consent.

477.    Because of Applicable Defendants' malicious actions, both Plaintiffs were held in interrogation rooms deprived of their liberty without cause for a period of approximately nine (9) hours,

478.   As a result of the trespass, assault, battery, and arrest and imprisonment, Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the Constitution of the United States, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, extreme shock and nervousness and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

479.   By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

480.   Applicable Defendants actions have proximately resulted in material damages to Plaintiffs.

481.   Plaintiffs are entitled to recover compensatory damages, special damages and punitive damages.

## PRAYER

WHEREFORE, Plaintiffs Steven B. Aubrey and Brian E. Vodicka request that on final hearing, the Court enter its judgment against Defendants and award Plaintiffs their damages and Grant the following relief:

A.   For an award of compensatory damages, exemplary damages and consequential damages against All Defendants, jointly and severally, for amounts that exceed the minimal jurisdictional limits of this court;

B.   For an award of nominal damages against All Defendants, jointly and severally;

C.      For an immediate, preliminary injunction and permanent injunction enjoining All Defendants from hosting, posting, or in any manner publishing or disseminating, whether under its legal identity or under any aliases, whether now created or created in the future, any defamatory or injurious information regarding Plaintiffs;

D.      For an Order compelling Defendant D Magazine to immediately remove from its websites: dmagazine.com, prestonhollowpeople.com and parkcitiespeople.com, as well as any and all other media and communication conduits, any and all postings of articles that mention Plaintiffs by name and/or can be attributed to or regarding either Plaintiff by reasonable logical deductive means;

E.      For an award of Plaintiffs' attorney's fees and costs incurred in prosecution of this action against Defendants, jointly and severally;

F.      For such other and further equitable relief as this Court deems just and proper.

Respectfully submitted,

By: _____
Steve Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: _____
Brian  Vodicka
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com

## **CERTIFICATION AND CLOSING**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this first amended complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case- related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  October 22, 2018.

Steve Aubrey

Brian Vodicka

# EXHIBIT A

## to

## Plaintiffs' First Amended Complaint



MEDIA

# Sneak Peek: *D Magazine*'s May Issue, Which Explores Who Killed Ira Tobolowsky

**We're giving you a look inside the pages of our May issue weeks before the stories are published online.**

BY MATT GOODMAN    PUBLISHED IN FRONTBURNER    APRIL 26, 2017    3:22 PM



On newsstands now!

Beginning today, you'll see the May issue of *D Magazine* rolling out on newsstands. That's it on the left. The name Ira Tobolowsky figures prominently on the cover. I'm willing to bet many of you remember that name. For one, Tobolowsky was a highly regarded attorney who operated for decades out of a small office on Lovers Lane, west of the Tollway. And two, he was burned to death in his North Dallas home just under a year ago, and police have still yet to charge anyone with the crime.

But the family believes they are close: "We are a little bit of evidence short of getting this case taken to a grand jury, getting an indictment, and moving forward with a capital murder trial," says Ira's 28-year-old son, Michael, who now runs his father's practice. "We've been here a couple months or so. The type of information we're looking for we believe someone has out there. We're just trying to reach out and connect with that person."

Michael, along with his siblings and his mother, spent hours with *D Magazine* writer Jamie Thompson for her cover story, "A Place Where Something Evil Happened." What emerges is a picture of a family driven to get justice, another family torn apart by greed and anger, and an overtaxed police department trying hard to solve a bizarre and unthinkable tragedy but coming up just short. Head to newsstands to read it now. (It'll go online in a few weeks.) But first, I wanted to leave you with how Michael described his father:

"Ira was definitely the type of person who had more personality than you could imagine. He was hands down the smartest person in the room, no matter what room he was in. He was caring, he was affectionate, he was a loving guy. He really was a perfect combination of all the good attributes you would want in a husband, father, friend, everything. He was amazing.

"Dad was actually what I would call an old school lawyer. He was a true councilor, someone who would help you on your business transactions, he'd help you in court, he would help you if you had just a little dispute where you needed some advice. No matter what it was, he was there. After all this happened, I started talking with a bunch of different lawyers. Dad did both transactional and litigation, and I found the transactional attorneys telling me, you know, 'Your dad is a very good transactional attorney, but what he's best at is litigation.' I had the litigators telling me, 'Your dad is really good at litigation but what he was best at was transactional work.' That really made me smile, because it proved he was one of the best at each and every aspect of law that he practiced."

After you pick up the May issue and read Jamie's story, flip one page to learn about the next Floyd Mayweather (minus the ever-mounting legal problems, we pray) under our noses. We'll find out on May 27, when DeSoto native Errol Spence Jr. flies to London to battle International Boxing Federation welterweight champion Kell Brook, who's 36-1. Spence is 21-0, with 18 knockouts, and he's got the eye of people like Mayweather, who had this to say: "The guy that I think that's gonna really make the most noise in boxing is Errol Spence."

Our dining critic, Eve Hill-Agnus, has a pair of important pieces—a review of famed restaurateur Nick Badovinus' opulent temple to beef, Town Hearth; and a guide to the finest regional Indian food in Dallas-Fort Worth, a trip that will take you well beyond biryani and butter chicken. Meanwhile, Michael J. Mooney returns to the pages of *D* by asking attorneys to explore their most memorable divorce cases. He gets dirt on murder-for-hires, pastor-punchers, stalkers, and more.

In the front of the book, Peter Simek chronicles the troubles of the Fort Worth Opera, and city columnist Eric Celeste has an exclusive profile of the Democrat policy wonk who is convinced that he can knock Pete Sessions from his longstanding congressional seat in District 32.

There's something for everyone. Get to your favorite local newsstand now.

**LOCAL NEWS     MEDIA**

**Get a weekly recap in your inbox every Sunday of our best stories from the week
plus a primer for the days ahead.**

Email

---

## RELATED CONTENT

**ETHIOPIAN**
**Gonna Be An Intense
Lunch at Wild Salsa,
Apparently**
ZAC CRAIN

**LOCAL NEWS**
**How To Approach the
Trinity: Wild Dallas vs. the
Status Quo**
MATT GOODMAN

**SPORTS**
**Dirk Hits 30,000: Revisit
How He Saved Dallas
Basketball, One Shot at a
Time**
ZAC CRAIN

## COMMENTS



0 Comments     D Magazine

♡ Recommend  1        🐦 Tweet        f Share

**Login**

Sort by Oldest

Start the discussion…

**LOG IN WITH**            **OR SIGN UP WITH DISQUS** ?

Name

Be the first to comment.

ALSO ON **D MAGAZINE**

**A Report on Racial Inequality Reveals the Relationship Between School …**

— I grew up in DISD and it is both. Dallas actively participated in bussing programs. The schools I went to had to be a …

**Leading Off (10/15/18)**

— If the indifference to the Cowboys here is caused by the Owner/General Manager then I guess that's …

**Robert Jeffress on the (Apparent) Khashoggi Murder**

— It says a lot about Jeffress that I'm genuinely surprised that he's anti-murder.

**I Used to Be a Crazy Cat Lady**

— She lived the very best life, and Kathy is the very best cat mom.

✉ Subscribe  Add Disqus to your siteAdd DisqusAdd  🔒 Disqus' Privacy PolicyPrivacy PolicyPrivacy

## D MAGAZINE PARTNERS

750 North St.Paul St.
Suite 2100
Dallas, Texas 75201

Tel: 214.939.3636
Fax: 214.748.4579

CONTACT US

NEWSLETTERS

## SECTIONS

FrontBurner

Food & Drink

Arts & Entertainment

Nightlife

Home & Design

Shopping & Fashion

Health & Fitness

Business & Economy

Weddings

## PUBLICATIONS

D Magazine

D Home

D CEO

Subscribe

Renew D Magazine

Subscriber Services

## COMPANY INFO

About Us

Masthead

Job Openings

Internships

Awards

Customer Service

## ADVERTISE

Media Kits

Events

Case Studies

Contact Us

## CONNECT

Facebook

Twitter

Instagram

Pinterest

YouTube

LinkedIn

Google+

Reddit

Copyright © 2018, D Magazine Partners, Inc. All Rights Reserved. Privacy Policy

# EXHIBIT B

## to

## Plaintiffs' First Amended Complaint



CRIME

# 'A Place Where Something Evil Happened'

**Ira Tobolowsky, a prominent lawyer, was burned alive in his North Dallas garage. A strong suspect quickly emerged. So why can't the cops solve the case?**

BY JAMIE THOMPSON    PUBLISHED IN D MAGAZINE MAY 2017    PHOTOGRAPH BY STEVEN VISNEAU

The gentle beeping of her home security system roused Debbie Tobolowsky from bed. It was about 7:15 on a Friday morning, and her husband, Ira, had just opened the back door leading to the garage, headed off to work. Debbie had stayed up late the night before, working on details for their eldest son's wedding rehearsal dinner, checking on the white daisy arrangements, perfecting the seating chart. The event would be a production. Theirs was a large, prominent Jewish family with more than a dozen lawyers in it, including State District Judge Emily Tobolowsky. George Tobolowsky, the noted Dallas sculptor, was Ira's brother. One of his cousins was actor Stephen Tobolowsky, who played Ned Ryerson, the insurance salesman in *Groundhog Day*.

Debbie knew that Ira was trying to leave the house without waking her. Her 68-year-old husband had a debilitating spine condition that turned his back into a portrait of pain. His shoulders were hunched, and he struggled to raise his arms above his chest or turn his neck, but he had learned to lift himself quietly from bed without disturbing his wife of 39 years.

About 30 minutes later, as she was getting ready in the bathroom, a blaring alarm startled her. She ran to the security system control panel in the bedroom, saw it said "Fire," and headed to the living room. From the back windows, she saw smoke drifting across the swimming pool. She opened the

**D**

Debbie grabbed her purse and wedding ring, and leashed Oliver, their Cavalier King Charles spaniel. Within minutes, firefighters arrived and asked how to get into the garage. Debbie gave them a remote.

As soon as she stepped outside, she called Ira. Her call went straight to voicemail. She dialed his cell again and again. No answer. Firetrucks crowded their cul-de-sac as neighbors gathered on their lawns. Smoke billowed from the eaves of their sprawling brick ranch in North Dallas. Debbie thought, *Why isn't he answering?* Then it hit her. She ran to a firefighter who was looking through the garage windows.

"How many cars are in there?" she asked.

"Two," the firefighter said. "Why?"

Debbie screamed, "He's in there! My husband is in there! Get him out!"

The remote wouldn't work, so firefighters smashed through the garage door. As smoke blackened the sky, they sprayed water into the garage, then searched for Ira. Paramedics raced up the driveway with a gurney. After a couple of minutes, they bowed their heads and pushed the empty gurney away. Debbie fell to her knees.



A Real Mensch: Ira with Oliver, the family's Cavalier King Charles spaniel. "If there was a time to lose Ira, it was not now," said Rabbi Adam Roffman at his funeral.

---

A homicide detective named Scott Sayers arrived at the house wearing a button-down and tie. Detectives routinely respond to house fires involving deaths, but Dallas' 34-member homicide unit was stretched thin in May of last year; they'd already caught 10 murders in the past week. The detective asked Debbie: "Do you think this was an accident, or could someone have done this?"

"What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband.

Sayers poked around, then told the family that Dallas Fire-Rescue would lead the investigation. Investigators combed through the wrecked garage, trampled by firefighters wielding axes and high-pressure hoses. They had broken through walls and tossed the family's belongings from a second-story media room into the swimming pool. While firefighters were trained to use the least destructive measures—to help preserve evidence—that took a back seat to putting down flames.

It appeared that Ira had made it down the steps into the garage, walked past his wife's car, and approached the driver's side of his Lexus. They found his burned body there, lying in a small space between the closed driver's side door and a wall lined with mops and brooms. He still had his wallet and phone. Had Ira's car caught fire? His phone? Investigators searched for flammable liquids, examining shelves packed with Clorox wipes, Windex, and paper towels. Gasoline fumes hung in the air.

Then they found their first big clue. In the back of the garage, lying beside cardboard boxes, they found a large plastic juice bottle with no label. It held a few ounces of what appeared to be gasoline. Investigators asked Debbie if she or Ira drank juice. Was there any reason for that plastic bottle to be in the garage? No, she replied. They asked if the couple kept gas in containers. No, she said. Her husband couldn't operate a lawn mower. They kept no fuel or

https://www.dmagazine.com/publications/d-magazine/2017/may/ira-tobolowsky-lawy...

**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ⚙ | SUBSCRIBE | Leave Us Feedback

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS

Ira in daylight, in one of the city's safest neighborhoods, doused him with fuel, and set him on fire?

The fire department was skilled at uncovering the cause of fires. Murder investigations were another matter. But now it appeared they were on the hunt for a killer.

---

Michael Tobolowsky woke in a haze to the sound of his older brother, Jonathan, screaming. A half-hour after their father had been found dead, Jonathan had gotten a call from his fiancée. Ira's three sons were at a beach in Destin, Florida, for Jonathan's bachelor party. The sons quickly booked return flights to Texas.

At a window seat, watching the landscape drift by below, Michael struggled to process the idea that his father was gone. The 28-year-old had decided to become a lawyer after spending summers in his dad's office, learning how to write motions and briefs, following his dad around the courthouse. At 6-foot-4, Michael had attended Trinity University on a partial basketball scholarship, gone to law school in San Diego, and was in his third year with a civil firm in Dallas. He spoke to his father every day, always ending with, "All right, good shit. Talk to you later, Pops."



Man: Ira and Debbie with their three sons, (from left) Zach, Michael, and Jonathan, at a wedding in 2015.

Before the flight, Michael had learned the fire might have been set intentionally. The thought infused his grief with rage. Cramped in his window seat, Michael felt his hands aching and realized both fists were clenched. All he could think about was *Who*?

Back in Dallas, by midmorning, fire investigators still hadn't roped off the house with police tape. Relatives and friends walked all over the yard. TV reporters broadcast live from the cul-de-sac. The investigators kept asking whether Ira had enemies. Sure, family members said, nearly every lawyer

**D**

LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ✪ | SUBSCRIBE | Leave Us Feedback

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS

Steven Aubrey, middle son of a Dallas orthodontist who died in 2004, was fighting an inheritance battle with his mother, who believed he'd come unhinged. He stood well over 6 feet tall and carried 220 pounds packed with muscle, which he flaunted in online ads for his services as a masseur. He promised strong hands, professionalism, and discretion. Aubrey had graduated from W.T. White High in Dallas and majored in finance at Texas A&M. He lived in a $1 million house in Austin with his longtime partner, Brian Vodicka, who had attended law school but was on disability for medical conditions.

After the death of his father, Aubrey had grown unhappy with how his 79-year-old mother, Betsy, and oldest brother, Buck, had handled the estate. Aubrey accused Buck in court filings of taking advantage of their mom and funneling family assets into his own name. Over the years, the feud grew more heated, and Betsy came to fear her son. "He has absolutely gone crazy and is on a rampage like no other," she wrote to a relative. By the end of 2012, she'd had enough and sent Aubrey an email saying she had cut him out of her will.



Aubrey responded a few hours later: "You have 3 days to change your mind and apologize to me or else. Or else I will make it my mission to make the rest of your life miserable, as you deserve. EVERYONE you have ever known will know what has happened and the poor choices you have made. It is sickening to watch you make threats with the money that dad made while you played bridge. I guess I am lucky that what I got from you is thin good looks but poor Buck got the 'lazy never had a job' part of you. … I don't know a single mother who would do what you have done. You should never have had children."

But Betsy refused to change her will or apologize to her son. About two weeks later, she called police to report a break-in at her home. A few pieces of art with sentimental value had been stolen. But she also discovered that someone had let loose in her house four pet-store rats. Everyone in her family knew she was terrified of rats. She suspected her middle son, though Aubrey said in an email to her that he had nothing to do with the rats. Betsy and Buck told the court that they thought Aubrey might hurt them, and a judge issued peace bonds forbidding Aubrey from contacting them for one year.



**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ⚙ | SUBSCRIBE | Leave Us Feedback

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS



Who Was Ira Tobolowsky?

Ira first met Aubrey in August 2014. They sat across a table from each other at a deposition in downtown Dallas. Aubrey, 53, working without a lawyer, was there to question his mother. Some lawyers take passive roles in depositions, objecting to questions for the record but then letting their clients answer them. Not Ira. After Aubrey asked his first question—for his mother to state her name—Ira objected. For the first hour, the mother barely talked, as her lawyer sparred with her son. Over the four-and-a-half-hour deposition, Ira objected more than 200 times. From the transcript, it's clear the interruptions frustrated Aubrey.

Aubrey: "Can you just be quiet?"

Ira: "You're wasting my time."

Aubrey: "I don't care about your time."

Two weeks after the deposition, a fax machine in Ira's office churned out a 118-page lawsuit in which Aubrey petitioned the court for a temporary restraining order against Ira. After the machine finished printing, Aubrey faxed the lawsuit five more times. Ira fumed as the machine spat out hundreds of pages, until his paralegal finally unplugged it. Ira searched online for the suit, but it was never officially filed.

The next week, Aubrey tried to set a deposition for September 26, during Rosh Hashana. Ira thought Aubrey did it just to irritate him and asked for a date change.



**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ⚙ | SUBSCRIBE | **Leave Us Feedback** 🔍

**NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS**

n: Frustrated with the lack of results in the investigation into Ira's murder, the family bought a billboard ad on Central Expressway.

Aubrey faxed his response: "Jews spend these days working to amend their behavior and seeking forgiveness for wrongs done during the past year. My suggestion: you attend the scheduled deposition and amend your behavior while there. Perhaps God will forgive you for your many wrongs during the past year and previous depositions." He included a list of Jewish holidays, asking if Ira planned to take off work for all of them.

Ira filed a motion for contempt. "ANTI-SEMITISM SHOULD NOT BE TOLERATED BY THIS COURT. PLAINTIFF'S RESPONSE IS FRAUGHT WITH INNUENDO AND OUTRIGHT ANTI-JEWISH REMARKS THAT ARE INSULTING, CRUEL, AND EVIL."

Aubrey's response: "TOBOLOWSKY'S PATTERN IN ALL OF HIS FILINGS IS TO RANT AND RAVE IN BOLD UPPERCASE LETTERING WHEN HE WANTS TO COERCE THE COURT TO BELIEVE SOMETHING THAT IS NOT TRUE."

The legal battle dragged on as Aubrey filed lengthy motions against his mother. Responding to them began to consume Ira's law practice. But nearly every time the men appeared before a judge, Ira won. Given the venom of Aubrey's filings, Ira and his paralegal, Leigh Allen, joked about locking the front door, and they did for a time. Ira wondered aloud whether Aubrey was violent. But mostly he laughed about the case, Allen says. "We felt like we were fighting the good fight," she says, "defending a mother against her hateful son."

Three days before Ira was set to question Aubrey under oath in a deposition, Aubrey nonsuited the case. It was the legal equivalent of: never mind. Ira had won, but by that point, Aubrey had accused him of bribery, witness tampering, and a host of other crimes. In one filing, he compared Ira to an "ISIS butcher." After all that, Ira was not ready to walk away. And, in any case, he figured Aubrey wasn't finished with his harassment.

_____

Ira enlisted a longtime colleague, Steve Schoettmer, a former linebacker for Duke University who worked at Thompson & Knight, to file a defamation suit against Aubrey in the summer of 2015. "He just desperately wanted them to stop," Schoettmer says. "And he'd become resigned that the only way they

The Search For Who Killed Ira Tobolowsky                            https://www.dmagazine.com/publications/d-magazine/2017/may/ira-tobolowsky-lawy...

**D**  LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ◎ | SUBSCRIBE | Leave Us Feedback    🔍

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS

But Ira also wanted to end Aubrey's ability to sue his mother by having him declared a vexatious litigant, a rare designation that, if granted, would require Aubrey to get approval from a judge to file further motions or lawsuits. Ira and his paralegal prepared a 367-page document detailing Aubrey's history. In two years, he had filed seven lawsuits against his mother in different courts. He had also sued her lawyers, her accountant, and three judges. Ira showed Aubrey's pattern: he'd file a lawsuit and clog the court with motions. If rulings didn't go his way, he'd sue the judge and demand recusal. If that didn't work, he'd nonsuit and file in a different court.

In February 2016, Judge Eric Moyé declared Aubrey a vexatious litigant and ordered him to pay his mother $250,000. He could no longer sue his mother, his brother, or Ira without permission.

But Ira continued with the defamation suit. In April 2016, five weeks before the fire, Aubrey and Vodicka came to Ira's office for a deposition. It had been a bruising couple of years for the couple. They had been involved in another contentious lawsuit in Austin, after they'd invested hundreds of thousands of dollars in a real estate deal that turned out to be a Ponzi scheme. They had to sell their $1 million house, and they moved to an apartment in Dallas. They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees. Aubrey had become estranged from his family. Ira had defeated Aubrey at every turn, stripped him of his ability to file lawsuits, and now was coming after him for defamation.

During the deposition, Ira and his attorney, Schoettmer, thought the 56-year-old Vodicka was impaired. He kept closing his eyes, mumbling about being in the bathtub that morning. Schoettmer asked if he was on medication.

"Yes, sir," Vodicka said.

"Tell me what the medication is for?" Schoettmer asked.

"It's anti-Ira medication," he said.

After about 30 minutes, Ira stopped the deposition and asked the men to leave. Aubrey and Vodicka refused.

"You invited us to be here. We're here," Aubrey said.

"And it's over with, and I'm asking everybody to please leave," Ira said. The men lingered, and Ira grew more stern. "Steven and Brian, will you please vacate my office now. These are my offices, this is my property, and I'm asking you all to leave. ... I'll be forced to have you escorted out of here."

The men left.

_____

Two days after the fire, more than 1,200 people packed Congregation Shearith Israel for Ira's funeral. The police department assigned extra officers to patrol. Rabbi Adam Roffman acknowledged the anger felt by many over Ira's death. The familiar words of Ecclesiastes—to everything there is a season—would provide no comfort on that day, the rabbi said. "If there was a time for Ira to die, surely that day was not Friday," he said. "If there was a time to lose Ira, it was not now."



**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ✪ | SUBSCRIBE | Leave Us Feedback

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS

Moye's home that weekend and had instructed him to carry a gun, fearing that he, too, might be in danger.

The day after the funeral, on Monday, fire investigators asked Dallas police homicide detectives for help. Detective Bob Ermatinger got the case. He had worked at the Dallas Police Department for three decades and was one of the detectives who had appeared on the A&E series *The First 48*, the title a reference to the premise that if cops didn't solve a case in the first two days, their odds of doing so decreased by half. Ermatinger came across as folksy on the show, tearing up with victims but coming down hard on suspects.



Aubrey—one of the suspects Dallas police detectives investigated following Ira Tobolowsky's murder—during a taped deposition.

By the time Ermatinger got the Tobolowsky case, 72 hours already had passed. Investigators believed the perpetrator might have been burned, because Ira had been doused in a confined area of the garage. They needed to find the killer before any injuries had time to heal. Investigators had about half a dozen suspects on their list. That included: Debbie, neighbors, a lawyer Ira was trying to get disbarred, a patient of a plastic surgeon that Ira had defended, a lawn worker's son who had asked the family for money, and a potential client who had called Ira at all hours and left bizarre phone messages. Some of the suspects cooperated and provided alibis; others were looked at only on paper.

But after talking to Ira's relatives and colleagues, detectives turned their focus to Aubrey and Vodicka. The level of hostility the men had displayed toward Ira—and the fact that he'd recently defeated them in court—pushed the men to the top of their list.

On May 17, the Tuesday after the fire, detectives went to Aubrey and Vodicka's Dallas apartment. They planned to take the men in for interviews, according to search warrants. But no one answered the door. Two detectives noticed the blinds on a window were open and angled upward. When they returned later, the blinds were closed. Both men's cars were in the parking lot.



The next day, Aubrey and Vodicka were scheduled to appear at a hearing in Ira's defamation case. Security was tight in the courtroom, as extra sheriff's deputies stood guard, but the men didn't show. From the bench, Judge Moyé announced his recusal. "I think at this point," he said, "with the allegations which have been made related to Mr. Aubrey and his implication in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case."

Later that day, detectives returned to the men's apartment. No answer. Aubrey's car was gone. Ermatinger called their phones and left messages and also sent them texts. No response.

Detectives began monitoring the men's credit card transactions and discovered that Aubrey's card had been used that day to book a room at the Crowne Plaza hotel in Dallas under the name Alexandra Krot (a friend who did spend the night at the hotel, police later learned). That night, at 9:30, Ermatinger got a judge to sign search warrants to examine Aubrey and Vodicka for burns and search their apartment. He was looking for combustible liquids, empty containers, medical supplies to treat burns, and gas receipts, according to the warrants. No one was at the apartment when police arrived, but detectives seized an Apple desktop computer and paperwork for burner phones.

By the next day, Thursday, detectives had learned that the men shared a second apartment, on Southwestern Boulevard. Plainclothes detectives watched and waited until about 3:30 pm, when they saw Aubrey and Vodicka get into their car, heading out for a late lunch. Police cars surrounded the men. Detectives jumped out with guns drawn and screamed, "Get down on the ground!" according to a complaint Aubrey would later file with DPD.



For the next nine hours, Aubrey was kept in an interrogation room, according to his complaint, which he provided to *D Magazine.* Detectives came by every so often and told him they were looking for a doctor to examine his skin for burns, according to a written statement from Aubrey's lawyer, Phillip Hayes. When a doctor finally arrived, he asked Aubrey to strip so he could examine him.

Ermatinger says Aubrey had red marks on both arms. But a SWAT doctor couldn't definitively say what the marks were from. "The doctor explained to us that it could be from the flash of a fire, it could be burns, or it could just be a sunburn," Ermatinger says. He says too much time had passed.

Ermatinger didn't have any physical evidence linking them to the crime scene. But the men remained strong suspects. They did not have good alibis, telling detectives that at the time of the fire, they were at their apartment. Phone records, detectives told the Tobolowsky family, showed no activity on the men's cellphones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. The records did show cell activity before and after that time period.

Ermatinger would have to wait for crime scene technicians to search the men's computers and process the juice bottle found in the garage for fingerprints.

---

Michael Tobolowsky, the middle of Ira's three sons, stepped in to help with his father's law practice. At the time of Ira's death, his firm had never been busier. He had cases pending, clients waiting, deadlines looming. Michael needed to file extensions and reassure clients that they hadn't been forgotten. But as he read through his dad's email, one case drew his attention: Aubrey's.

The Thursday after Ira was killed—the day police detained Aubrey and Vodicka—more than a dozen Tobolowsky family members gathered at Ira's sister's house, around the block from the scene of the fire. Not knowing that police were interrogating suspects, the family set up headquarters, working on laptops at the kitchen table. At about 7 pm, Michael and his girlfriend stepped outside to get some air. They crossed the street and walked into the alley that runs behind Ira and Debbie's house.

Michael felt that he'd lost not just his dad in the fire, but the backdrop of his favorite memories. It had been a noisy, lively home, where the three Tobolowsky boys kicked soccer balls down the halls, shot carrots from slingshots, and slid little brother Zach down the stairs in a cardboard box. As Michael and his girlfriend walked down the alley that night, the air still smelled of smoke. Michael didn't think he'd ever be able to smell a campfire



n found a suspicious hole had been drilled in his
backyard fence.

He stopped to talk with a neighbor, then heard his girlfriend shout, "Michael!" She was staring at the wooden fence behind his parents' home. Michael saw a hole surrounded by what looked like black paint. It appeared to have been made recently. For someone of his height—the 6 feet and 4 inches that helped get him onto the team at Trinity—it provided a clear view to the garage where his father had died.

"Holy shit," he said.

The next morning, Detective Ermatinger had a look at the fence. He, too, thought it looked as if someone had drilled the hole. Crime scene technicians took the board for processing.

Detectives remembered seeing a drill at Aubrey and Vodicka's apartment and obtained warrants for another search. When they searched it the following week, they found an Apple MacBook in the process of having its hard drive wiped clean, according to a later search warrant. They seized it for testing. From the two apartments, they also collected a cordless drill and bits, two red gasoline containers, a yellow propylene tank with a torch attachment, a blue propane torch, two cans of paint, and a couple of pairs of shorts and pants.

Aubrey refused to talk without a lawyer and said he couldn't afford one. Detective Ermatinger called Assistant District Attorney Gary McDonald, who helped find a public defender and also subpoenaed Aubrey to testify before a grand jury, a tactic prosecutors sometimes use when dealing with uncooperative witnesses. A few days later, the prosecutor questioned Aubrey before jurors. It would be a violation of law for anyone to reveal what exactly was said that day, but the proceedings didn't produce an indictment.

─────────────────────────────────────────

Last September, Michael left his law firm and took over his dad's practice full time. He had spent months debating the decision. He had his dream job, working in a civil firm on big contingency cases. He worried that his father's small practice might feel lonely, but he couldn't stand the thought of shutting it down. Now he spent every day behind his father's old mahogany desk. There were things about the office Michael wanted to change: the old wallpaper, the red and pink bathroom tiles. But he couldn't bring himself to touch anything that had been his dad's.

He focused on keeping his father's clients happy, but the murder investigation was a constant concern. The medical examiner had released preliminary findings. His father had died of burns, smoke inhalation, and blunt force injuries. The family desperately hoped that Ira had been knocked unconscious before the fire had been set.

Michael filled a whiteboard with evidence and photos of Aubrey and Vodicka. He still researched other suspects, but the more he learned about the two men, the more he believed they were responsible. Michael decided to keep representing Aubrey's mother and to move forward with his dad's defamation case.

His mother was furious. "How dare you do this to our family?" she said. "We have lost too much. What if I lose you, too?"

**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES  | SUBSCRIBE | Leave Us Feedback

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS

vexatious litigant, but that designation only applied to Aubrey as a *pro se* litigant. Vodicka had reactivated his law license and could file the lawsuits on his partner's behalf, sidestepping the need to get approval. Michael wanted to get Vodicka disbarred, to shut them down for good.

On September 12, Michael went to the courthouse for a hearing in the defamation suit. It was his first chance to see Aubrey and Vodicka since his dad's death, four months earlier. When Michael walked into the courtroom, his heart raced and his hands clenched into fists. He made a point to look both men in the eye. He wanted to see if he could tell whether they had murdered his dad. As the hearing went on, Schoettmer and Aubrey sparred, trading insults. It grew so tense that the judge ordered the parties to leave the court separately.

Michael and Aubrey emailed about the cases, and their discourse quickly turned contentious. "As luck (or bad luck) would have it, you were born into a filthy and dirty family," Aubrey wrote. Aubrey filed another lawsuit, this time accusing the *Dallas Morning News* of defamation for its coverage of the case. He was also suing Judge Moyé, Schoettmer, and Debbie.

Debbie had never been sued before, and she was frightened. Someone sent a blank piece of paper to her house, in an envelope with Aubrey's return address on it. To her, it seemed to be saying: *I know where you live.*

---

Last fall, after work, Michael stayed up late in his East Dallas town home watching true crime shows: *I (Almost) Got Away With It* and *Real Detective*. They made him feel normal again, somehow. He got to repeatedly experience that climactic moment when the cops finally caught the bad guy, the satisfying ending that his family longed for.

In the shows, murders were solved by single-minded detectives who were obsessed with their cases. In real life, the Dallas detectives were distracted and overworked, running from one murder to the next. 2016 was a tough year for the Dallas Police Department. A gunman ambushed officers downtown in July, killing five. The Tobolowsky family mourned the tragedy, but they knew it meant their case would take longer to solve. And then came the fiasco with the Police and Fire Pension System, which, teetering toward insolvency, drove scores of older, experienced cops to retire before they'd planned to in an effort to preserve their pensions.

As the months passed, the family began to lose hope that the police could solve Ira's murder. In 2016, there were 171 murder cases in Dallas, and police solved just half of them, falling below the national average of about 60 percent.

It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?' "

Most of the family thought Aubrey had killed Ira. But he was still free, living not far away in North Dallas. One afternoon Ira's sister saw Aubrey in Bed Bath & Beyond, and her knees buckled.

The family came to believe that investigators had bungled the case. Why had they waited six days before picking up Aubrey and Vodicka? If the men had burns, they'd had time to heal. Michael learned that the fence board with the hole had not been sent for testing to determine whether the black substance



**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ⊙ | SUBSCRIBE | Leave Us Feedback

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS

but most agencies deleted video after 30 days. The family had tried to stay
out of the detectives' way; now they regretted it.

They'd call detectives and get no response. Michael called one detective
every single day for a week. Nothing. If a prominent North Dallas family
couldn't get police to respond—one that had so many lawyers and a state and
federal judge among its relatives—what must it be like for others with less
means and access?

Michael contacted the investigator who had been hired by his parents'
insurance company to examine the fire scene. A 29-year arson investigator,
he told Michael that several days after the fire he had bagged a dozen pieces
of evidence that he was surprised authorities had left behind. He had
carefully archived the items to preserve chain of custody. He told Michael
that he'd ruled out all other causes—faulty wiring, car fire—and was
convinced someone had poured an ignitable liquid on his father and set him
on fire. He found nothing in the garage that matched the fuel source. It had
been brought into the garage that morning by the killer, he said. Also, he told
Michael that there was a 50-50 chance the suspect had suffered burns. If so,
it might look like a sunburn, he said.

The family had debated hiring a private investigator and finally decided to
call around. They talked to a retired FBI agent who charged a $25,000
retainer. They talked to another guy who told them, "I'm gonna do some
stuff, but I can't tell you because most of it's illegal." A third told them, "If
you want to solve the case, you're going to have to do it yourselves."

In early October, Michael got an email from a pair of private investigators.
"We are private investigators who simply have a low tolerance for
scumbaggery and this case really bothers us," they wrote. Michael liked the
email and agreed to a meeting. The pair offered to start pro bono, see what
they could find, and Michael agreed. The family had put up a billboard on
Central Expressway offering a $25,000 reward. If the investigators could
solve the case, the money was theirs.



How Ira Tobolowsky's Family is Trying to Solve His Murder

_____

As the family was taking an active role in searching for Ira's killer, Dallas
police were running an undercover investigation into the website
masseurfinder.com. Aubrey regularly posted ads there, showing a picture of
himself shirtless.

His ads read: "My goal is to offer male massage at its very best for ALL men of
any curiosity, any size or any age. Professionalism and discretion are
assured. I am a muscular 6'5", 220 lb fit and masculine masseur—smooth,
friendly, easy going, intuitive, skilled and GIANT STRONG hands."

A police officer sent a text message to "Massage Bi Steve" in response to the

**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ⚙ | SUBSCRIBE | Leave Us Feedback    🔍

**NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS**

into a sexual conversation," the officer wrote. Aubrey agreed to masturbation and sexual intercourse for $300. Officers booked Aubrey into jail on a prostitution charge.

That night, the Tobolowskys' private investigators got word of the arrest and went looking for Vodicka. In Aubrey's absence, they hoped he might talk. One of the PIs spotted him pulling into his apartment complex, carrying takeout. The PI identified herself as merely "an investigator" and offered to put him up in a hotel in case the media got word of Aubrey's arrest and swarmed. Vodicka agreed.

While in the parking lot, Vodicka asked, "Do you know Debbie Tobolowsky?" The PI answered yes, and Vodicka said, "Will you please tell her that I'm sorry, and I never meant for any of this to happen?"

The second PI soon joined them, and the three went to a hotel room. One of the PIs had a video recorder, disguised as a pen, in his pocket. As they chatted, watching the Chicago Bears play the Green Bay Packers, one PI raised the subject of Ira's murder.

"I mean, do you think he's capable of doing something like that?" There was a long pause. "Well, I guess everybody's capable, to some degree, but," the investigator said.

"I don't know," Vodicka said. "I'd say, if there were anybody that he would bust out of the gate, you know, cross a line, it'd be his brother. And he hasn't done anything, you know, like that on his brother."

During the hourlong exchange, Vodicka said nothing definitive about Ira's murder.

---



Tobolowsky lays out all the homemade evidence in his Lovers Lane law office as he attempts to solve the mystery of who killed his father.

In mid-November, Detective Ermatinger went to Michael's law office to let him know where the case stood. He brought another detective, Dale Richardson. After the men took seats in Michael's office, Ermatinger said that he was retiring. Though he didn't share this with Michael, his decision

**D** LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ◇ | SUBSCRIBE | Leave Us Feedback

NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS

Richardson would take over.

Michael had a question. If they found no more evidence, did prosecutors have enough to file a case? No, the detectives answered. They had good circumstantial evidence against Aubrey, but nothing that placed him at the house on May 13.

As Michael walked them out, he told Richardson he'd leave him alone for the next two weeks as he got up to speed on the case. Richardson said he would appreciate that. He told Michael about a mom who had been calling him every week since her son's murder three years ago. Michael wondered whether he would wind up like that mom, calling detectives every week— forever?

Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close. He says detectives executed more search warrants on the Tobolowsky case—roughly 18—than on any other case he'd worked. Most of those dealt with Aubrey and Vodicka; others were for cell tower dumps.

"They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them. We like to have a fingerprint at the scene or catch them on a video or, of course, DNA is even better than a fingerprint. They provided all those samples, but we can't match anything at this time."

Family members also worry about the lack of physical evidence. While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects. "I'm deathly afraid we've spent all our time focused on them, and someone else is out there laughing, thinking they got away with it," she says.

Aubrey declined an interview for this story but did respond to questions over email. "Ermatinger is a lying sack of shit," he wrote. Aubrey says his arms were not red when detectives picked him up. He offered a list of Ira's adversaries, asking why those people were never pursued by police. His only connection to Ira, Aubrey says, was a string of lawsuits—just words, no threats. As for the emails to his mother, he says he only threatened to expose her behavior. "I did not say I would physically harm her or anybody," Aubrey wrote. Aubrey says he was not hiding from police after the fire, that he was at the second apartment, and he says the equipment that police found—the drill, plumbing supplies, gas containers—was left over from when he did maintenance on his house in Austin.

"I did not kill Ira, nor do I know who did," Aubrey wrote.

———————————————————————————————————





ger Home: Debbie Tobolowsky won't return to the house she shared with her husband, Ira, even after it has been repaired. "Because he was murdered there, I felt violated."

One afternoon in January, Ira's eldest son, Jonathan, and one of the family's private investigators went to see Aubrey's younger brother, Tom. Tom had been the one member of the family who had taken Aubrey's side during the inheritance battle. The police hadn't interviewed Tom, and the Tobolowskys wondered if he was still in touch with Aubrey. Jonathan knocked on the door of his Dallas home and introduced himself and the investigator, calling her "his friend Rachel." Tom invited the pair inside. Jonathan had the pen video camera clipped to his shirt between two buttons.

"Thank you for letting us in," Jonathan said, as they settled in chairs in the living room.

"No problem," Tom said.

Jonathan got to the point: "Do you think he did it?"

"That was my first instinct, yeah," Tom said.

"I mean, you know him. He's your brother," Jonathan said. "Is he capable of something like this?"

"Well, it's hard to imagine, but obviously somebody did it," Tom said. "Like I said, that was my first instinct, but it's very difficult to imagine somebody that you grew up with killing somebody."

Jonathan asked if Tom would be willing to help the family by calling Aubrey.

"I don't know that he'd be stupid enough to tell me something," Tom said. He hadn't spoken to his brother since before the fire. Tom continued: "He had the perfect upbringing, but then he's had a really shitty last eight or nine years. ... Several years ago, if he had killed Buck, I wouldn't have been surprised."

"Really? I didn't know it was that bad," Jonathan said.

"It was that bad," Tom said.

Case 0:18-cv-61117-BB   Document 106   Entered on FLSD Docket 10/22/2018   Page 120 of 159

https://www.dmagazine.com/publications/d-magazine/2017/may/ira-tobolowsky-lawy...

LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ✿ | SUBSCRIBE | Leave Us Feedback

**NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS**

battle," Tom said.

"I mean, that's a very hard thing to hear, to be honest with you," Jonathan said.

After a half-hour, the men exchanged phone numbers. Tom said he was sorry for all the Tobolowsky family had been through and told Jonathan to call anytime.

---

These days, Michael arrives at the office around 6 am. He likes to get his legal work done early, so he can spend the rest of the day trying to push his father's murder investigation forward. His office is filled with whiteboards, columns detailing lists of motive and opportunity and evidence. One whiteboard lists 10 suspects in his dad's death. He has crossed off only two, his mother and neighbors. Like his mother, he fears police may not have done enough work to rule out any of the rest.

He's still awaiting results from police on key evidence. Detectives sent the juice bottle to Quantico for analysis; forensic experts are trying to extract data from the wiped computer.

The Tobolowsky family worries whether the Dallas police have the resources to find Ira's killer. They've pinned their hopes on private investigators. Late last year, they learned Aubrey and Vodicka had moved to Florida. The men live in a bungalow surrounded by palm trees.

Aubrey continues filing motions in Dallas courts. He has taken aim at Michael. After hearing about one particularly hostile filing against her son, Debbie cried for two days. Michael worries about her. She has been living elsewhere, paralyzed about what to do next. She wanted to move back into the house after it was repaired, hoping to feel her husband's presence. But over time, she realized she couldn't go back.

"If he had died a natural death, it would have been different," she says. "But because he was murdered there, I felt violated. It became a place where something evil happened."

One afternoon recently, Ira's longtime paralegal, Leigh Allen, walked into Michael's office as he and his older brother, Jonathan, discussed the case.

"Are you ever going to stop investigating?" Allen asked.

Jonathan looked at her. He said, "Don't you know him better than that by now?"

Michael vows he will never stop. He knows his father trusted the justice system, believed that everyone was innocent until proven guilty, and that the system generally works. He can hear his father telling him, *Life isn't fair. I'm not coming back either way. I don't want you sitting here, mourning me forever.*

With an arrest, with justice and closure, maybe Michael could move on. But not now. Because he can also hear his father saying, *Get the bastard.*

10/21/18, 2:49 PM

https://www.dmagazine.com/publications/d-magazine/2017/may/ira-tobolowsky-lawy...

**D**

LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ✿ | SUBSCRIBE | Leave Us Feedback

**NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS**

▶

CRIME

Keep me up to date on the latest happenings and all that *D Magazine* has to offer.

| Email |

---

## RELATED CONTENT

CRIME
**When the Bough Breaks**
JAMIE THOMPSON

LAW
**Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit**
JAMIE THOMPSON

MEDIA
**Sneak Peek: *D Magazine*'s May Issue, Which Explores Who Killed Ira Tobolowsky**
MATT GOODMAN

COMMENTS

10/21/18, 2:49 PM



LIFE IN COLOR COMPETITION | DIRECTORIES | EVENTS | PODCASTS | MAGAZINES ⚙ | SUBSCRIBE | Leave Us Feedback

**NEWS   FOOD   ARTS   HOME   HEALTH   CHARITY   BUSINESS   WEDDINGS   NEIGHBORHOODS**

Start the discussion…

**LOG IN WITH**



**OR SIGN UP WITH DISQUS** ⑦

Name

Be the first to comment.

ALSO ON **D MAGAZINE**

**Overreaction to Last Night's Mavericks Loss**

Mavellas — I know, I know...we had such high hopes they would go through an undefeated season.Lesson learned: if you allow the ...

**Tim Rogers' Patented Season-Starting Super Awesome Good Mavericks …**

Opinion — goodi say 43

**Dallas, The City That Hates Pedestrians: Part 15**

R Fleming — I don't, i'm sorry. But i drove by that intersection 4x a day on school back-and-forths, and i saw someone …

**Who Approved This Cartoon That Ran in Yesterday's Star-Telegram?**

Jim Lowell — The PC Police in action at D Magazine, the home of thin-skinned liberals

✉ Subscribe     ➕ Add Disqus to your siteAdd DisqusAdd     🔒 Disqus' Privacy PolicyPrivacy PolicyPrivacy

---

**D MAGAZINE PARTNERS**

750 North St.Paul St.
Suite 2100
Dallas, Texas 75201

Tel: 214.939.3636
Fax: 214.748.4579

CONTACT US

NEWSLETTERS

**SECTIONS**
FrontBurner
Food & Drink
Arts & Entertainment
Nightlife
Home & Design
Shopping & Fashion
Health & Fitness
Business & Economy
Weddings

**PUBLICATIONS**
D Magazine
D Home
D CEO
Subscribe
Renew D Magazine
Subscriber Services

**COMPANY INFO**
About Us
Masthead
Job Openings
Internships
Awards
Customer Service

**ADVERTISE**
Media Kits
Events
Case Studies
Contact Us

**CONNECT**
Facebook
Twitter
Instagram
Pinterest
YouTube
LinkedIn
Google+
Reddit

---

Copyright © 2018, D Magazine Partners, Inc. All Rights Reserved. Privacy Policy

# EXHIBIT C

## to

## Plaintiffs' First Amended Complaint

# "A Place Where Something Evil Happened"

**NO LONGER HOME:**
Debbie Tobolowsky
won't return to the house
she shared with her hus-
band, Ira, even after it has
been repaired. "Because
he was murdered there, I
felt violated."



Ira Tobolowsky, a prominent lawyer,
was burned alive in his North Dallas garage.
A strong suspect quickly emerged.
So why can't the cops solve the case?



**The gentle beeping of her home security system roused Debbie Tobolowsky from bed. It was about 7:15 on a Friday morning, and her husband, Ira, had just opened the back door leading to the garage, headed off to work. Debbie had stayed up late the night before, working on details for their eldest son's wedding rehearsal dinner, checking on the white daisy arrangements, perfecting the seating chart. The event would be a production. Theirs was a large, prominent Jewish family with more than a dozen lawyers in it, including State District Judge Emily Tobolowsky. George Tobolowsky, the noted Dallas sculptor, was Ira's brother. One of his cousins was actor Stephen Tobolowsky, who played Ned Ryerson, the insurance salesman in *Groundhog Day*.**

Debbie knew that Ira was trying to leave the house without waking her. Her 68-year-old husband had a debilitating spine condition that turned his back into a portrait of pain. His shoulders were hunched, and he struggled to raise his arms above his chest or turn his neck, but he had learned to lift himself quietly from bed without disturbing his wife of 39 years.

About 30 minutes later, as she was getting ready in the bathroom, a blaring alarm startled her. She ran to the security system control panel in the bedroom, saw it said "Fire," and headed to the living room. From the back windows, she saw smoke drifting across the swimming pool. She opened the door to the garage, and hot, black smoke hit her face. The alarm company called, and Debbie told them to send help.

Debbie grabbed her purse and wedding ring, and leashed Oliver, their Cavalier King Charles spaniel. Within minutes, firefighters arrived and asked how to get into the garage. Debbie gave them a remote.

As soon as she stepped outside, she called Ira. Her call went straight to voicemail. She dialed his cell again and again. No answer. Firetrucks crowded their cul-de-sac as neighbors gathered on their lawns. Smoke billowed from the eaves of their sprawling brick ranch in North Dallas. Debbie thought, *Why isn't he answering?* Then it hit her. She ran to a firefighter who was looking through the garage windows.

"How many cars are in there?" she asked.

"Two," the firefighter said. "Why?"

Debbie screamed, "He's in there! My husband is in there! Get him out!"

The remote wouldn't work, so firefighters smashed through the garage door. As smoke blackened the sky, they sprayed water into the garage, then searched for Ira. Paramedics raced up the driveway with a gurney. After a couple of minutes, they bowed their heads and pushed the empty gurney away. Debbie fell to her knees.

**A REAL MENSCH:**
Ira with Oliver, the family's Cavalier King Charles spaniel. "If there was a time to lose Ira, it was not now," said Rabbi Adam Roffman at his funeral.



COURTESY OF THE TOBOLOWSKY FAMILY

**A homicide detective named Scott Sayers**
arrived at the house wearing a button-down and tie.
Detectives routinely respond to house fires involv-
ing deaths, but Dallas' 34-member homicide unit
was stretched thin in May of last year; they'd already
caught 10 murders in the past week. The detective
asked Debbie: "Do you think this was an accident,
or could someone have done this?"

"What do you mean?" she asked. She couldn't
think of anyone who wanted to hurt her husband.

Sayers poked around, then told the family
that Dallas Fire-Rescue would lead the investiga-
tion. Investigators combed through the wrecked
garage, trampled by firefighters wielding axes and
high-pressure hoses. They had broken through
walls and tossed the family's belongings from
a second-story media room into the swimming
pool. While firefighters were trained to use the
least destructive measures—to help preserve evi-
dence—that took a back seat to putting down flames.

It appeared that Ira had made it down the steps into the garage,
walked past his wife's car, and approached the driver's side of
his Lexus. They found his burned body there, lying in a small
space between the closed driver's side door and a wall lined with
mops and brooms. He still had his wallet and phone. Had Ira's car
caught fire? His phone? Investigators searched for flammable
liquids, examining shelves packed with Clorox wipes, Windex,
and paper towels. Gasoline fumes hung in the air.

Then they found their first big clue. In the back of the garage,
lying beside cardboard boxes, they found a large plastic juice
bottle with no label. It held a few ounces of what appeared to
be gasoline. Investigators asked Debbie if she or Ira drank juice.
Was there any reason for that plastic bottle to be in the garage?
No, she replied. They asked if the couple kept gas in containers.
No, she said. Her husband couldn't operate a lawn mower. They
kept no fuel or gas-powered equipment.

Investigators took photographs of the bottle and placed it in
an evidence can for testing. Was it possible, they wondered, that
someone had snuck up on Ira in daylight, in one of the city's saf-
est neighborhoods, doused him with fuel, and set him on fire?

The fire department was skilled at uncovering the cause of
fires. Murder investigations were another matter. But now it
appeared they were on the hunt for a killer.

**Michael Tobolowsky woke in a haze to the sound of his older**
brother, Jonathan, screaming. A half-hour after their father had
been found dead, Jonathan had gotten a call from his fiancée.
Ira's three sons were at a beach in Destin, Florida, for Jonathan's
bachelor party. The sons quickly booked return flights to Texas.

At a window seat, watching the landscape drift by below,
Michael struggled to process the idea that his father was gone.
The 28-year-old had decided to become a lawyer after spending
summers in his dad's office, learning how to write motions and
briefs, following his dad around the courthouse. At 6-foot-4,
Michael had attended Trinity University on a partial basketball
scholarship, gone to law school in San Diego, and was in his third
year with a civil firm in Dallas. He spoke to his father every day,
always ending with, "All right, good shit. Talk to you later, Pops."

Before the flight, Michael had learned the fire might have been
set intentionally. The thought infused his grief with rage. Cramped
in his window seat, Michael felt his hands aching and realized
both fists were clenched. All he could think about was *Who?*



**FAMILY MAN:**
Ira and Debbie with their
three sons, (*from left*) Zach,
Michael, and Jonathan,
at a wedding in 2015.

Back in Dallas, by midmorning,
fire investigators still hadn't roped
off the house with police tape. Rel-
atives and friends walked all over
the yard. TV reporters broadcast live
from the cul-de-sac. The investiga-
tors kept asking whether Ira had enemies. Sure, family members
said, nearly every lawyer makes enemies. Ira had practiced law
for more than 45 years. They could run through a list of people
Ira had defeated or angered at one time or another. But among
them, one stood out.

**Steven Aubrey, middle son of a Dallas orthodontist who**
died in 2004, was fighting an inheritance battle with his mother,
who believed he'd come unhinged. He stood well over 6 feet tall
and carried 220 pounds packed with muscle, which he flaunted
in online ads for his services as a masseur. He promised strong
hands, professionalism, and discretion. Aubrey had graduated
from W.T. White High in Dallas and majored in finance at Texas
A&M. He lived in a $1 million house in Austin with his longtime
partner, Brian Vodicka, who had attended law school but was
on disability for medical conditions.

After the death of his father, Aubrey had grown unhappy with
how his 79-year-old mother, Betsy, and oldest brother, Buck,
had handled the estate. Aubrey accused Buck in court filings
of taking advantage of their mom and funneling family assets
into his own name. Over the years, the feud grew more heated,
and Betsy came to fear her son. "He has absolutely gone crazy
and is on a rampage like no other," she wrote to a relative. By the
end of 2012, she'd had enough and sent Aubrey an email saying
she had cut him out of her will.

Aubrey responded a few hours later: "You have 3 days to change
your mind and apologize to me or else. Or else I will make it my
mission to make the rest of your life miserable, as you deserve.
EVERYONE you have ever known will know what has happened
and the poor choices you have made. It is sickening to watch you
make threats with the money that dad made while you played
bridge. I guess I am lucky that what I got from you is thin good
looks but poor Buck got the 'lazy never had a job' part of you. ...
I don't know a single mother who would do what you have done.
You should never have had children."

But Betsy refused to change her will or apologize to her son.
About two weeks later, she called police to report a break-in at her

COURTESY OF THE TOBOLOWSKY FAMILY



**BAD SIGN:**
Frustrated with the lack of results in the investigation into Ira's murder, the family bought a billboard ad on Central Expressway.

home. A few pieces of art with sentimental value had been stolen. But she also discovered that someone had let loose in her house four pet-store rats. Everyone in her family knew she was terrified of rats. She suspected her middle son, though Aubrey said in an email to her that he had nothing to do with the rats. Betsy and Buck told the court that they thought Aubrey might hurt them, and a judge issued peace bonds forbidding Aubrey from contacting them for one year.

Aubrey responded by calling the judge a lesbian and continuing to file lawsuits against his mother. Eventually, Betsy sought help at a small law office on Lovers Lane run by Ira Tobolowsky.

**Ira first met Aubrey in August 2014. They sat across a table** from each other at a deposition in downtown Dallas. Aubrey, 53, working without a lawyer, was there to question his mother. Some lawyers take passive roles in depositions, objecting to questions for the record but then letting their clients answer them. Not Ira. After Aubrey asked his first question—for his mother to state her name—Ira objected. For the first hour, the mother barely talked, as her lawyer sparred with her son. Over the four-and-a-half-hour deposition, Ira objected more than 200 times. From the transcript, it's clear the interruptions frustrated Aubrey.

Aubrey: "Can you just be quiet?"

Ira: "You're wasting my time."

Aubrey: "I don't care about your time."

Two weeks after the deposition, a fax machine in Ira's office churned out a 118-page lawsuit in which Aubrey petitioned the court for a temporary restraining order against Ira. After the machine finished printing, Aubrey faxed the lawsuit five more times. Ira fumed as the machine spat out hundreds of pages, until his paralegal finally unplugged it. Ira searched online for the suit, but it was never officially filed.

The next week, Aubrey tried to set a deposition for September 26, during Rosh Hashana. Ira thought Aubrey did it just to irritate him and asked for a date change.

Aubrey faxed his response: "Jews spend these days working to amend their behavior and seeking forgiveness for wrongs done during the past year. My suggestion: you attend the scheduled deposition and amend your behavior while there. Perhaps God will forgive you for your many wrongs during the past year and previous depositions." He included a list of Jewish holidays, asking if Ira planned to take off work for all of them.

Ira filed a motion for contempt. "ANTI-SEMITISM SHOULD

NOT BE TOLERATED BY THIS COURT. PLAINTIFF'S RESPONSE IS FRAUGHT WITH INNUENDO AND OUT-RIGHT ANTI-JEWISH REMARKS THAT ARE INSULTING, CRUEL, AND EVIL."

Aubrey's response: "TOBOLOWSKY'S PATTERN IN ALL OF HIS FILINGS IS TO RANT AND RAVE IN BOLD UPPER-CASE LETTERING WHEN HE WANTS TO COERCE THE COURT TO BELIEVE SOMETHING THAT IS NOT TRUE."

The legal battle dragged on as Aubrey filed lengthy motions against his mother. Responding to them began to consume Ira's law practice. But nearly every time the men appeared before a judge, Ira won. Given the venom of Aubrey's filings, Ira and his paralegal, Leigh Allen, joked about locking the front door, and they did for a time. Ira wondered aloud whether Aubrey was violent. But mostly he laughed about the case, Allen says. "We felt like we were fighting the good fight," she says, "defending a mother against her hateful son."

Three days before Ira was set to question Aubrey under oath in a deposition, Aubrey nonsuited the case. It was the legal equivalent of: never mind. Ira had won, but by that point, Aubrey had accused him of bribery, witness tampering, and a host of other crimes. In one filing, he compared Ira to an "ISIS butcher." After all that, Ira was not ready to walk away. And, in any case, he figured Aubrey wasn't finished with his harassment.

**Ira enlisted a longtime colleague, Steve Schoettmer, a for-**mer linebacker for Duke University who worked at Thompson & Knight, to file a defamation suit against Aubrey in the summer of 2015. "He just desperately wanted them to stop," Schoettmer says. "And he'd become resigned that the only way they would stop was if a court ordered them to." "They" were Aubrey and his domestic partner, Brian Vodicka, whom Ira made a co-defendant in the defamation suit.

But Ira also wanted to end Aubrey's ability to sue his mother by having him declared a vexatious litigant, a rare designation that, if granted, would require Aubrey to get approval from a judge to file further motions or lawsuits. Ira and his paralegal prepared a 367-page document detailing Aubrey's history. In two years, he had filed seven lawsuits against his mother in different courts. He had also sued her lawyers, her accountant, and three judges. Ira showed Aubrey's pattern: he'd file a lawsuit and clog the court with motions. If rulings didn't go his way, he'd sue the judge and demand recusal. If that didn't work, he'd nonsuit and file in a different court.

In February 2016, Judge Eric Moyé declared Aubrey a vexatious litigant and ordered him to pay his mother $250,000. He could no longer sue his mother, his brother, or Ira without permission.

But Ira continued with the defamation suit. In April 2016, five weeks before the fire, Aubrey and Vodicka came to Ira's office for a deposition. It had been a bruising couple of years for the couple. They had been involved in another contentious lawsuit in Austin, after they'd invested hundreds of thousands of dollars in a real estate deal that turned out to be a Ponzi scheme. They had to sell their $1 million house, and they moved to an apartment in Dallas. They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees. Aubrey had become estranged from his family. Ira had defeated Aubrey at every turn, stripped him of his ability to file lawsuits, and now was coming after him for defamation.

During the deposition, Ira and his attorney, Schoettmer, thought the 56-year-old Vodicka was impaired. He kept closing

COURTESY OF THE TOBOLOWSKY FAMILY

his eyes, mumbling about being in the bathtub that morning. Schoettmer asked if he was on medication.

"Yes, sir," Vodicka said.

"Tell me what the medication is for?" Schoettmer asked.

"It's anti-Ira medication," he said.

After about 30 minutes, Ira stopped the deposition and asked the men to leave. Aubrey and Vodicka refused.

"You invited us to be here. We're here," Aubrey said.

"And it's over with, and I'm asking everybody to please leave," Ira said. The men lingered, and Ira grew more stern. "Steven and Brian, will you please vacate my office now. These are my offices, this is my property, and I'm asking you all to leave. ... I'll be forced to have you escorted out of here."

The men left.

**Two days after the fire, more than 1,200 people packed** Congregation Shearith Israel for Ira's funeral. The police department assigned extra officers to patrol. Rabbi Adam Roffman acknowledged the anger felt by many over Ira's death. The familiar words of Ecclesiastes—to everything there is a season—would provide no comfort on that day, the rabbi said. "If there was a time for Ira to die, surely that day was not Friday," he said. "If there was a time to lose Ira, it was not now."

Police officers eyed the crowd packed with judges and attorneys. Ira's cousin Emily, the state district judge, was there, as was Judge Moyé, who had been presiding over the defamation case. Sheriff's deputies had been patrolling Moyé's home that weekend and had instructed him to carry a gun, fearing that he, too, might be in danger.

The day after the funeral, on Monday, fire investigators asked Dallas police homicide detectives for help. Detective Bob Ermatinger got the case. He had worked at the Dallas Police Department for three decades and was one of the detectives who had appeared on the A&E series *The First 48*, the title a reference to the premise that if cops didn't solve a case in the first two days, their odds of doing so decreased by half. Ermatinger came across as folksy on the show, tearing up with victims but coming down hard on suspects.

By the time Ermatinger got the Tobolowsky case, 72 hours already had passed. Investigators believed the perpetrator might have been burned, because Ira had been doused in a confined area of the garage. They needed to find the killer before any injuries had time to heal. Investigators had about half a dozen suspects on their list. That included: Debbie, neighbors, a lawyer Ira was trying to get disbarred, a patient of a plastic surgeon that Ira had defended, a lawn worker's son who had asked the family for money, and a potential client who had called Ira at all hours and left bizarre phone messages. Some of the suspects cooperated and provided alibis; others were looked at only on paper.

But after talking to Ira's relatives and colleagues, detectives turned their focus to Aubrey and Vodicka. The level of hostility the men had displayed toward Ira—and the fact that he'd recently defeated them in court—pushed the men to the top of their list.

On May 17, the Tuesday after the fire, detectives went to Aubrey and Vodicka's Dallas apartment. They planned to take the men in for interviews, according to search warrants. But no one answered the door. Two detectives noticed the blinds on a window were open

and angled upward. When they returned later, the blinds were closed. Both men's cars were in the parking lot.

The next day, Aubrey and Vodicka were scheduled to appear at a hearing in Ira's defamation case. Security was tight in the courtroom, as extra sheriff's deputies stood guard, but the men didn't show. From the bench, Judge Moyé announced his recusal. "I think at this point," he said, "with the allegations which have been made related to Mr. Aubrey and his implication in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case."

Later that day, detectives returned to the men's apartment. No answer. Aubrey's car was gone. Ermatinger called their phones and left messages and also sent them texts. No response.

Continued on **PAGE 125**





**IN THE HOT SEAT:** Steven Aubrey (above), one of the suspects Dallas police detectives investigated, during a taped deposition.

**KEEPING WATCH:** Ira's son found a suspicious hole (below) had been drilled in his father's backyard fence.

COURTESY OF THE TOBOLOWSKY FAMILY



**WHERE SOMETHING EVIL HAPPENED**
*Continued from PAGE 93*

Detectives began monitoring the men's credit card transactions and discovered that Aubrey's card had been used that day to book a room at the Crowne Plaza hotel in Dallas under the name Alexandra Krot (a friend who did spend the night at the hotel, police later learned). That night, at 9:30, Ermatinger got a judge to sign search warrants to examine Aubrey and Vodicka for burns and search their apartment. He was looking for combustible liquids, empty containers, medical supplies to treat burns, and gas receipts, according to the warrants. No one was at the apartment when police arrived, but detectives seized an Apple desktop computer and paperwork for burner phones.

By the next day, Thursday, detectives had learned that the men shared a second apartment, on Southwestern Boulevard. Plainclothes detectives watched and waited until about 3:30 PM, when they saw Aubrey and Vodicka get into their car, heading out for a late lunch. Police cars surrounded the men. Detectives jumped out with guns drawn and screamed, "Get down on the ground!" according to a complaint Aubrey would later file with DPD.

For the next nine hours, Aubrey was kept in an interrogation room, according to his complaint, which he provided to *D Magazine*. Detectives came by every so often and told him they were looking for a doctor to examine his skin for burns, according to a written statement from Aubrey's lawyer, Phillip Hayes. When a doctor finally arrived, he asked Aubrey to strip so he could examine him.

Ermatinger says Aubrey had red marks on both arms. But a SWAT doctor couldn't definitively say what the marks were from. "The doctor explained to us that it could be from the flash of a fire, it could be burns, or it could just be a sunburn," Ermatinger says. He says too much time had passed.

Ermatinger didn't have any physical evidence linking them to the crime scene. But the men remained strong suspects. They did not have good alibis, telling detectives that at the time of the fire, they were at their apartment. Phone records, detec-

tives told the Tobolowsky family, showed no activity on the men's cellphones from about 9 PM the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. The records did show cell activity before and after that time period.

Ermatinger would have to wait for crime scene technicians to search the men's computers and process the juice bottle found in the garage for fingerprints.

**Michael Tobolowsky,** the middle of Ira's three sons, stepped in to help with his father's law practice. At the time of Ira's death, his firm had never been busier. He had cases pending, clients waiting, deadlines looming. Michael needed to file extensions and reassure clients that they hadn't been forgotten. But as he read through his dad's email, one case drew his attention: Aubrey's.

The Thursday after Ira was killed—the day police detained Aubrey and Vodicka—more than a dozen Tobolowsky family members gathered at Ira's sister's house, around the block from the scene of the fire. Not knowing that police were interrogating suspects, the family set up headquarters, working on laptops at the kitchen table. At about 7 PM, Michael and his girlfriend stepped outside to get some air. They crossed the street and walked into the alley that runs behind Ira and Debbie's house.

Michael felt that he'd lost not just his dad in the fire, but the backdrop of his favorite memories. It had been a noisy, lively home, where the three Tobolowsky boys kicked soccer balls down the halls, shot carrots from slingshots, and slid little brother Zach down the stairs in a cardboard box. As Michael and his girlfriend walked down the alley that night, the air still smelled of smoke. Michael didn't think he'd ever be able to smell a campfire again without feeling ill.

He stopped to talk with a neighbor, then heard his girlfriend shout, "Michael!" She was staring at the wooden fence behind his parents' home. Michael saw a hole surrounded by what looked like black paint. It appeared to have been made recently. For someone of his height—the 6 feet and 4 inches that helped get him onto the team at Trinity—it provided a clear view to the garage where his father had died.

"Holy shit," he said.

The next morning, Detective Ermatinger had a look at the fence. He, too, thought it looked as if someone had drilled the hole. Crime scene technicians took the board for processing.

Detectives remembered seeing a drill at Aubrey and Vodicka's apartment and obtained warrants for another search.

When they searched it the following week, they found an Apple MacBook in the process of having its hard drive wiped clean, according to a later search warrant. They seized it for testing. From the two apartments, they also collected a cordless drill and bits, two red gasoline containers, a yellow propylene tank with a torch attachment, a blue propane torch, two cans of paint, and a couple of pairs of shorts and pants.

Aubrey refused to talk without a lawyer and said he couldn't afford one. Detective Ermatinger called Assistant District Attorney Gary McDonald, who helped find a public defender and also subpoenaed Aubrey to testify before a grand jury, a tactic prosecutors sometimes use when dealing with uncooperative witnesses. A few days later, the prosecutor questioned Aubrey before jurors. It would be a violation of law for anyone to reveal what exactly was said that day, but the proceedings didn't produce an indictment.

**Last September,** Michael left his law firm and took over his dad's practice full time. He had spent months debating the decision. He had his dream job, working in a civil firm on big contingency cases. He worried that his father's small practice might feel lonely, but he couldn't stand the thought of shutting it down. Now he spent every day behind his father's old mahogany desk. There were things about the office Michael wanted to change: the old wallpaper, the red and pink bathroom tiles. But he couldn't bring himself to touch anything that had been his dad's.

He focused on keeping his father's clients happy, but the murder investigation was a constant concern. The medical examiner had released preliminary findings. His father had died of burns, smoke inhalation, and blunt force injuries. The family desperately hoped that Ira had been knocked unconscious before the fire had been set.

Michael filled a whiteboard with evidence and photos of Aubrey and Vodicka. He still researched other suspects, but the more he learned about the two men, the more he believed they were responsible. Michael decided to keep representing Aubrey's mother and to move forward with his dad's defamation case.

His mother was furious. "How dare you do this to our family?" she said. "We have lost too much. What if I lose you, too?"

It didn't take Aubrey and Vodicka long to resume their legal filings, trying to undo Ira's work. Aubrey once again tried to get his mother removed from the family trust. Michael alerted the courts to Aubrey's designation as a vexatious litigant, but that designation only applied to Aubrey as a *pro*

*se* litigant. Vodicka had reactivated his law license and could file the lawsuits on his partner's behalf, sidestepping the need to get approval. Michael wanted to get Vodicka disbarred, to shut him down for good.

On September 12, Michael went to the courthouse for a hearing in the defamation suit. It was his first chance to see Aubrey and Vodicka since his dad's death, four months earlier. When Michael walked into the courtroom, his heart raced and his hands clenched into fists. He made a point to look both men in the eye. He wanted to see if he could tell whether they had murdered his dad. As the hearing went on, Schoettmer and Aubrey sparred, trading insults. It grew so tense that the judge ordered the parties to leave the court separately.

Michael and Aubrey emailed about the cases, and their discourse quickly turned contentious. "As luck (or bad luck) would have it, you were born into a filthy and dirty family," Aubrey wrote. Aubrey filed another lawsuit, this time accusing the *Dallas Morning News* of defamation for its coverage of the case. He was also suing Judge Moyé, Schoettmer, and Debbie.

Debbie had never been sued before, and she was frightened. Someone sent a blank piece of paper to her house, in an envelope with Aubrey's return address on it. To her, it seemed to be saying: *I know where you live.*

**Last fall,** after work, Michael stayed up late in his East Dallas town home watching true crime shows: *I (Almost) Got Away With It* and *Real Detective.* They made him feel normal again, somehow. He got to repeatedly experience that climactic moment when the cops finally caught the bad guy, the satisfying ending that his family longed for.

In the shows, murders were solved by single-minded detectives who were obsessed with their cases. In real life, the Dallas detectives were distracted and overworked, running from one murder to the next. 2016 was a tough year for the Dallas Police Department. A gunman ambushed officers downtown in July, killing five. The Tobolowsky family mourned the tragedy, but they knew it meant their case would take longer to solve. And then came the fiasco with the Police and Fire Pension System, which, teetering toward insolvency, drove scores of older, experienced cops to retire before they'd planned to in an effort to preserve their pensions.

As the months passed, the family began to lose hope that the police could solve Ira's murder. In 2016, there were 171 murder cases in Dallas, and police solved just half of them, falling below the national average of about 60 percent.

It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?'"

Most of the family thought Aubrey had killed Ira. But he was still free, living not far away in North Dallas. One afternoon Ira's sister saw Aubrey in Bed Bath & Beyond, and her knees buckled.

The family came to believe that investigators had bungled the case. Why had they waited six days before picking up Aubrey and Vodicka? If the men had burns, they'd had time to heal. Michael learned that the fence board with the hole had not been sent for testing to determine whether the black substance on it matched the cans of paint found in the men's apartments. He didn't believe police had collected all the available video footage. The family began filing their own public records requests to obtain footage from DART buses, but most agencies deleted video after 30 days. The family had tried to stay out of the detectives' way; now they regretted it.

They'd call detectives and get no response. Michael called one detective every single day for a week. Nothing. If a prominent North Dallas family couldn't get police to respond—one that had so many lawyers and a state and federal judge among its relatives—what must it be like for others with less means and access?

Michael contacted the investigator who had been hired by his parents' insurance company to examine the fire scene. A 29-year arson investigator, he told Michael that several days after the fire he had bagged a dozen pieces of evidence that he was surprised authorities had left behind. He had carefully archived the items to preserve chain of custody. He told Michael that he'd ruled out all other causes—faulty wiring, car fire—and was convinced someone had poured an ignitable liquid on his father and set him on fire. He found nothing in the garage that matched the fuel source. It had been brought into the garage that morning by the killer, he said. Also, he told Michael that there was a 50-50 chance the suspect had suffered burns. If so, it might look like a sunburn, he said.

The family had debated hiring a private investigator and finally decided to call around. They talked to a retired FBI agent who charged a $25,000 retainer. They talked to another guy who told them, "I'm gonna do some stuff, but I can't tell you because most of it's illegal." A third told them, "If you want to solve the case, you're going to have to do it yourselves."

In early October, Michael got an email from a pair of private investigators. "We are private investigators who simply have a low tolerance for scumbaggery and this case really bothers us," they wrote. Michael liked the email and agreed to a meeting. The pair offered to start pro bono, see what they could find, and Michael agreed. The family had put up a billboard on Central Expressway offering a $25,000 reward. If the investigators could solve the case, the money was theirs.

**As the family** was taking an active role in searching for Ira's killer, Dallas police were running an undercover investigation into the website masseurfinder.com. Aubrey regularly posted ads there, showing a picture of himself shirtless.

His ads read: "My goal is to offer male massage at its very best for ALL men of any curiosity, any size or any age. Professionalism and discretion are assured. I am a muscular 6'5", 220 lb fit and masculine masseur—smooth, friendly, easy going, intuitive, skilled and GIANT STRONG hands."

A police officer sent a text message to "Massage Bi Steve" in response to the ad and set up an appointment at the Hilton Anatole on Stemmons Freeway. Aubrey knocked on the door and walked in carrying a massage table, according to court records. They "started a casual conversation that turned into a sexual conversation," the officer wrote. Aubrey agreed to masturbation and sexual intercourse for $300. Officers booked Aubrey into jail on a prostitution charge.

That night, the Tobolowskys' private investigators got word of the arrest and went looking for Vodicka. In Aubrey's absence, they hoped he might talk. One of the PIs spotted him pulling into his apartment complex, carrying takeout. The PI identified herself as merely "an investigator" and offered to put him up in a hotel in case the media got word of Aubrey's arrest and swarmed. Vodicka agreed.

While in the parking lot, Vodicka asked, "Do you know Debbie Tobolowsky?" The PI answered yes, and Vodicka said, "Will you please tell her that I'm sorry, and I never meant for any of this to happen?"

The second PI soon joined them, and the three went to a hotel room. One of the PIs had a video recorder, disguised as a pen, in his pocket. As they chatted, watching the Chicago Bears play the Green Bay Packers, one PI raised the subject of Ira's murder.

"I mean, do you think he's capable of doing something like that?" There was a long pause. "Well, I guess everybody's capable, to some degree, but," the investigator said.

"I don't know," Vodicka said. "I'd say, if there were anybody that he would bust out of the gate, you know, cross a line, it'd be

his broth[…]
you kno[…]

During[…]
said noth[…]

**In mid-N[…]** 
went to M[…]
where the[…]
detective.[…]
took seats[…]
said that h[…]
share this[…]
retire was[…]
of the pen[…]
much of hi[…]
ble. He sai[…]
unsolved.[…]
good. Ric[…]

Michael[…]
more evide[…]
to file a ca[…]
They had[…]
against Au[…]
at the hous[…]

As Mic[…]
Richards[…]
next two w[…]
case. Ric[…]
that. He to[…]
been callin[…]
murder h[…]
whether h[…]
calling de[…]

Detecti[…]
the men r[…]
else on th[…]
tives exec[…]
Tobolows[…]
other case[…]
with Aub[…]
cell tower[…]

"They[…]
ones." Er[…]
dence to[…]
fingerpri[…]
video or[…]
fingerpri[…]
but we ca[…]

Family[…]
of physica[…]
men killed[…]
wonders[…]
ruled out[…]
afraid we[…]
them, an[…]
ing, think[…]

Aubre[…]
story be[…]
email. T[…]
he wrote[…]
when del[…]
a list of t[…]
people t[…]
only cou[…]

his brother. And he hasn't done anything, you know, like that on his brother."

During the hourlong exchange, Vodicka said nothing definitive about Ira's murder.

**In mid-November,** Detective Ermatinger went to Michael's law office to let him know where the case stood. He brought another detective, Dale Richardson. After the men took seats in Michael's office, Ermatinger said that he was retiring. Though he didn't share this with Michael, his decision to retire was based in part on the shaky state of the pension. He wanted to preserve as much of his retirement savings as possible. He said that he hated to leave Ira's case unsolved, but fresh eyes might do it some good. Richardson would take over.

Michael had a question. If they found no more evidence, did prosecutors have enough to file a case? No, the detectives answered. They had good circumstantial evidence against Aubrey, but nothing that placed him at the house on May 13.

As Michael walked them out, he told Richardson he'd leave him alone for the next two weeks as he got up to speed on the case. Richardson said he would appreciate that. He told Michael about a mom who had been calling him every week since her son's murder three years ago. Michael wondered whether he would wind up like that mom, calling detectives every week—forever?

Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close. He says detectives executed more search warrants on the Tobolowsky case—roughly 18—than on any other case he'd worked. Most of those dealt with Aubrey and Vodicka; others were for cell tower dumps.

"They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them. We like to have a fingerprint at the scene or catch them on a video or, of course, DNA is even better than a fingerprint. They provided all those samples, but we can't match anything at this time."

Family members also worry about the lack of physical evidence. While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects. "I'm deathly afraid we've spent all our time focused on them, and someone else is out there laughing, thinking they got away with it," she says.

Aubrey declined an interview for this story but did respond to questions over email. "Ermatinger is a lying sack of shit," he wrote. Aubrey says his arms were not red when detectives picked him up. He offered a list of Ira's adversaries, asking why those people were never pursued by police. His only connection to Ira, Aubrey says, was a

string of lawsuits—just words, no threats. As for the emails to his mother, he says he only threatened to expose her behavior. "I did not say I would physically harm her or anybody," Aubrey wrote. Aubrey says he was not hiding from police after the fire, that he was at the second apartment, and he says the equipment that police found—the drill, plumbing supplies, gas containers—was left over from when he did maintenance on his house in Austin.

"I did not kill Ira, nor do I know who did," Aubrey wrote.

**One afternoon** in January, Ira's eldest son, Jonathan, and one of the family's private investigators went to see Aubrey's younger brother, Tom. Tom had been the one member of the family who had taken Aubrey's side during the inheritance battle. The police hadn't interviewed Tom, and the Tobolowskys wondered if he was still in touch with Aubrey. Jonathan knocked on the door of his Dallas home and introduced himself and the investigator, calling her "his friend Rachel." Tom invited the pair inside. Jonathan had the pen video camera clipped to his shirt between two buttons.

"Thank you for letting us in," Jonathan said, as they settled in chairs in the living room.

"No problem," Tom said.

Jonathan got to the point: "Do you think he did it?"

"That was my first instinct, yeah," Tom said.

"I mean, you know him. He's your brother," Jonathan said. "Is he capable of something like this?"

"Well, it's hard to imagine, but obviously somebody did it," Tom said. "Like I said, that was my first instinct, but it's very difficult to imagine somebody that you grew up with killing somebody."

Jonathan asked if Tom would be willing to help the family by calling Aubrey.

"I don't know that he'd be stupid enough to tell me something," Tom said. He hadn't spoken to his brother since before the fire. Tom continued: "He had the perfect upbringing, but then he's had a really shitty last eight or nine years. ... Several years ago, if he had killed Buck, I wouldn't have been surprised."

"Really? I didn't know it was that bad," Jonathan said.

"It was that bad," Tom said.

Tom said he had seen his brother and Ira face off in court, and it had always seemed professional, not particularly contentious. "I think he had a bit of a love-hate relationship with your dad. ... I think he enjoyed the sparring, the battle," Tom said.

"I mean, that's a very hard thing to hear, to be honest with you," Jonathan said.

After a half-hour, the men exchanged phone numbers. Tom said he was sorry for all the Tobolowsky family had been through and told Jonathan to call anytime.

**These days,** Michael arrives at the office around 6 AM. He likes to get his legal work done early, so he can spend the rest of the day trying to push his father's murder investigation forward. His office is filled with whiteboards, columns detailing lists of motive and opportunity and evidence. One whiteboard lists 10 suspects. He has crossed off only four: his mother, the neighbors, a former client, and the lawyer Ira was trying to get disbarred. Like his mother, he fears police may not have done enough work to rule out any of the rest.

He's still awaiting results from police on key evidence. Detectives sent the juice bottle to Quantico for analysis; forensic experts are trying to extract data from the wiped computer. But the Tobolowsky family worries whether the Dallas police have the resources to find Ira's killer. They've pinned their hopes on private investigators. Late last year, they learned Aubrey and Vodicka had moved to Florida. The men live in a bungalow surrounded by palm trees.

Aubrey continues filing motions in Dallas courts. He has taken aim at Michael. After hearing about one particularly hostile filing against her son, Debbie cried for two days. Michael worries about her. She has been living elsewhere, paralyzed about what to do next. She wanted to move back into the house after it was repaired, hoping to feel her husband's presence. But over time, she realized she couldn't go back.

"If he had died a natural death, it would have been different," she says. "But because he was murdered there, I felt violated. It became a place where something evil happened."

One afternoon recently, Ira's long-time paralegal, Leigh Allen, walked into Michael's office as he and his older brother, Jonathan, discussed the case.

"Are you ever going to stop investigating?" Allen asked.

Jonathan looked at her. He said, "Don't you know him better than that by now?"

Michael vows he will never stop. He knows his father trusted the justice system, believed that everyone was innocent until proven guilty, and that the system generally works. He can hear his father telling him, *Life isn't fair. I'm not coming back either way. I don't want you sitting here, mourning me forever.*

With an arrest, with justice and closure, maybe Michael could move on. But not now. Because he can also hear his father saying, *Get the bastard.* **D**

*Write to jamie.thompson@dmagazine.com.*

# EXHIBIT D

## to

## Plaintiffs' First Amended Complaint

# Who wanted Ira Tobolowsky dead?



**Read the story in
*D Magazine*'s May issue.**
ON NEWSSTANDS NOW

# EXHIBIT E

## to

## Plaintiffs' First Amended Complaint

**D**



CRIME

# The Unsolved Murder of Ira Tobolowsky

**The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it.**

BY TIM ROGERS   PUBLISHED IN FRONTBURNER   MAY 8, 2017   10:00 AM

The May issue of *D Magazine* features a story by Jamie Thompson about the
murder of Ira Tobolowsky. A year ago, the prominent lawyer was burned
alive on a Friday morning in his North Dallas garage. Police still don't know
who did it. But the Tobolowsky family thinks they know who the killer is.
The story is now online.

I asked Jamie about her reporting process and what she had to leave out of
the story that she wished we'd had the space to include.

I followed the news about Ira's death when it happened. I live
about 10 minutes from his house, and it is rare for someone to be
murdered in this part of North Dallas. Rarer still that it would be a
respected attorney, killed in such a violent way, as he's about to
climb into his Lexus and head to his law office. I thought I might
want to write something about it. After about six months—when
no one had been charged with the murder—I decided to look into
the case.

I reached out to Jonathan Tobolowsky, the eldest brother, toward
the end of last year, told him I'd like to meet with him and his two
brothers. They weren't sure they wanted to do a story, but agreed

The Unsolved Murder of Ira Tobolowsky - D Magazine                    https://www.dmagazine.com/frontburner/2017/05/the-unsolved-murder-of-dallas...

to get together and talk about it. We met for lunch at Mi Cocina in West Village. I didn't take any notes or record. We just chatted and got to know each other. Jonathan seemed the most hesitant. He had to get up and leave the table at one point, because talking about his dad's death upset him so much. He looked me in the eye at one point and said something like: We don't want to be a crazy story. If we do this, you will write this story, then move on. We will still be here, without our dad. This isn't just a story to us. Someone stole our father from us. We want that person to be caught and to pay for what they've done.

I started out thinking the story would be part biography and part murder investigation. I interviewed several dozen people about Ira—the man, the father, the friend, the lawyer—and have several hundred pages of notes of interesting stories and interviews about him, and zero of that made it into the story. Of all the people I've written about over the years, it's rare that I encounter a person who was as beloved as Ira. People often talk about lost loved ones in adoring terms, but this man was LOVED. Nearly everyone I spoke to said the same things: Ira dropped everything and focused on whoever was in front of him in the moment. Ira was a loyal, faithful friend. I laughed my ass off and cried more than a few times, hearing Ira's relatives and friends talk about their times with him. He loved the law, loved his family and friends, loved living. Although he was often in excruciating pain due to his spine deformity, whenever anyone asked how he was doing, he'd say, "I'm terrific." It is my one regret that more of Ira didn't make it into the story.

But as the reporting unfolded, I began spending more and more time with Michael, Jonathan's brother, keeping up with the investigation. The story began to turn in that direction. In March, I talked to Michael at least once a day—sometimes multiple times a day—as I followed along. I was at his office at least once a week, sitting across from him as he sat in his father's chair, at his father's desk, trying to find justice for his dad.

Ira's death shook—probably forever—how his family and friends and acquaintances feel about their own safety. Michael sleeps with a gun in his nightstand. After learning so much about Ira's death, I, too, got a little paranoid, making sure my keys were in my hand when I walked out of my house into the garage toward my car, making sure no one was out there. That's part of what's so unsettling about this crime. If a lawyer like Ira could get murdered in daylight in a safe neighborhood, it starts to strip away everyone else's feelings of safety.

I have no doubt that this family will not rest until they discover, for certain, who killed Ira. They believe that if the tables had been turned, and one of them had been murdered, Ira would have done the same, probably to an even greater extent than what they are doing.

**CRIME**

**Get a weekly recap in your inbox every Sunday of our best stories from the week plus a primer for the days ahead.**

Email

---

## RELATED CONTENT



**CRIME**
**Shooter Loose in East Dallas**
PETER SIMEK

**Barrett Brown Writes About His Case for the First Time**
TIM ROGERS

**Drive-By Shooting in Highland Park**
TIM ROGERS

COMMENTS



The Unsolved Murder of Ira Tobolowsky - D Magazine       https://www.dmagazine.com/frontburner/2017/05/the-unsolved-murder-of-dallas...

0 Comments     D Magazine                                                    ● Login

♡ Recommend  10        ▼ Tweet       f Share                         Sort by Oldest

    Start the discussion…

LOG IN WITH              OR SIGN UP WITH DISQUS ⑦

Ⓓ f G                    Name

                         Be the first to comment.

ALSO ON D MAGAZINE

**Leading Off (10/12/18)**

— What a lame way to signal that we've entered a new dimension.(Thanks for catching that! Double thanks for the ...

**These Dallas-Fort Worth Restaurants Are Giving a Discount to Voters**

— That's illegal and opens the door to anyone who is unhappy with how the election turns out to challenge the results.

**Dallas, The City That Hates Pedestrians: Part 15**

— I don't, i'm sorry. But i drove by that intersection 4x a day on school back-and-forths, and i saw someone ...

**Who Approved This Cartoon That Ran in Yesterday's Star-Telegram?**

— The PC Police in action at D Magazine, the home of thin-skinned liberals

✉ Subscribe   ◉ Add Disqus to your siteAdd DisqusAdd   🔒 Disqus' Privacy PolicyPrivacy PolicyPrivacy

**D MAGAZINE PARTNERS**

750 North St.Paul St.
Suite 2100
Dallas, Texas 75201

Tel: 214.939.3636
Fax: 214.748.4579

CONTACT US

NEWSLETTERS

**SECTIONS**

FrontBurner

Food & Drink

Arts & Entertainment

Nightlife

Home & Design

Shopping & Fashion

Health & Fitness

Business & Economy

Weddings

**PUBLICATIONS**

D Magazine

D Home

D CEO

Subscribe

Renew D Magazine

Subscriber Services

**COMPANY INFO**

About Us

Masthead

Job Openings

Internships

Awards

Customer Service

**ADVERTISE**

Media Kits

Events

Case Studies

Contact Us

**CONNECT**

Facebook

Twitter

Instagram

Pinterest

YouTube

LinkedIn

Google+

Reddit

Copyright © 2018, D Magazine Partners, Inc. All Rights Reserved. Privacy Policy

# EXHIBIT F

## to

## Plaintiffs' First Amended Complaint





Family Man: Ira and Debbie with their three sons, (from left) Zach, Michael, and Jonathan, at a wedding in 2015.

LAW

# Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit

**Neither Steve Aubrey nor Brian Vodicka, the defendants, appeared in court.**

BY JAMIE THOMPSON    PUBLISHED IN FRONTBURNER    MAY 9, 2017    10:01 AM

On Monday morning, when visiting Judge Don Cosby called to order his courtroom in downtown Dallas, he quickly noted the absence of the co-defendants in the case he was about to hear. Steve Aubrey and and his partner Brian Vodicka had moved to Florida. The original plaintiff in the case, Ira Tobolowsky, wasn't there either. He'd been murdered in his North Dallas garage on May 13, 2016.

This defamation suit was anything but usual. Ira's widow, Debbie, and their three sons were all in the courtroom. The sons had continued to pursue the case after their father's death. And they all believe that Aubrey killed Ira. Aubrey's unorthodox defense in the defamation case — some done *pro se*, some done by Vodicka, a lawyer — had consisted of numerous lengthy and venomous motions. But after the couple's move to Florida, they quit showing up at hearings. Two judges had voluntarily recused themselves from the case after Ira's death, and the Supreme Court of Texas had to appoint Cosby, a Fort Worth judge, to hear the case.

A key reason the family and police suspect Aubrey in the murder is the

personal animosity he showed against Tobolowsky, who had represented
Aubrey's estranged mother in a contested estate case. Aubrey strongly
denies that he had anything to do with Ira's death. Aubrey and Vodicka have
said in court filings that they are indigent and could not afford to travel to
Texas for the trial. They asked Judge Cosby if the court would pay for
travel and lodging. They also asked to appear by telephone. Cosby denied
that request.

The bailiff yesterday called out into an empty court corridor: "Mr. Aubrey?
Mr. Vodicka?" He walked back into the courtroom and shook his head. The
judge nodded. Time to begin.

Tobolowsky's attorney, Steve Schoettmer, rose and motioned to the empty
defense table. "I wish the defendants were here," Schoettmer said. "What
these two defendants do ... is that they sue people in order to destroy their
lives."

Schoettmer called his first witness, Ira Tobolowsky's youngest son, Zach,
who described seeing a blog post Aubrey had written about his father,
calling him a mortgage fraudster, jail bars superimposed over his picture.
Zach called Ira to tell him about the post.

"He was taken aback, to say the least," Zach testified. "He was very caught
off guard." What most upset Ira about the post was that it listed some
corporations he had formed for his clients. To take aim at him was one
thing, but maligning his clients was another, Zach said. Ira suspected
Aubrey was responsible. (Aubrey had first denied, but later admitted he had
written the post about Ira.)

Ira typically would downplay and laugh at anything that happened to him,
Zach said. "But this was different to me. I could tell that this truly affected
him in a serious way ... . The heart of a lawyer's success is their reputation.
That's all a lawyer has."

Schoettmer put a picture of the post on an overhead projector in the
courtroom, showing it had been viewed more than 800 times. How many
times had that post been seen by potential clients thinking of hiring Ira? It
was likely that at least a handful of people had viewed the post and decided
against hiring him, his family said.

Schoettmer called his second witness, Ira Tobolowsky's middle son,
Michael. Michael took the judge through his father's work in defending
Aubrey's mother, showing how contentious the litigation had become.
Schoettmer put on the screen an affidavit Ira had written before his death,
detailing the things Aubrey had said about him. That he was a crooked
lawyer, a fraudulent businessman. That he was part of a team of attorneys
who represented pedophiles. That he'd had a sexual relationship with the
CEO of the *Dallas Morning News*. Judge Crosby listened from the bench,
raising his eyebrows, shaking his head.

After every filing, Michael said, his father had called him. "It was very clear
Dad was stressed," Michael said. "I know he had a lot of emotion surface
every single time they accused him of something like this. Dad had dealt
with crazy individuals in the past. He had dealt with evil individuals." But
this was different, he testified. "He'd spent so long and so much effort
building and creating a name for himself for being ethical, being honest,
being trustworthy." No one had ever attacked him like this before, with such
blatant lies, Michael said.

He told the judge that his father had a medical condition that had caused his spine to fuse and caused symptoms similar to arthritis. It was exacerbated by stress. His dad didn't like people to know this, but during times of stress, Ira needed more help doing basic tasks, like putting on his socks. He began asking his wife to put on his socks during the litigation with Aubrey, became more stooped and began looking tired.

After testifying for about an hour, Michael stepped off the witness stand. Schoettmer made his closing statement. He asked the judge to rule against the defendants and order them to pay $500,000 for mental anguish and damage to Ira's reputation. "It probably should be more," Schoettmer said. "But this has never truly been about going to judgment for damages. This was about trying to absolutely stop the conduct that is so atrocious."

Schoettmer rested. All eyes turned toward Judge Cosby. He sat quietly for a minute or two, looking down. Then he raised his head and spoke. "I think the fear that this family, the Tobolowsky family, has endured over these past many months ... the court recognizes what has been happening," Cosby said. The plaintiff proved his case, Cosby said. He awarded the Tobolowskys $500,000. And then he went further.

In addition to the half a million the family had asked for, the court would grant them an additional $5 million. Hearing the number, Tobolowsky's eldest, Jonathan, sharply inhaled. He looked at his brothers. Their eyes filled with tears.

The judge looked at Tobolowsky's widow, Debbie, in the front row. "I'm sorry it's come this far."

Debbie Tobolowsky started to weep, as did the other family members in the courtroom. They rose and hugged. As they walked out into the hallway, Debbie looked at her sons. "I wish your father had been here to see this," she said. "He would be proud." She turned toward her dead husband's friend and attorney, Schoettmer, a former linebacker who also was in tears. "Steve, you did an amazing job," she said. He nodded quietly.

In the year since Ira's death, the family has had little relief. For that one brief moment on Monday, the legal system that Ira had loved seemed to stand behind him.

"The judge seemed to be sending a message," Debbie said. "He seemed to be saying that he believed those guys were lying. That he respected Ira. That Ira didn't deserve this. It felt like the judge was saying, 'I'm with you. I feel your family's pain.'"

For the youngest of Ira's sons, Zach, the verdict felt as if one small painful chapter had come to a close. "For us, this was about finishing a fight for our father," he said.

"I genuinely lost my breath," Jonathan said of the verdict. "For the first time since my father's death, I felt completely happy for a moment."

The middle son, Michael, who has taken over his father's law practice, also felt relieved. But he and the rest of the family know their fight is not over. The verdict will be appealed. More motions will be filed. Aubrey and Vodicka claim to be indigent, so there seems little possibility of ever collecting any money. Most important, they still don't know if police will ever solve their father's murder case.

Michael walked out of the courthouse into the sunlight, relishing the
verdict, but planning to soon return to his father's law office. There he
would take his seat behind his father's desk and continue working to solve
his murder.

When asked for comment over email, Aubrey wrote: "I hope this trial gives
the Tobolowsky family the closure they have been so desperate to find."

LAW

**Get a weekly recap in your inbox every Sunday of our best stories from the week
plus a primer for the days ahead.**

Email

## RELATED CONTENT



CRIME
**'A Place Where Something
Evil Happened'**
JAMIE THOMPSON



MEDIA
**Sneak Peek: *D Magazine*'s
May Issue, Which Explores
Who Killed Ira Tobolowsky**
MATT GOODMAN



CRIME
**The Unsolved Murder of Ira
Tobolowsky**
TIM ROGERS

COMMENTS



5 Comments     **D Magazine**                                                      🔘 Login

♡ Recommend  4          🐦 Tweet      f Share                                        Sort by Oldest

     Join the discussion…

LOG IN WITH        OR SIGN UP WITH DISQUS ⓘ

🔵 f ⚪ G           Name

**Kathy Wise** Mod • a year ago
What an epilogue.
1 ∧ ∨ • Reply • Share ›

**Mavdog** • a year ago
olav ha-shalom
∧ ∨ • Reply • Share ›

**ecstatist** • 9 months ago
I wonder what skeletal problems Ira suffered from. The journalist I think should have mentioned it to make the reporting comprehensive, no shame in disease. It could be relevant as far as his death may have been suicide which he may have tried to disguise to protect his post mortem reputation. Many people including older generation Jews dogmatically consider suicide to be cowardly and shameful and he was known to be a tenacious fighter.
I take a guess at (progressive) ankalosing spondylitis. He exhibits the bending back that causes one's breathing volume to decrease and some times losing throat control to the point that it similar to waterboarding and can be the ultimate cause of a horrifying death. He may have wanted to protect his family from witnessing this kind of ending. Some of the drugs used to extend life are also used in cancer treatment with varying side effects.
I wonder what Ira's feelings were about homosexuals. Nevertheless I have great pity and sympathy for the man
There was too much innuendo to call the reporting balanced.
I fail to see how most Texas judges could be impartial dealing with the defamation of a fellow (dead) lawyer in the same generation as so many judges. Lawyers seldom criticize lawyers unless there is some money in it Consider their prejudices exhibited in patent cases so flagrant that patent cases are now disallowed in that part of Texas. Also their crazy responses to the Waco "motorbike gang" / "police gang" debacle.
The suspects certainly don't seem to be nice people but assume for a moment that they are actually innocent. And consider what their situation would be now if they were African- Americans!

The police pension or non pension should be an interesting story. Note how so many police are scrabbling to get "their fair share" probably leaving their brothers with an unfair share. I wouldn't like to be on the Titanic with them. Bet they would still vote for the same type of politicians that caused this problem or was some of this caused by police departments and cities being sued for their police misbehavior. Greed is good? Texas certainly doesn't need fiction writers.

see more

**Sandy** • 8 months ago
dd
∧ ∨ • Reply • Share ›

**Sandy** • 8 months ago
I would have to agree with "ecstatist." The reporting was not balanced. While the story mentions many potential suspects, it hides the identity of all except two. There does not seem to be anything factual connecting the two to the crime. It appears that because the reporter had no facts to give foundation to her story, she resorted to barrage of innuendo.

It is absolutely horrific what happened to this family. But I really hope the reporter does a more thorough reporting job on her next piece. For D to have its cover story be one about who they think may have committed a crime is lame.
∧ ∨ • Reply • Share ›

ALSO ON **D MAGAZINE**

**Who Approved This Cartoon That Ran in Yesterday's Star-Telegram?**
12 comments • 2 days ago
afterwood — The PC Police in action at D Magazine, the home of thin-skinned liberals

**Overreaction to Last Night's Mavericks Loss**
1 comment • 4 months ago
Mavdog — I know, I know...we had such high hopes they would go through an undefeated season.Lesson learned: if you allow the ...

**The Real Housewives of Dallas Recap: Battle of the Brunchers**
1 comment • 10 months ago
Rebecca Lofton — I'm shocked that Court takes anything Kam says seriously. I mean, come on - that pink, flashing, rose-topped ...

**Leading Off (10/17/18)**
1 comment • 4 days ago
Mavdog — https://www.bestbuy.com/sit...

✉ Subscribe    ⊕ Add Disqus to your siteAdd DisqusAdd    🔒 Disqus' Privacy PolicyPrivacy PolicyPrivacy

**D MAGAZINE PARTNERS**

750 North St.Paul St.
Suite 2100
Dallas, Texas 75201

Tel: 214.939.3636
Fax: 214.748.4579

CONTACT US

NEWSLETTERS

**SECTIONS**

FrontBurner

Food & Drink

Arts & Entertainment

Nightlife

Home & Design

Shopping & Fashion

Health & Fitness

Business & Economy

Weddings

**PUBLICATIONS**

D Magazine

D Home

D CEO

Subscribe

Renew D Magazine

Subscriber Services

**COMPANY INFO**

About Us

Masthead

Job Openings

Internships

Awards

Customer Service

**ADVERTISE**

Media Kits

Events

Case Studies

Contact Us

**CONNECT**

Facebook

Twitter

Instagram

Pinterest

YouTube

LinkedIn

Google+

Reddit

Copyright © 2018, D Magazine Partners, Inc. All Rights Reserved. Privacy Policy

10/21/18, 5:01 PM

# EXHIBIT G

## to

## Plaintiffs' First Amended Complaint

<u>AFFIDAVIT FOR SEARCH WARRANT</u>

| STATE OF TEXAS | § | Steven Benton Aubrey |
|---|---|---|
| | § | W/M/ 10-11-1960 |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

1.  There is in Dallas County, Texas, a suspected person described as follows: Steven Benton Aubrey, a white male with the date of birth 10/11/1960, 6'5" tall, 210 lbs, withTexas Driver's License number 03274252.

2.  The said suspected person as described in paragraph 1 is believed to have evidence in the form of injuries or burns and accordingly the affiant in this case requests to examine and photograph the body of Steven Benton Aubrey within accepted practices. Additionally, affiant requests to fingerprint subject Aubrey to verify his identity, as well as compare to any latent prints from the crime scene.

3.  It is the belief of Affiant, and he hereby charges and accuses that:  the above described individual has evidence on his body in the form of injuries and burns from an arson/murder offense that occurred on May 13, 2016 at 7435 Kenshire Lane in Dallas, Dallas County, Texas and documented on Dallas Police case number 114044-2016.

4.  Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 a.m. Dallas Fire Rescue and Dallas Police were called to a residential structure fire located at 7435 Kenshire Ln, Dallas, Dallas County, Texas.  Fire Rescue discovered the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.  During the investigation Detectives discovered that the victim Ira Tobolowsky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.  Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey.  It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court docket number 15-08135 in the 14th Judicial District Court Judge Eric Moye presiding.  Ira Tobolowsky is of Jewish descent and felt Jihad was an anti-Semitic statement. It is the belief of Detectives in this case as well as Arson investigators that the person who set fire to Complainant Tobolowsky could have burned themselves as the area of the burning was inside the garage in a small

confined space that would not allow for very much movement.  It is believed that whoever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives. On May 17, 2016, Detectives went to the location of 7777 Glen America and knocked on the door of #223 to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door. Detective R. Laurence #9191 and Detective D. Richardson #6361 initially observed the blinds in the window of apartment #223, the first window south of the front door, were open and slightly angled upwards with a darkened background. Detectives Laurence and Richardson left the location for a while and when they returned they observed the blinds to the same window closed and angled downward with a light on in the background, which indicated that someone had been in the apartment. Steven Aubrey's white Nissan Murano and Brian Vodicka's white Nissan Altima were both parked in the parking lot of their apartment. Neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside. A court hearing was scheduled on May 18, 2016 at 11:00 a.m. in civil suit between Complainant Tobolowsky and subject Aubrey.  Suspect Aubrey and Brian Vodicka did not appear. On May 18, 2016, at approximately 2:50 P.M. Detectives returned to the apartment of Steven Aubrey and Brian Vodicka. Detectives observed that Steven Aubrey's white Nissan Murano was no longer in the parking lot. Detectives knocked on the door to apartment #223 but there was no answer.  Detectives called both Steven Aubrey's phone number and Brian Vodicka's phone number but there was no answer, so Detective Ermatinger left them both a voicemail. Detective Ermatinger also sent a text message to both numbers but he did not receive a reply. Approximately 2½ hours after Detective Ermatinger sent the text messages, Detectives were notified by Steven Aubrey's credit card company that Aubrey's card was used at a truck stop in Belton, Texas, which is approximately two hours south of Dallas. A short time later, Detectives were notified that Steven Aubrey's card was used to book a hotel room at the Crowne Plaza Hotel in Dallas, Texas, but the room was booked under the name Alexandria Krot. The actions of Steven Aubrey and Brian Vodicka show that they are intentionally avoiding the Detectives.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected person which will allow affiant to examine, photograph and fingerprint  the subject identified in paragraph 1.

AFFIANT

Subscribed and sworn to before me by the said affiant on this _____ 18 _____ day of _____ , 20 16 .

DISTRICT JUDGE, DALLAS COUNTY, TEXAS

**SEARCH WARRANT**

| STATE OF TEXAS | § | Steven Benton Aubrey |
|---|---|---|
| | § | W/M/ 10-11-1960 |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

THE STATE OF TEXAS to any Sheriff or any Peace Officer of Dallas County, Texas, or any Peace Officer of the State of Texas.

GREETINGS:

WHEREAS, the affiant whose name appears on the affidavit in support of this warrant is a peace officer under the laws of the State of Texas and did swear to that affidavit before me or someone authorized to take the affiant's oath under the laws of this state.  I find the verified facts stated by affiant in the affidavit show that affiant has probable cause for the affiant's belief expressed in the affidavit, and those facts establish the existence of proper grounds for issuance of this Warrant:

NOW, THEREFORE, you are commanded to go to the accused person identified as Steven Benton Aubrey, a white male with the date of birth 10/11/1960, 6'5" tall, 210 lbs,  with Texas Driver's License number 03274252 and then examine, photograph and fingerprint said Steven Aubrey within accepted practices.

Herein fail not, but have you then and there this Warrant within three days, exclusive of the day of its issuance and exclusive of the day of its execution with your return thereon, showing how you have executed the same.

ISSUED AT _9 : 23_ o'clock _P_. M., on this the ___18th___ day of ___May___, 20_10_, to certify which witness my hand this day.

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

# EXHIBIT H

to

## Plaintiffs' First Amended Complaint

## AFFIDAVIT FOR SEARCH WARRANT

STATE OF TEXAS          §        Residence located at
                        §        7777 Glen America #223
COUNTY OF DALLAS   §        Dallas, Dallas County, Texas


1.  There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at 7777 Glen America #223 Dallas, Dallas County, Texas. The residence is an apartment complex called Tonti Lakeside Apartments. The Apartment in question is located on the second floor and is a red brick structure the number 223 is located on the top center of the door.

2.  There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense:  Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases.  Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing, blood,shoes,weapons of any kind.  Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3.  Said suspected place and premises are in charge of and controlled by each of the following persons: StevenBenton Aubrey W/M 10/11/60 and Brian Edward Vodicka W/M 08/09/59 who are on the lease argeemnet for the address listed in this warrant. The lease agreement was dated on 2/07/16.

4.  It is the belief of Affiant, and he hereby charges and accuses that:  the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns.  Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases.  Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing, blood,shoes,weapons of any kind.  Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor that can be sent to a laboratory and compared to evidence found at the scene. 7777 Glen America #223 Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at 7435 Kenshire Ln, Dallas, Dallas County, Texas.  Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.   During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.  It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding. Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.  Detectives went to the location of 7777 Glen America and knocked on the door of #223 to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____ 5051
AFFIANT

Subscribed and sworn to before me by the said affiant on this _18th_ day of _May_, 20_16_.

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

## SEARCH WARRANT

| | | |
|---|---|---|
| STATE OF TEXAS | § | Residence located at |
| | § | 7777 Glen America #223 |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

THE STATE OF TEXAS to any Sheriff or any Peace Officer of Dallas County, Texas, or any Peace Officer of the State of Texas.

GREETINGS:

WHEREAS, the affiant whose name appears on the affidavit in support of this warrant is a peace officer under the laws of the State of Texas and did swear to that affidavit before me or someone authorized to take the affiant's oath under the laws of this state. I find the verified facts stated by affiant in the affidavit show that affiant has probable cause for the affiant's belief expressed in the affidavit, and those facts establish the existence of proper grounds for issuance of this Warrant:

1.  NOW, THEREFORE, you are commanded to enter **the suspected place and premises described in said Affidavit and to there search premises, persons, and vehicles described as follows:** A private residence located at 7777 Glen America #223 Dallas, Dallas County, Texas.  The residence is an apartment complex called Tonti Lakeside Apartments.  The Apartment in question is located on the second floor and is a red brick structure the number 223 is located on the top center of the door.

2.  Any combustible liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns.  Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases.  Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind.  Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.  7777 Glen America #223 Dallas, Dallas County, Texas..

If you find the above described items, you are to seize that property and dispose of the items as provided by law.

Herein fail not, but have you then and there this Warrant within three days, exclusive of the day of its issuance and exclusive of the day of its execution with your return thereon, showing how you have executed the same.

ISSUED AT _9:35_ o'clock _P_. M., on this the _18th_ day of _May_ 20_16_ to certify which witness my hand this day.

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

# EXHIBIT I

## to

## Plaintiffs' First Amended Complaint

## AFFIDAVIT FOR SEARCH WARRANT

| | | |
|---|---|---|
| STATE OF TEXAS | § | Residence located at |
| | § | 8617 Souhwestern Blvd #911 |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

1.  There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at 8617 Southwestern Blvd #911 Dallas, Dallas County, Texas.  The residence is an apartment complex called The North Bridge Apartments located in the Village apartment comunity. The Apartment in question is located on the first floor and is a red brick structure with the top floors being gray wood.  The number 911 is to the right of the door.

2.  There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense:  Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases.  Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing, blood,shoes,weapons of any kind.  Tools or drills and drill bits that could be used to drill a hole in a wood fence.  Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3.  Said suspected place and premises are in charge of and controlled by each of the following persons:  StevenBenton Aubrey W/M 10/11/60 who uses this location for business purposes to meet clients and give massage therapy.  Brian Vodicka who is steve Aubreys boyfriend stated in an interview that the apartment is used for this purpose.

4.  It is the belief of Affiant, Detective Scott Sayers #7157 who is employed by the Dallas Police Department for 21 years and who has been assigned to the Homicide unit does hereby charges and accuses that:  the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing,

blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence.  Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.  8617 Southwestern Blvd #911 Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at 7435 Kenshire Ln, Dallas, Dallas County, Texas.  Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.   During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.  It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.  Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.  Detectives went to the location of 7777 Glen America and knocked on the door of #223 to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Detectives executed a search warrant on Steven Aubrey and Brian Vodicka's Apartment located at 7777 Glen America #223 on May 19th 2016. After searching the apartment detectives received information from the complainants family about some holes that were drilling in the complianants fence so that someone could observe the complainant coming and going from his residence without being seen.  The holes were located on the far southeastern part of the fence and gave a clear hidden view from the Alley of the complainants garage. Detective Richardson remembers seeing a dril and dril bits inside the apartment at the time of the execution of the warrant but

detectives had not received the information about the suspicious holes till after the warrant was executed.  It is believed that the drill and drill bits need to taken for examination purposes  to determine if in fact it was used to drill the suspicious holes in the complainants fence.  Steven Aubrey was finally located coming out of 8617 Southwestern Blvd #911 and was taken to Dallas Headquarters to be photographed and interviewed.  The apartment that he came out of was never searched for the above listed items.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____
AFFIANT

Subscribed and sworn to before me by the said affiant on this _25__ day of ___M-7___ , 201_6_ .

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

## SEARCH WARRANT

| | | |
|---|---|---|
| STATE OF TEXAS | § | Residence located at |
| | § | 8617 Southwestern Blvd #911 |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

THE STATE OF TEXAS to any Sheriff or any Peace Officer of Dallas County, Texas, or any Peace Officer of the State of Texas.

GREETINGS:

WHEREAS, the affiant whose name appears on the affidavit in support of this warrant is a peace officer under the laws of the State of Texas and did swear to that affidavit before me or someone authorized to take the affiant's oath under the laws of this state. I find the verified facts stated by affiant in the affidavit show that affiant has probable cause for the affiant's belief expressed in the affidavit, and those facts establish the existence of proper grounds for issuance of this Warrant:

1. NOW, THEREFORE, you are commanded to enter **the suspected place and premises described in said Affidavit and to there search premises, persons, and vehicles described as follows:** A private residence located at 8617 Southwestern Blvd #911 Dallas, Dallas County, Texas. The residence is an apartment complex called The North Bridge Apartments. The Apartment in question is located on located in the Village apartment comunity. The Apartment in question is located on the first floor and is a red brick structure with the top floors being gray wood. The number 911 is to the right of the door.

2. Any combustable liquids or empty containers that are similar to the items found at the crime scene. Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in awood fence. Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor that can be sent to a laboratory and compared to evidence found at the scene.

If you find the above described items, you are to seize that property and dispose of the items as provided by law.

Herein fail not, but have you then and there this Warrant within three days, exclusive of the day of its issuance and exclusive of the day of its execution with your return thereon, showing how you have executed the same.

ISSUED AT ___9.26___ o'clock __A__. M., on this the __25th__ day of __May__, 20 __16__ to certify which witness my hand this day.

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

26th      Bennett